## ATTACHMENT ONE: GROUNDS FOR 2255 MOTION
### Robert Rivernider    96006-004

Ground 1: Failure to Argue Culpability of the Lenders

Counsel argued in Doc. 623:10 that it is a "well-established rule that co-conspirators, who by definition know of the scheme, are not victims and may not receive restitution" in the 2nd Circuit, and if they are "in on the scheme" could not be seen as victims either.  Here, not only did the borrowers know CAV would be making the payments, causing the "victim borrowers" to be in on what the government claims is the crime, the lenders clearly were not "unwitting" as they were not only accepting regular payments from CAV, without question, they also approved the HUD-1 Settlement Statements that included the marketing fees paid to CAV, approved the appraisers and all appraisals, as well as approving the mortgage application their loan officers created, and their underwriters underwrote.

In Doc. 628: 10-11, the prosecution in this case argues it was "rogue employees", namely Shellie Kemp who defrauded their employers.  However, the government at the same time is prosecuting the lenders, namely Wells Fargo and SunTrust.  In U.S. v. Wells Fargo, U.S. Dist. Lexis 136539, a case filed in New York prior to trial, the government argued and the court, in denying Well Fargo's motion to dismiss on 9/24/13, stated "Wells Fargo engaged in a regular practice of reckless origination and underwriting... the Bank relied on inadequately trained employees, impermissably paid underwriters a bonus based on the number of loans they approved; applied heavy pressure on loan officers and underwriters to originate, approve, and close loans"; "required underwriters to make decisions on loans on extremely short turnaround times; and employed lax and inconsistent underwriting standards and controls." "Wells Fargo's conduct was intentional." Shellie Kemp was one of those loan officers, and the underwriters were the same employees, inadequately trained by Wells Fargo, not rogue employees.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

In U.S. v. SunTrust Bank, the DOJ in the Western District of Virginia has a criminal probe in process, as well as the DOJ recently settled for $1 BILLION specifically due to SunTrust Bank's "Government Agency Shortcut Mortgage Program", the exact program the loans in the instant case were approved under, the DOJ received $ 468 MILLION for that settlement. Neither Wells Fargo nor SunTrust can be seen as unwitting lenders.

Petitioner unwittingly referred clients to these lenders and their loan officers. Petitioner did not send false information for the loan application and publicly advertised the incentive deal. The sales contract and the HUD both show the seller was paying closing costs while the marketing fee to CAV was listed on the HUD's, which the lenders approved.

The government, just prior to trial, filed a motion in limine, Docket 314, to preclude evidence or arguments blaming victim lenders. However, Petitioner believes the government left out pertinent details about the government case in U.S. v. Wells Fargo in the motion to mislead the court. Defense counsel did inform the Petitioner the government told counsel something about the case, but the government did not fully disclose the details, thereby withholding exculpatory evidence that would have been helpful to the defense.

Counsel failed to interview the lenders to determine if the claimed misrepresentations were in fact material to them, or even if they were misrepresentations. The Petitioner relied on a grand jury transcript of SA West who stated he spoke to the lenders when Petitioner stated at the change of plea hearing that he believed the misrepresentations were material to the lender's purchasing them. However, during cross-examination at the loss hearing SA West stated that he did not speak to the lenders, rendering Petitioner's plea unintelligently made.

Counsel's failure to argue that the named victim lenders were "in on the scheme", as the government calls it, severely prejudiced Petitioner. As

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006–004

the government infers in their response to Petitioner's pro se motion to dismiss in Section XI of Part IV, stating "even if the allegations are true with regards to Wells Fargo, the fraud still stands on the other counts".  Clearly, the allegations are true regarding Wells Fargo and since SunTrust is the lender on the "other counts", none of the mortgage charges can stand.

Ground 2: Counsel Induced Petitioner to Plead Guilty.

Counsel induced Petitioner to plead guilty by threatening not to go back into trial, yelling at Petitioner "I can't go back in there [to trial]!" as Petitioner was refusing to plead guilty.  Petitioner was threatened by having to return to court without counsel.

Ground 3: Counsel Misled Petitioner and Submitted an Unapproved "Admission of Offensive Conduct" to the Court

Counsel misled Petitioner as to what he would have to plead to.  The only time counsel reviewed pre-written stipulations was on Saturday, February 23, 2013 at Dr. Filipopulous' office with Petitioner, then made major changes to what became the "admission of offensive conduct" that was submitted to the court without ever reviewing it with Petitioner.  Counsel allowed Petitioner to sign this revised document that was handed down from the court, knowing Petitioner never read it and that counsel never reviewed it with Petitioner.  Petitioner e-mailed counsel on Sunday morning specifically stating he would not agree to what is in the original indictment, yet it was all written into the "admission".

Ground 4: Conflict of Interest

As Petitioner was refusing to plead guilty and insisting on going back to trial throughout Monday morning, February 25, 2013, counsel had a conflict of interest and could not return to court for possibly another month, as counsel had an appointment set for Tuesday morning, February 26, 2013,

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

with a new "non CJA" client.  This conflict of interest adversely affected counsel's performance as counsel refused to return to trial, which also was just days before the government shutdown which counsel knew affected CJA funds and payments.  As the court had scheduled the change of plea hearing for 8 AM, Monday, February 25, 2013, counsel's conflict of interest caused counsel's and Petitioner's interest to diverge with respect to the course of action as counsel, with the in-person assistance of Dr. Fillipopolous, spent five hours badgering Petitioner to plead guilty, causing the hearing to be delayed until Monday afternoon.

Ground 5: Counsel Made False Promises to Petitioner

Counsel made false promises to Petitioner to induce Petitioner to plead guilty regarding the collateral consequences of pleading guilty by telling Petitioner: 1) it was in his best interest; 2) He maintained his constitutional rights; 3) Petitioner would go to a camp; 4) be able to see his kids; and 5) get back to them as soon as possible.  Not only was it not in the Petitioner's best interest, he is not in a camp, he is not able to see his kids, and will not be released until three weeks after his youngest child's 18th birthday.

Ground 6: Violation of 6th Amendment Right to Effective Assistance of Counsel

Counsel coerced, badgered and misled Petitioner for 2 1/2 days until he pled guilty.  Counsel misled Petitioner based on counsel's diagnosis that Petitioner had Diminished Mental Capacity.  Counsel was not competent to make this diagnosis and he based his diagnosis on a 4 month old report from a non-board certified doctor, about whom counsel stated "we can't put her on the stand".

As counsel stated at the change of plea hearing, page 53, "That's the only reason we got here today.  I don't think we could have been here today were it not for the four hours we spent on Saturday reviewing this information, because it was very significant to... and directly

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)

Robert Rivernider   96006-004

corresponding to the conduct in the period of this case", which proved not to be true; according to the government's doctors.  On December 5, 2013, immediately following the hearing in which the government's doctors stated Petitioner did not suffer from what counsel diagnosed Petitioner as having, which was "the only reason we got here today", Petitioner "approached chambers and then the clerk's office seeking to discharge counsel and file a motion to withdraw his guilty pleas", see government's response to defendant's pro se motion to dismiss, page 7, Petitioner did not wait 10 minutes when he learned the "only reason" he plead was not true.  As Petitioner insisted on going back to trial, counsel coerced his ill-advised client to plead guilty when it was not in his best interest to do so, but due to counsel's deficient performance.

Ground 7: Violation of the 6th Amendment Confrontation Clause

Counsel failed to object to witnesses testifying before the court after Petitioner plead guilty, which influenced the court and affected Petitioner's sentence, without any meaningful cross-examination.  Several witness testified who had nothing to do with the co-defendant who remained in trial, whose counsel had no knowledge of and no opportunity to cross-examine.  Both Carolyn LaPorte and Tosha Wade made numerous false statements that effected their credibility.

Ground 8: Counsel Failed to Investigate.

Counsel failed to investigate and learn what the government claims is a crime that caused 104 properties to be included in the loss and total victim calculation until the September 4, 2013 loss hearing.  The misrepresentation common to all deals was that the borrower would not be making the payments, CAV (Cut Above Ventures) would be, and SA West saw "nothing where it was disclosed".  Counsel then failed to argue at the loss hearing or at sentencing that which they argued in Document 623 [Memorandum Regarding Restitution] 9-10, that the lenders had knowledge of the payments being made, and continued to accept payments from Cut Above Ventures, and close new loans.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

Counsel also failed to argue that the government's key witness, Tosha
Wade, stated that she "would leak it out a lot", Wade TR. 21:15-16,
thereby telling the lenders about the incentive deal as she also stated in
numerous 302's that the lenders were "in the know". Clearly lenders knew
CAV was making the payments and accepted them without question making the
lenders not unwitting.

Counsel also failed to investigate Wells Fargo's suspension of Shellie
Kemp or Wells Fargo's settlement with the borrowers in this case. Nor did
counsel investigate SunTrust's claims with United Guarantee, in which
SunTrust argues the alleged misrepresentations are not material.

Ground 9:  Counsel Failed to Ask the Court to Determine if NMB Clients Are
Victims or Unindicted Co-conspirators

As counsel did not learn that it was a crime, until the loss hearing, not
to tell a lender that CAV would be making the repayments, counsel failed
to ask the court to determine if the NMB clients, who borrowed money from
their HELOC's or 401k's to loan the money to the NMB program, told the
lenders that CAV would be making the repayments. The NMB clients knew CAV
would be making the repayments, and did make them, making the NMB client
in on what the government claims is a crime. They were not unwitting and
cannot be seen as victims.

Ground 10:  Counsel Failed to Show Source of Payments

Counsel failed to obtain Petitioner's e-Gold, e-bullion and MYICIS
accounts that show the source of payments made to other participants did,
in fact, come from investment returns. Counsel failed to determine who
claimed they were misled about the source of payments as no 302's or grand
jury testimonies turned over to the defense made this claim, which became
the offense, post trial.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Counsel continues to allow the government to make the false claim that
loan repayments made to NMB clients are returns on investments when they
were loan repayments and were, in fact, paid by CAV investment returns
and/or funds exclusively in CAV's possession and control.

Ground 11: Violation of Petitioner's 6th Amendment Right to Counsel

As Petitioner, who faced incarceration, had to stand alone against the
government at a critical stage of the proceedings, when Petitioner had to
file a pro se motion to withdraw his plea due to numerous constitutional
violations and clearly erroneous finding of facts, the government argued
that it would be prejudiced, which the court cited in denying Petitioner's
pro se motion.  However, the 2nd Circuit Court of Appeals stated that "no
showing of prejudice is necessary to establish a 6th Amendment violation
where a defendant is deprived of counsel in bringing it".  Additionally,
the 2nd Circuit Court of Appeals states "the 6th Amendment guarantees a
defendant the right to have a counsel present at all critical stages of
the criminal proceedings", and that a motion to withdraw a plea is a
critical stage.

Petitioner was handed the government's response to petitioner's pro se
motion as the judge was entering the court on December 18, 2013.
Petitioner did not have an opportunity to read or respond to the
government's response.  Petitioner then had to argue before the court on
his own without knowing what the government's response was, which was full
of falsehoods and legal inaccuracies.

Ground 12: Allowed Petitioner to Meet with a Government Agent Without
Counsel

Counsel allowed Petitioner to meet with a government agent without counsel
being present.  Petitioner was taken to meet with Dr. Lewis who was
working for the government, and left there at the meeting without counsel

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006–004

being present.   Petitioner asked counsel if counsel should be present;
counsel replied "Don't worry, you'll be fine.  Just be yourself."

Ground 13: Counsel Failed to Obtain Bank of America Bill Payment Records
and Complete Tennessee State Bank Records

Counsel failed to obtain the Bank of America (BoA) bill payment records
either from the government of from BoA.  The records would show that the
government committed a Brady violation by not turning over the records.
They would also show the accurate repayments to each client as well as
numerous payments on all the mortgages.  These records would have reduced
the total number of victims as well as the total loss.

Based on the subpoena sent by the government to Tennessee State Bank
(TSB), TSB should have turned over all documents regarding a mortgage to
CAV for a property located on Red Bud Road in Sevierville, TN.   The
government did not turn over these documents over as they implicated
Robert Hall, counsel's failure to obtain these records prejudiced
Petitioner, as the records not only show the government was withholding
exculpatory evidence helpful to Petitioner, but that petitioner, along
with his real partner, did have a real, ongoing business which was
expanding, but not contemplate harming anyone.  Additionally, withholding
this purchase which occurred in 2007 caused counsel to argue in his
opening that Petitioner needed the market to go up, even though counsel
knew this was false.  Counsel was prevented from making an appropriate
opening statement rebutting the government's theories.

As the government continually argues, an argument the court adopted,
Petitioner plead guilty because the trial was not going well, to the
extent trial was not going well can be directly attributed to the
government withholding the records from these two banks. which they
subpoenaed, as the records can prove the following:

1) Witnesses who testified at the trial made money

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

2) The actual loss to NMB clients is far less than Petitioner invested and less than the money stolen by David Praise.

3) That Robert Hall was Petitioner's partner, not Robert Ponte.

4) That the 302's written by SA West are intentionally false regarding Petitioner's partner.

5) That Petitioner had an ongoing business that was expanding in order to make loan repayments.

6) That Petitioner had recurring payments set up long after January, 2008, believing the payments would be made, thereby notdefrauding anyone.

The Petitioner was irreparably harmed by the government's withholding information and counsel's failure to subpoena these records.

Ground 14: Failure to Present Evidence of False Testimony

On the morning of Monday, February 25, 2013, while Petitioner was sitting in counsel's office refusing to go to court to plead, Counsel received a call from a sheriff in New Jersey, which counsel answered on speakerphone. The sheriff had a subpoena to deliver to Eric Reid seeking his bank statements which would show that Eric Reid wired money to Martin W. Porter in November of 2007, not CAV as he testified in trial, just as Donna Moore's bank statements demonstrated who testified falsely before the grand jury. Counsel said to the sheriff "You should have already received a call to cancel that". Those statements would have shown that Reid was complicit in the NMB Program and that the government had him testify falsely at trial. Counsel decided he was not going back to trial irregardless of the fact that Petitioner was refusing to plead.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 15: Counsel Failed to Object to Misrepresentations During Trial

Counsel continuously failed to object to the government's ongoing
misrepresentation of the "Recipe for NMB Disaster" e-mail which they
called the "NMB Disaster E-mail" leaving out the word "Recipe", an email
describing what 2 co-conspirators, one indicted, one not indicted, were
requesting Petitioner to do in which the Petitioner is stating why he was
not doing what they requested.

This clear misrepresentation before the court and the jury gave the
impression that the trial was not going well for the Petitioner, a reason
the court cited in denying Petitioner's motion to withdraw plea.   Here
counsel failed to seek suppression of damaging misrepresentations of
evidence, for no strategic reason.

Ground 16: Counsel Failed to Investigate Violation of Petitioner's Rights
Under the CVRA

Counsel failed to investigate the violation of Petitioner's rights under
the Crime Victim's Rights Act as to who on the prosecution team was
responsible for the violation, and who was responsible for violating the
DOJ policy that requires AUSA's to inform the grand jury of substantial
exculpatory evidence.

Ground 17: Counsel Failed to Make Corrections to Presentencing Report

Counsel failed to make numerous corrections to the pre-sentencing report,
which the Petitioner had informed the court on December 4, 2013 was not
accurate and Petitioner disagreed with the report.   Counsel also failed to
challenge the accuracy of the guideline calculations as set forth in the
presentence report in spite of the fact that the calculations are clearly
overstated, as follows:  (See Doc 524: 6-7 of 57)

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)

Robert Rivernider    96006-004

1) 22 point adjustment for loss:
   a) The NMB loss figures are based on unsound methodology which misstates the NMB Loan Program and how the new loans restructured the client's existing plan.
   b) The real estate figures grossly overstate losses based on an internal e-mail sent from SunTrust

2) 4 level adjustment for 50 victims:
   As the 2nd Circuit recently stated, you cannot be a victim if you are in on the scheme, counsel should have argued that the lenders and the borrowers all knew CAV was to make the mortgage payments and the NMB clients failed to inform the lenders they borrowed from of this fact, which the government claims is a crime.

3) 2 level enhancement for more than $1 million in gross receipts:
   Petitioner did not derive anywhere near a fraction of $1 million as all proceeds were paid to "all participants" not Petitioner, which is required in the 2nd Circuit.

4) 2 level upward adjustment for sophisticated means:
   The government and the court failed to show how borrowing money from NMB clients or referring clients to mortgage lenders is sophistication, nor how Petitioner's getting a mortgage broker's license 10 years earlier gave the Petitioner specialized knowledge. The government, in its sentencing memorandum, comically argues that using Bank of America's Bill Paying Program and an Excel spreadsheet is sophisticated.

In summary, counsel failed to challenge the accuracy of the guideline calculations even though counsel said to Petitioner "I was hired to get you the best sentence".

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 18: Counsel Failed to Interview Witnesses to Impeach Government
Witness Tosha Wade

Counsel conducted an inadequate investigation by failing to interview
witnesses that would have impeached the government's star witness, Tosha
Wade; failed to present public records that contradicted her testimony;
and failed to inform the court of numerous false statements Ms. Wade
stated at trial. Statements which the government continues to present to
the court even though they know they are false. Their support of these
lies by Ms. Wade is further demonstrated by her being rewarded with a 5K.1
and no prison time. To summarize her false testimony, refer to the
following excerpts from her testimony and my rebuttals:

1) Refer to Ms. Wade transcript, Page 21: 2-5

"I did get yelled at... If the lenders knew that he was paying their
closing costs and their mortgage". The government had all the HUD-1
settlement statements showing the seller, REAMCO, paying the closing
costs, not Petitioner, and the government had CAV's bank statements
showing the lenders accepting the payments from CAV for more than a year
and continuing to close new loans without question.

2) Refer to Ms. Wade transcript Page 23: 1-3

"Q: And this was just because it was generally coming after perhaps a
lender had found out "about the incentive deal?" A: "Yes". The lender
knew. They did not stop any deals from closing, which clearly means the
incentive deal was not material. Not only was this actual perjury, it was
material, and the government should have known of the perjury at the time,
which remains not only undisclosed, but the government continues to
mislead the court about it.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

3) Refer to Page 25: 12-20

Q: "And was there a difference in terms of pricing of the Rivernider units versus the Breakstone units? A: "Well, yeah, on paper there was... so for instance, a one bedroom is 199 normally. Well, Rivernider would get it for 160, 170 and then he would sell it for 220."

The government subpoenaed the lenders' and title companies' files on each loan; the government has access to the internet where public records of each sale are available on Palm Beach County's government website; and, the government has Petitioner's spreadsheet. All of these show the one bedroom's that Petitioner marketed for the developer sold for $190,900, not $220,000. In fact, the government has e-mails showing Petitioner negotiating a reduction from $199,000 that Wade sold one bedroom's for, down to $190,900, yet they chose to allow Wade to knowingly lie, committing material perjury before this court.

4) Refer to Page 26: 9-14

Q: "So what about appraisals to support these higher listed price units? Did Rivernider have any appraisals that he would go to?" A: "He did have select appraisers that he would work with on a regular basis and that he guided me to go to whenever I couldn't get it appraised with our own appraisers." Not only did the government not have one appraiser on their witness list, they did not turn over one 302 from any of the dozen or so appraisers who appraised the Florida properties. They had the appraisals and all the state licensed appraiser's contact information. Most of the appraisers were ordered by the lenders directly. The previously mentioned one bedroom units were appraised by an appraiser in Miami, who the developer used, not the Petitioner.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

5) Refer to Page 96: 18-19

"I was contacted by his sister, sister-in-law, Anna Marie LaPorte." Anna
Marie LaPorte is the sister of Mike LaPorte and sister-in-law of Carol
LaPorte, and is not related to the Petitioner nor Seneca. The LaPorte's
worked at the Sterling every day. Neither the Petitioner nor Loretta
Seneca were at the Sterling daily, as Wade claims, as Seneca had a full
time job in Ft. Lauderdale and Petitioner worked from home as Petitioner's
time stamped e-mails from his desktop computer clearly show. The
government should know this, as they copied Petitioner's hard drive which
included Petitioner's e-mail accounts. Wade's entire testimony is based
on false identification and the government knows it.

6) Refer to Page 8: 4-11

"I started working with Noah Breakstone at Breakstone Homes, and that's
where I got into the real estate market." Q: "That was around 2006?" A:
"Yes." Q: "At that point in time did you get a real estate license?" A:
"Yes, sir". According to Florida public records, Tosha Wade got a real
estate license June 14, 2007, 2 weeks before moving out of the Sterling as
she no longer worked there. This is clearly material as the government,
who should have known this at the time, allowed Wade to commit perjury
about her credibility in violation of the Supreme Court's rulings. The
government continues to use Wade's testimony without disclosing this false
statement.

Petitioner handed defense counsel a detailed spreadsheet of every property
in the Sterling development which proved that Wade's statement was false,
as well as informing counsel about Wade's licensing falsehood. Yet,
knowing the government's main material witness would lie on the stand,
counsel forced Petitioner to plead guilty as counsel was unprepared to go
back to trial as counsel had already decided not to go back, using the
four month old report to diagnose Petitioner with diminished mental
capacity.

**ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)**
**Robert Rivernider   96006-004**

Ground 19: Failure to Investigate Tosha Wade's Other Business Dealings and Testimony

In Government Exhibit 4 titled "RE: Swap Units", the 3rd email in the string from Tosha Wade, Wade writes on 6/13/07 4:43 PM, Page 2, "By the way the Gambino's and Oded gave me the green light to pay the down payment for those who did not qualify for 100% financing and they are giving incentives on reducing mortgae [sic] and stainless steel appliances and paying HOA for 1year... just FYI... between you and I... just giving you a heads up."

The court was never informed that Wade was selling properties for two other "investors", Gambino's and Oded. In fact, Wade stated no one was offering similar incentive programs. Like other government witnesses who have faulty memories, as the Petitioner has no recollection of the numerous statements made by Wade, and as the records prove her allegations are false, perhaps it was Gambino's or Oded who sold one bedrooms for $220,000; told Wade what not to tell the lenders; sat at the desk from mid 2006; worked in the back with the other mortgage brokers; and cursed in front of her daughter. It certainly was not the Petitioner or the defendants in this case.

Counsel's failure to investigate the truth and present the facts, caused this court to rule and sentence the Petitioner based on clearly erroneous findings of fact.

Ground 20: Failure to Investigate Fraudulent 302's

Counsel failed to investigate 302's that the government submitted to the defense. For example, FBI Agent Stephen M. West, Jr. submitted two 302's concerning John Miceli that include numerous falsehoods, including the date of the interview.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 21: Tainted Jury Pool

Counsel failed to object during voir dire when a potential juror tainted
the jury pool for two days in a row by standing up and saying she heard
something about a "Rivernider Fraud", then looked it up on the internet.
On the second day she said it was a different person, then announced she
could not be impartial and was excused.  Counsel failed to object to this
obvious tainting of the remaining jury pool, as any of them could easily
search the internet for "Rivernider Fraud" would certainly have found this
case, especially with the quantity of government press releases about the
Petitioner's case.  Petitioner was surely prejudiced by this "juror's"
statements and counsel's inaction.

Ground 22: Counsel Was Not Going to Put On a Defense

Counsel's announcement to the court and the government at the beginning of
trial that defense counsel was not going to put on a defense severely
prejudiced Petitioner.  Petitioner went to trial believing that counsel
was going to put on a defense, as Petitioner disproved every allegation in
the indictment, which caused the government to change the crimes post
plea.

Counsel also led Petitioner to believe counsel was going to put on a
defense as counsel had a material witness being detained to delay
deportation.  Counsel later stated to Petitioner "I was hired to get the
best possible sentence", it appears that David Praise was held not to be
called as a witness at trial, but to "get the best possible sentence".

Ground 23: Counsel Failed to Inform Petitioner About Status of Bill of
Particulars

Counsel failed to inform Petitioner that a Bill of Particulars, filed on
6/15/11, docketed by former counsel (Sadin) was denied on 6/19/12 Docket
174, after trial counsel was appointed by the court to represent
Petitioner, despite Petitioner's ongoing request for a Bill of
Particulars.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

Ground 24: Government Induced Perjury

The government continually and intentionally put witnesses before the
court who misled and lied to the court; the government knew or should have
known what they were telling the court was not true.  Examples of the
untruths and fabrications by various individuals include:

1) Maureen Walters: Claimed she did not check to see if payments were
   made.

2) Dan Fallow: Claimed he dealt with Petitioner from the beginning

3) Eric Reid: Claimed he wired money to CAV in November, 2007

4) Tosha Wade: See Ground's 18 and 19; too numerous to list here

5) Carolyn LaPorte: Claimed she did not know John Miceli; that she did not
   use the Tennessee property as a secondary residence; that she did not
   know what Petitioner got from real estate deals.

6) Anna Marie LaPorte: Claimed she did not know she was buying a property,
   and that to this day does not know what was on the mortgage application

7) Teresa Doughman: Claimed Petitioner stopped paying her after four
   months, when she was paid for two years

8) FBI Agent Stephen M. West, Jr. claimed:
   a) He did not talk to the lenders during the loss hearing, yet he told
      the grand jury that he did
   b) He told the grand jury that Ponte received money into his account
      from real estate deals
   c) that Ponte and Seneca were the only others who had official dealings
      on behalf of CAV

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

8) SA West Claims, Continued
    d) that Michael Mastoris said he lost $800,000
    e) that Seneca was a necessary component of the real estate process
    f) that the only funds seen going out as any type of additional
       investment were much later in 2007
    g) that Piecyk purchased a property for $150,000 but received a
       mortgage for $175,000

9) AUSA Christopher W. Schmeisser claimed:
    a) claimed Petitioner had his passport at the arraignment hearing
       when Agent West, while sitting next to him, had taken
       Petitioner's passport a year and a half earlier.
    b) knowingly lied when he claimed that defendant admitted
       putting misrepresentations on the various loan applications.

10) AUSA John H. Durham lied when he claimed:
    a) that the controlling 2nd Circuit law presented during argument
       on Petitioner's motion to withdraw was wrong as Petitioner
       had to proceed pro se
    b) that other entities and investments had nothing to do with
       the charges
    c) that when Petitioner indicated that he had no mens rea
       that he lied, that Petitioner knew from the very beginning
       of the No More Bills process that Petitioner had no returns
       on investments
    d) that all information was withheld from the lenders
    e) that the Donna Moore email had anything to do with Mark Taylor
    f) that everything the Petitioner asserted in his pro se motion
       is untrue.

    (Ground 24 continues on the following page)

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Documents in discovery prove each and every claim listed above are false.
With the government's knowing participation of their witnesses' perjurious
statements, witness after witness, from the grand jury through sentencing
violated Petitioner's constitutional right to a fundamentally fair
process. By not insuring a fair process, counsel's performance fell below
objective standards of reasonableness.

Ground 25: Failure to Investigate Violation of Client - Attorney Privilege

Petitioner believes the government violated attorney-client privilege by
accessing Petitioner's email account and reading privileged emails. The
government took Petitioner's laptop computer and iPhone, both of which had
access to Petitioner's email account. Counsel informed Petitioner that
the court ordered the government to return the laptop computer; however no
entry appears on the docket. Counsel also stated that a password was
needed to access the laptop. No password that Petitioner provided worked.
Counsel failed to respond to Petitioners requests asking the government
for the password in order to examine the laptop.

Ground 26: Failed to Obtain All Grand Jury Transcripts, Logs and Records

Counsel failed to challenge numerous material representations made to the
grand jury to indict Petitioner. For example:

1) Falsely stating that Piecyk purchased a property for $150,000 and got
   a mortgage for $175,000 when the government knew the purchase price
   was $175,000.

2) Falsely stating that Michael Mastoris said he lost $800,000 when the
   video shows that Mastoris did not say or confirm he lost $800,000.

After receiving and reviewing a portion of the grand jury transcripts,
Petitioner notified counsel of dozens of false statements and false
inferences made by or induced by the government. Counsel's failure to act
caused counsel's performance to fall far below acceptable standards and
harmed the Petitioner.

**ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)**
**Robert Rivernider   96006-004**

Ground 27: Failed to Challenge Filing of False Documents

Evidence shows that the government continually filed or files documents that knowingly mislead and misrepresent the facts.  Counsel's lack of action challenging these submissions severely prejudiced the Petitioner.

Ground 28: Counsel Failed to Discover and/or Demand Release of Exculpatory Evidence Held by the Government

The government withheld the following exculpatory evidence, in part:

1) Complete Bank of America records.
2) Complete Tennessee State Bank records.
3) Caused a victim letter not to be sent to the Petitioner.
4) Withheld mortgage records for Eric Reid until after he testified.
5) The outdated appraisals government alleges in the government's sentencing memorandum.
6) 302's from all but one of over 30 different appraisers that appraised the 104 properties.
7) Statements or 302's from clients who claimed they believed they were going to get paid from other client's investments.
8) Evidence that clients who sent money to CAV told their lenders CAV would be making the repayments on the money they borrowed to lend to CAV.
9) Interviews and 302's with lenders that SA West said he spoke to in his testimony before the grand jury.
10) Evidence the government learned about their original star witness, Robert Hall, which caused them to remove him from the witness list days before trial.
11) Employment records and properties sold at the Sterling by Tosha Wade.
12) Tosha Wade's real estate license she said she obtained when she started working for REAMCO in 2006.
13) Evidence that shows a blind copy email sent to Petitioner would not have left a paper trail as Tosha Wade comically claimed.

### ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
### Robert Rivernider    96006-004

14) 302's from Mike Zaric or Peter Mead, his boss.

15) 302 from Jamie Navarro that would show she did not know Loretta Seneca as Jackie Santo's 302 says.

16) Phone records and emails showing Dan Fallow talking to Petitioner prior to joining the NMB program or buying a property in Idaho.

17) Maureen Walters' Bank of America account records which she accessed via a secure password protected website in order to email her statement.

18) The HUD-1 Settlement Statements that show Petitioner paid the closing cost on loans when Petitioner was not the seller. All the HUD's Petitioner recalls reviewing in discovery show closing costs were paid by the seller and usually detailed on the HUD and the contract signed by the seller and buyer, both of which were approved by the lender.

19) Shellie Kemp's employment records with Wells Fargo that show why she was suspended and, why they allowed her to continue to do business with CAV.

20) All correspondence between government agents prosecuting Petitioner and the SEC, FBI agents and AUSA's involved in prosecuting David Praise.

21) The 302's from all the borrowers who were told by Petitioner not to tell the lender about the incentive deal.

22) The 302's from all the borrowers who were told by Petitioner not to read any of the mortgage documents that were mailed to them by either the mortgage lender or the title company for their mail-away closing, or to read the HUD-1 Settlement Statement that included a marketing fee, paid to CAV (Cut Above Ventures).

23) Rough notes of interviews taken by government agents that contain Jenck's Act or Brady material.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 29: Counsel Failed to Challenge Government's Misrepresentation of Risk

The government's actions continually deliver a false message directly and by inference that the Petitioner and his surrogates did not tell clients or lenders the true risk. However, a surrogate and sister of Petitioner, Carol LaPorte, wrote in an email that is in discovery the following: "As for me the program could end, nothing is a sure thing", "Bob works hard so that doesn't happen, but you never know", "We could all lose everything", and "I am not trying to keep you out of the program. I just want you to understand that there is a risk". The recipient of the email then went ahead and purchased a property.

Documents in discovery show not only did the lenders know the risk of their programs, they took out insurance to cover themselves. The government's lawsuits clearly demonstrate they knew the risk and made substantial profits by taking the risk, a portion of which is now being kicked back to the government.

Counsel's failure to challenge these lies and misrepresentations severely prejudiced the Petitioner.

Ground 30: Failure to Investigate Witness Tampering

Counsel failed to investigate and expose the government's tampering with witnesses before testifying at trial by telling witnesses that the defendants knew they would never get paid back before sending money to CAV, based on the government's misrepresentation of an email which was about a different program that was frozen. This misleading adversely affected the witnesses, enraging them just before their testimony, violating Petitioner's right to a fair trial.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006–004

Ground 31: Counsel Failed to Properly Cross-examine Witnesses and Dispute Government's Claim of Reason for Plea

The government and the court state that Petitioner plead guilty because the trial was not going well. As the trial was based on the memories of witnesses the fact that the government on December 18, 2013, in their response to Defendant's (Petitioner) pro se motion to dismiss, which was handed to Petitioner on the day of sentencing, giving Petitioner no time to read or review, the government infers that the very witnesses who caused the trial to not be "going well" for the Petitioner had faulty memories as "testimony at trial took place years after." Pages 27–28 states that witnesses "did not recall", "may well have believed his/her statement was true", "agent made an honest mistake", and as such, counsel was ineffective for failing to properly cross-examine witnesses.

Ground 32: Conflict of Interest

Counsel's law firm previously represented Webster Bank. Based on information in discovery, a named victim, Donna Moore, committed bank fraud against Webster Bank. Counsel did not inform the court or Webster Bank, and had Petitioner plead guilty just as Moore was going to testify.

Ground 33: Counsel Failed to Obtain Records from Mountain Charm Cabin Rentals

Counsel failed to obtain records from Mountain Charm Cabin Rentals (MCCR), an investment of Cut Above Ventures (CAV). This failure to obtain MCCR's financial records would have been mitigating evidence, as MCCR was making money and was to pay the mortgages on the properties so they would not go into foreclosure, causing a substantial increase in the loss and victim calculations.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 34: Court Erred in Denying Motion to Withdraw Plea

Court erred by not providing Petitioner counsel at a critical stage of the criminal process without first obtaining a legally required, voluntary, knowing and intelligent waiver of the Petitioner's constitutional right to counsel.

Ground 35: Failure to Present Petitioner's Substantive Assistance

Counsel failed to investigate the extensive and substantive assistance Petitioner provided to the government, including the SEC (Securities and Exchange Commission), in their investigation and prosecution of David Praise. The court stated at sentencing that Petitioner provided assistance as any victim would. Counsel failed to inform the court that Petitioner investigated Mr. Praise for well over a year, found his bank accounts in numerous countries, disrupted multimillion dollar scams Praise was orchestrating, tracked Praise's location as he was on the run.

Petitioner also found out who had received the stolen money Petitioner sent to the Bank of Bermuda that Praise had stolen. Counsel also failed to inform the court that Petitioner was threatened by Praise's associates when Petitioner was informing new victims of Praise's Floris Bank scam that he was scamming them, even though the documents proving this were in discovery. When Petitioner mentioned this to counsel, counsel replied "You have those?".

Counsel also failed to inform the court that Petitioner was paid a "visit" by Mr. Buttiker's "people" to insure Petitioner would not continue to pursue the $8.7 million that was sent to Werner Buttiker. Petitioner tracked down Buttiker who invested $3.2 million with Praise in the summer of 2007 and received back $8.7 million, in part, monies directly from CAV.

In their typical fashion of mischaracterizing and misrepresenting the truth and the facts, the government, in their sentencing memorandum,

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

Document 524: pages 45-46 of 57, refer to a recorded call, which
Petitioner recorded with Zurich attorney Claudio Faoro, who represented
Buttiker, the alleged victim of Praise (and who had received $8.7 million
on his $3.2 million, to remind the court). While it is true that the
Petitioner did not commiserate with Attorney Faoro, Petitioner did attempt
to get back the money due the true "victims". Certainly this exclusion
and misrepresentation by the government caused the court to believe
Petitioner is likely to re-offend, as the court stated at sentencing.

In fact, Petitioner, in his 18 month long effort, was attempting to
retrieve the stolen money to return it to the true victims. Along with
the $325,000 CD deal, the $1 million stolen by Praise in which he promised
return of $15 million, and his promises in March and April, 2008, that
$4.9 million was wired to Petitioner (which it was not) caused Petitioner
to accept new loans in September, 2007. The true actual losses to NMB
clients is less than $1 million, which is likely the reason the government
did not turn over the Bank of America bill pay records, and why they
continue to use their false and unsound methodology to calculate loss and
restitution.

The Petitioner was threatened and paid a visit, putting his family at risk
by attempting to retrieve the stolen money to return to the victims, just
as he did in March, 2008, when another investment returned funds which the
government embarrassingly claimed to this court that they knew nothing
about, while the court, agreeing with counsel, in typical white collar
crimes, had never seen anyone go after someone's family. The court may
not be aware, due to counsel's ineffectiveness, that David Praise had been
granted asylum (reasons unknown) by the United States from Nigeria, was
later ordered to be deported after a previous felony under the name Musa
Muhammed, but was not deported. When later captured he possessed multiple
passports in different names. Praise is not a typical white collar
criminal.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006–004

When Praise (Muhammed) was released from prison after serving 37 months,
Petitioner notified counsel when Petitioner became aware that Praise's
status on the BOP website had changed to "not in custody", the government
refused to inform counsel (and Petitioner) of Praise's location.  As a
result of not being informed, Petitioner had to relocate his family so as
not to have to leave them alone while Petitioner had to go to trial.