IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Robert H. Rivernider, Jr.　　　:

　　　Petitioner　　　　　　　　:

v.　　　　　　　　　　　　　　:　　No. 3:10CR222 (RNC)
　　　　　　　　　　　　　　　:　　3:14-cv-01000-RNC
United States of America　　　:

　　　Respondent　　　　　　　:

　　　　　　　　　　　　　　　:

—————————————————————————— :


**Motion for Preliminary Injunction for Release**


Comes now Petitioner Robert H. Rivernider, Jr., pro se, hereby requesting release from custody as Petitioner is challenging the legality of his custody. Petitioner requests that this Court exercise its power to order Petitioner released pending final adjudication of Petitioner's 2255 and all appeals.[1] The 2nd Circuit supports release in such cases, see U.S. v. DiMattina, 885 F. Supp 2d 582-590 (2nd Cir 8-8-12) "the defendant has raised substantial questions that merit relief on appeal or collateral attack" and that "it would be unfortunate to incarcerate the defendant for a year or more while his appeal pends if reversal follows or, alternatively, if there is an affirmance followed by a successful habeas petition" id. at 589.

---

[1] Ostrer v. United States, 584 F.2d 594, 596 n.1 (2d Cir 1978) "[a] district court has inherent power to enter an order affecting the custody of a habeas corpus petitioner who is properly before it contesting the legality of his custody". See also Argo v. United States, 505 F.2d 1374, (2d Cir, 1974)

The standards for a preliminary injunction are well known. The party requesting the preliminary injunction must establish the following four prongs:

(Prong 1) Likelihood of success on the merits

(Prong 2) Irreparable injury in the absence of preliminary relief

(Prong 3) The balance of equities tip in applicant's favor

(Prong 4) That an injunction is in the public interest.
(Winter v. NRDC, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L. Ed. 2d 249 (2008))

Prong 1 - Petitioner is likely to succeed on several merits:

(A) Counsel was constitutionally ineffective, violating Petitioner's 6th Amendment Rights.

1) Counsel had a conflict of interest[2] as counsel had an appointment with a new "non-CJA" client causing counsel and Petitioner's interest to diverge[3,4] and counsel to mislead Petitioner while coercing and badgering Petitioner to plead guilty.[5]

---

[2] Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) ("where a constitutional right to counsel exists... there is a correlative right to representation that is free from conflicts of interest")

[3] U.S. v. Graham, 493 Fed.Appx. 162 (2d Cir 8-15-12) "An actual conflict of interest exists when "the attorney's and defendant's interest diverge with respect to a material factual or legal issue or to a course of action".

[4] U.S. v. Schwarz, 283 F.3d 76, 91 (2d Cir 2002) "A defendant claiming he was denied his right to conflict-free counsel based on an actual conflict need not establish a reasonable probability that but for the conflict or deficiency in counsel's performance caused by the conflict the outcome of the trial would have been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected counsel's performance.

[5] Lopez v. Scully, 58 F.3d 38 (2d Cir 1995) (Counsel had "actual conflict of interest" at time of sentencing because client had moved to vacate guilty plea on grounds that counsel induced plea by threats and misinformation)

2) Counsel failed to review with Petitioner what became known as the "admission of offensive conduct" and allowed Petitioner to sign it knowing Petitioner had not reviewed it. [6],[7]

3) Counsel failed to properly investigate government witnesses,[8] mortgage lender's complicity, NMB lender's complicity, Petitioner's substantial assistance or prosecutorial misconduct.[9],[10]

4) While counsel did a wonderful job[11] diagnosing Petitioner with Diminished Mental Capacity (DMC), counsel was not qualified to make this diagnosis. Counsel mislead Petitioner into believing it was in his best interest to plead guilty due to Petitioner's alleged DMC, which proved not to be correct according to the government's doctors. [12]

---

[6] North Carolina v. Alford, 400 U.S. 25, 31,27 L.Ed.2d 162, 91 S.Ct. 160 (1970) Holding that the standard for evaluating the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to defendant".

[7] U.S. v. Arteca, 411 F.3d 315, 320 (2d Cir 2005). "Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty."

[8] U.S. v. Karlov, 2013 U.S. Lexis App. Lexis 17941 (2d Cir 8-28-13) "Because the credibility of a witness who testifies to substantive facts is a material issue at trial, evidence impeaching the witnesses credibility cannot be deemed immaterial."

[9] Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir 2001) "failure to pursue a particular course of action is not considered strategic when it is not a "conscious, reasonably informed decision" made by an attorney with an eye to benefiting his client".

[10] Bramble v. Griffin, No. 12-3322-CV (2d Cir 9-19-13) ABA standard "attorney's errors "that fell below an objective standard of reasonableness" include omissions that can not be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness."

[11] U.S. v. Hughes-Boyles, 2013 U.S. Dist. Lexis 70279 (10th Cir 5-17-13) "Such statements are not necessarily an absolute bar to post conviction relief because a defendant may still claim that her representations were so much the product of misunderstanding, duress, or misrepresentations that it rendered the guilty plea constitutionally inadequate".

[12] U.S. v. Cuoto, 311 F.3d 179 (2d Cir 2002) "A "defendant" who has not received reasonably effective assistance of counsel in deciding to plead guilty cannot be bound by the plea."

Therefore, Petitioner's plea was not intelligently made. [13],[14]

5) Counsel allowed Petitioner to meet with government's doctors without counsel present. [15],[16]

6) Citing Chhabra v. U.S. 720 F.3d 395 (2d Cir 1-26-12) "In order to satisfy the prejudice prong of an ineffective assistance of counsel claim with respect to a plea of guilty, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.  Where the defendant's specific claim is that counsel has misled him as to the possible sentence which might result from a plea of guilty, the prejudice issue is whether the defendant was aware of actual (2-3 years) sentencing possibilities, and if not, whether accurate information would have made any difference in his decision to enter a plea.  Factors to be considered by the district court in determining

---

[13] U.S. v. Ramsey, 323 F. Supp. 2d 27 (D.C. 7-1-04) "Where the ill-advised client pleads guilty when it was not in his best interests to do so, he establishes prejudice by showing that but for counsel's deficient performance a reasonable probability exists that the defendant would not have pleaded guilty and would have insisted on a trial.  It is not necessary that he would have been acquitted after that trial."

[14] Wilson v. McGinnis, 413 F.3d 196, 199 (2d Cir 2005) "It is a settled principle of federal constitutional law that a guilty plea violates due process and is therefore invalid if not entered voluntarily and intelligently", citing Brady v. U.S. 397 U.S. 742, 748 90 S. Ct. 1463, 25 L.Ed 2d 747 (1970)

[15] Estelle v. Smith, 451 U.S. 454 (1981) (State-employed psychiatrist permitted to testify... on Petitioner's... statements that were not freely and voluntarily given and that were made without counsel or waiver of counsel)  Buttram v. Block, 908 F. 2d 695 (11th Cir 1990) (State-hired psychiatrist's use of Petitioner's uncounseled statements during competency evaluation to show future dangerousness violated Estelle v. Smith, supra)

[16] Lindstadt v. Keane, 239 F.3d. 191 (2d Cir 2001) (representation was rendered ineffective by cumulative effect of four errors)

whether a defendant would have decided not to plead guilty and insisted instead on going to trial include (a) whether the defendant pleaded guilty in spite of knowing that the advice on which he claims to have relied might be incorrect, (b) whether pleading guilty gained him a benefit in the form of more lenient sentencing, (c) whether the defendant advanced any basis for doubting the strength of the government's case against him, and (d) whether the government would have been free to prosecute the defendant on counts in addition to those on which he pleaded guilty."  Petitioner will now show the elements of this instant case that satisfies the four prongs just listed:

a) After 2½ days of counsel and a doctor telling Petitioner had a brain deficiency, Petitioner believed them.
b) Petitioner did not gain much of a benefit as Petitioner's sentence includes a trial penalty.
c) At the change of plea during allocution the judge stated what he believed was the crime.  He asked Petitioner if it was true; Petitioner said no, and then went on to explain why what he believed was the crime, and what Petitioner was indicted on, was, in fact, not true.
d) Petitioner plead to all counts.

(B) Court erred in denying Petitioner's motion to withdraw
his plea while failing to provide counsel to Petitioner.

In denying Petitioner's pro se motion the court cited
essentially the government's argument, based on the
Schmidt factors, that the government would be
prejudiced and Petitioner did not state a claim of
innocence.[17]

1) Petitioner stated he had no mens rea, which Petitioner
believed was a requirement to be guilty, nor
contemplate harm or injury to victims.  The court
erred in not construing Petitioner's mens rea
claim,[18] or harm to victims,[19] liberally.[20]

2) ... continues on following page...

---

[17] Dimattina v. U.S., 949 F.SUpp.2d 387, 2013 WL2632570 at *27 (E.D.N.Y. 2103) "the 2nd Circuit
has apparently not ruled on whether a claim of actual innocence is cognizable."

[18] U.S. v. Starr, 816 F.2d 94, 98 (2d Cir 1987) "only a showing of intended harm will satisfy the
element of fraudulent intent".

[19] U.S. v. Bifulco, 127 Fed.Appx. 548 (2d 4-11-05) "Critical to a showing of a scheme to defraud
under the mail and wire fraud statutes is proof that the defendants possessed a fraudulent
intent.  (the government) must prove the defendants contemplated some actual harm or injury
to their victims.  Only a showing of intended harm will satisfy the element of fraudulent
intent.  Misrepresentations amounting only to a deceit are insufficient to maintain a mail or
wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the
victim.  Similarly, it is not sufficient that the defendant realize that the scheme is
fraudulent and that is has the capacity to cause harm to its victims.  Some realization that a
scheme may be fraudulent and potentially harmful does not alone automatically satisfy the
intent to harm requirement of the mail and wire fraud statutes."

[20] Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct 2197, 167 L.Ed.2d 1081 (2007) " a pro se
complaint, however inartfully pleaded, must be held to less stringent standards than formal
pleadings drafted by lawyers."

2) As Petitioner's motion to withdraw a guilty plea was a critical stage [21] of a criminal proceeding, no showing of prejudice was necessary as Petitioner was deprived of counsel in filing the motion. [22,23]   As Petitioner claimed in his motion that counsel was ineffective, it is the government who bears the burden of constitutionally ineffective counsel. [24]

The **Schmidt** court certainly expected a defendant to be represented by counsel, as Schmidt was, since the 2nd Circuit as well as others previously ruled that a defendant is entitled to be represented by counsel and should not have to stand alone...

---

[21] Gardner v. Florida, 430 U.S. 349, 51 L.Ed.2d 393, 97 S.Ct. 1197 (3-22-97) "A defendant's U.S. Const. Amend. VI right to counsel attaches at all critical stages in the proceedings after the initiation of formal charges. It cannot be gainsaid that a defendant's guilty plea is the most <u>critical stage</u> of the proceedings as it forecloses his very right to a trial. Consequently, in the face of an allegedly involuntary plea, a plea withdrawal hearing is vital to ensuring the integrity of the process by which guilt may ultimately determined. Given the occasionally complex standards governing plea withdrawals pursuant to Fed. R. Crim. P.32(e), it would be unreasonable to expect a criminal defendant to navigate this area of law without the competent advice of counsel... In the face of a motion to withdraw a plea based on counsel's misconduct, district courts must determine whether the facts as alleged support a finding of a conflict. If they do not, there is no problem. If they do, the defendant may still waive his right to conflict-free counsel or his right to counsel altogether and proceed pro se; otherwise, the district court must provide the defendant with the effective assistance of conflict-free counsel for purposes of the plea withdrawal. The United States Court of Appeals for the Second Circuit's frequent review of district courts' actions in the circuit confirms that the appointment of new counsel in such situations is the common practice."

[22] Forbes v. U.S., 574 F.3d 101 (2d 6-25-09) citing U.S. v. Davis, 239 F.3d 283 (2d 2001) "a motion to withdraw a guilty plea is a critical stage of a criminal proceeding, meaning no showing of prejudice is necessary to establish a 6th Amendment violation where a defendant is deprived of counsel in bringing it". Hines v. Miller, 318 F.3d 157, 164 (2d Cir 2003) "the Hines court left open the question of the proper standard to apply in such situations". (Forbes)

[23] Iowa v. Tovar, 541 U.S. 77, 88-89 (2004) (While the Constitution 'does not force a lawyer upon a defendant,'... it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent, see Johnson v. Zerbst, 304 U.S. 458, 464 (1938))

[24] U.S. v. Williamson, 706 F.3d 405(4th Cir 1992) "A new trial motion filed after the trial but before the appeal is a critical stage with the attendant 6th Amendment right to counsel."

... against the government at any critical stage[25] of the criminal proceeding,[26] which the Petitioner had to do to file a motion to withdraw his plea.[27]

(C) Prosecutorial misconduct

1) The government failed to disclose exculpatory evidence in the government's possession regarding ongoing investigations and cases filed against "victim lenders". The government filed a complaint against Wells Fargo Bank on 10/9/12, Civil Docket Case 1:12-CV-07527-JMF, and an amended complaint on 12/14/12, Docket 22, (attached) based on Wells Fargo's motion to dismiss, Docket 14. Instead of turning over evidence helpful to the defense, the government filed a motion in limine, Docket 314, on 1/15/13, to preclude evidence or argument blaming victim lenders which the prosecution knew would show the lenders were complicit, not unwitting, and could not be seen as ...

---

[25] Kimmelman v. Morrison, 106 S.Ct. 2574 (1986) "the 6th Amendment mandates that the state or the government bear the risk of constitutionally deficient assistance of counsel".

[26] U.S. v. Wade, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) observing that 6th Amendment right to counsel "guarantee[s] that [the accused] need not stand alone against the state at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial".

[27] Bell v. Hill, 190 F.3d 1089, 1093 (9th Cir 1999), cert denied, 529 U.S.1004 (2000) (violation of Petitioner's 6th Amendment right to appointment of counsel for purposes of preparing new trial motions results in grant of writ)

victims. [28],[29],[30]   Failure to turn over this evidence violates
U.S. v. Saforian, 233 F.R.D. 12, 15 (.D.D.C. 2005) ("in the
course of their investigation, and in collecting and reviewing
evidence, the Prosecutors must ensure that any information
relevant to this case that comes into the possession, control,
or custody of the Justice Department remains available for
disclosure.  See U.S. v. Marshall, 328 U.S.App. D.C. 8,
132 F.3d 63, 69 (D.C. Cir 1998) (cautioning against government
'gamesmanship in discovery matters')").

2) The government knowingly used false testimony and false
   inferences during trial.

   In the government's response to Petitioner's pro se
   motion the government argues that their witnesses
   basically had faulty memories, yet, in each case the
   "faulty" response came while answering direct questions
   from the government, which the government had to know was
   false, [31] even assuming the government did not induce
   perjury, they sat by and failed to correct testimony that

---

[28] U.S. v. Carr, 424 F.2d 213, 227 (2d Cir 2005) the error "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings."

[29] Caraballo v. City of New York, 2013 U.S.APP. Lexis 9662 (2d Cir 5-14-13) citing U.S. v. Heath, 455 F.3d 52, 57 (2d Cir 2006) (We have reasoned that "those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense.")

[30] U.S. v. Lacey, 699 F.3d 710 (2d Cir 5/17/12) ("in on the scheme ... could not be seen as a victim")

[31] Napue v. Illinois, 360 U.S. 264 (1959), (the [prosecutor] has the responsibility and duty to correct what he knows to be false and elicit the truth.)

they knew was false. [32,33,34] See Giglio v. U.S. 405 U.S.
150 (1972), Napue v. Illinois, 360 U.S. 264 (1959) and
WEI SU v. Filion, 335 F.3d 119, 126 (2d Cir 2003)
("Since at least 1935, it has been the established
law of the United States that a conviction obtained
through testimony the prosecutor knows to be false is
repugnant to the Constitution")

3) The government continues to fail to turn over the
Bank of America Bill Pay records.  The government
can no longer argue they are unaware the records
exist as their own witness testified they do exist,
and where they are located during the trial.  The
records are helpful to the defense and were
required to be turned over under this Court's rules
as well as under Brady.  These records not only
affected the trial, they affected the loss,
sentencing, and currently affect any restitution [35]

---

[32] U.S. v. Freeman, 650 F.3d 673, 680 (7th Cir 2011) ("Napue does not require that the witness could be successfully prosecuted for perjury.) U.S. v. Boyd, 55 F.3d 238,243 (7th Cir 1995). In this area of the law, the governing principle is simply that the prosecutor may not knowingly use false testimony. This includes 'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury."

[33] U.S. v. Hernandez, 2013 U.S.APP. Lexis 6168 (2d Cir 3-28-93) "a witness perjures himself when he give false testimony concerning a material matter with the intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory."

[34] U.S. v. Wallace, 935 F.2d 445 (2d Cir 1991) ...the Second Circuit held that "[t]he taint of [the] false testimony is not erased because his untruthfulness affects only his credibility as a witness.  The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence."

[35] Austin v. Bell, 126 F.3d 843 (6th Cir 1997), cert denied, 523 U.S. 1079 (1998) (counsel "did not present mitigating evidence because he did not think it would do any good"; counsel's "reasoning does not reflect a strategic decision, but rather an abdication of advocacy")

order the court is reviewing.  See U.S. v. Triumph
Capital Group, Inc. 544 F.3d 149 (2nd Cir 3-22-08)
("the government has a duty to disclose all material
evidence favorable to a criminal defendant.  When the
government violates this duty and obtains a
conviction, **it deprives the defendant of his or her
liberty without due process of law**").  As in
"Triumph Capital" the same prosecutor violated a duty
causing the defendants to be deprived of their
liberty without due process. [36],[37]

## Prong 2 - Irreparable injury in the absence of preliminary relief:

Section 2255 provides that "unless the motion and the files and
records of the case conclusively show that the prisoner
is entitled to no relief, the court shall cause notice thereof to
be served upon the U.S. Attorney, grant a prompt hearing thereon,
determine the issues and make findings of fact and conclusions of
law with respect thereto."

As numerous grounds listed in Petitioner's 2255 motion cannot be
found in the current files and records, the court "shall" grant a
prompt hearing.

---

[36] Smith v. Cain, 132 S.Ct. 627 (11-8-11) "under Brady, the State violates a defendant's rights
to due process if it withholds evidence that is favorable to the defendant and material to the
defendant's guilt or punishment".

[37] U.S. v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005)(Freidman, J.) held that prosecutors must
disclose "any potentially exculpatory or otherwise favorable evidence... without regard to
whether the failure to disclose it likely would effect the outcome of the upcoming trial."
(citations omitted).

In order to prepare for the hearing, Petitioner will need access to the massive discovery as well as Petitioner's e-mail account as numerous allegations made by Petitioner can be proven with e-mail to and from counsel.  Petitioner currently does not have access to a computer to view electronic discovery as the BOP does not have a working computer where Petitioner is held.

Petitioner will be irreparably harmed by not being able to prepare for a hearing and argue before the court.  See Puglisi v. U.S. 586 F.3d 209, 213 (2d Cir 2009) (In considering a §2255 petition, "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."

Petitioner hereby requests an evidentiary hearing.

## Prong 3: The balance of equities tips in applicant's favor:

Petitioner has now been incarcerated for nearly a year, in addition to the nearly three years spent in pre-trial supervised release.

In Document 603 Page 4 of 5, this Court's ruling and order denying motion to stay surrender, the court wrote "even assuming the defendant could show that the government has withheld information showing that some or even all of the banks were not

deceived, any such Brady violation does not effect the validity of his guilty please based on the No More Bills scheme, which alone support a sentence of imprisonment greater than the time served by the defendant in pretrial detention and the expected duration of any appeal".

Based on the docket sheet (attached) in U.S.v. Wells Fargo Bank, N.A., the government filed its original complaint on 10/9/12, four months prior to trial began in this case.  The government argued in its several complaints filed, as well as its response to Wells Fargo's motion to dismiss that "Wells Fargo's conduct was intentional", as Judge Furman, in ruling in the government's favor adopted the government arguments, writing "Wells Fargo engaged in a regular practice of reckless origination and underwriting... the Bank relied on inadequately trained employees; inpermissably paid underwriters a bonus based on the number of loans they approved; applied heavy pressure on loan officers and underwriters to originate, approve, and close loans; required underwriters to make decisions on loans on extremely short turnaround times; and employed lax and inconsistent underwriting standards and controls."

None of this was ever disclosed to the defense.  Nor was any information disclosed regarding SunTrust Mortgage and their "Government Agency Shortcut Mortgage program", which all SunTrust loans in the instant case were underwritten under, that was in the possession of the Justice Department, who settled with SunTrust for $1 Billion.  Clearly, the Brady violations in the

mortgage program are abundant and require a full investigation or dismissal of the mortgage related charges.

With regards to the "No More Bills" (NMB) program, due to the government's Brady violation in failing to turn over the Bank of America Bill Pay records, as well as the government's ongoing misrepresentation of the NMB program, the number of actual victims and the total loss is continually overstated as it is based on the government's unsound methodology. The NMB program was a loan, not an investment; the clients who made additional loans had their entire plan restructured or refinanced. They did not make new investments. The entire repayment went to the client's already existing debts. The old plan, along with the old payments, ended when the new plan began, which is why Maureen Walters and Robert Ponte never would have received 252 payments; the promissory note called for a review to reduce the term. The government knew this as it was detailed on Petitioner's spreadsheets.

As the actual loss is less than the amount stolen by David Praise, the court sentenced Petitioner based on clearly erroneous finding of facts and false information provided by the government. At sentencing, the court noted that the Petitioner was a victim of a crime and the court never had a case such as this; that is because the government typically does not prosecute victims.

Based on the NMB program, the fact that the court denied Petitioner's motion to stay surrender based on clearly erroneous finding of facts, overstated loss figures and victims. It is impossible to know what, if any, sentence Petitioner would have been given had the court had accurate information. Therefore, as Petitioner is requesting relief from incarceration, the balance of equities tip in Petitioner's favor.

Prong 4: An injunction is in the public interest:

(A) As the Petitioner is incarcerated due to activity stemming from the "financial crisis" brought on by lax standards by employees of the financial institutions (banks), it is in the public's interest that the banks, who unlike the Petitioner are not being charged criminally and having their liberty taken away, but the DOJ is pursuing the bank in civil court. The banks are settling with the DOJ (who prosecuted the Petitioner) for multi-billion dollar settlements, in many cases without any admission of wrong doing, paying a small fraction of the profits earned during what became the "financial crises".

The public has a direct and compelling interest in knowing that crimes the Petitioner was prosecuted for allegedly committing are currently still being perpetrated by the same banks the DOJ is accepting large

settlements from, where the DOJ itself receives
multi-million dollar fines, while allowing the banks to
continue with the same activity Petitioner is
incarcerated for, thereby putting the public at risk.

Both Wells Fargo and SunTrust Bank, named victims,
currently have civil suits pending against them, with
ongoing investigations by the DOJ in the Southern
District of New York and the Western District of
Virginia, respectively, as well as the Special Inspector
General of the Troubled Asset Recovery Program for the
exact same activity, the same products, and the same
programs the Petitioner was prosecuted for.

(B) Based on recent revelations that the FBI now uses
"wire taps" in white collar criminal investigations,
that the FBI, along with the NSA, records and has access
to all electronic e-mails and communications, and now
requires e-mail service providers to turn over all
e-mails, as the FBI ordered Apple (Petitioner's
provider) to do in October 2012, four months prior to
trial, with the preponderance of evidence that
Petitioner's e-mail with counsel were being read before
and during the trial, [38] the public has an interest in

---

[38] U.S. v. Lyons, 352 F.Supp. 2d 1231, 1251-52 (M.D. Fla. 2004) (finding a due process violation,
dismissing the remaining counts of the indictment and refusing to order a new trial because of
the government's multiple and flagrant Brady and Giglio violations).

knowing that original defendant's attorney/client privilege rights are being violated.

In the instant case the government's actions directly following Petitioner's e-mailing counsel had a direct effect on the defense counsel pre-trial investigation and actions filed, as well as trial decisions including the decision to cause Petitioner to plead guilty.

Examples include:

1) Removing their star witness, Robert Hall, from the witness list just before trial[39] as Petitioner documented Hall stealing properties from CAV, stole the rental income from the properties while not paying the mortgages, causing the foreclosures, and signed on the mortgage on the Red Bud properties with Tennessee State Bank.  The defense, assuming counsel effectively cross-examined Hall, could have disputed most of the government's case as an effective cross-examination would reveal:

   a) Robert Hall was actually Petitioner's partner, <u>not</u> Robert Ponte.

---

[39] U.S. v. Wang, No. 98 CR. 199 (DAB), 1999 WL 138930, at "37 (S.D.N.Y. Mar. 15, 1999) [1999 U.S. Dist. Lexis 2913] (finding due process violation and dismissing an indictment due the government's failure to provide defense counsel with "material information" until the "eve of trial", and its delay in disclosing that its key witness was unavailable and would not be called to testify).

b) SA West lied on all the 302's where he had entered Ponte's name instead of Mr. Hall.

c) The 4th Amendment was violated as the search warrant on Petitioner's house was based on Robert Hall's false testimony.  A testimony the government should have known was false at that time.

d) That Petitioner had an actual business that did make money.

e) That the NMB clients knew of the investment in Mountain Charm Cabin Rentals.

f) That the purchase of three parcels of land in Tennessee in November, 2007, with a deposit made on 9/10/07 to expand a money making business shows the Petitioner had no mens rea and did not intend or contemplate harming anyone, a requirement to be found guilty in the 2nd Circuit, and why the government withheld the Tennessee State Bank mortgage records on the Red Bud properties.

g) That if Hall testified and was proven to have lied about everything in his 302, and possibly before the grand jury, it would have caused reasonable doubt in the minds of the jurors when Tosha Wade, who also committed serial perjury, testified saying essentially what Hall was supposed to testify to.

2) During trial the prosecution continually read and misrepresented e-mails written by Petitioner.

Petitioner e-mailed counsel with bullet points to stop
the false inferences and inform the court what the
prosecution was doing.  The minute that defense
counsel stood up and began addressing the issue, AUSA
Schmeisser stood up and told the court they would no
longer use the e-mail, effectively stopping defense
counsel from informing the court of the falsity of
prosecution's use of the **"Recipe** for NMB Disaster" e-mail.

As similar cases have been dismissed when it was revealed
that the government violated attorney-client privilege by
reading e-mails of criminal defendants;[40]  the
public has an interest in knowing that this violation of
criminal defendant's attorney-client privilege continually
occurs throughout this instant case.

(C) In April, 2009, after the embarrassing revelations of
the misbehavior by prosecutors in the Senator Ted Stevens
case, the new Attorney General Eric Holder said "I have
determined that is in the interest of justice to dismiss
the indictment and not proceed with a new trial".  He
also said the department must ensure that all cases are
"handled fairly and consistent with its commitment to
justice".  As the investigation in the instant case
began December, 2008, the public has a direct interest

---

[40] U.S. v. Aguilar, 831 F.Supp. 2d 1180 (C.D.Cal. 2011) "[3] improperly reviewed e-mail
communications between one Defendant and her lawyer..."

in knowing if other cases were conducted in a similar
manner.

It is clear that the same investigative and prosecutorial
playbook was used in both U.S. v. Ted Stevens,
No. 09-0198, and U.S. v. Rivernider, the instant case.
In "Stevens" an investigation was ordered by the
Honorable Emmet G. Sullivan and conducted by Special Counsel
Henry F. Schuelke III, Esq.  The following examples listed
below demonstrate the similarities, using excerpts from the
Schuelke Report, Document 84 of Case 1:90-MC-00198-EGS.  The
examples include:

1) Ted Stevens (TS): Page 12 of 525, "systemic concealment of
        significant exculpatory evidence."
   Rivernider (RR): See 2255 Motion filed, Ground 28 (Ex. 2)
        listing 23 different items withheld by the government.

2) TS: Page 14 of 525, "The review of government files for
        Brady information was conducted by FBI and IRS agents,
        some of whom were unfamiliar with the facts or with
        Brady/Giglio requirements, unassisted and unsupervised
        by the prosecutors."
   RR: It is unclear who would have been responsible, if
        anyone, for review and supervision of Brady materials
        based on the numerous documents not turned over to the
        defense.

3) <u>TS:</u> Page 14 of 525, "The prosecutors also failed to review their own notes of witness interviews which contained significant Brady information that was never disclosed".

   <u>RR:</u> The prosecution turned over <u>no</u> notes, nor did the FBI or IRS.


4) <u>TS:</u> Page 15 of 525, "Despite Judge Sullivan's orders on September 16 and October 2, 2008, the prosecutors never disclosed all the 302's for their witnesses or all the Brady information in their possession."

   <u>RR:</u> A government witness, Lou Carlson, told defense investigator that he was interviewed a dozen times by the government, yet only one 302 was turned over to the defense.


5) <u>TS:</u> Page 16 of 525, "Mr. Sullivan was not aware when he gave his opening statement, and never learned during or after trial, that the prosecutors possessed evidence that directly corroborated Senator Steven's defense."

   <u>RR:</u> Mr. Bergenn was not aware when he gave his opening statement the prosecutor's most likely possessed evidence (Tennessee State Bank mortgage documents for the Red Bud Road properties) that directly corroborated Mr. Rivernider's defense.

6) <u>TS:</u> Page 19 of 525, "A few days before trial began,
[a government witness] did poorly on a mock cross-
examination ... the prosecutors ... returned him to
Alaska ... the day opening statements were given.  The
prosecutors did not inform [the judge] or [defense],
... though they knew he'd been listed as a trial
witness."

<u>RR:</u> The prosecution, days before trial, without notice to
the defense and without informing defense counsel why,
removed their star witness from the trial witness
list.  Robert Hall was their main witness for three
years whose testimony caused a warrant to be issued on
Petitioner's house, as well as summary testimony
before the grand jury; all of which resulted from
Robert Hall; false testimony that SA West delivered.
Again, <u>none</u> of it was true.

7) <u>TS:</u> Page 22 of 525, "The prosecutors did not disclose
[witnesses'] subordination of perjury in the search
warrant application".

<u>RR:</u> [Prosecution] did not disclose perjury by Robert Hall
in the search warrant application.

8) <u>TS:</u> Page 29 of 525, "The defense was shocked by
Mr. Allen's CYA testimony.  None of the 55, FBI 302's
of the government's interviews of Mr. Allen from
August 30, 2006 to September 9, 2008, which were

provided to him by the prosecutors, contained any
reference by Mr. Allen to this CYA statement."
"Also, during his cross-examination ...
Mr. Sullivan accused Mr. Allen of inventing that
testimony recently."

RR: Petitioner remains shocked that <u>none</u> of the 302's
written by investigators in this case, from 2008
through 2013, state that NMB clients believed that the
payments they were to receive would come from other
NMB clients' previous investments, yet this became the
crime post trial.

9) TS: Page 30 of 525, "The prosecutor knew the testimony was
false and knew that he had an obligation under the
Supreme Court's decision in Napue v. Illinois,
360 U.S. 264 (1959) to correct that testimony there
and then, but he did not."

RR: The prosecutor, who investigated this case for over
**four years** before trial, knew or should have known
that the testimony of witness after witness was false;
see Ground 18 and 19 (Ex. 2) of Petitioner's 2255
motion, as well as the list of witness who testified
falsely in this motion.  It is absolutely unimaginable
that the prosecution did not know that the testimony
of their witnesses was false.

10) TS: Page 31 of 525,  However, not only did he fail to
       correct the false statement as was required by Napue,
       Mr. Bottini endorsed and capitalized on Mr. Allen's
       false denial ... "you saw and you heard from Bill
       Allen and you saw and you heard from Bob Persons.  You
       can judge for yourself the credibility of these two
       individuals.  Again, if that were so, if Allen just
       made that up, wouldn't the story be better about
       that?"

    RR: The government continues to use the testimony of Tosha
        Wade who clearly lied about her credentials, damaging
        her credibility for the government.  The government's
        sentencing memo and all other subsequent filings
        utilize Tosha Wade's false stories.  See Ground 24
        within Exhibit 2.


11) TS: Page 33 of 525, "... until the week before the trial
        began when Mr. Allen's memory suddenly improved, after
        prodding by Agent Kepner."

    RR: At trial Tosha Wade suddenly remembered that Loretta
        Seneca did and said everything Petitioner did and
        said, however, in her several 302's turned over to the
        defense it was usually just Petitioner.  At trial,
        however, every time Wade said Petitioner's name she
        included Seneca, certainly after prodding by the
        government.

12) TS: Page 35 of 525, Agent Kepner did not write a 302 for this interview of Mr. Allen.  She told DOJ investigators in 2009 that no 302 was written because "the debriefing of Bill Allen did not go well".

RR: The government turned over only <u>one</u> 302 from over 30 appraisers involved in the case.  They did not turn over 302's from key people involved in the loans, nor from any lenders.  See Ground 20 in Exhibit 2.

13) TS: Page 40 of 525, ... the evidence establishes that this conduct [of withholding Brady/Giglio material] was intentional.

RR: It is hard to believe that two large banks simultaneously withheld exculpatory evidence that, to this day, has not been received by either the government or trial counsel.  Both Bank of America and Tennessee State Bank were subpoenaed for these records in 2009.  These possibly exculpatory records are missing that went to guilt, loss and restitution.  The Petitioner, meanwhile, suffers in prison due to this ongoing constitutional violation.

14) TS: Page 47 of 525, Each prosecutor denied that he or she intentionally withheld any exculpatory information and various explanations were provided for the repeated nondisclosure of significant Brady/Giglio information

which indisputably occurred during the prosecution of
Senator Stevens. ...evidence gathered during this
investigation compels the conclusion that Mr. Bottini
and Mr. Goeke intentionally withheld and concealed
material exculpatory information, which was required
to be disclosed...

RR: During the December 18, 2013 hearing on Petitioner's
pro se motion. AUSA John H. Durham told the court "we
didn't do that" referring to reading Petitioner's
e-mails during trial, but gave no explanation as to
why they suddenly changed exhibits or why they said
during trial they would stop using the "Recipe for NMB
Disaster" e-mail?  Also, they claim they asked for the
Bank of America records but provided no evidence that
they did, even after learning at trial, from their own
witness, that the records did exist.

14) TS: Page 201 of 525, "Defendant's motion is the proverbial
'Hail Mary'."

RR: When the prosecution had to admit the Petitioner did
make investments as the Petitioner informed the court
at the change of plea (proving the indictment was
false), the prosecutions called the investments
'Hail Mary's'.

15) TS: Page 201 of 525, "... defendant resorts instead to
leveling baseless accusations against the government.

The faulty premise woven throughout the defendant's motion is the idea that the government deliberately suppressed exculpatory evidence ... Defendant erroneously suggests that the government withheld exculpatory information..."

<u>RR:</u> Please see the government's response to Petitioner's pro se motion, page 24, "the defendant provides no evidence to support his unfounded allegations".

Had counsel conducted an adequate investigation and filed motions to compel the government to turn over all exculpatory evidence and all evidence they subpoenaed, the evidence of misconduct will be as overwhelming in the instant case as it is in the Steven's case. Petitioner does not have the benefit of an adequate investigation, as the Stevens' court ordered, nor does the Petitioner, at this time and location, have access to discovery which would demonstrate that the prosecution in this instant case mirrors the prosecution in the Steven's case.

In both the Petitioner's and the Stevens case, the government followed the same the playbook. For these and other reasons presented (and which can be proven, Petitioner requests that this motion for a Preliminary Injunction be granted.

Respectfully submitted, this the __19TH__ of __July__, 2014.

Robert H. Rivernider, Jr.

E X H I B I T   1

in support of

Preliminary Injunction

by

Robert H. Rivernider, Jr.

New York, NY 10006
(212) 225-2000
Fax: (212) 225-3999
Email: mkotler@cgsh.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Kurt Lofrano**                                 represented by **Lewis J. Liman**
                                                 Cleary Gottlieb
                                                 One Liberty Plaza
                                                 New York, NY 10006
                                                 212-225-2000
                                                 Fax: 212-225-3499
                                                 Email: lliman@cgsh.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Liana Roza Vitale**
                                                 Cleary Gottlieb
                                                 One Liberty Plaza
                                                 New York, NY 10006
                                                 (212)-225-2000
                                                 Fax: (212)-225-3999
                                                 Email: lvitale@cgsh.com
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Mary Catherine Blanton**
                                                 Cleary Gottlieb Steen & Hamilton
                                                 One Liberty Plaza
                                                 New York, NY 10006
                                                 (212)-225-2976
                                                 Email: mblanton@cgsh.com
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Meredith Eve Kotler**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/09/2012 | 1 | COMPLAINT against Wells Fargo Bank, N.A. Document filed by United States of America. (Attachments: # 1 part 2, # 2 Exhibit)(mro) (Entered: 10/11/2012) |
| 10/09/2012 |  | SUMMONS ISSUED as to Wells Fargo Bank, N.A.. (mro) (Entered: 10/11/2012) |

EXHIBIT 1

| 11/08/2012 | 8 | ORDER granting 6 Motion for Douglas W. Baruch to Appear Pro Hac Vice (HEREBY ORDERED by Judge Jesse M. Furman)(Text Only Order) (Furman, Jesse) (Entered: 11/08/2012) |
|---|---|---|
| 11/08/2012 | 9 | ORDER granting 7 Motion for Jennifer M. Wollenberg to Appear Pro Hac Vice (HEREBY ORDERED by Judge Jesse M. Furman)(Text Only Order) (Furman, Jesse) (Entered: 11/08/2012) |
| 11/08/2012 | 10 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 1/9/2013 at 04:00 PM in Courtroom 6A, 500 Pearl Street, New York, NY 10007 before Judge Jesse M. Furman. (Signed by Judge Jesse M. Furman on 11/8/2012) (ae) (Entered: 11/08/2012) |
| 11/14/2012 | 11 | CERTIFICATE OF SERVICE of Notice of Initial Pretrial Conference, and Individual Rules and Practices in Civil Cases of Judge Jesse M. Furman on 11/14/12. Service was made by Mail. Document filed by Wells Fargo Bank, N.A.. (Johnson, William) (Entered: 11/14/2012) |
| 11/15/2012 | 12 | MOTION for Michael J. Missal to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-7980600. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Wells Fargo Bank, N.A.. (Attachments: # 1 Exhibit Certificate of Good Standing from DC Court of Appeals, # 2 Text of Proposed Order)(Missal, Michael) (Entered: 11/15/2012) |
| 11/15/2012 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 12 MOTION for Michael J. Missal to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-7980600. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 11/15/2012) |
| 11/15/2012 | 13 | MOTION for Amy Pritchard Williams to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-7982327. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Wells Fargo Bank, N.A.. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Text of Proposed Order Granting Motion for Admission Pro Hac Vice)(Williams, Amy) (Entered: 11/15/2012) |
| 11/16/2012 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 13 MOTION for Amy Pritchard Williams to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208-7982327. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 11/16/2012) |
| 11/16/2012 | 14 | MOTION to Dismiss. Document filed by Wells Fargo Bank, N.A..(Johnson, William) (Entered: 11/16/2012) |
| 11/16/2012 | 15 | MEMORANDUM OF LAW in Support re: 14 MOTION to Dismiss.. Document filed by Wells Fargo Bank, N.A.. (Johnson, William) (Entered: 11/16/2012) |

EXHIBIT 1

| 11/16/2012 | 16 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - DECLARATION of Douglas W. Baruch in Support re: 14 MOTION to Dismiss. Document filed by Wells Fargo Bank, N.A. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Johnson, William) Modified on 11/21/2012 (db). (Entered: 11/16/2012) |
| 11/16/2012 | 17 | DECLARATION of Douglas W. Baruch (With Corrected Exhibits) in Support re: 14 MOTION to Dismiss.. Document filed by Wells Fargo Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B (Corrected Version), # 3 Exhibit C, # 4 Exhibit D (Corrected Version), # 5 Exhibit E (Corrected Version), # 6 Exhibit F, # 7 Exhibit G (Corrected Version), # 8 Exhibit H)(Johnson, William) (Entered: 11/16/2012) |
| 11/20/2012 | 18 | ORDER granting 12 Motion for Michael J. Missal to Appear Pro Hac Vice (HEREBY ORDERED by Judge Jesse M. Furman)(Text Only Order) (Furman, Jesse) (Entered: 11/20/2012) |
| 11/20/2012 | 19 | ORDER granting 13 Motion for Amy Pritchard Williams to Appear Pro Hac Vice (HEREBY ORDERED by Judge Jesse M. Furman)(Text Only Order) (Furman, Jesse) (Entered: 11/20/2012) |
| 11/20/2012 | 20 | ORDER: Accordingly, it is hereby ORDERED that Plaintiff shall file any amended complaint by December 7, 2012. Plaintiff will not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss. If Plaintiff does amend, by three (3) weeks after the amended complaint is filed, Defendant shall: (1) file an answer; (2) file a new motion to dismiss; or (3) submit a letter to the Court, copying Plaintiff, stating that it relies on the previously filed motion to dismiss. If Defendant files an answer or a new motion to dismiss, the Court will deny the previously filed motion to dismiss as moot. It is further ORDERED that if no amended complaint is filed, plaintiff shall serve any opposition to the motion to dismiss by December 7, 2012. Defendant's reply, if any, shall be served by December 14, 2012. At the time any reply is served, the moving party shall supply the Court with one courtesy hard copy of all motion papers by mailing or delivering them to the United States Courthouse, 500 Pearl Street, New York, New York. SO ORDERED.( Amended Pleadings due by 12/7/2012.) (Signed by Judge Jesse M. Furman on 11/20/2012) (ama) Modified on 11/26/2012 (ama). (Entered: 11/20/2012) |
| 12/06/2012 | 21 | ENDORSED LETTER addressed to Judge Jesse M. Furman from Sarah J. North dated 12/05/2012 re: Accordingly, we respectfully request a one week extension of the Government's time to amend its complaint, until December 14, 2012. ENDORSEMENT: Application Granted., ( Amended Pleadings due by 12/14/2012.) (Signed by Judge Jesse M. Furman on 12/06/2012) (ama) (Entered: 12/06/2012) |
| 12/14/2012 | 22 | FIRST AMENDED COMPLAINT OF THE UNITED STATES OF AMERICA amending 1 Complaint against Wells Fargo Bank, N.A. with JURY DEMAND. Document filed by United States of America. Related document: 1 |

EXHIBIT 1

| | | |
|---|---|---|
| 01/11/2013 | 303 | Proposed Jury Instructions by Robert Rivernider, Robert Ponte, Loretta Seneca (Chase, Michael) (Entered: 01/11/2013) |
| 01/14/2013 | 304 | ORDER granting 294 Motion to Seal as to Robert Rivernider (1). Signed by Judge Robert N. Chatigny on 1/14/2013. (Rickevicius, L.) (Entered: 01/14/2013) |
| 01/14/2013 | 305 | ORDER granting 295 Motion to Seal as to Robert Rivernider (1). Signed by Judge Robert N. Chatigny on 1/14/2013. (Rickevicius, L.) (Entered: 01/14/2013) |
| 01/15/2013 | 314 | MOTION in Limine *to Preclude Evidence or Arguments Blaming Victim Lenders* by USA as to Robert Rivernider, Robert Ponte, Loretta Seneca. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Durham, John) (Entered: 01/15/2013) |
| 01/15/2013 | 315 | MOTION Order authorizing deposition of witness by USA as to Robert Rivernider, Robert Ponte, Loretta Seneca. (Durham, John) (Entered: 01/15/2013) |
| 01/16/2013 | 317 | ORDER granting 312 Motion to Seal as to Loretta Seneca (3). Signed by Judge Robert N. Chatigny on 1/16/13. (Goldsticker, M) (Entered: 01/16/2013) |
| 01/16/2013 | 319 | Minute Entry for proceedings held before Judge Robert N. Chatigny: denying 261 Motion in Limine as to Robert Rivernider (1), Robert Ponte (2), Loretta Seneca (3); granting 263 Motion to Sever Defendant as to Robert Rivernider (1); granting 257 Motion to Sever Defendant as to Robert Ponte (2); taking under advisement 253 Motion in Limine as to Loretta Seneca (3); Motion Hearing as to Robert Rivernider, Robert Ponte, Loretta Seneca held on 1/16/2013 re 257 MOTION to Sever Defendant *'s Trial on Tax Evasion Counts* filed by Robert Ponte, 261 Joint MOTION in Limine *to Exclude Evidence Regarding Uncharged Transactions and Other Bad Acts* filed by Loretta Seneca, Robert Ponte, Robert Rivernider, 253 First MOTION in Limine filed by Loretta Seneca, 263 MOTION to Sever Defendant *'s Trial on Counts 1-18 from Defendant Robert Ponte's Trial on Counts 19 and 20 of the Indictment* filed by Robert Rivernider. Total Time: 2 hours and 3 minutes(Court Reporter Warner, Darlene.) (Glynn, T.) (Entered: 01/17/2013) |

EXHIBIT 1

E X H I B I T   2

in support of

Preliminary Injunction

by

Robert H. Rivernider, Jr.

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 27: Failed to Challenge Filing of False Documents

Evidence shows that the government continually filed or files documents
that knowingly mislead and misrepresent the facts.  Counsel's lack of
action challenging these submissions severely prejudiced the Petitioner.

Ground 28: Counsel Failed to Discover and/or Demand Release of Exculpatory
Evidence Held by the Government

The government withheld the following exculpatory evidence, in part:

1) Complete Bank of America records.

2) Complete Tennessee State Bank records.

3) Caused a victim letter not to be sent to the Petitioner.

4) Withheld mortgage records for Eric Reid until after he testified.

5) The outdated appraisals government alleges in the government's
   sentencing memorandum.

6) 302's from all but one of over 30 different appraisers that appraised
   the 104 properties.

7) Statements or 302's from clients who claimed they believed they were
   going to get paid from other client's investments.

8) Evidence that clients who sent money to CAV told their lenders CAV
   would be making the repayments on the money they borrowed to lend
   to CAV.

9) Interviews and 302's with lenders that SA West said he spoke to in
   his testimony before the grand jury.

10) Evidence the government learned about their original star witness,
    Robert Hall, which caused them to remove him from the witness list
    days before trial.

11) Employment records and properties sold at the Sterling by Tosha Wade.

12) Tosha Wade's real estate license she said she obtained when she
    started working for REAMCO in 2006.

13) Evidence that shows a blind copy email sent to Petitioner would not
    have left a paper trail as Tosha Wade comically claimed.

EXHIBIT 2

**ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)**
**Robert Rivernider   96006-004**

14) 302's from Mike Zaric or Peter Mead, his boss.

15) 302 from Jamie Navarro that would show she did not know Loretta Seneca as Jackie Santo's 302 says.

16) Phone records and emails showing Dan Fallow talking to Petitioner prior to joining the NMB program or buying a property in Idaho.

17) Maureen Walters' Bank of America account records which she accessed via a secure password protected website in order to email her statement.

18) The HUD-1 Settlement Statements that show Petitioner paid the closing cost on loans when Petitioner was not the seller.  All the HUD's Petitioner recalls reviewing in discovery show closing costs were paid by the seller and usually detailed on the HUD and the contract signed by the seller and buyer, both of which were approved by the lender.

19) Shellie Kemp's employment records with Wells Fargo that show why she was suspended and, why they allowed her to continue to do business with CAV.

20) All correspondence between government agents prosecuting Petitioner and the SEC, FBI agents and AUSA's involved in prosecuting David Praise.

21) The 302's from all the borrowers who were told by Petitioner not to tell the lender about the incentive deal.

22) The 302's from all the borrowers who were told by Petitioner not to read any of the mortgage documents that were mailed to them by either the mortgage lender or the title company for their mail-away closing, or to read the HUD-1 Settlement Statement that included a marketing fee, paid to CAV (Cut Above Ventures).

23) Rough notes of interviews taken by government agents that contain Jenck's Act or Brady material.

<u>EXHIBIT 2</u>

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 18: Counsel Failed to Interview Witnesses to Impeach Government
Witness Tosha Wade

Counsel conducted an inadequate investigation by failing to interview
witnesses that would have impeached the government's star witness, Tosha
Wade; failed to present public records that contradicted her testimony;
and failed to inform the court of numerous false statements Ms. Wade
stated at trial.  Statements which the government continues to present to
the court even though they know they are false.  Their support of these
lies by Ms. Wade is further demonstrated by her being rewarded with a 5K.1
and no prison time.  To summarize her false testimony, refer to the
following excerpts from her testimony and my rebuttals:

1) Refer to Ms. Wade transcript, Page 21: 2-5

"I did get yelled at... If the lenders knew that he was paying their
closing costs and their mortgage".  The government had all the HUD-1
settlement statements showing the seller, REAMCO, paying the closing
costs, not Petitioner, and the government had CAV's bank statements
showing the lenders accepting the payments from CAV for more than a year
and continuing to close new loans without question.

2) Refer to Ms. Wade transcript Page 23: 1-3

"Q: And this was just because it was generally coming after perhaps a
lender had found out "about the incentive deal?" A: "Yes".  The lender
knew.  They did not stop any deals from closing, which clearly means the
incentive deal was not material.  Not only was this actual perjury, it was
material, and the government should have known of the perjury at the time,
which remains not only undisclosed, but the government continues to
mislead the court about it.

EXHIBIT 2

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

3) Refer to Page 25: 12-20

Q: "And was there a difference in terms of pricing of the Rivernider units versus the Breakstone units? A: "Well, yeah, on paper there was... so for instance, a one bedroom is 199 normally. Well, Rivernider would get it for 160, 170 and then he would sell it for 220."

The government subpoenaed the lenders' and title companies' files on each loan; the government has access to the internet where public records of each sale are available on Palm Beach County's government website; and, the government has Petitioner's spreadsheet. All of these show the one bedroom's that Petitioner marketed for the developer sold for $190,900, not $220,000. In fact, the government has e-mails showing Petitioner negotiating a reduction from $199,000 that Wade sold one bedroom's for, down to $190,900, yet they chose to allow Wade to knowingly lie, committing material perjury before this court.

4) Refer to Page 26: 9-14

Q: "So what about appraisals to support these higher listed price units? Did Rivernider have any appraisals that he would go to?" A: "He did have select appraisers that he would work with on a regular basis and that he guided me to go to whenever I couldn't get it appraised with our own appraisers." Not only did the government not have one appraiser on their witness list, they did not turn over one 302 from any of the dozen or so appraisers who appraised the Florida properties. They had the appraisals and all the state licensed appraiser's contact information. Most of the appraisers were ordered by the lenders directly. The previously mentioned one bedroom units were appraised by an appraiser in Miami, who the developer used, not the Petitioner.

EXHIBIT 2

Attachment One: Page 13

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

5) Refer to Page 96: 18-19

"I was contacted by his sister, sister-in-law, Anna Marie LaPorte." Anna
Marie LaPorte is the sister of Mike LaPorte and sister-in-law of Carol
LaPorte, and is not related to the Petitioner nor Seneca. The LaPorte's
worked at the Sterling every day. Neither the Petitioner nor Loretta
Seneca were at the Sterling daily, as Wade claims, as Seneca had a full
time job in Ft. Lauderdale and Petitioner worked from home as Petitioner's
time stamped e-mails from his desktop computer clearly show. The
government should know this, as they copied Petitioner's hard drive which
included Petitioner's e-mail accounts. Wade's entire testimony is based
on false identification and the government knows it.

6) Refer to Page 8: 4-11

"I started working with Noah Breakstone at Breakstone Homes, and that's
where I got into the real estate market." Q: "That was around 2006?" A:
"Yes." Q: "At that point in time did you get a real estate license?" A:
"Yes, sir". According to Florida public records, Tosha Wade got a real
estate license June 14, 2007, 2 weeks before moving out of the Sterling as
she no longer worked there. This is clearly material as the government,
who should have known this at the time, allowed Wade to commit perjury
about her credibility in violation of the Supreme Court's rulings. The
government continues to use Wade's testimony without disclosing this false
statement.

Petitioner handed defense counsel a detailed spreadsheet of every property
in the Sterling development which proved that Wade's statement was false,
as well as informing counsel about Wade's licensing falsehood. Yet,
knowing the government's main material witness would lie on the stand,
counsel forced Petitioner to plead guilty as counsel was unprepared to go
back to trial as counsel had already decided not to go back, using the
four month old report to diagnose Petitioner with diminished mental
capacity.

<u>EXHIBIT 2</u>

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider    96006-004

Ground 19: Failure to Investigate Tosha Wade's Other Business Dealings and
Testimony

In Government Exhibit 4 titled "RE: Swap Units", the 3rd email in the
string from Tosha Wade, Wade writes on 6/13/07 4:43 PM, Page 2, "By the
way the Gambino's and Oded gave me the green light to pay the down payment
for those who did not qualify for 100% financing and they are giving
incentives on reducing mortgae [sic] and stainless steel appliances and
paying HOA for 1year...just FYI... between you and I... just giving you a
heads up."

The court was never informed that Wade was selling properties for two
other "investors", Gambino's and Oded. In fact, Wade stated no one was
offering similar incentive programs. Like other government witnesses who
have faulty memories, as the Petitioner has no recollection of the
numerous statements made by Wade, and as the records prove her allegations
are false, perhaps it was Gambino's or Oded who sold one bedrooms for
$220,000; told Wade what not to tell the lenders; sat at the desk from mid
2006; worked in the back with the other mortgage brokers; and cursed in
front of her daughter. It certainly was not the Petitioner or the
defendants in this case.

Counsel's failure to investigate the truth and present the facts, caused
this court to rule and sentence the Petitioner based on clearly erroneous
findings of fact.

Ground 20: Failure to Investigate Fraudulent 302's

Counsel failed to investigate 302's that the government submitted to the
defense. For example, FBI Agent Stephen M. West, Jr. submitted two 302's
concerning John Miceli that include numerous falsehoods, including the
date of the interview.

EXHIBIT 2

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

Ground 24: Government Induced Perjury

The government continually and intentionally put witnesses before the court who misled and lied to the court; the government knew or should have known what they were telling the court was not true. Examples of the untruths and fabrications by various individuals include:

1) Maureen Walters: Claimed she did not check to see if payments were made.

2) Dan Fallow: Claimed he dealt with Petitioner from the beginning

3) Eric Reid: Claimed he wired money to CAV in November, 2007

4) Tosha Wade: See Ground's 18 and 19; too numerous to list here

5) Carolyn LaPorte: Claimed she did not know John Miceli; that she did not use the Tennessee property as a secondary residence; that she did not know what Petitioner got from real estate deals.

6) Anna Marie LaPorte: Claimed she did not know she was buying a property, and that to this day does not know what was on the mortgage application

7) Teresa Doughman: Claimed Petitioner stopped paying her after four months, when she was paid for two years

8) FBI Agent Stephen M. West, Jr. claimed:
   a) He did not talk to the lenders during the loss hearing, yet he told the grand jury that he did
   b) He told the grand jury that Ponte received money into his account from real estate deals
   c) that Ponte and Seneca were the only others who had official dealings on behalf of CAV

EXHIBIT 2

ATTACHMENT ONE: GROUNDS FOR 2255 MOTION (CONTINUED)
Robert Rivernider   96006-004

8) SA West Claims, Continued

   d) that Michael Mastoris said he lost $800,000

   e) that Seneca was a necessary component of the real estate process

   f) that the only funds seen going out as any type of additional
investment were much later in 2007

   g) that Piecyk purchased a property for $150,000 but received a
mortgage for $175,000

9) AUSA Christopher W. Schmeisser claimed:

   a) claimed Petitioner had his passport at the arraignment hearing
when Agent West, while sitting next to him, had taken
Petitioner's passport a year and a half earlier.

   b) knowingly lied when he claimed that defendant admitted
putting misrepresentations on the various loan applications.

10) AUSA John H. Durham lied when he claimed:

   a) that the controlling 2nd Circuit law presented during argument
on Petitioner's motion to withdraw was wrong as Petitioner
had to proceed _pro se_

   b) that other entities and investments had nothing to do with
the charges

   c) that when Petitioner indicated that he had no mens rea
that he lied, that Petitioner knew from the very beginning
of the No More Bills process that Petitioner had no returns
on investments

   d) that all information was withheld from the lenders

   e) that the Donna Moore email had anything to do with Mark Taylor

   f) that everything the Petitioner asserted in his _pro se_ motion
is untrue.

(Ground 24 continues on the following page)

EXHIBIT 2

## C E R T I F I C A T E   O F   S E R V I C E

The undersigned does hereby confirm and acknowledge that a copy of this instant motion and both Exhibit 1 and Exhibit 2 were placed in the B.O.P mail system on the date below, for delivery via the U.S. Mail to the United States attorney at the address below.

U.S. Attorney's Office-NH

157 Church Street, 25th Floor

New Haven, CT  06510

Signed this, the _____19 rth_____ day of July, 2014.

Robert H. Rivernider, Jr.
96006-004
Federal Satellite Low
2680 US 301 South
Jesup, GA  31599