UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
ROBERT RIVERNIDER, Petitioner   :  No. 3:14CV1000(RNC)
                                :
          vs.                   :
                                :
USA,                            :
                                :  HARTFORD, CONNECTICUT
                  Respondent    :  September 21, 2017
                                :
- - - - - - - - - - - - - - - - x
```

STATUS CONFERENCE

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

Darlene A. Warner, RDR–CRR
Official Court Reporter

APPEARANCES:

    FOR THE PETITIONER:

        FROST BUSSERT, LLC
        129 Church Street, Suite 226
        New Haven, Connecticut 06510
        BY:  ROBERT M. FROST, JR., ESQ.

    FOR THE RESPONDENT:

        U.S. ATTORNEY'S OFFICE
        157 Church Street
        P.O. Box 1824; 23rd Floor
        New Haven, Connecticut 06510
        BY:  JOHN H. DURHAM, AUSA
             CHRISTOPHER W. SCHMEISSER, AUSA

2:20 P.M.

THE COURT:  Good afternoon.  This is the Rivernider case.  Would you please identify yourselves for the record.

MR. DURHAM:  Good afternoon.

MR. SCHMEISSER:  Good afternoon, Your Honor, Christopher Schmeisser for the United States.  With me to my right is Assistant United States Attorney John Durham. I would also introduce others at the table, but they are independently on the record as representing two of the attorneys.

MR. HOWARD:  Charles Howard, Shipman & Goodwin. And with me is Lee Duvall.  We are representing Mike Chase and Jim Bergenn.

THE COURT:  Good afternoon.

MR. FROST:  Good afternoon, Your Honor, Attorney Robert Frost, and at counsel table is Mr. Rivernider.

THE COURT:  Mr. Frost, I want to thank you for accepting the appointment.  My understanding is that there is a possible conflict issue.

MR. FROST:  I'm not sure it's a conflict, Your Honor.

In an abundance of caution, it came to my attention that -- I used to work at Zeldes, Needles and

Cooper, and I was law partners for a period of time with Attorney Shelly Sadin, who was Mr. Rivernider's original attorney. I left there in 2011, did not work on this case, had nothing to do with this case, but was made aware that one of the issues, I think, maybe for today, was an issue related to some of Ms. Sadin's material, whether there's a waiver as to that with respect to the Shipman & Goodwin file.

In addition, in just raising this issue with Mr. Rivernider, I disclosed it to him and indicated that I didn't think that there was any actual conflict but that he had a right to know that information, and in the course of that, he indicated that I could raise this with the Court.

I asked him whether he anticipated Ms. Sadin to be a witness at all, for any of the claims set forth in his 2255 petition, including the first claim that I know the Court is focusing on, which is the coerced guilty plea claim; and Mr. Rivernider told me that she may have a minor role as a witness related to a conversation he may have had before he was charged. But that would be my understanding as to the extent of what her potential role would be as a witness.

I'm in the position now of standby counsel, and to the extent that testimony is allowed, Mr. Rivernider

would question Ms. Sadin, I didn't think there would be any actual conflict with me serving as standby counsel. But in an abundance of caution, I raised it with Mr. Rivernider and with the Court in case there are any issues.

Mr. Rivernider indicated he doesn't see any problem or conflict and has no concern, but I told him that probably, under the circumstances, it was a good idea that everybody was aware of the issue and the Court could rule as it sees fit.

THE COURT:  Thank you.

Mr. Rivernider, addressing you directly:  How is your state of mind today, sir?

THE PLAINTIFF:  Excuse me?

THE COURT:  How is your state of mind?

THE PLAINTIFF:  I'm here, I'm fine.

THE COURT:  All right.  Are you satisfied that it would be appropriate to have Mr. Frost in the case as standby counsel?

THE PLAINTIFF:  Yes, I am, I'm satisfied.

THE COURT:  Notwithstanding his affiliation with Attorney Sadin in the past?

THE PLAINTIFF:  No problem.

THE COURT:  All right, thank you.

Any comment?

MR. SCHMEISSER:  Your Honor, just in terms of the timing, as Mr. Frost indicated, he left the office in 2011, and this case was indicted in 2010, and there had been some significant investigation and discovery before that time period including, my dim recollections are, with Ms. Sadin.

I guess the government's concern is that I think on one of the witness lists, that Mr. Rivernider's indicated part of the individuals he might call in an evidentiary hearing would be Ms. Sadin.

In addition, it's my understanding -- and I'm not sure of the exact scope of Mr. Frost's assistance with Mr. Rivernider -- it was my understanding that he was being appointed as standby counsel for purposes of the evidentiary hearing and not more broadly.  But if it is more broadly, I don't think that changes the government's analysis.

I think the government's concern is that, because there was an overlap of Mr. Frost and Ms. Sadin at the time that the investigation and prosecution was ongoing of Mr. Rivernider, and the potential that Ms. Sadin at least is considered by the defendant as a potential witness in an evidentiary hearing where Mr. Frost might have to assist in actually cross-examining a former law partner, it does raise concerns from the

government, for the simple reason that it seems that every single prior attorney Mr. Rivernider has, at some point in time, come under his gaze as being a culpable party.

And it seems to me that, given the range of potential standby counsel, it may not be prudent to begin this current standby counsel's situation as someone who is identifying a potential conflict.  It just raises another issue.

I don't think that Attorney Frost is necessary to proceed with today's hearing, which is primarily scheduling and is not the substance of an actual evidentiary hearing.  But I think the government's concern, as a general matter, is that we are confronting an issue which the government thinks might not be an issue, it might not be an issue because Attorney Frost is very professional, but it does create another issue that I anticipate we could have to address at some point down the road in this case.

Thank you, Your Honor.

THE PLAINTIFF:  Your Honor, I've never had a problem with Ms. Sadin.  I never asked, as Mr. Schmeisser once indicated, for her to get out of there, to get off the case.  I've never asked Ms. Sadin -- Ms. Sadin apparently had something else to do, so that's why she got off the case.

I have no problems with Mr. Frost acting as standby counsel.  I'm not even sure what the government's argument is for some time down the future.

If there is an issue regarding Ms. Sadin, then maybe she will be called as a witness, that may have something to do with some comments or some things.  And as you know, during the May 26th hearing when I was talking about waiving attorney/client privilege, I brought up Ms. Sadin's name and waived the privilege.  And Shipman has documents from her.  They have all the documents from Ms. Sadin.

So there's really no problem with Ms. Sadin that I see, or any problem with Mr. Frost.

THE COURT:  All right.

MR. HOWARD:  If I may, Your Honor, following up on the point from Mr. Rivernider.

We do have documents in our file from Ms. Sadin. As I was preparing for today and working on the matter -- we are in the process of preparing affidavits -- I think it may be necessary for us to include a document or some documents from that file in our affidavits.  And as I raised with both the government and with Mr. Frost, we have no objection to Mr. Frost continuing, but I thought this was something I should bring to the Court's attention, that we may need to rely on some of that

documentation first.

And, secondly, in the Court's order, Docket 109, the Court entered an order finding a waiver of attorney/client privilege with the people from our office, allowing us to use our file, but did not find a waiver in connection with prior counsel.

And we had not addressed that issue in the proposed order that we had given to Your Honor, but I saw this as really more of a housekeeping thing, where I think it might be appropriate to expand the scope of the order that you've already issued on the waiver because it's quite consistent, as Mr. Rivernider says, with the canvass that you did at the May 26th hearing, where he did waive the privilege with her.

So I just want to make it clear that we may use some of that documentation.  I think that he's already waived the privilege, and I think that was clear.  I think the order is not as explicit, although it does say we could use information from our file.

So I just thought that should be information brought to Your Honor's attention.

THE COURT:  Thank you.

The order can be amended to make it explicit, that it applies to communications involving Ms. Sadin in her capacity as counsel to Mr. Rivernider; and those

communications, insofar as they qualify as waived information and communications within the meaning of the order, can be handled just like the communications with Mr. Bergenn and Mr. Chase.

So that should be clear on the record, and I appreciate your bringing that to my attention.

MR. SCHMEISSER:  Your Honor, continuing on that point, Mr. Rivernider's raised at least five or six claims involving his appellate counsel.  It seems that the same scope of the waiver would apply to those types of communications.  In due course we can come back relating to other counsel, Marjorie Smith, but it may be most efficient to move this forward to actually include in the Court's proposed order, also, a waiver as it relates to appellate counsel.

THE COURT:  Any objection to that, Mr. Rivernider?

THE PLAINTIFF:  I have no objection to that, outside of the objection with the whole order.  Because on May 26th, I was specific about proving or disproving the claims.  That apparently has been expanded -- it seems like it has been expanded further.  If I'm wrong -- I get the impression that Shipman can give whatever the government attorneys want over to Shipman -- or over to the government.

So if it's to prove or disprove the claims, then that's fine, but I have no problem expanding to Ms. Smith.

THE COURT: Thank you.

Then we'll amend the order so that it applies explicitly to communications with Ms. Smith.

To be clear, the intention of the order is to facilitate the disclosure of information on documents reasonably necessary to the adjudication of the claims in the petition. That's the definition of waived information of documents contained in the order. So I hope that's clear.

With regard to Mr. Frost's role as standby counsel and the possibility of a conflict arising down the road in connection with testimony by Ms. Sadin, I think that it's best to have Mr. Frost continue for the time being. The reality is that obtaining standby counsel is not something that can be done easily. I agree that there are, no doubt, other people on the CJA list who could serve in this capacity, but I'd like to move things along and not encounter a potentially protracted delay.

So while I understand the government's concern, I think we ought to go ahead with Mr. Frost as standby counsel. I will ask Mr. Frost to take appropriate steps to obtain a waiver from Mr. Rivernider of any potential conflict, and it will be important that the waiver reflect

your representation that you have discussed the potential conflict with Mr. Rivernider.  Mr. Rivernider's written consent to your continued participation will be honored by the Court at this time.

Before we proceed, Mr. Rivernider, in your motion for recusal, you say that you are suffering from a heart condition that is worsening and it's not being treated.

Do you want to tell me a bit more about that so I understand exactly what the problem might be?

THE PLAINTIFF:  I'm kind of reluctant to do that, Your Honor.

On July 18th, I brought up the issue, and next the thing I know, I'm being shipped out in the -- in conditions that have worsened my heart condition.

The problem, I was supposed to -- I was waiting for approval from the Bureau of Prisons to get nuclear stress testing done.  That may have happened, I don't know.  I can't -- I asked Wyatt to try to check the medical records, to get the medical records from the prison.  They still haven't gotten them.

So I'm waiting for a nuclear stress to be approved to get a stress test done.  When I was in Estill, they gave me basically nitro tablets, isosorbide tablets, which I was able to carry with me and have with me so that

any time I had a problem, I was able to take them.  Here they don't allow you to do that.

I took one early this morning, I haven't had one since.  Who knows if I'll make it through, but I'll do my best.

THE COURT:  What are your symptoms?

THE PLAINTIFF:  I have a lot of chest pains, heart pains; same symptoms my mother lived with for years and has now passed because of it, so --

THE COURT:  Have you been seen by a doctor at Wyatt?

THE PLAINTIFF:  Yes.  I went to see a cardiologist at Estill, and he informed me that I could keel over and croak at any time or not, his quote.

And at Wyatt, I see the regular doctor -- when everybody goes in there, they see the regular doctor -- and she just approved me getting the heart medication.

And I've been asking them several times to get the records from Estill, and they keep saying they haven't been able to get them yet, and that's where we are.

THE COURT:  All right.

THE PLAINTIFF:  And to this day I still haven't gotten a stress test.  I could have gotten it done two months ago, but I was sitting here at Wyatt for no reason, doing nothing.

THE COURT:  Mr. Frost, would you be willing to follow up on Mr. Rivernider's statement and see if you can get clarification as to what Wyatt is or is not doing and what they have in mind for Mr. Rivernider?

MR. FROST:  Yes, Your Honor, I'll do that.

THE COURT:  Thank you; and thank you again for accepting the appointment.

MR. FROST:  Yes, Your Honor, thank you.

THE COURT:  With regard to the status of the case, Mr. Schmeisser, where do things stand regarding the disclosure of waived information and documents?

MR. SCHMEISSER:  Thank you, Your Honor.

There's been some consultation with counsel for Attorneys Bergenn and Chase to try to determine sort of the production records on how that would go forward.

I believe that Shipman has been very active in gathering materials, and I believe it probably makes the most sense for them to outline their proposed approach in terms of going forward.

I think the intent today is to try to set a relatively expedited schedule to get these pleadings finished.  My understanding, there's been a fair amount of work done since the last hearing with -- by Shipman on this, but I think it's -- I have not talked with them more than several times, so I think it's more important that

they give the Court an idea of exactly what's going on on their end.

MR. HOWARD:  If I may, Your Honor?

We have been quite active in trying to figure out how we proceed with all of this.

First of all, we have not disclosed any documents to the government yet.

Having gone through our file, and we've had people looking through our email record, I think the most efficient way to proceed here, consistent with the obligation to disclose only what is reasonably necessary to defend the claims, is to have affidavits prepared by and for both Mr. Bergenn and Mr. Chase.  That process is well underway.

What we're envisioning is affidavits that address all of the claims because they're all of a piece, if you will, at various stages of the case.  And we're getting into the file, and it makes sense for us to cover the waterfront on that.

I think that can be done -- again, we've made substantial progress on that -- I would ask the Court for a month to finish that up.  But what I would be envisioning at that point is a draft affidavit from each of them, with a substantial amount of documentation attached to that in grouping the claims by stage of

proceedings -- so pretrial or plea or trial or investigation, that sort of thing -- and tendering that simultaneously to Mr. Rivernider and the government so they will both see what we're proposing to disclose at that time.

Mr. Rivernider can make whatever objection, the government can raise whatever additional questions it has to that.  It may be that it decides that it's appropriate for them to meet with Mr. Chase and Mr. Bergenn.  The Court has already ruled on the procedure that would be followed at that point in terms of a summary of any oral communications with those people being disclosed to Mr. Rivernider.

So I think we can complete that task within the next month, and I think it would be an extensive affidavit from both gentlemen with documentation.

My goal is not to provide exhaustive documentation, but it's to anchor the narrative that will be presented with emails, documents, or whatever we have.

Some of the claims that are made, there will not be any documentation, there will only be a narrative.  And so once we do that, the government again I think may have questions, and there may be additional information that they need from other sources or from us.

I would propose at that point that we then

recede into the background, complete the affidavits, submit the affidavits to the government, and then Mr. Rivernider can proceed with whatever sequence they want in terms of the report, the review of the issues.

It may be that the plea issue, having the full documentation in front of you, is the first issue you address. You will have from the lawyers who handled the criminal trial, the scope of, you know, what they have dealt with on the issues that Mr. Rivernider has raised.

So that's how I would envision going from here.

Another order that the Court made was in connection with a discovery request that Mr. Rivernider had raised, and the Court essentially invited Mr. Rivernider to make a request of Shipman & Goodwin for particular records or documents and that sort of things, and he has done that. And I have given Mr. Frost a copy of that. I have a copy that we can present to the Court today, and I have copies for the government.

And just to summarize that, there are 16 categories of information that Mr. Rivernider is seeking. Would the Court like us to present that?

Okay. There are certain categories of information that Mr. Rivernider is seeking. Many of those categories are either quite voluminous or contain confidential, personally identifiable information -- loan

documents, social security numbers, financial information -- from the trial.

The process of going through and redacting that information would be very time consuming. We already have essentially five people working on this matter, trying to comply with our obligation to provide the Court and the government with the affidavits necessary. And I'm not even sure all of that is going to be relevant.

So what I would propose is, there are four or five categories of documents -- five categories of requests, one of which we don't have anything on; and the other four, we're quite willing to provide a response to that information at no charge to Mr. Rivernider relatively soon. By the end of next week we will have pulled that all together, and we can make that available.

But I guess I would object to proceeding with the rest of that request until after we submit our affidavits and the case progresses. And if Mr. Rivernider, as the Court has ordered, feels that additional information is necessary at that point, he can renew his request, and the government could comment, and we could give the Court a sense of what might be involved in complying with that. That's how I would propose to address that issue.

THE COURT: All right.

Any comments?

MR. SCHMEISSER:  Yes, Your Honor.

Attorney Howard proposed this approach to the government several days ago, and it does seem to make a fair amount of sense.

My understanding is that the documents Mr. Howard may be intending to produce, I think he represented to us that those would be relevant to the plea-related issues.

I think that there is some logic, even though it seems to be requiring a tremendous amount of work, effort, and expense by Shipman to respond to all of the claims, that there is some logic to, I guess, telling the story in terms of what happened before; to explain why the advice given at the time it was given, in terms of to plead guilty, is put in the proper context.  So there is some logic there.

In terms of the government's intended approach upon receiving the affidavit and supporting documents would be to review it and determine whether or not there are additional areas that need to be addressed.  Hopefully it will cover the areas that the government believes it's going to need to cover to respond to the petition.

At that point -- the government would envision actually starting preparation in response to the petition

before then, but actually working on incorporating whatever the affidavit says into the response, primarily focusing on the plea areas.  But it would also makes sense addressing the case law as it would be applicable to some of the other areas.

So it would be the government's intent to try to have an entirely responsive pleading to the entire petition within perhaps 45 days after receiving the affidavit.  Of course, if the affidavit raises a series of areas that require the government to actually reach out through Mr. Howard to Bergenn and Chase for some supplementation or additional information, that might take a little time, but the government is prepared to try to provide an entire response to the petition within the 45 days.

I should note for the record that we have not reached out to actually talk to Bergenn and Chase at this point because, in some ways, the government thinks it would be premature because there are so many claims that have been made in this case that in some ways, unlike other habeas matters that come before this Court and before the government, there is some sense to allowing defense counsel, who are being put under the scope here, actually be allowed to respond entirely to the charges and make a solid response.

I think that there's a separate area in terms of sort of the document production that Mr. Howard has mentioned as part of the difficulty in reviewing a lot of materials here.

As the Court will recall, this case involved a tremendous number of documents, both electronic and paper documents, and the claims touch on the really sort of narrow aspects of a few of many of those areas, and so I think that I could anticipate that it has taken some time to sort of go back and cull information relating to some narrow areas.

As to the document issue as a general matter, the government's concern with sort of wholesale production of documents in the habeas matter is that that's beyond really the scope of what happens in most habeas cases. It's the government's position that if there are particular claims that, upon receipt of the affidavit and the supporting documentation, the defendant believes, "Well, it would be helpful to have this document here, or this document here, that I recall, or this document here," then that makes sense for the Court, in its capacity of ordering discovery in a habeas action, to order production of those materials if they exist.

I think it's a separate issue to allow or order sort of wholesale discovery unless specifically tailored

to specific claims for a demonstrated need.  I think the case law gives the Court a fair amount of discretion in controlling discovery so that a firm like Shipman, who has spent hundreds and hundreds of hours very ably defending the defendant, is now suffering the repercussions from that and spending what appears to be, from what I'm hearing, many, many hours with many individuals to gather information.

If this petition goes forward and if, in fact, the Court finds, as the Second Circuit found, that there was a knowing and voluntary plea, a number of these pre-plea claims would be waived.  And while it helps to have sort of additional reason -- two, three, and four -- as to why the claims wouldn't be valid claims, it still is a tremendous amount of time, of the Court's time and of counsel's time, in particular, Shipman's time, to explore those areas if, at the end of the day, those claims are waived.

So the approach that Shipman has proposed, the government supports and thinks that there could be a sort of an efficient consideration of the important issues here and determine whether there's any validity to them.

Thank you, Your Honor.

THE COURT:  If I were to go along with you, what would the schedule be?

MR. SCHMEISSER:  I think, Your Honor, as I understand, there would be a period of time, it sounds like three weeks to a month, for the draft affidavits to be finished by Shipman and documents gathered.  I have no knowledge of that process.  From what Mr. Howard is representing, that appears to be sort of the time that they would need to do that.  He can obviously talk to that.

After that, the government would get those affidavits, Mr. Rivernider would get those affidavits, both sides could look at those affidavits and see sort of how they either support or don't support the claims that have been made.

At that point in time, the government would be actively preparing a response to the petition; and at the same time, Mr. Rivernider could look at the affidavits and say, "No, I don't think that's right, I don't think that's right," and in looking at that stuff say, "These are specific documents that I'm going to need."

So in some ways the affidavits, I think, will actually focus the issues in terms of identifying what specific documents might be needed for the Court to consider to resolve the matter if they aren't already included.  It may well be that the necessary documents are already included in the relevant affidavits.

So the timing would be to get those draft affidavits for the government then to be in the process of preparing a response; and the government, within 45 days of that time, to prepare a response; and for the Court to evaluate what additional documentation Mr. Rivernider may need; and if there's a need for an evidentiary hearing at that point in time, set the evidentiary hearing, have the hearing, and then the Court can rule on the issues relating to the plea.

But there may be sufficient information in the record at that point for the Court to address the entire petition.

THE COURT:  So Shipman & Goodwin would need about a month to provide the affidavits and supporting documents to you, and you would need how much time to file your response?

MR. SCHMEISSER:  We were asking for 45 days, Your Honor.

THE COURT:  From then?

MR. SCHMEISSER:  From then.  We don't know what the affidavits are going to say.  We haven't had conversations with Bergenn or Chase because we think it's premature, and they are in the process of collecting the records out of the many records that exist to support their claims.

We would review that stuff, and I can start preparing the law to respond to the petition, but incorporating the facts and otherwise preparing a response to the petition right now, what I believe are 51 claims, will take some time.

THE COURT: Let's suppose you were to file your response within 45 days, what then, in terms of the schedule?

MR. SCHMEISSER: At that point, from the government's perspective, I think that the case would be joined so that the Court could look at it, and Mr. Rivernider could have a response to say, "Look, I need to actually respond to what Bergenn and Chase were saying in the affidavit," following the documents; or "I don't need the documents, I can sit up here in Court and testify that this didn't happen."

And there would be a period to allow that to happen if in fact the Court believes there's a hearing necessary on the record.

THE COURT: On that point, have you looked at the law with an eye toward assessing the likelihood that an evidentiary hearing would be necessary in a case like this one, where the claim is that guilty pleas were coerced by counsel?

MR. SCHMEISSER: Your Honor, I've looked at it a

little.  I have not looked at it in the last several weeks.  In large part it depends on what the Court is going to see in these affidavits.

And, in fact, at the end of the day, it may just be that there is a dispute between Mr. Rivernider, where he says something didn't happen and Mr. Bergenn and Mr. Chase, and perhaps the documents that say that it did happen.

It appears that a limited evidentiary hearing may be appropriate, but I haven't expressly looked at that closely.

I think, in large part, it's going to depend on exactly what is said in the affidavit, and then, frankly, what Mr. Rivernider says is true or not true.

THE COURT:  In the scenario that you envision, if it turned out that such a hearing were necessary, when do you suppose that would take place?

MR. SCHMEISSER:  I think that the government would be prepared for a hearing any time after its response is filed.  I think the question at that point depends on how much time -- well, first, I guess we could consider the issue of whether a hearing, in fact, is necessary.  But assuming if prudence suggests it would be, then whatever time it would take the defendant to prepare to participate in the hearing.

THE COURT:  All right.

THE PLAINTIFF:  Your Honor, the law is pretty clear that an evidentiary hearing is required whenever there's off-the-record conversations that need to be put on the record so that the appellate court can review what happened.  I'll just go with the two quotes from Judge Chatigny.

"This case is on the front burner."  That's what you said at the last hearing.

And secondly, you said, "As far as these type of cases, you get on the stand and say what happened, he gets on the stand and says what happened.

I'm ready to do that now.  I don't need to wait a couple of months in order to get on the stand to say what happened.  I've been saying what happened for four years.  This has been delayed for four years.  We could have had an evidentiary hearing four years ago.  Now I've lost the opportunity to get fresher recollections, and now we have to wait another month or two months before they put together what happened.  They could have been doing this the last couple of months too.

So now I have witnesses who were at Mr. Bergenn's office, with me and Mr. Bergenn, who can come in and testify as to what happened that day, the day that I pled, when we were four hours late to come to the

pleading hearing.

Mr. Bergenn said, the only reason we're here is for the four hours we spent with Dr. Filippopoulos the Saturday before.

Dr. Filippopoulos, if she's still around, can come in and testify as to what happened for those four hours. We could have had this hearing four years ago, and I wouldn't have had to spend four years in prison.

As far as the repercussions, I'm the one that's dealing with the pretty serious repercussions. I got pretty much a life sentence at this point.

Mr. Schmeisser referenced the Second Circuit. The Second Circuit ruled based on a lot of false information.

The government themselves, in Document 576 say that their witnesses may only believe what they were saying was true. The Second Circuit's ruling and pretty much every ruling that you issued, refers to witnesses' testimony, which may be something they only believed was true. And I continually proved that what they say wasn't true.

I continually file motions showing that the government has submitted fraudulent documentation to this Court. You issued a restitution order for $285,000 to a company who bought a property 13 months after a

foreclosure.  That invalidates the entire sentencing process according to case law, which is in the documents.

So there's plenty of case law says an evidentiary hearing is required, an evidentiary hearing is needed, whenever there's off-the-record conversations.

Similarly to the Court Reporter Act.  The issue with the Court Reporter Act, when the court reporter was sent home, there's no record of that hearing.

You mentioned in your order that it was about scheduling.  Well, it was a little bit more than scheduling.  It was about whether or not you were going to declare a mistrial.  And had you declared a mistrial, I would suggest that the outcome of the proceedings would have been different, which is one of the key factors and prejudice in Hill v. Locker; also the Supreme Court's ruling in Lee v. United States; and the Second Circuit's recent ruling in United States v. Johnson, which was in March of this year, where the Second Circuit and the Supreme Court all ruled in a very similar situation to this, and all reversed in a very similar situation to this.

So we don't need to go months and months and months on top of this, where we lose more time.  We just lost eight months because of a previous situation with -- whatever the situation -- why we lost eight months, I'm

not sure why we lost eight months when we could have done this a year ago.

This was filed last October, as far as reopening the 2255.

As far as the affidavits go, they can get the affidavits done, but they should have been working on this for a long time. They can narrow the scope of the affidavits.

If you just look at the coerced issues on the plea, which is all you want to deal with right now, I believe Grounds 2 through 6 deal with the coerced issues. If they just deal with Grounds 2 through 6, they can have the affidavits done as quickly as possible, and then the Court can look at those affidavits, we can have an evidentiary hearing, Mr. Bergenn, Mr. Chase, can get on the stand, they can say what happened, I can get on the stand, say what happened, and then you can decide whether or not it was coerced, whether or not, under the Supreme Court and the Second Circuit rulings, if -- this case is almost identical, and you can decide whether or not this needs to be reversed. If it does, then whatever needs to happen after that has to happen after that.

But the more time that goes by, the more -- I just continue to get prejudiced more and more every day because time is going by.

In the D.C. Circuit, U.S. v. Pasha, recently, after just an eight-month delay, reversed an entire indictment because of an eight-month delay.  We're now four years later.  We could have had this hearing four years ago.  Because in the motions to withdraw the plea, I specifically stated, "Mr. Bergenn forced me to plead guilty," it says it in there.

You knew about it then.  We could have dealt with this at the time.  We didn't deal with it at the time.  You've already ruled on this.

As a matter of fact, the Second Circuit in U.S. v. Robin 553 F.2d 1977 says the sentencing judge should not normally conduct a hearing upon a 2255 petition challenging validity of its prior determination that the guilty plea was voluntary.

You've made this decision that the guilty plea was voluntary, and you've been making it for the last four years.  I don't know what's going to change at this point, but the sooner we get this done, we can have an evidentiary hearing so that it can be decided on with an actual record which we could have had four years ago -- when the Second Circuit, where they ruled, they could have had the actual record of what happened at the time.

Now we've lost all that time, and I would ask the Court not to continue to allow this to go on

indefinitely, which is what apparently everybody wants to happen here, just drag it out and drag it out, and drag it out.

I'm sure the Court doesn't want that to happen. I'm sure you don't want to ever see my face ever again. I'm sure now you don't want to see it. But I'm here because there are problems here. There are constitutional issues.

I've addressed many Constitutional issues with this Court, not just the ineffective assistance of counsel issue. At sentencing, my Fifth Amendment rights were violated when I didn't have an opportunity to read or respond to the government's response to the motion to withdraw the plea. That violated the Fifth Amendment right that's filed in motions to which you just denied one liners because you appointed counsel.

My attorneys didn't have an opportunity to read it either, which also violates the Sixth Amendment.

So there are a series of constitutional violations in addition to the First and Fifth Amendment violations where I wasn't able to confer with my co-defendants to prepare for trial; and the First Amendment right to association, that's now being litigated through another court.

So there are a number of constitutional issues

that have to be dealt with in this case.

And to continue on, to just continue to violate my due process rights to have this -- a prompt hearing, rules for 2255 require a prompt hearing, it doesn't sound like, with the constant delays, we're going to get a prompt hearing.

So I'm asking for a prompt hearing. I'm ready, we can do it now. You can call them in, or I'll come back tomorrow after a pill. But I'm ready to do it at any time, not months from now. Who knows if I'll make it.

So thank you.

THE COURT: Any comments, Mr. Frost?

MR. FROST: No, Your Honor. I did discuss with Mr. Rivernider the -- he was very concerned about the timing. And, in light of my review of the docket and the issues -- or the issue that the Court seemed to be focused on initially on how that may affect the other issues in the petition and the claims about a coerced employee, and given the information that doesn't relate to that specific issue, as I think Mr. Rivernider pointed out, is probably going to turn on what people will say in front of the Court.

And the Court is going to have to weigh the testimony of each and decide on a factual matter. If there are going to be affidavits, maybe they can be

limited to that issue, and Mr. Rivernider can submit his version.

If those issues raise enough of a factual question, then the Court can hold that hearing limited to that issue.  And depending on the factual finding that flows from that hearing, that may have some collateral estoppel, inclusive effect or not, based on the other claims, but it seems to narrow a significant threshold question that the Court seems to be focused on.

So I think Mr. Rivernider seemed to be agreeable to that approach, but I've heard today from the government and Shipman & Goodwin that they may want to get into other issues to get to give context and background to their response.

So that's obviously up to the Court, but I think to address his timing concerns, maybe narrowing the scope of the affidavits might accelerate things.  And then if there's a need for the hearing, that might get to the hearing sooner.

THE COURT:  Okay, thank you.

MR. HOWARD:  If I may, Your Honor, just a quick observation?

The Court's earlier rulings, I interpreted and believed that the Court didn't limit the issue just to the plea, was going to allow Mr. Rivernider to address all

those issues.  And given the difficulty and complexity of the case, I thought that made a lot of sense.

I will say, I found it a difficult process trying to figure out how we were going to deal with this given the volume of information that we've had.  I'm not aware that there's been a habeas quite as complex as this in this district.  And so I really do believe that the plea actually came out of a course of representation that goes back to when we first got involved following Ms. Sadin's involvement.

So as I have gotten into this now, I do think it would be helpful to describe the context in which this took place with some of the other issues that Mr. Rivernider has raised.

We will obviously do whatever the Court orders us to do in terms of narrowing issues that would make it easier for us, but I think there may be some merit to taking the time of Mr. Bergenn and Mr. Chase off of other matters, focusing on this, on refreshing a memory, putting it down, dealing with the attached records, and then now you've got something both the government and Mr. Rivernider can use as reference points, either to object or to build their case around it.

As I say, I think we're well underway.  I don't think an additional month for something as complicated as

this, with people, you know, still in a very busy practice, is an unreasonable request.

We are at this point, I think I can bring this piece of it to conclusion expeditiously.  But out of an abundance of caution, I think I've said I'd like to have at least that long.

THE COURT:  The difficulty is that the schedule that we set at the government's recommendation contemplated that our focus would be on the validity of the guilty pleas, and that the rest of the claims in the petition would be held in abeyance.  That made good sense then, and it continue to make good sense now, because if Mr. Rivernider were to convince me that the pleas were invalid, the other claims really don't matter anymore, and he's entitled to a new trial.

Conversely, if the claims in the petition fail with regard to the validity of the pleas, then many, if not all, of the other claims become moot as a result of the effect of a valid guilty plea on those claims.

So no doubt Mr. Rivernider is concerned to learn that our schedule is actually leading to the submission of affidavits that are all encompassing, and a response to the petition that may go well beyond the validity of the guilty pleas, and he no doubt is concerned that, to the extent this results in further delay, he's in a position

that is not good for him.

Bear in mind that having adopted the government's recommended approach as I just outlined it, I maintained a stay in this case and lifted it only insofar as his principal claim was concerned; that is, the claim that his pleas were coerced by his counsel.  Having maintained the stay with regard to everything else, I have denied Mr. Rivernider's numerous applications.

So in that context, I'm reluctant to now proceed as if everything is fair game, in effect, lifting the stay that has been in place to date.

I can understand that, as counsel looks at the validity of the pleas in light of the allegations of coercion, it becomes apparent perhaps for the first time that it's necessary to put matters in context, as you have said, and certainly I would like to have that context.

If you can provide that to me and to the parties in 30 days, that's fine.  I think that it's reasonable for me to give you 30 days, but I want the focus to be on the validity of the pleas, not on other claims in the petition.

Insofar as you need to get into pre-plea matters to provide necessary context, again, I understand and that's fine, but please don't shift your attention to other matters that may well be unnecessary for me to

resolve.

With regard to the timing of the government's response, I would like the government to move as expeditiously as possible, bearing in mind that the stay remains in place with regard to everything except the validity of these pleas insofar as the adjudication of the case is concerned. If the government can be in a position to provide me with a response to the petition sooner than 45 days, I think that would be good.

Mr. Rivernider continues to maintain, as he had just now, that he's being prejudiced, and I think we do need to move as promptly as possible.

I won't venture a guess as to the need for an evidentiary hearing, but as I listen to Mr. Frost and Mr. Rivernider, it sounds like an evidentiary hearing may be in order. We'll see. But if we're going to have an evidentiary hearing, I'd like to have it as soon as possible, not next year.

This case has been around for a very long time. I think it's been properly stayed pending the appeal, and I think that the approach we've taken has been a good one, and I think we should continue on that path. Hopefully we'll be able to make some real progress in the next couple of months.

MR. SCHMEISSER: Your Honor, the government in

no way disagrees with the Court.  Just for clarification of the record, the government had proposed the approach that we have been talking about, which is considering the coercion issue first, and then addressing the other issues.

The ability even to discuss with Mr. Howard, you know, whether or not there would be an affidavit coming that addressed that, that is really pretty much dated after August 28, which was just a month ago when the Court addressed the waiver issue because of some back-and-forth with the petitioner and then resolved that issue.

So that sort of -- I know that Shipman had been working on that beforehand, but in terms of any discussions for the government to sort of find out the next steps for production, that was sort of a telling date.  And it was subsequent to that, that the government learned from Shipman that it wouldn't incrementally take that much additional time to do what they were doing now, frankly, I think, so that they could have the five or so people that were dealing with this matter not have to go through a two-step process.

That said, the government was prepared -- so I think that the additional incremental time they were talking about was not significant.

So from the government's perspective, it still

continues to agree that the primary focus of the government's response will be the issue of the voluntary plea because, as the Court indicated, many of these claims will be waived or precluded, if that's the case.

The government, however, was not going to sort of look away if Shipman actually had spent the time, effort, and work to address the claims, particularly as Shipman was representing, and I think has represented today, that in giving advice to plead guilty, a lot of that depended on touching on areas which are covered by those claims. So there's not that much additional effort to gather the materials that would respond to that.

So I take the Court's point that we want to move this along. It's certainly the government's intent, and has been the government's intent, to try to push this forward. We will try to be working on a response during this time period, as we've already started to look at this, and try to get it in before the 45 days.

To the extent that that gives the Court at least some understanding that this was not an effort to sort of change things, it just happened out of a development of the record as we heard back from Shipman.

THE COURT: Okay. With regard to the validity of the pleas, the orders that I have entered before now have referred to the claim that the pleas were coerced by

counsel, and I gather from Mr. Rivernider's submissions that what he would propose to claim is that the pleas were coerced by me.  This raises, in my mind, the question whether the validity of the pleas may implicate other matters besides the role of counsel that should also be addressed now without delay.

So I would ask you to look at the petition, construe it reasonably and in formulating your response to the petition, take up matters bearing on the validity of the pleas that are ripe and can be addressed without delay.

I don't want to be in a situation where we're able to address the validity of the pleas in the face of the claim that the pleas were coerced by counsel, but we still have work to do because the validity of the pleas also is under attack for other reasons that could be addressed at the same time.

So to be clear, I want to ask you to please formulate your response to the petition with this in mind. If the affidavits of the attorneys and other information available to you allows you to respond to any challenge of the validity of the pleas, then that should be done even if it goes beyond the claim that the pleas were coerced by counsel.  All right?

MR. SCHMEISSER:  Yes, Your Honor.  I think the

government understands.

THE PLAINTIFF:  Your Honor, one of the questions I have is, when you say "the coercion," there are a number of grounds -- maybe it would be helpful if the Court could define those grounds.

For example, I think two through six specifically deal with different issues of coercion.  Two through six, I can dig it out and go through it, two through six, maybe it would be helpful for everybody if you just would tell us, we're going to deal with two, three, four, five and six, because they do specifically deal with the coercion issue.

That might be helpful for everybody because -- and also, when you bring up situations where you might have been involved, there is a time period, as you know, between February 14 and February 25, where there was this issue of a mistrial, and why that didn't happen, why the jurors weren't told that this case was going to go for another six to eight weeks.

Was the government coercing Mr. Bergenn?  Was the Court saying something at the sidebars or during a conference?

I don't know that, because that's not on the record.  And that's part of the issue, where I may have to ask Mr. Bergenn, "Was anybody telling you not to push for

a mistrial," because a mistrial would have been a different outcome.

THE COURT:  Thank you.

Does anybody remember what Mr. Rivernider's describing?

MR. SCHMEISSER:  No, Your Honor.

THE PLAINTIFF:  Your Honor, Mr. Schmeisser doesn't remember.  You were discussing having a mistrial if this trial was going for another six to eight weeks.  You actually said that you weren't concerned about you committing a crime because you told the jurors that the trial was going to go for another -- for a certain period of time.

When you sent a letter out to the potential jurors, you said the trial was going to be for a specific period of time.  That was going to be another six to eight weeks, and that's where the problem comes in at, Your Honor, because that's what that hour-long hearing was about.  And the fact that it's not on the record is why a record needs to be reconstructed.

THE COURT:  I see.

THE PLAINTIFF:  And that's why I've been trying to reconstruct the record, because if the other attorneys all were there, and you've sent an email out -- and I've asked for a copy of that email.  I'd like to get a copy of

that email that you sent to all the attorneys which lists all the witnesses and the amount of time they're going to take.  And that on the record, Mr. Willson cut a couple of days off of his time, and Mr. O'Reilly cut a couple of days off of his time.

You said on the record -- and I put this in one of the motions -- you said on the record that, "The hearing we had last Thursday night," and what that hearing was about.  And then you asked if they were going to speed the trial up at all.

At one point earlier, Mr. Bergenn actually says, when you asked him something about intent, he says, "My only intent is to get this over with as fast as possible."

THE COURT:  I see.  So your recollection is that the conference that was held after the court reporter went home had to do with a schedule for the rest of the trial?

THE PLAINTIFF:  That's correct, that's what it had to do with.

THE COURT:  And you claim that the discussion had a coercive effect on your position?

THE PLAINTIFF:  It had a coercive effect on Mr. Willson.  It had a coercive effect on Mr. O'Reilly.  It had a coercive effect on whether or not we plead to get the trial over with as fast as possible.  Why?  Because according to Mr. Bergenn, whether he will say this on the

stand or not, because it will make you happier, in order to get this over with so the jurors can go home.

He used that against -- he used that in order to get me to plead.  He used the fact that it was going to -- "You would be happy that I got this over with, that I helped to get this thing over with so that the jurors can go home," so that they didn't have to come here for the next six to eight weeks.

THE COURT:  I see.

THE PLAINTIFF:  So that's where the coercion does come in at, and that's where I keep asking for a reconstruction of the hearing that happened that night. Because what happened that night, you went through -- if you don't recall -- you went through every witness that was on everyone's witness list, and asked everyone how much time they were going to take with that witness.  And then you calculated it, and you said that we would be a certain date, I don't remember what the dates would be.

But then after that, a couple days later, I believe -- that was on the 14th, and it was a couple days later, I think it was the 19th -- you said, "The hearing we had last Thursday," and then you referenced that back, and then Mr. Willson cut a couple days off of his time, and Mr. O'Reilly cut a couple days off.  That was a full week off of our time.

And if you remember what's happening, at the time of the trial, we're cutting time off, and the government is not cutting any time.  And if you recall, Mr. Bergenn was pulling teeth trying to get answers out of witnesses who were coached by the government and who weren't testifying truthfully.

So we needed to overcome that false testimony, which they don't deny, because they say that their witnesses, they believed what they were saying was true.

So since we had to overcome all of that, and with the attorneys cutting their time off was severely prejudicial to us, and Mr. Bergenn used that information against me in order to get me to plead.

So that's where the coercive nature of -- and that does fit in.  And I can't put him on the stand at an evidentiary hearing without asking him, "Was that part of why he coerced me in order to get me to plead?"  Between that and why he then came up with the story with Dr. Filippopoulos and this report, and told me I had executive function deficit disorder, which of course I never heard of, and I wasn't sure what it was.  But they came up with this story, and he forced me to plead because of that.

Part of that was because of that hearing --

THE COURT:  I see.

THE PLAINTIFF:  -- and to get this over with as fast as possible, as he stated on the record.  Then it is part of the issue.

I'll just make one other point.

They keep talking about discovery, and I'm asking for certain things in discovery.  Well, I've been asking you for issues in discovery from the government, but what I'm asking for, the lawyer file, the client file from my previous lawyers, that's not considered discovery, that's the lawyer file, and that file should be available and turned over to me and/or, at this point, Mr. Frost here.

So this isn't discovery issues.  I've asked him for certain things like emails between the government and counsel, specifically that weekend.  What was happening with the government that weekend?  Was the government pressuring them in order to get me to plead?

What were they telling the government?  Were they telling the government that I was pleading?

Because that does make a difference, and it does make a difference why we were four hours late.  Why were we in court at 8:00 in the morning for that change of plea hearing where Mr. Bergenn says, in an email to me, we were scheduled for 8:00 in the morning.  If we were scheduled for 8:00 in the morning, you don't show up until 12:15 and

the Court never asked about it, "Why are you four hours late?"  What were we doing for those four hours?

Dr. Filippopoulos, if you recall, was with us that day at the hearing.  I've checked LexisNexis for the last hundred some-odd years, never could find a neuropsychologist at a change of plea hearing.  But Dr. Filippopoulos was there.  She was there for a reason, because Mr. Bergenn was mentally coercing me to plead guilty, and he was using you being happy about -- about you being happy and getting a favorable sentence in order to end this thing so the jurors can go home.  And that's the issue.

THE COURT:  Let's see if we can recap where we are.

Shipman & Goodwin will endeavor to produce the affidavits and supporting documents as expeditiously as possible but, in any event, within 30 days.  I will give the government 30 days from that time to file its response to the petition.  Consistent with our colloquy today, that response will be focused on the validity of the guilty pleas.  We'll address that in as complete a way as possible given the allegations of the petition in the paragraphs cited by Mr. Rivernider.

In the meantime, Mr. Frost, you're welcome to participate more fully in this process if you are willing

to do so, and Mr. Rivernider would like you to do so.

Counsel was appointed for Mr. Rivernider, at his request, to represent him in connection with this petition without the limitation that applies to you at the moment, that is the limitation in the order approving the appointment whereby you serve as standby counsel in the event an evidentiary hearing is necessary.

I'll leave that to you and Mr. Rivernider to discuss, and all I will say is that I'm open to hearing back from you with whatever suggestions you think might be helpful.

In my experience, it's always better to have the assistance of conscientious counsel, and I'd welcome your assistance here, and I do thank you again for accepting the appointment.

MR. FROST:  Yes, Your Honor.

THE COURT:  Also, I understand that you are going to be in touch with the people at Wyatt to be sure that Mr. Rivernider's medical issue is being properly addressed.

What I will do is enter an order on the docket consistent with what we've discussed, and I may include a date for Mr. Rivernider to reply to the government's response.  I think that will make sense for me to do.

With regard to Mr. Rivernider's request for

documents, I understand that the firm will be providing him with documents that are relevant to the claims regarding the validity of the pleas but withholding other documents pending further order of the Court on the ground that the burden of complying with the requests for those documents is, at this moment, not justified.

I would just as soon not get into specific document requests, which is why I declined your gracious offer to give me the requests, Mr. Howard.

I don't think it's my place to oversee or referee a dispute between a lawyer and his former client except insofar as it does pertain to a matter that is before me for adjudication.

So to avoid any misunderstanding:  To the extent Mr. Rivernider is looking for information and documents from the law firm of Shipman & Goodwin that don't bear on this case in its present form, I don't think I have a responsibility to address that, and I don't want you to be under any misimpression in that regard.

Insofar as the requests are related to the litigation, if they're presented to you that way then, consistent with my prior order and consistent with what you have told me today, I think documents relating to the validity of the pleas should be produced.

If you don't want to produce anything else, then

that's fair enough, and I can address an application from Mr. Rivernider or from the firm that brings that before me.

MR. HOWARD:  If I may, Your Honor?

There were particular requests that he made which we can comply with that are reasonably straightforward and there will be no charge for that. Other documents will be supplied as part of the affidavit process.

So in responding to that, yes, we will be able to do this, but I'm sure Mr. Rivernider will not get everything he wants in terms of our initial response to his request.  We will provide what we're willing to do on that initially, and provide other documentation in connection with the affidavits.

THE COURT:  I see no undue prejudice to Mr. Rivernider or anybody else if we go that way, given that our focus is on the validity of the pleas and not on other matters.

THE PLAINTIFF:  Your Honor, I just want to confirm that.  Because according to Mr. Frost, they've stated that emails and texts between themselves and the government, they won't be turning over, which especially that weekend, that week prior to the plea, I would suggest those are very material; and is that something that they

will be turning over?

If I recall, I posted most of the emails between me and Shipman in the motion to stay surrender or in several other motions. So I know the book. I got -- everything that happened between us, I've already posted. It's already on the docket.

So I'd just like to know if I'm going to be able to get the emails between them and the government.

THE COURT: I think that if they bear on the voluntariness of the pleas, you will get them. I would assume that a document that was created and transmitted hours before the plea would be within the scope of the Court's order.

MR. FROST: Your Honor, I was just mentioning to Mr. Rivernider, after the affidavit is submitted, that may also shed some light on what additional documents he may feel are needed, and so it may be at that point I could have a role to fill to sort of communicate that to Mr. Howard and see if we can have a dialogue about that. And if there are any issues, then we can raise it with the Court.

That might be one way as opposed to trying to deal with the issues in more detail now. I think it sounds like the Court's been clear that the disclosure would be limited to the validity of the pleas, there may

be some additional documents with the draft affidavit, so that Mr. Rivernider and I will have an opportunity to decide if there's anything else that we think he needs.

THE COURT:  Thank you.

I'm going to adjourn in a moment, but before we do, I want to be sure to mention that I have read Mr. Rivernider's motion for recusal and his affidavit of bias, more than once actually, and I think I would be remiss if I failed to state that it contains statements that are, in my view, very unfortunate.

There are allegations in that document that serve to accuse me of engaging in deliberate wrongdoing in violation of Mr. Rivernider's rights.

Please understand, Mr. Rivernider, that your right to appear pro se does not give up a license to abuse the Court or anybody else, and I'm concerned that you may have the misimpression that you can say whatever you want, no matter how insulting to the integrity and dignity of the Court.

What I think makes the most sense is for you to read a case that may help you understand that there are limits on what you can say, and I'll ask the clerk to give you a copy of the case.  It's United States v. Marshal, a Second Circuit case reported at 371 F.3d 42.

I was hoping that you would conduct yourself

today in a respectful manner, in a constructive manner, and you have done so, and I appreciate that.  I hope that this will continue.  I don't want to have unnecessary difficulty with anybody, and I certainly don't want to have to revisit this subject again.

So I do thank you for your appropriate conduct today.  I do take exception to what you have said in your motion, and I just want you to understand that this is not a free-for-all, and you need to be more circumspect.  That doesn't chill your exercise of your First Amendment rights, it doesn't chill your ability to represent yourself.

You can still make the points that you wish to make if you make them in good faith, believing that they are properly a part of your case.  But unwarranted insults to the dignity of the Court are not appropriate, and I ask you to please bear that in mind.  All right?

MR. FROST:  Yes, Your Honor.

THE COURT:  Thank you.

THE PLAINTIFF:  Your Honor, as far as me still staying here, I assume that that's going to continue?

I'm sitting in a maximum security facility here for the last two months.  I don't know if the marshals are going to leave me there, if that's the intent.

THE COURT:  It's been my assumption that, like

anybody else with a matter pending here, you would be detained at Wyatt. I have not had any complaints about Wyatt. To the contrary, most people seem to prefer to stay at Wyatt than go elsewhere.

But yes, I'm not aware of any reason why I should make an exception in your case.

I have asked Mr. Frost to follow up with regard to your medical situation. I trust he will do so. If there are other issues, please bring them to his attention.

But in the meantime, I expect that you will be staying at Wyatt.

THE PLAINTIFF: We're looking at 90 days here before anything happens so --

THE COURT: I understand you'd rather be at a camp, but unfortunately we don't have anything nearby, so we'll do the best we can.

(Proceedings adjourned at 3:41 p.m.)

C E R T I F I C A T E

In Re: RIVERNIDER vs. UNITED STATES

I, Darlene A. Warner, RDR-CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/_____

DARLENE A. WARNER, RDR-CRR
Official Court Reporter
450 Main Street, Room #223
Hartford, Connecticut 06103
(860) 547-0580