UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                  :
ROBERT RIVERNIDER,                :  No. 3:14CV1000(RNC)
                                  :
              Petitioner,         :
                                  :
         vs                       :
                                  :
USA,                              :
                                  :  HARTFORD, CONNECTICUT
              Respondent.         :  JANUARY 16, 2018
                                  :
- - - - - - - - - - - - - - - - - x


EVIDENTIARY HEARING


     BEFORE:

          HON. ROBERT N. CHATIGNY, U.S.D.J.



APPEARANCES:

     FOR THE PETITIONER (AS STANDBY COUNSEL):

          FROST BUSSERT LLC
               129 Church Street, #226
               NEW HAVEN, Connecticut 06510
          BY:  ROBERT M. FROST, JR., ESQ.

     FOR THE RESPONDENT:

          U.S. ATTORNEY'S OFFICE-NH
               157 Church Street
               P.O. Box 1824; 23rd Floor
               New Haven, Connecticut 06510.
          BY:  CHRISTOPHER W. SCHMEISSER, AUSA
               JOHN H. DURHAM, AUSA


                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

ROBERT H. RIVERNIDER, JR.

 BY MR. FROST:           7

 BY MR. SCHMEISSER:              85

9:18 A.M.

THE COURT:  Good morning.  We're here for the hearing in the Rivernider case.  Would you please state your appearances.

MR. SCHMEISSER:  Yes, Your Honor, Christopher Schmeisser for the United States.  With me at counsel table is Ulla Plourde, a paralegal, as well as U.S. Attorney John Durham.

THE COURT:  Good morning.

MR. FROST:  Good morning, Your Honor, Robert Frost, standby counsel for Mr. Rivernider who is also present.

MR. RIVERNIDER:  Mr. Rivernider also present, Your Honor.

THE COURT:  Good morning.

Mr. Frost, are you all set to proceed?

MR. FROST:  Yes, Your Honor.

MR. RIVERNIDER:  Your Honor, before we begin, I'd like to point out that the respondent in this case is the United States of America, and the only one who filed an appearance today is Mr. Schmeisser and of course Mr. Durham.

And as the Court's well aware, in the past, the Court on May 26th was noticed that both Mr. Schmeisser and

Mr. Durham, there are serious allegations of prosecutorial misconduct, and I would like to put on the record that should there be relief in this case that there would be a conflict of interest in this proceeding with Mr. Schmeisser and Mr. Durham because of the allegations of the prosecutorial misconduct, which are -- in my motions there is plenty of evidence that there is serious evidence of prosecutorial misconduct.

So I want to make sure that moving forward there is not a conflict of interest with Mr. Schmeisser and Mr. Durham because of the prosecutorial misconduct in this case. Because if relief is granted, then they're subject to penalties and punishment for that prosecutorial misconduct.

I just want to get that on the record and make sure that's clear that -- because with them here, if there is relief, then they're subject to penalties and punishment, then there will be a conflict of interest, which would indicate that maybe it's already been determined that there's to be no relief.

THE COURT: We're here to have a hearing on certain specified matters and I don't want to be diverted from that.

MR. FROST: Yes, Your Honor.

THE COURT: So let's proceed.

MR. FROST:  Before we proceed, Your Honor, obviously we will be calling Mr. Rivernider to the stand and I will conduct his examination.  Mr. Bergenn will be the next witness, and I would request that Mr. Bergenn be sequestered during the time Mr. Rivernider is testifying.

THE COURT:  I'll grant that application.

MR. FROST:  Thank you, Your Honor.

THE COURT:  Mr. Rivernider, would you please take the stand?  I'll ask the clerk to swear you.

THE CLERK:  Please raise your right hand.

You do solemnly swear or affirm that the testimony you shall give concerning the case now in question shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  I'll do the best I can considering the events took place long ago, frankly.

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Robert H. Rivernider, Junior. Currently Rhode Island, the Wyatt Detention Center.

THE CLERK:  Please be seated.

MR. SCHMEISSER:  Your Honor, I didn't hear the first part.  He has affirmed he will be telling the truth today?

THE COURT:  I believe so.

That is your obligation as a witness under oath.

THE WITNESS:  It's my obligation to tell the truth.

I just want to point out that the events took place long ago, as the government has notified that their witnesses -- when their witness didn't tell the truth on the stand, they said that the events took place long ago, so I'm pointing out that these events also took place long ago, which is directly related to their actions.

THE COURT:  Do you understand that because you're under oath you have a legal obligation to do your best to testify truthfully?

THE WITNESS:  I will do my best to testify truthfully, I understand that, yes.

THE COURT:  All right, thank you.

MR. SCHMEISSER:  Your Honor, if he could speak into the microphone?  It's hard to hear.

THE COURT:  Yes.

ROBERT H. RIVERNIDER, JR.,

called as a witness, having been first duly

sworn or affirmed, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. FROST:

Q.   Good morning, Mr. Rivernider.

A.   Good morning, Mr. Frost.

Q.   The exchange that you had with the Court a moment
ago, I know you were emphasizing the fact that these
events took place long ago.

Having been with you some time on this case, were you
intending to indicate that there's been some prejudice to
you by the fact that this hearing is now happening a long
time after the motion for --

A.   That's correct.

Q.   From when the section 2255 was filed?

A.   That's correct.

Q.   It wasn't an indication that you wouldn't be able to
tell the truth?

A.   Absolutely not.

Q.   You understand the obligations of an oath and you're
going to do your best to testify truthfully today?

A.   I will do better than all the government witnesses.

Q.   So you understand, the Court, we had a status conference and the Court wished to focus the parties on certain claims in your 2255 motion, right?

A.   Yes.

Q.   And we've been referring in these proceedings to the non-state claims, focusing primarily on your change of plea and the claims that you've made that that plea was not a knowing, voluntary and intelligent plea, you understand that?

A.   Yes.

Q.   What I'd like to do for the benefit of the Court is to take you through the decision process that led up to your plea, which you know occurred on February 25, 2013, right?

A.   February 25, 2013, correct.

Q.   Which was a Monday?

A.   Yes, it was.

Q.   Using that as a benchmark, you entered your plea Monday, February 25, 2013, I want to work up to that proceeding, that date in the course of your direct examination today, okay?

A.   Yes.

Q.   So prior to your plea on February 25, you and your counsel, Mr. Bergenn and Mr. Chase, were involved in a

trial, right?

A.    That's correct.

Q.    You were defending yourself in a trial with the assistance of counsel?

A.    We were in trial every day, appeared every day on time for three weeks.

Q.    In the week leading up to the weekend before your plea, you were in trial, is that right?

A.    We were in trial.  I believe the Monday may have been a holiday, so I believe the trial may have been four days.

Q.    And during that week before, when you were in trial before your change of plea, did you indicate to Mr. Bergenn or Mr. Chase that you wanted to plead guilty to the charges?

A.    I never indicated that I wanted to plead guilty, would plead guilty or was going to plead guilty at any time.

Q.    When you got to the end of that week of trial, which would have been Friday, February 22 --

A.    22.

Q.    Focusing your attention on that, Friday, February 22, do you remember what happened after the trial day ended?

A.    After the trial ended, probably around 6:00 or so, it was a long day, we left -- I left ahead of Mr. Bergenn and Mr. Chase and Ms. Vargo, and I left with Mr. Ponte and

Ms. Seneca.  We walked out, walked up to the parking lot. Mr. Ponte had a car, so he was going to drive us back to the hotel.

At that time while we're in the parking lot, while he's getting his car, my phone rings and it was Mr. Bergenn, and Mr. Bergenn said:  Hey, where are you?

I said:  I'm in the parking lot.

He said:  We're down on the street.  Mike and I want to meet with you.

And I said:  Okay.

So he said, Can you see us?

So I walked out to the edge of the parking lot there, looked down the street, I saw him down there, he's there with his bag hanging off his shoulder and phone up in his ear.

He said:  Come on down and meet us.

I said:  All right.

I excused myself from Mr. Ponte and Ms. Seneca, walked down the street to Mr. Bergenn, and then we walked down the road here, I guess on Main Street, and went into some local bar or restaurant.

Q.   When you entered the restaurant, do you remember the name of the restaurant or the bar you went into?

A.   I have no idea.

Q.   When you went into the bar and restaurant, who was

with you?

A.    Just Mr. Chase and Mr. Bergenn.

We walked in, and I think it was like a podium where people go into the restaurant, and then off to the side, there's a bar area where there's some tables along the window.  And so we went and sat at the table that was at the far end near the bar.

Mr. Bergenn sat with his back to the window, Mr. Chase was across from him, and I sat next to Mr. Chase.

Q.    Now, you've reviewed Mr. Bergenn's affidavit that was filed in this case, right?

A.    I've reviewed it, yes.

Q.    And he describes that interaction that you just described where you went to the bar/restaurant, he described it as a dinner meeting?

A.    Uh-huh.

Q.    Did you sit and have dinner, a lengthy meeting with Mr. Bergenn and Mr. Chase?

A.    Mr. Bergenn ordered two appetizers.  I've been trying to rack my brain to remember what it was, but I can't remember what it was.  I had a beer, Mr. Chase had a beer and Mr. Bergenn had a mixed drink.

Q.    How long did the meeting last?

A.    Not more than 30 minutes.

Q.    Tell us as completely as you can what happened during that meeting, what was said to you and what you said to Mr. Bergenn and Mr. Chase.

A.    I was eating appetizers, whatever Mr. Bergenn ordered for me and whatever drinks he bought for me, which was the beer.  It may have been two beers.  I don't want to say it was only one.  It may have been two beers.

What was exchanged, he was talking about some witnesses testifying and I only -- because we're in a bar, we're in a loud crowded bar, it was a Friday night around 6:00, 6:30 -- I really couldn't understand or hear much of what was going on.  It was just basic the same kind of thing as, this witness testified and some witnesses are testifying in the, you know, next week.  And I said, yeah, okay, those witnesses are testifying and we'll be ready for those witnesses.

After that, I remember I walked, went to the bathroom, because I walked past like sort of a makeshift wall that separates the bar and the restaurant and there's some high top tables there, and I walked past the high top tables, went to the restroom, came back and left.

Because as I said, any time I'm in a loud crowd like the place I'm living at now, which, you know, are loud crowded places, I try to get out of because I have a hearing difficulty in my right ear, and Mr. Chase was

sitting to my right, Mr. Bergenn was across from him, and it's just very difficult for me to hear.

Q.   Do you remember the subject of entering a plea coming up at any point during this meeting with Mr. Bergenn and Mr. Chase?

A.   Certainly not.

Q.   Did you bring up the subject of entering a plea in this meeting with Mr. Bergenn and Mr. Chase?

A.   Not only in that meeting, I've never brought up the subject of entering a plea.  Definitely not in that meeting.  It wasn't even on the -- it wasn't even discussed.

Q.   At any point in time during that meeting with Mr. Bergenn and Mr. Chase, did you have, I believe Mr. Bergenn has characterized it in his affidavit as an epiphany regarding the evidence and your decision about whether to continue with your trial and plead guilty.

A.   I had no epiphany other than getting out of a loud, crowded, noisy bar.  It would have been better off going back to his office if we were going to have any type of discussion like that, but certainly not while drinking at the bar.

Q.   Let me ask you this:  You don't remember the subject of a plea coming up.  Do you remember whether it was brought up that you should meet with Dr. Filippopoulos at

some point either over the weekend or the following week?

A.   We had a scheduled appointment with Dr. Filippopoulos on the 1st, the following Friday.

I don't recall that coming up.  He may have had said that, but I do not recall specifically going to meet Dr. Filippopoulos.

I don't remember if the conversation turned to Dr. Filippopoulos.  Again, I could only hear bits and pieces of it.  He may have said something like that.  I'm not going to say he didn't, because I just don't know.

Q.   So have you told us at this point as completely as you can recall what took place at that meeting on Friday night at the bar?

A.   Beer and appetizers took place.

Q.   And at the end of the meeting, you said you left. How did you get -- where were you staying at that time during the trial?

A.   Staying I believe it's the Ramada or Radisson.  I think it changed at one point in time.

But I believe I was staying at the hotel the government usually puts people up at, I think.

Q.   How did you -- when you left the bar/restaurant at the end of the interaction with Mr. Bergenn and Mr. Chase, how did you get back to the hotel?

A.   I walked back.

Q.   And at the end of that meeting at the bar or restaurant, from your perspective, had you changed your position as to how you were going to approach things when trial resumed on Monday the 25th of February?

A.   Not on Friday night, absolutely not.  I was -- I went back and continued to prepare that night for the next witnesses.

Q.   So when you left that meeting on Friday night, you were in a preparing-for-trial mode, not getting-ready-to-plead mode?

A.   Preparing for trial, like I did every day and every night for years.

Q.   Did anything else happen -- you got back to the hotel that night, I take it?

A.   I went back to the hotel, yes.

Q.   Any interactions with Mr. Bergenn or Mr. Chase later that night that are relevant to the decision that you ultimately made to plead guilty on Monday the 25th of February?

A.   Nothing on Friday night.

Q.   So moving on to Saturday, which would be Saturday, February 23, I take it you woke up at the hotel that morning?

A.   Correct.

Q.   What was going on during the course of that morning

relative to trial and/or the subject of possibly entering a guilty plea the following Monday?

A.   That morning I did what I normally would do.  I started researching documents in discovery, I started going through what the witnesses were going to be saying, what the witnesses were going to be testifying to, and helping prepare for cross-examination by sending emails to Mr. Bergenn and Mr. Chase and Ms. Vargo so that they could try to put together examinations for the up and coming witnesses.

I was actively engaged in assisting in continuing on with trial.

MR. FROST:  Your Honor, will we be using A or 1 for Plaintiff's Exhibits?

THE COURT:  One is fine.

MR. FROST:  Okay.  So Plaintiff's 1, 2 and 3.

THE COURT:  Are these copies for me, Mr. Frost?

MR. FROST:  I have an extra copy for you as well, Your Honor.

Let me just give copies to both the government and the Court, and then I'll quickly examine Mr. Rivernider on these exhibits.

THE COURT:  Okay.  Is each page a separate exhibit?

MR. FROST:  There are three exhibits, one of the

exhibits I think is stapled as two pages.

THE COURT: Okay.

MR. FROST: Hopefully I gave them to the clerk in chronological order, which was my intent.

BY MR. FROST:

Q. Mr. Rivernider, you described for us that that morning on Saturday, February 23, you were preparing for trial, right?

A. That's correct.

Q. You said you were sending emails to your attorneys in connection with those preparation efforts, is that right?

A. That's correct.

Q. And you were in that trial preparation mode, not talking about pleading guilty the following Monday, right?

A. That's correct.

Q. I want to show you three exhibits that I've just marked, Plaintiff's 1, 2 and 3. I'm going to show you Plaintiff's Exhibit 1.

Can you take a look at that document and tell me if you recognize it?

A. Yes, I do.

MR. SCHMEISSER: Attorney Frost, just so we're clear, could you indicate the Bates stamp?

MR. FROST: Yes. The Bates number on Plaintiff's Exhibit 1 is RR5350.

BY MR. FROST:

Q.   Is that a copy of an email that you sent to your attorneys while you were preparing for trial on that Saturday, February 23?

A.   Yes this is a detailed bullet point --

Q.   Before I get to the content of it:  Can you confirm whether that was an email that you sent to your attorneys?

A.   Yes, it is.

Q.   And was this intended to address witnesses that would be coming up the following week?

A.   Very first witness for Monday morning, yes.

Q.   And this is consistent with your intent to prepare for trial and assume that the trial was going to continue the following week?

A.   That's correct.

        MR. FROST:  I'd offer it as a full exhibit, Your Honor.

        THE COURT:  Any objection?

        MR. SCHMEISSER:  I have no objection.

        THE COURT:  Okay.

BY MR. FROST:

Q.   And just briefly showing you Plaintiff's Exhibit 1, you sent this email at 11:17 a.m., is that right?

A.   On Saturday, February 23 at 11:17 a.m., correct.

Q.   And that email was sent to Mr. Bergenn, Mr. Chase and

the paralegal that was working with you, Ms. Vargo?

A.    That's correct.

Q.    And the subject line was Laporte Question, Part One.

These were questions and things you wanted your attorneys to cover with this witness the following week?

A.    Yes.  I went through discovery, I went through emails, I went through documents, and I put together a bullet list, a number of items that they could cover with her, correct.

Q.    Showing you what's been marked as Plaintiff's Exhibit 2.

MR. FROST:  One moment with the clerk, Your Honor?

THE COURT:  Sure.

(Pause)

BY MR. FROST:

Q.    Mr. Rivernider, showing you what has been marked as Plaintiff's Exhibit 2, which for the record and the government's benefit, I believe starts at Bates RR5366 -- 67, I'm sorry.

Can you take a look at that document and let me know if you recognize it?

A.    Yes, I do.

Q.    Is this another email that you sent during that morning that you were preparing for trial on Saturday,

February 23?

A.   Yes, it is.

Q.   And this was to your attorneys again dealing with issues that were likely to come up at the trial the following week?

A.   This was actually in response to the government's ongoing misrepresentation of an email that they presented, and I had sent this to my attorneys back in 2012 on September 9, as you can see below, with details of information that would show that the recipe for the no more bills disaster email was clearly being misrepresented by the government.

Q.   Okay.  But it related to events that you anticipated would take place when trial would resume the following week?

A.   When trial would resume because they continued on with the misrepresentation, correct.

Q.   And showing you Plaintiff's Exhibit 3, can you tell me if you recognize that document?

A.   Yes, I do.

Q.   And is that another email that you were sending to your attorneys on the morning of February 23, or actually it was almost the early part of the afternoon, February 23, relative to issues and witnesses that would be coming up during the course of the trial?

A.    Yes.   This was a witness -- a potential witness that I was asking them to try to track down who can support our case.

Q.    And again, consistent with your trial preparation efforts that day?

A.    That's correct.

MR. FROST:   I'd offer Plaintiff's Exhibits 2 and 3 as full exhibits.

MR. SCHMEISSER:   No objection, Your Honor.

THE COURT:   Thank you.

BY MR. FROST:

Q.    So just showing you the last exhibit we marked, which was Plaintiff's Exhibit 3, you sent that -- well, Plaintiff's Exhibit 2 was sent at 11:37 a.m., is that right?

A.    That's correct.

Q.    And then you sent the email marked as Plaintiff's Exhibit 3 at 12:00 on February 23, right?

A.    That's correct.

Q.    So at some point after you sent Plaintiff's Exhibit 3 at 12:00, did you speak with either Mr. Bergenn, Mr. Chase or Ms. Vargo about the case?

A.    At some point I wound up at Mr. Bergenn's office.   I don't remember whether they called or texted or whatnot, but I went to his office.

Q.    And that would have been after 12:00 noon?

A.    Yes.

Q.    And do you recall approximately what time?  Are we talking about within an hour or so of sending that email or are we talking later in the afternoon?

A.    It would have been later between -- around the 1:00 hour.

Q.    Okay, your best estimate is it was around 1:00?

A.    I would say after 1:00, maybe closer to 1:30.

Q.    And what were you told or what did you expect was going to happen when you went to Mr. Bergenn's office at around 1:00 or 1:30?

A.    All I remember is when I got to Mr. Bergenn's office, I was waiting in the lobby area, Mr. Bergenn came out and said we were going to see Dr. Filippopoulos, Mr. Chase came out, looked at Mr. Bergenn and said that he was going to continue to work on the trial on upcoming witnesses and Mr. -- I just happened to notice that Mr. Chase looked at Mr. Bergenn, didn't look at me and went back into the back office area.

Q.    Okay.  So you arrive, you're told you're going to Dr. Filippopoulos's office; did you ask Mr. Bergenn why?

A.    Did I ask him why?  I'm trying to remember if I asked him why.  He may have told me why we were going.  We were going to review the report.  All I know is we were going

to review the report based on my previous interviews with Dr. Filippopoulos.

Q. How did you get over to Dr. Filippopoulos's office?

A. Mr. Bergenn drove.

Q. I assume you arrived there a short -- like somewhere around 2:00, 2:30, somewhere in there?

A. It was probably around 2:00, maybe a little after 2:00.

She wasn't there when we got there. We had to wait for her. We waited in the hallway, and then she arrived.

Q. And at some point did you -- well, strike that.

Take us through what happened when you got to Dr. Filippopoulos's office with Mr. Bergenn on that Saturday afternoon the 23rd.

A. I'll tell you what I remember happened.

We'd go into Dr. Filippopoulos's office. When she got there, she had to make copies of the report. So she has a single copier, so she was making copies, and I remember, because she then had to sort the papers, and it was like 30, 40 pages or so. So she's making copies on this single copier.

She gives us both a copy. Now she had an appointment that was coming in at that time, so her appointment goes into her office and Mr. Bergenn and I go into Dr. Stoll's office. He wasn't there. So we go into Dr. Stoll's

office in order to read the report.

So we're sitting there.  We get in Dr. Stoll's office and he has these two big leather chairs with ottomans.  So we're sitting there and intently reading the report for probably 45 minutes to an hour or so.

And as we're intently reading the report, Dr. Filippopoulos comes in and wakes us both up from reading the report, because her appointment was finished; and then we go into her office.

Q.   Anything that you recall about the conversation while you were waiting for Dr. Filippopoulos that took place between you and Mr. Bergenn about potentially changing your plea at that point before you met with Dr. Filippopoulos?

A.   No, there was no conversation regarding the case or the plea.  The conversation at that point, there really wasn't much conversation, we were just joking around a little bit, and then we started reading the report and that was the end of -- next thing I know, Dr. Filippopoulos came in and got us.

Q.   And I take it you went into her office, you, Dr. Filippopoulos and Dr. Bergenn?

A.   Yes.

Q.   So just the three of you?

A.   That's correct.

Q.   And tell us as completely as you can what you recall about that meeting that you had with Dr. Filippopoulos and Mr. Bergenn.

A.   Mr. Bergenn sat in the chair to my left on the wall over there, I sat with the windows to my back, Dr. Filippopoulos was on that side, and Mr. Bergenn was just telling me about the report, which I can't tell you much about it because I don't understand much about it.

If you ask me what executive function deficit disorder and scoring low on this test and how that came about, it was all new to me and unclear to me.  But Mr. Bergenn is telling me how this affects my thinking and my actions and how it affected my actions at the time, and because I fell off a roof and, as Mr. Durham likes to say, bumped my head, that this affected the case.  And Dr. Filippopoulos is agreeing with everything that Mr. Bergenn is saying.  So I'm just sitting there saying, well, okay, I have this whatever it is.  What it is, hard for me to understand.

We spent two days in -- trying to get me to understand it, and all I know is I still have trouble figuring out what it is that was claimed that I have, but all know is that Mr. Bergenn then went into "and because of this, we should consider changing the plea."

Q.   So that came up in the meeting with Dr. Filippopoulos

that Saturday?

A.   Yeah.  The way he brought it up, he pulled a piece of paper out of his folder that he had with him and he said, you know -- now I look back at it, it was a typical -- the way I look at it was a used car salesman trick where he pulled it out and said, if you're going to buy this car, what color would you like it in, blue or red?  And the minute you say red, a red car comes out and you own that car.

The way he did it, he pulled the document out and said, if we were going to do this, let's just figure out what it is that we can agree to, and then he started reading off:  We could agree to this, right?  And we can agree to this, right?

I'm like, yeah, no, well, that's not really the way it happened; but, yeah, okay.

And then he just kind of working his way into it, slowly working his way:  But we can agree to this, right?

And that's pretty much how it all played out.

MR. FROST:  Let me mark an exhibit, if I can, Plaintiff's Exhibit 4.

BY MR. FROST:

Q.   Mr. Rivernider, I want to show you what I just marked as Plaintiff's Exhibit 4 for identification.  Do you recognize this document?

A.   I recognize it.

Q.   Is this a true and accurate copy of the document you say was shown to you or reviewed by you and Mr. Bergenn in that meeting with Dr. Filippopoulos?

A.   This is a copy that was handed to me.  The original I sent -- the actual original with his three-hole punch on it -- in document 596, and it was Exhibit 7, as you can see at the top there.

Q.   This is a document that you've actually submitted in prior proceedings in the criminal case, right?

A.   Correct.

Q.   And Docket Number 3:  10-CR-222, that's the criminal case, correct?

A.   Correct.

Q.   Those notations were not on the document that were handed to you?

A.   That's correct.

Q.   The lower right-hand margin has notations?

A.   That's my handwriting.

Q.   Aside from that, was this the document you were handed and reviewed in that meeting?

A.   This is the document.

        MR. FROST:  I'd offer this as Plaintiff's Exhibit 4, Your Honor.

        MR. SCHMEISSER:  No objection.

THE COURT:  It will be admitted.

BY MR. FROST:

Q.   So at the time -- How long does this meeting last with Dr. Filippopoulos and Mr. Bergenn?

A.   Total of about four hours or so.

Q.   How long into that four-hour meeting is it before Mr. Bergenn starts going over -- raising with you entering a guilty plea and going over this document?  And this is Exhibit 4.

A.   I want to note that that four hours is the time that we spent in Dr. Stoll's office reviewing the document and napping.

Q.   I see, okay.

So there was a portion of time where Dr. Filippopoulos was not with you, correct?

A.   Correct.

Q.   Just focusing on the time it was you, Mr. Bergenn and Dr. Filippopoulos, how long was that portion?

A.   That was probably two and a half, three hours.

Q.   So the majority of the time you were there?

A.   Yes.

Q.   So again my question:  How long was it before the subject of pleading guilty -- strike that.

How far into the meeting was it before Mr. Bergenn brought up changing your plea to guilty and going over

this document, Plaintiff's Exhibit 4?

A.   Towards the end of the meeting, maybe after an hour and a half or so of convincing me I had -- as Judge Chatigny's referred to it, and I now picked that up -- brain damage.

Q.   Well, did anybody use the word "brain damage" in that meeting?

A.   It wasn't in that meeting.

Q.   Did Dr. Filippopoulos say anything about what your opinion was about your mental health condition in that meeting with Mr. Bergenn?

A.   Based on what she was telling me, she was agreeing with what Mr. Bergenn was saying.  Mr. Bergenn was telling me that whatever, whatever this was I had, and she was agreeing with him.

She had some comments here and there, but it was mostly just agreeing with Mr. Bergenn.

Q.   At some point after having that discussion with Mr. Bergenn and Dr. Filippopoulos, did you agree to explore whether you should change your plea to guilty?

A.   I agreed to explore it because he told me that I had this mental disorder and I needed to plead guilty.

Q.   Any other reasons why you agreed to explore pleading guilty at that time?

A.   No, not at that time.

Q.    During the course of the meeting with Mr. Bergenn and Dr. Filippopoulos, did he bring up the subject of getting back to your kids sooner?  Did that come up?

A.    In that meeting on Saturday?

Q.    Right.  Or was that later?

A.    That was later.  I don't think that was discussed on Saturday.

Q.    Did the subject of, you know, getting less time on a guilty plea come up in that meeting?

A.    Not at that meeting.  I assumed I got brain damage, why am I even going to prison.  If I got this mental disorder, okay, I plead guilty and who would put somebody with brain damage in prison when they were a crime victim.

Q.    Showing you again what's marked as Plaintiff's Exhibit 4, it says in the first paragraph that you and the government stipulate to the following offense conduct. You see that?

A.    Yes, I do.

Q.    Did that have any effect on how you viewed changing your plea or potentially changing your plea the fact that the government might stipulate to these facts?

A.    It had to do with a lot of it.  Because a lot of this stuff that was coming out, was planned on coming out, wasn't what the facts were.  So if Mr. Bergenn told me that by pleading, we controlled the dialogue, we're taking

it right to the Judge, going right to the Judge, as what he described as an open plea. And because we were going right to the Judge, we could tell our side of the story, which we hadn't been able to tell our side of the story.

So now we're going to be able to tell our side of the story and the government's going to stipulate to what was essentially our side of the story.

Q. And the other thing I noticed in the first paragraph of Plaintiff's Exhibit 4, the potential stipulation related to a plea of guilty to only Counts One and Nine, is that right?

A. That's correct.

Q. So at that time there was no discussion about pleading to every count in the indictment --

A. No.

Q. -- without a plea agreement?

A. We were pleading to just the minimum that we had to plea to in telling our side of the story; and, believe me, I had a side of the story that I wanted to tell, and that wasn't being told, and this was the way I can tell our side of the story and get our side of the story out and on the record. And when we get our side of the story on the record, it will all be clear. And you got brain damage and, okay, well, now the Judge will understand the truth of the case, what actually happened.

Unfortunately that never happened.

Q.    How does the meeting end?

A.    We left the meeting and we went to -- after we left the meeting, we went to Mr. Bergenn's car, if that's what you're asking, and we proceeded to drive back.

After Mr. Bergenn made major changes to this document.  He's taking notes, every time he asked me, he reads something to me, and then I say, no, this is the way it worked or, no, I'm not saying that, and he would make some notes in the margin.

And then when we left, then he called Mr. Chase and dictated those notes to Mr. Chase.

Q.    And this is on the way back to, what, his office?

A.    This is on the way back to his office in the car while he's driving with his left knee going about 80 miles an hour holding the paper in his hand in one hand and holding the phone in the other hand, and he's going down the highway about 80 miles an hour and he's dictating the changes.  I'm holding onto the little handle there for dear life.

And he almost misses the exit, so he cuts over three lanes in order to get to the exit, nearly rams into the car in front of us, but he stops just before the car.

We then pull into the hotel parking lot, sat in the hotel parking lot probably for another 20, 30 minutes

while he's dictating to Mr. Chase over the phone.

Q.   And you say he's dictating to Mr. Chase while you're waiting in the car there for 20 to 30 minutes, what's he dictating, changes that you and he discussed?

A.   That's correct.

Q.   So there's interaction between you and Mr. Bergenn in the car while you're waiting there parked in front of the hotel?

A.   No.   Well, there was an interaction, I was just sitting there waiting to get out and he just kept talking and kind of like made me stay there just so he can -- I guess so I would hear what his dictations were.   But I just wanted to get out and scratched the bottom of the door on the curb of the -- because I was -- I couldn't wait to get out because I just needed to get out of the car.

Q.   Why?

A.   Because it was not something that I wanted to be continuing to do.

Q.   Meaning what?

A.   Meaning that he was dictating changes to this, where I'm going to then go plead, and I just didn't want to be a part of it; but I couldn't tell him that because he's already now committed to I'm pleading and this is what we're pleading to, so I just got away from him.

Q.   So you eventually got out of the car and went into the hotel?

A.   Yes.

Q.   And you remember approximately what time that would have been?  What part of the day you were at at this point?

A.   Well, yeah, it's seven'ish, maybe after seven.

Q.   And you go straight to your room?

A.   Yeah.  I may have stopped and grabbed a bite to eat at the hotel there because I hadn't eaten all day, so --

Q.   When you get back to your room, do you get an email from Mr. Bergenn about the draft stipulation?

A.   I got an email with -- appeared to be a typed up rewrite and changes, new version of what it was that he dictated to Mr. Chase.

Q.   Mr. Rivernider, I'm going to show you what I just marked as Plaintiff's Exhibit 5, and just take a look through the entire exhibit.  It's a several-page exhibit.

You tell me if you recognize Plaintiff's Exhibit 5.

A.   I do.

Q.   Is this a copy of the email that was sent to you with a revised typed up version of the stipulation of offense conduct?

A.   Yes, it is, and it's got a version number down the bottom and a Bates number, and it's got several changes.

Q.   And this is what was sent to you by Mr. Bergenn after you got back to your room that night?

A.   Yes, it was.

Q.   And you received it at or about 7:32 p.m. on Saturday February 23?

A.   That's correct.

         MR. FROST:  I'd offer that as a full exhibit.

         MR. SCHMEISSER:  No objection, Your Honor.

         THE COURT:  It will be admitted.

BY MR. FROST:

Q.   Showing you Plaintiff's Exhibit 5, if you can see it on the screen:  Did Mr. Bergenn indicate in the email sent at 7:32 that it might be in your interest to plead to more counts of the indictment?

A.   I'm sorry, could you --

Q.   In the third paragraph, Mr. Bergenn writes to you, "We need to think about whether tactically it makes more sense to plead to more counts because the Court can sentence you to anything he wants anyway"; you see that?

A.   Yes.

Q.   Is that where he brought up pleading to more than just Counts One and Nine which you talked about earlier that day?

A.   In the car we may have discussed because the conspiracy, you had to have another count, he may have

talked about that, and that's why it's added on this form.

But it was not something that was very important at that point in time.

Q.   If you look in the second paragraph, it makes a reference to Loretta; you see that?  "I made my pitch for Loretta."

Do you see that?

A.   Yes.

Q.   Do you know what that was a reference to?

A.   I said if I'm going to plead and I have this mental disorder and my sister was getting -- got railroaded.  The government just used her in order to try to get me to plead.  And so I asked him if he -- if I'm going to plead, then can they get my sister, the case dropped against her, and apparently he says he tried but I don't think that happened.

Q.   Mr. Bergenn says after that, "But your plea and acceptance of responsibility will be the best thing for her," I take it that means Loretta, "because her best defense is that you excluded her as the initial draft stipulation states."

Did that have any impact on your thinking about whether you should continue to explore pleading guilty?

A.   Yes.  If my pleading and accepting responsibility -- and thinking I was going to get an acceptance of

responsibility after going to trial for three weeks now sounds totally crazy, but that's what I believed at the time -- if that would be good for her that even if they're not dropping her, that it's not going to be as damaging to her, like she's not going to prison or something like that, then, yeah, that definitely played in my mind.

Q.   Turning to the second page of the exhibit, Bates number on the right lower margin, SG61, this is much more -- you would agree this is a much more detailed stipulation of offense conduct than the one that you had been shown in your meeting with Dr. Filippopoulos and Mr. Bergenn?

A.   Yes.  It probably includes things that I said or I was telling him, no, I actually was paying people's bills, and so he included stuff like that in there, that I tried to get corrected on the record because I thought that we were now going to control the dialogue and I thought that we were now going to have a chance to get the truth put out on the table.

Q.   Mr. Rivernider, I'm going to show you what's been marked as Plaintiff's Exhibit 6.  Take a look at that and tell me if you recognize it.

A.   I do.

Q.   What is it?

A.   My response to one of the things that is in the

stipulation where I'm questioning one -- questioning one of the examples that's in there.  I write --

Q.   Before we get there, is this something that you sent back to Mr. Bergenn, Mr. Chase, and Ms. Vargo after receiving what we were just looking at, Plaintiff's Exhibit 5?

A.   That's correct.

MR. FROST:  I'd offer it as a full exhibit.

MR. SCHMEISSER:  No objection, Your Honor.

THE COURT:  It will be admitted.

BY MR. FROST:

Q.   So now that we've put it into evidence, Mr. Rivernider, tell us why you sent this email to Mr. Bergenn and Mr. Chase.

A.   Well, they're giving an example of something that Will Sawran who worked for Mr. Ponte would send to the clients, and they're assuming that the -- the assumption is that the information is inaccurate.

Q.   And you were intending to convey that to Mr. Bergenn and the defense team?

A.   That's correct.

Q.   Did you speak with Mr. Bergenn, Mr. Chase or Ms. Vargo about what's contained in this email that evening?

A.   No, we didn't speak that evening.

Q.    Were your communications through the course of that evening by email?

A.    Yes.

Q.    Going back to Plaintiff's Exhibit 5, it says that Mrs. Bergenn had his cell with him every hour until Monday morning and Mike is working on the language, do you see that?

A.    Yes.

Q.    And see below where we are so far?  Mike will work with you more.  Did you speak to Mike Chase that evening?

A.    I did not.  I found it best to email because talking to Mr. Bergenn wasn't productive.

Q.    Mr. Rivernider, I'm going to show you what I marked as Plaintiff's Exhibit 7.  Take a look at it.  It's a several-page exhibit.  Let me know if you recognize it.

A.    Yes, I do.

Q.    Is this a series of emails that you exchanged with the defense team, including Mr. Bergenn, later that evening on Saturday, February 23 --

A.    Yes, it is.

Q.    -- related to the issue of your changing your plea?

A.    Yes, it is.

Q.    And the stipulation of offense conduct?

A.    Yes, it is.

            MR. FROST:  I'd offer it as a full exhibit.

MR. SCHMEISSER:  No objection.

THE COURT:  It will be admitted.

BY MR. FROST:

Q.   It's a series of emails, right?  It's not just one single email?

A.   That's correct.

Q.   And if we go back to, or turn to the second page which in the lower right-hand margin has the Bates number RR5358, if you look at the bottom half of the page, there's that email from Mr. Bergenn saying he's with his cell every hour until Monday.  Do you see that?

A.   Yes.

Q.   And that's sent looks like around 7:31 p.m.

And then after that, at 7:48 p.m., there's an email from you to Mr. Bergenn, right?

A.   Yes.

Q.   Copy to others?

A.   Yes.

Q.   And you state "What happened to the letter we went through," signed Bob.  You see that?

A.   Yes.

Q.   What are you referring to there?

A.   The letter we went through at Dr. Filippopoulos's office.  I thought it was just that letter and what we had agreed to and the changes that I gave him.

Q.    And he indicates at the top of the page, February 23, 2013, 7:51:  "This is that, I just added Borovay detail. But we will talk them through Two.  Recall we talked on phone regarding Counts Six through Eighteen."  Do you see that?

A.    I do.

Q.    Do you recall talking about Counts Six through Eighteen?

A.    I'm not saying we didn't talk on the phone, I just don't remember talking on the phone.  I remember most of it was in the car, done in the car.

Q.    Did you continue to email with Mr. Bergenn later that night?

A.    And Mr. Chase, yes.

Q.    Mr. Rivernider, I'm going to show you what I just marked as Plaintiff's Exhibit 8.  Take a look at that exhibit and tell me if you recognize it.

A.    I do.

Q.    And is that another email between you and Mr. Bergenn copied to other people --

A.    Yes, it is.

Q.    -- related to the issues we've been talking about, your change of plea and what you could include in the offense conduct?

A.    My change of plea.  And if I could expand on that?

Q.    In a minute.  But is it relevant to that same subject area?

A.    Yes, it is.

Q.    And it was the email that's at the top of the first half of the page that was sent around 11:08 p.m.?

A.    That's correct.

Q.    And that's after the emails we were just looking at, is that right?

A.    Yes.

MR. FROST:  I'd offer it as the next exhibit, Plaintiff's Exhibit 8.

MR. SCHMEISSER:  No objection.

THE COURT:  It will be admitted.

BY MR. FROST:

Q.    Focusing your attention on the exchange on the top half of the page -- the bottom half the page and the other pages seem to be relating to the emails we were talking about earlier, right?

A.    Yes.

Q.    There's an exchange here on the first half of the first page of the exhibit.  You ask Mr. Bergenn a question and he gives you a response in an email, is that right?

A.    That's correct.

Q.    And in your question, you say, "Question:  If the G" -- you meant the government, right?

A.   The government, yes.

Q.   -- "is not dropping the case against Loretta, that means Carol, Wade, Kemp, Taylor, et al, all still testify and they all blame me and the Judge hears it all and we aren't there to answer it, how is that helping me?  So I'm thinking if Carol is testifying on Monday and the Judge hears everything anyway, maybe this isn't a great idea."

You sent that to Mr. Bergenn?

A.   Yes, I did.

Q.   You sent that at 10:13 p.m. on that evening?

A.   Yes.

Q.   He responded to that?

A.   Yes.

Q.   Did anything about his response influence your thinking about whether you should still consider pleading guilty?

A.   Yes.

Q.   Can you explain?

A.   Yes.  When you go through the response, for example, 2D, I'm no longer being blamed.  He says you are not being blamed.  He says, "Recall it's human nature both to forgive the contrite and become enraged at the person who won't accept either reality or responsibility."

So what he's telling me in that line is that the Judge is going to be forgiving me and become enraged at

Mr. Ponte for continuing on with the trial -- not that I thought that that was a good thing -- but since I'm accepting responsibility for my -- now having learned that I have a mental disorder, I'm pleading guilty because of it -- I'm no longer going to be blamed.

He then goes on to say, "If or when he hears it," so when the Judge hears testimony from witnesses like Wade, for example, or Kemp, then I would be gaining points every minute.

Q.   When he used that phrase, putting aside whatever he had in his mind, how did that impact your thinking?  How did you hear that phrase when he wrote it?

A.   If the Judge is hearing what people are saying, that he's not going to be taking that against me and that when he ultimately sentences me, nothing that can happens in a continuing trial is going to be taken against me or I would be the blame for.

So add gaining points, means that every day that this goes on it's better for me.

Turned out that to be the most erroneous thing I've ever read in my life that I would not be losing points.  I don't know who here could say that I didn't lose points when people were testifying, especially with the testimony that came out which had we been here would have been completely different.

Q.   Do you recall any other substantive conversations or emails with Mr. Bergenn the rest of that night?

A.   Well, in that document there's several, in that document itself, where he continues to harp on my newly learned of low emotional intelligence and issues of my newly found mental disorder where he's telling me that -- he's just continuing to say that this is what we just learned.  As you see at the bottom there, "your proven low emotional intelligence."  You trusted when you should not have.

Well, that's the most profound statement I've ever read because, yeah, I was trusting him when I should not have.

Q.   So you're referring to what Mr. Bergenn sent to you at 8:19 p.m. at the bottom of the first page?

A.   That's correct.

Q.   And emphasizing your low emotional intelligence, you took that to be a reference to the testing by Dr. Filippopoulos on the opinion that was discussed earlier that day?

A.   That's correct.

And the one above that, on the previous page, one of the things in my mind at the time was if I'm pleading guilty, how are we going to convince the Judge I was actually guilty when I did what I said I was going to do,

and I detailed that I did what I said I would do.

One of the things that the government was attempting to, or claiming at trial, was that I didn't put any money into investments. So, okay, well, the money that people sent in, the money went into an investment. Months later we learned it didn't work. That was in 2008. I didn't know in September of 2007 it wasn't going to work or I wouldn't have sent the money.

Q. Fair to say that -- I assume you're referencing in part the email that you sent at 8:27 p.m. discussing some of the information that was in the factual stipulation?

A. That's correct.

Q. And you were disputing those facts?

A. I was disputing the facts because what was in the factual stipulation wasn't factual, and I assume that that's why they were removed.

Q. So you were disputing that Saturday evening notwithstanding Mr. Bergenn was working on putting on a plea for Monday?

A. That's correct.

Q. So after those series of emails that we just looked at, Plaintiff's Exhibit 8, getting late in the evening, now after 11:00 p.m., do you recall any other substantive conversations with either Mr. Bergenn or Mr. Chase?

A. I don't recall it. I don't know if you have

anything.  I don't recall anything.  I think that's the string for the night.

Q.   So when your head hits the pillow that night, are you having doubts about changing your plea or are you ready to change your plea on Monday?

A.   I don't see how I'm going to be able to change the plea at that point, because what he's telling me what I have to plea to and what my understanding of a reading of the law didn't match up.

Q.   Mr. Rivernider, I'm going to show you what I just marked as Plaintiff's Exhibit 9.  Take a look at that document and tell me if you recognize it.

A.   I do.

Q.   Does this contain an exchange of emails that you had with Mr. Bergenn very early on the following morning, Sunday, February 24, 2013?

A.   Yes, it does.

Q.   Starting at 5:55 a.m.?

A.   Yes.

Q.   And a response from him at 6:13 a.m.?

A.   Yes.

Q.   Relating to the subject of whether you would be pleading guilty to any charges?

A.   That's correct.

MR. FROST:  I'd offer this as the next exhibit,

Your Honor, Plaintiff's Exhibit 9.

MR. SCHMEISSER:  No objection.

THE COURT:  It will be admitted.

BY MR. FROST:

Q.   So you're up early the next morning, Sunday the 24th.

A.   That's correct.

Q.   And you sent an email to Mr. Bergenn and Mr. Chase, copy to Ms. Vargo?

A.   That's correct.

Q.   And subject is "Indictment," and it starts "Jim, I want to be clear about something, I just remembered what the actual counts are and reread them.  Count One says that me and Ponte did unlawfully knowingly and intentionally conspire, blah-blah-blah, Count Nine says me, Ponte and Seneca did unlawfully knowingly and intentionally conspire, blah-blah-blah.  I'm not pleading to that language, and if the Judge asks me, I will say that is absolutely not true.  I would rather get on the stand and tell the truth and do 26 years than say that is true."  In caps, "It is not."

What were you intending to convey to Mr. Bergenn in this email?

A.   For the last several years, I've been saying that the only way they could indictment me is if they lied to the grand jury.  Turns out they did lie to the grand jury and

commit perjury.

And what I was telling Mr. Bergenn is that what is in the indictment, I wasn't going to plead to because it was not true. I did not sit there and conspire with somebody to commit a crime. I did not sit and figure a way to take people's money, as they were attempting to say. None of that is true.

I did not knowingly, willfully -- which comes up later -- attempt to take people's money. I was paying people. I was doing what I said I would do. Things didn't work out.

Q. Okay. Fair to say that in this email you're disputing the facts that you would have to plead to while Mr. Bergenn is working on the plea?

A. That's correct.

Q. And he responds to your email at 6:13 a.m., right?

A. That's correct.

Q. And he says, "I get that." Do you see that?

A. Yes. And he should have got that because I was very clear that I was not going to sit -- stand in front of the Judge and lie.

Q. Mr. Rivernider, I'm going to show you what I just marked as Plaintiff's Exhibit 10. Take a look at that document. It's two pages.

Can you tell me if you recognize it?

A.   I do.

Q.   And what is it?

A.   This is an email string between me and Mr. Bergenn starting with the original 5:55, his response at 6:21 and then a few responses that morning.

Q.   And this again is related to the subject of whether you would plead guilty and the facts necessary for a guilty plea?

A.   That's correct.

        MR. FROST:  I'd offer it as Plaintiff's Exhibit 10, full exhibit.

        MR. SCHMEISSER:  No objection.

        THE COURT:  It will be admitted.

BY MR. FROST:

Q.   And we were just looking at the exhibit where the exchange between you and Mr. Bergenn, which is the second page of this exhibit, there's your email at 5:55 a.m., right?

A.   That's correct.

Q.   The response that we just looked at "I get that," that's not in this email thread, is that right?

A.   It's not.

Q.   And so there's a pretty substantive response from Mr. Bergenn that starts at 6:21 a.m.; do you see that?

A.   Yes.  Could you slide it up a little on the screen?

Q.   Sure.

A.   Yes, thank you.

Q.   In the course of responding to your email,
Mr. Bergenn says -- if you can see that?

A.   Yes.

Q.   Quote, "If we cannot force the end of the case, it's
better to plead out the substantive counts because it
makes clear with our coincidental tender to the Court of
our confidential interim report from our expert doctor
that you admit guilty now, that you see what you couldn't
see before about your own neuropsychological limits."
     Do you see that?

A.   Yes, I do.

Q.   Did you take that to be a reference to
Dr. Filippopoulos and the testing?

A.   That is exactly what that is.

Q.   And the discussion that you had on that Saturday?

A.   That's correct.

Q.   And did that influence your decision about whether
you should listen to Mr. Bergenn about changing your plea?

A.   Yes, it did.

Q.   How?

A.   Well, he continues to tell me that I have this mental
disorder, this neuropsychological limits, and the expert
doctor in her report, which as he says there is an interim

report, that wasn't even a completed report -- it's not something I picked up at the time, but just looking at it now, okay, well, obviously it wasn't completed.

So we have an expert doctor telling me that I have neuropsychological limits.  Neuropsychological are words that are not normally in my vocabulary.  They're way above my education level, so when somebody is talking about things that are way above my education level, I have to -- you tend to believe that what they're saying is true and accurate.

Q.   Let me ask you this:  At that point in time, we're now on Sunday, did you still trust Mr. Bergenn?

A.   Yes.

Q.   That he had your interests in mind?

A.   Yes.

Q.   Did you trust Dr. Filippopoulos?

A.   Yes.

Q.   And you were relying upon their advice?

A.   Their expert advice.

Q.   And one of the things they were telling you is that you had these neuropsychological deficits?

A.   That's correct.  That is what they were telling me.

Q.   And because of that, you should consider pleading guilty?

A.   I have to plead guilty.

Q.   You say "have to," is that a word that was ever used by Mr. Bergenn or Dr. Filippopoulos?

A.   Yes.  I have to plead guilty because of this.

Q.   When was that said?

A.   It was continuous throughout the weekend.

Well, after Saturday in Dr. Filippopoulos's office, I have to plead because of this and this is the only way the Judge is going to see you for who you are, see the true Bob, not what the government's presenting.

Q.   After that exchange or series of emails with Mr. Bergenn, I take it you're at the hotel when you're sending these emails?

A.   Yes, Sunday morning.

Q.   At some point did you go over to Mr. Bergenn's office?

A.   He emailed me and asked me to come over, yes.

Q.   And do you remember approximately when that was?

A.   I believe just before 11:00 a.m.

Q.   How do you get over to his office?

A.   I walk.

Q.   When you went there, tell us what happens as it relates to the decision of whether to plea or not plea.

A.   Sitting in his office for a couple of hours that afternoon and he's going back and forth with Mr. Chase regarding this document.

He spent an hour teaching me algebra.  I remember that specifically.

Q.    What do you mean by that?

A.    At some point I said, well, when I was in -- we were talking about when I was in high school.  I said I didn't do very well in algebra for some reason.  So he sat there and taught me algebra.  Just one of those things that you remember happened for an hour.

And as far as the rest of it, Mr. Chase would come in with some paper, hand him some paper, he would talk, say here's what -- you know, reading, and I would say no, that's not accurate or, okay, whatever.  But then he would just say, well, this and -- and then he would just throw some out and say it five times, and then finally say, okay, Jim, whatever, and Mr. Chase would go back and type it.

I know specifically, I remember, Mr. Chase the entire day did not talk to me and did not look at me the entire day.

Q.    So just so I -- what I have in my mind is that you're in Mr. Bergenn's office primarily?

A.    Sitting in Mr. Bergenn's office on the 19th floor in the corner office.

Q.    And it's primarily you and Mr. Bergenn and Mr. Chase is coming in at various points?

A.   That's correct.

Q.   And it's your recollection that you were not speaking to or interacting with Mr. Chase in any substantive way?

A.   Not at all.

Q.   In fact, the way you described it, at least the way I heard it, was Mr. Chase was sort of like a scribe making changes and updating the offense conduct based on conversations between you and Mr. Bergenn?

A.   That's correct.

Q.   If that's occurring, it sounds like there's still at that point the possibility that you are going to change your plea on Monday, is that true?

A.   That there's a possibility that I'm going to change?

Q.   Right.  Why would you be working on the offense conduct if there wasn't the possibility that it was going to be used in a change of plea proceeding, either Monday or at some point in the future?

A.   Because there was no discussion, Mr. Bergenn wouldn't have any other discussion.  We were changing the plea. It's just, we're changing the plea, and here's what we're going to agree to.  But I'm like, no, I can't say that, it's not true.  So they would -- they would wordsmith it.

I learned that day what wordsmithing was.

Mr. Bergenn's standing by the door holding his piece of paper and he says, "I'm a wordsmith, I'll take care of

it" and he walks out and goes into Mr. Chase's office.

I didn't know wordsmithing was a thing but I learned it that day.

Q.   I guess what I'm asking is at any point in time during that meeting, at least in that meeting, we'll get to emails later, but in that meeting, did you say, "I'm not doing this"?

A.   No, not in person with Mr. Bergenn because if I had said it in person with Mr. Bergenn, it would have fell on deaf ears and he would say, yes, we have to do this. And he would have went right back to the neuropsychological issue.

Q.   How long are you there -- I may have already asked you this -- but how long are you there having this meeting with Mr. Bergenn that you've just described, how long does that take?

A.   Several hours.

As I say, we spent an hour going over algebra. I was going back and forth getting coffee, walking around while they were doing their thing. For awhile I had stepped out of Mr. Bergenn's office while he was on a phone call, and I was just hanging around. And I remember not having eaten all day trying to get out of there to leave to go eat.

My father was in town and I was going to go eat with

my father.

Q.   So at some point you do leave?

A.   Yes.

Q.   And later that night, do you get an updated revised version of the stipulation of offense conduct?

A.   Yes.

Q.   Is that by email?

A.   Yes.

Q.   Mr. Rivernider, I'm going to show you what I just marked as Plaintiff's Exhibit 11 for ID.  Can you take a look at it again?  It's a multi-page exhibit.

     Can you take a look at it and tell me if you recognize it?

A.   I do.

Q.   Is this a copy of the email that was sent to you later that night at the meeting at Mr. Bergenn's office sending you the updated draft?

A.   Yes.

Q.   And it was sent to you about 9:20 p.m.?

A.   That's correct.

Q.   That matches with your recollection?

A.   That's correct.

          MR. FROST:  I'd offer it as the next exhibit.

          MR. SCHMEISSER:  No objection.

          THE COURT:  It will be admitted.

BY MR. FROST:

Q.   In the exhibit, this is an email from Mr. Bergenn to you and to other members of the defense team, right?

A.   Yes.

Q.   And it attaches an updated version of what is now being called a proposed admission of offense conduct.  Do you see that?

A.   Draft proposed admission, yes.

Q.   And it's proposing a guilty plea to all of the counts in the indictment.  Do you see that?

A.   Yes.

Q.   Mr. Bergenn writes that, we think this is in final and we spoke with Kit.

     Would you understand the reference to Kit to be a reference to Mr. Schmeisser?

A.   Yes.

Q.   And he states, "This has tweaks that mention the technicality that wires were used and otherwise conforms to the law.  We held firm on the Ponte knowledge thing we were wrestling with because we couldn't think of anything else to say than what we said."

     Is that a reference to some of the things you were talking about in that meeting?

A.   Very well could be, yes.

Q.   And he indicates, "I'm available to you tonight, but

maybe it is better to me you here in the morning at 6:45," that being early in the morning on the 25th?

A.   Yes.

Q.   Because we're now in the evening hours of Sunday the 24th, correct?

A.   That's correct.

Q.   And he invites you to call him on the cell if you want to meet or talk on the phone.  Do you see that?

A.   Yes.

Q.   Did you talk to him on the phone that night?  Do you recall by recollection?

A.   We did not talk that night.

Q.   Did you receive emails in response to Plaintiff's Exhibit 11?

A.   Certainly did.

THE COURT:  Mr. Frost, would this be a good time to break?

MR. FROST:  Sure.

THE COURT:  Thank you.  We'll be in recess for 20 minutes.

(Whereupon, a recess followed)

THE COURT:  Mr. Rivernider, if you would please resume the stand.

BY MR. FROST:

Q.   Good morning, Mr. Rivernider, I'm going to pick up

where we left off, and just to orient us a bit:

There had been an email from Mr. Bergenn sending you the, quote-unquote, final version of the admission of offense conduct.  Do you remember that?

A.   Yes.

Q.   And that was at about 9:20 p.m.?

A.   Yes.

MR. FROST:  During the break I marked several additional exhibits.  My understanding is there's no objection from the government.

Plaintiff's Exhibit 12, that can be full?

MR. SCHMEISSER:  Yes.

BY MR. FROST:

Q.   And so showing you Plaintiff's Exhibit 12, a series of emails, and it starts on the last page, it's a truncated version, but essentially the email from Mr. Bergenn at 9:20 p.m. with an attachment of the draft stipulation.  Do you see that?

A.   Yes, it says "Rivernider stipulation draft."

Q.   And you responded to that email, right?

A.   I did.

Q.   What did you indicate in your email to Mr. Bergenn about your decision whether you were going to go forward with this plea?

A.   That I can't do this and live with myself, sorry,

meaning I'm not going forward with the plea.

Q.    Mr. Bergenn responded to you --

      By the way, you sent that email which you just quoted at 9:51 p.m.; that's a short while after receiving the draft?

A.    That's correct.

Q.    And Mr. Bergenn responded to you?

A.    That's correct.

Q.    And there's an exchange on the page with Bates number SG85, an exchange between you and Mr. Bergenn?

A.    Yes.

Q.    After that exchange, you sent an email at 10:25 p.m. to Mr. Bergenn stating, "See you in court" -- looks like a typo -- "at 9:00 a.m..  I will take the lead if need be." You see that?

A.    Yes.

Q.    What did you mean by that?

A.    I'm going back to trial.  See you in court at 9:00. In all capital letters.  And if he doesn't want to go back, then I'll take over.

Q.    And Mr. Bergenn responded to you at 10:27 p.m. stating "We are due at 8:00."  Do you see that?

A.    I do.

Q.    Then you have an email after that at 10:28 p.m. stating "Waiting time deal is off."  What did you mean by

that?

A.   His email's at 10:27 and my email is at 10:28, so I'm probably typing as that comes in.

And what I meant by that is very clear that the deal to plead is off.

Q.   And Mr. Bergenn responded at 10:34 p.m. and he states, "Please call me in the morning.  I do not want you to harm yourself, and this to me is a pure reflection of all that you and I learned after your thorough and honest testing.  You will be self destructive and ruin the only angle you have to save a lot of time."  And that's in caps.  Do you see that?

A.   I do.

Q.   And you responded at 10:46 p.m., "I can't harm myself any more."  What did you mean by that?

A.   Basically if I'm going to plead guilty, I'm harming myself.  And I don't know what he meant by harming myself any more, but I don't know why -- if I'm pleading guilty, I'm harming myself.  And I guess once you're harming yourself, you're harming myself, so how is it harming myself any more?

Well, the difference between pleading guilty and harming myself and being found guilty and harming myself, the difference would be the same.

Q.   After that email that you sent at 10:46 p.m.,

Mr. Bergenn asks you to call him in the morning or text. Do you see that?

A.   He says call me in the morning and I'm telling him I'm looking forward to five more weeks of trial plus us putting on a defense case.

Q.   Showing you what's been marked as Plaintiff's Exhibit 13 --

MR. FROST:  Offer this as a full exhibit.

MR. SCHMEISSER:  No objection.

BY MR. FROST:

Q.   Showing you what has been marked as Plaintiff's Exhibit 13, which is now a full exhibit, you see that it looks as though this is an e-mail -- Series of emails that were exchanged in part between you and Mr. Bergenn, but he's also forwarding exchanges he's had with the defense team, including Dr. Filippopoulos?

A.   That's correct.

Q.   And I want to focus your attention to the email at the top.

So at 6:03 a.m -- we're now on the morning, Monday morning, February 25 -- he sends you an email, is that right?

A.   Yes.

Q.   And he's asking you, "The doctor's available, are you?  We should at least take advantage of your dad being

in town."

Did that -- did you respond in any way to that email?

A.   I do not believe I did, no.

Q.   That morning did you -- strike that.

Showing you what's marked as Plaintiff's Exhibit 14.

MR. FROST:  Any objection?

MR. SCHMEISSER:  No.

BY MR. FROST:

Q.   Plaintiff's Exhibit 14, full exhibit, does this contain additional emails sent that morning, February 25, the day you changed your plea?

A.   Yes.

Q.   And that last email exchange at 6:03 a.m. looks like an email from you to Mr. Bergenn at 6:57 a.m.?

A.   That's correct.

Q.   What were you indicating about your decision to plead or go to trial in that email?

A.   That there's no reason to plead, I'm going to continue to go to trial.  And I can't do it.  And I'd rather put everybody on the stand and take the stand myself.

Q.   Mr. Bergenn responded at 7:02 a.m. which is the email at the top of the exhibit.  Do you see that?

A.   Yes.

Q.   And does he mention anything about your testing or

your mental health situation?

A.   Well, yes.  I mean, while he's telling me that, "you can be the government's view of Bob or the truth's view of the decent person who tried to help everyone but who didn't know the things you couldn't know without an expert and two days of testing."

Q.   Well, without indicating what he means, how did you hear that as it came from Mr. Bergenn?

A.   First thing is that we're going to get the truth out and it's not going to be the government's view anymore and the government's version anymore, it's now going to be our view and our version and the truth of what happened, and I couldn't have known things without the tests and the two days of 17 tests.

And now that with Mr. Bergenn telling me that I have this disorder and Dr. Filippopoulos's report and her confirming everything that he's telling me, that I need to continue on pleading because of it and this is the only way that the truth is going to come out.

Q.   After these exchange of emails that we've just looked at, did you eventually go to Mr. Bergenn's office?

A.   I did.

Q.   How did that come about?

A.   Starting early in the morning, I wasn't taking his calls because I knew what he wanted to talk about.

But then Mr. Chase started calling me, Ms. Vargo was calling me and texting me. And then Dr. Filippopoulos called me. And when Dr. Filippopoulos called me and asked me to meet her over at Mr. Bergenn's office, I agreed. If Dr. Filippopoulos calls and asks me to meet at Mr. Bergenn's office, I go and meet at Mr. Bergenn's office.

Q. Did you go to Mr. Bergenn's office?

A. I did.

Q. Around what time would that have been?

A. I'd say probably around nine'ish.

Q. And when you get there, what happens?

A. In Mr. Bergenn's office, it just begins.

Q. What begins?

A. The psychological pressure regarding the -- having a mental disorder, that I got to go in there and plead. And we're just going back and forth.

And I'm telling him that if I go in and plead, the government gets away with lying to the Court, witnesses lied to the Court, the truth isn't going to come out, they're going to get away --

I remember specifically sitting there crying about Berger v. United States (1935) and how the government's going to get away with just violating the Supreme Court. Crying in his office saying that.

Q.   You mention crying.  How many times did you cry during the course of that meeting?

A.   Twice I believe.

Q.   How long was the meeting?

A.   Well, up until we left his office when I basically couldn't take it anymore and we went down and came to the court and pled.  And that, I believe, is sometime after 11:00.

Q.   I want to stay focused on the meeting before we go over to court.

During the course of the meeting, can you describe Mr. Bergenn's demeanor when he was interacting with you?

A.   At times he was caring and concerned and at times he was passionate and emotional.

Q.   How did he demonstrate that he was being emotional and passionate?

A.   At one point in time he stood over me while I'm sitting in the chair in his office, my back is to the window and he's at the front of his desk, and he actually pounded on the desk and yelled, "I can't go back in there."

He said for -- and then he said right after that "for ethical reasons."  He had ethical reasons he was telling me that he couldn't go back to trial to try the case.

Q.   How did you react to that?

A.   Well, when somebody who's like 6-foot 3-inches is standing over you, and I'm only like 5-foot 7-inches and he's standing over me, I'm sitting in the chair, it was a breaking point.  That was the point.

There was no sense in continuing the fight and the argument anymore.  Hours have gone by, people are waiting, he told me my sister had just pled, and I just had to go down and do it.

Q.   At any point in time on the morning on Monday the 25th, did Mr. Bergenn say anything about your children?

A.   Mr. Bergenn told me I would get home to my children. This is what I need to do to get home to my children.

He knew that that was the most important thing to me, to get home to my children.  I had young children at the time.

Q.   How old were they at the time?

A.   Four and eight.

Q.   When he said you would get home to your children, how did you hear that?

A.   That I would be going home to take care of my kids.

I was the only one who worked and made any money, my wife wasn't working at the time, and I needed to support my kids.

We don't have money, you know, so I've lost everything as a multiple recidivist crime victim,

everything I had was gone, and I needed to take care of my kids.

Q.   Getting back to your kids could mean getting back to your kids when they're in their 20's or while they're still young, less than 18 years old.

How did you hear it?

A.   He assured me it would be somewhere in the neighborhood of not more than two and a half years.

Q.   When did he give you that assurance?

A.   Monday morning.

I was not going to plead.  I said, I'm not going to plead and leave my kids.  And he assured me I would be getting home to my kids.  I said, all right, if it's just going to be a short period of time, they could get a little help for a short period of time, but I've got to be getting back to my kids.  And I was assured I would be getting back to my kids.

Q.   Dr. Filippopoulos was present during this meeting, is that right?

A.   She was in and out because she had appointments all day on Monday and she was canceling her appointments.  So she would go out and make phone calls to her appointments, then she would come in and sit there with us.

So she was there for a good portion of it, but she was in and out.

Q.   Was she, to your recollection, present for the exchange that you just described where Mr. Bergenn put his fist down on the table?

A.   I can't tell you she was in the room at that time. It was one of those moments I don't know if she was in the room or she just stepped out.  But she was always close by.  She was in the approximate area.

Just down the hall from Mr. Bergenn's office is a little break area, so she might have been in there to make a phone call or something.

Q.   Did she say anything to you while she was in the room with you and Mr. Bergenn that influenced your decision to go over to court and plead guilty?

A.   Well, she was agreeing with Mr. Bergenn that I had this deficit disorder and because I had this deficit disorder -- and you know, I -- she -- I, you know, she knew that I -- it meant everything to me to get home to my kids.  And the only way this was going to happen is if I was going to get home to my kids.

Q.   And coming back to some of your earlier testimony, the exchange where Mr. Bergenn slammed his fist down on the table, it was not long after that that you went over to court?

A.   Yes.

Q.   So do you remember approximately what time you left

to go over for court?

A.    I'm thinking sometime after 11:00, but at that point I wasn't focused really on time or anything, I was just -- I wasn't clear at that point.

Q.    Before you -- in that meeting before you went over to court, did you and Mr. Bergenn review or make changes to the admission of offense conduct that had been under discussion over the weekend?

A.    Me and Mr. Bergenn did not discuss the -- we never -- we didn't discuss the admission of offense of conduct until months after the plea.  We discussed the document at Dr. Filippopoulos's office only and then the email exchange on Saturday.

Sunday he would just ask me questions about it and -- but I never saw the form.  I put my signature on the first page, but I never saw the other pages.  I never saw the form.

I went over it, and it was months later that we went over it.  When I sent an email and Mr. Chase called me up and then three-wayed Mr. Bergenn; and that was the only time we ever actually went over what was on the form.

Q.    When you say, "on the form," do you mean the admission of offense conduct that was attached to the petition to plead?

A.    Yes.

Q.   So the final version that was actually documented and submitted to the Court?

A.   That's correct.

Q.   But your signature appears on the first page of that document?

A.   I was handed the document and I signed the bottom of the first page.

Q.   Did that occur after you got over to court?

A.   That occurred in court.  Judge Chatigny asked me to sign it, and I signed it in front of Judge Chatigny.

Q.   Why don't we take -- quickly go -- not quickly, but go through what happened when you got to court.

You went over to court after the meeting with Dr. Filippopoulos and Mr. Bergenn, you went to court you say around 11:00 a.m. you think?

A.   Well, we would have got there.  Mr. Bergenn drove me and Dr. Filippopoulos over to court, parked in the parking lot across the street.  We came in, we went through security, however long that took, and then we walked up the hall.  And then at the top of the hallway is a courtroom door, and we went into that courtroom.

Q.   At what point in time were you provided with the form, the petition to plead guilty?

A.   The petition -- just before the hearing started, they had the form and Mr. Bergenn gave me the form, he wanted

me to fill everything out on it.  So I filled whatever blank lines there were, I filled out, and asked him what goes in here and they told me what goes in there and I wrote it in.

Q.   And where were you doing this physically?

A.   In the courtroom, I was sitting at the table that I pled from.  Dr. Filippopoulos was sitting right there behind me as we're going through the whole thing, and I did it all right there in the courtroom.

Q.   Did you ever write out in your own handwriting what you did -- strike that.

Do you remember whether there was a question about writing out in your own handwriting what you did to be guilty of the offense?

A.   I was told to write "see attached" in there.

Q.   And the attachment was the offense conduct stipulation?

A.   That's what it became, yes.

Q.   So you fill out the petition to plead and you write "see attached;" what happens next?

A.   Well, we sat in there for a little bit longer and then the hearing began.

Q.   Did you talk to Mr. Bergenn at all in that period of time other than asking which boxes to check on the petition?

A.   Not that I can recall.

Q.   Were you reviewing the offense conduct in that period of time prior to when Judge Chatigny took the bench?

A.   The only thing I remember about that is just before the hearing began, Mr. Bergenn came in and he dropped the document in front of me, and I look up at him and I see him walk around, and then he grabs a couple others, one of them which was a stipulation of -- because I looked at that -- it was on the table, and it was a stipulation of offense of conduct that we had discussed prior.  And he scoops up whatever other documents were on there and just left it there.  I didn't look at it, didn't bother with it.

Q.   Did you read that final version before that day, before Judge Chatigny took the bench?

A.   No, I did not.

Q.   When was the first time that you read it word for word?

A.   The first time I read it was when I was home.  At some point in time I was going through some documents and I pulled it out and I started looking at it and I'm saying -- it was similar to what I had gotten at 9:20, but when I got the one at 9:20 on Sunday night and I saw the word "willful," I just basically blew up.  I said I'm not pleading, I didn't do anything willful and I'm not

pleading.

And then I never even got back to it because I was not pleading from that point in time, from Sunday on. So I never even concerned myself what was in an admission of offense of conduct. Never even thought of it after that point until it came up in the hearing when I was asked about it.

Q. You recall Judge Chatigny took the bench and you went through a plea proceeding in court, right?

A. Yes.

Q. I've had marked Plaintiff's Exhibit 15 a copy of the change of plea transcript from February 25, 2013?

MR. FROST: And there's no objection that it's going to be full?

MR. SCHMEISSER: No objection.

BY MR. FROST:

Q. You were obviously asked a series of questions by the Court about whether your change of plea was a voluntary act on your part. Do you remember those questions?

A. I remember being asked a series of questions, yes. This was my first change of plea hearing that I've ever experienced.

Q. And there came a time -- strike that.

And there came a point in time in the proceeding where Judge Chatigny -- and focusing your attention on

page 44, and if you look at line 13 on page 44 -- the Court asked you in open court "Looking back, what do you see that you did that makes you guilty?"

Do you see that?

A.   I do.

Q.   And you responded, "I didn't properly do my proper due diligence and ensure that what people believed was happening was happening."

You see that?

A.   I do.

Q.   And the Court indicates, "all right," and you say "or what they thought was happening was indeed happening."

The Court addressed you and said, "You've heard the testimony of the witnesses with regard to the no more bills scheme and they seemed to testify credibly that they believed they were going to be getting the 10 percent payments, and you knew and had reason to know that wasn't going to be the case."

And you responded, "My intent was for that to be the case.  I did everything I can to make sure that was the case.  I did everything I can to make sure that was the case.  I knew they believed when they parted with their money what they expected would be the case, but unfortunately things happened and I could not perform. But, yes, they intended, and from consulting with

Mr. Bergenn, they just weren't informed properly about the proper risk. And because of that, that leads me to believe what the offense is."

The Court indicates at line 12, "I was strike by their testimony that they thought that their money would be invested in foreign currency exchange opportunities, and I gather from the admission that you've signed that their money wasn't going into those investments as promised, is that true?" And you answered "Your Honor, that's not true."

What were you trying to indicate to the Court at that time?

A. That what the Court read apparently in this admission of offense of conduct with the major changes that were made to it wasn't true and that what the Court believed wasn't true.

As a matter of fact, just taking everything that you just read in there, for example, on line 9 it says about the proper risk. Mr. Bergenn is telling me people didn't know the proper risk. I don't know what the proper risk is as opposed to the improper risk, because I say in here, witnesses testified that they did know there was risk.

If witnesses are testifying they did know there was risk, then I don't know what the proper or improper risk was. They knew there was a risk.

There's a risk to everything that you do in life. And if Judge Chatigny or Mr. Bergenn here tells me -- is constantly telling me they didn't know what the proper risk is, and then you get back to some of the emails where I was arguing the law and why I didn't believe that the Court could accept the plea, because the risk would be equivalent to the people -- of the people being deceived, the way I look at it, the people -- the risk of where people were deceived.

Well, Mr. Bergenn is also telling me, yeah, you didn't intend to harm anybody, and then I read the law, which the Second Circuit said again in U.S. v. Binday, I keep reading the law, and they say the deceit has to be coupled with a contemplated harm.

So I still can't wrap my head around if the risk is the deceit and Mr. Bergenn, with his 37 years as an attorney and his 27 years as teaching it, if he's telling me I didn't intend to harm anybody, I didn't think about harming anybody, which means I didn't contemplate harming anybody, if the deceit has to be coupled with a contemplated harm according to the Second Circuit and I didn't contemplate to harm anybody even if they didn't know the proper risk, that's just the deceit.

That's the way I read the law.  Maybe I'm wrong, but that's the way I read it.  And that's why I still, at this

point in time, can't understand why I'm pleading.

Judge Chatigny believes one thing because of what's in this admission, and most of what he's told comes from witnesses who the government later says may have only believed what they were saying was true.

Well, if the government's witnesses may have only believed what they were saying was true, how do you know what they were saying was true after they were coached by the government to testify.

Q.   Here is the next question, which is on page 46, while you're attempting to respond to the Court's question, Mr. Bergenn interjects if he could add something in line 8.  And he indicates that, it says "I think he," being you, "is very comfortable with the core fact that is expressed in the admission that as the government brought out more clearly this past week from the witnesses, is that when the witnesses parted with their money, they thought that no more bills was earning and that that's what was paying the monthly 10 percent and most of the money was being distributed was not from these foreign investments."

And he goes on to expound upon that.  And the Court asks you, at line 25, "Is that right, Mr. Rivernider?" And you answer, "That's pretty much it in a nutshell." Reading from page 47.  "That a lot of the people believed

something different than what was happening."

And you indicate, "I wish they had been better informed."

But you didn't question what Mr. Bergenn said, right?

A.   No.

Q.   Why not?

A.   Because what Mr. Bergenn was doing at this point in time was creating his own version of the crime, not what the government's version or what the indictment was, Mr. Bergenn created his own version of the crime, which is exactly what you just read there.

What the government was saying was that I knew in September that the house of cards would collapse.  That's proven not to be true -- provable not to be true if we had just put the evidence on because we have the evidence to show that.

And Mr. Lopez who wrote the PSR couldn't justify how if I knew the money was stolen in September, but it wasn't sent until October, how does money get stolen in September.  It's not sent until October, and I knew in September that the money was stolen.  It never gets reconciled.

Because what the government was presenting was simply not true.  So Mr. Bergenn created his own version of the crime, got me to believe his version of the crime and got

me to agree to his version of what the crimes were, which to me still doesn't fit the law.

And then I go and read case law that says you're supposed to know and understand the law when you plead. Clearly I still don't know and understand the law and that's still confusing to me.

Q.   Jumping ahead to page 53 -- so you entered your plea, I don't want to skip over that.  So page 48, the clerk puts you to plea on the charges in the indictment, you enter your guilty plea, and then there's a discussion that follows regarding the sentencing schedule and then also a request for you to remain on release, and Mr. Bergenn references the testing, on page 52, the testing that took place or the assessments that started with Dr. Stoll and shifted to Dr. Filippopoulos, and he shifts on page 53, line 8, "It will assist the Court and that's the only reason we got here today.  I don't think we could have been here today were it not for the four hours we spent on Saturday reviewing this information."

I take that that's the reference to a meeting you had at Dr. Filippopoulos's office?

A.   That's correct.

Q.   Because it was very significant to and directly corresponding to the conduct in the period of this case.

You agree with that statement by Mr. Bergenn that the

meeting on Saturday and what was discussed there in those four hours was the only reason you got there?

A.   That is the only reason we got there was because of the reason with Dr. Filippopoulos who was sitting right behind us in court that day, and if it wasn't for that meeting, there was -- there would have been no plea.

Q.   Now, you -- at some point you filed a motion to withdraw your plea, right?

A.   I did.

Q.   And that followed the hearing related to the diminished capacity departure request by the defense, right?

A.   Correct.

Q.   And there were some statements made by the Court during the course of that proceeding that indicated that the Court was questioning whether you had executive deficit function disorder or deficits?

A.   Yes.

Q.   And upon hearing that, which related to the reason why you believed you changed your plea, how did that affect you?

A.   It wasn't just what the Court said, it was what the government's doctor said.

The government went out of their way to -- and if I can take a second, Your Honor, you know, as you know, the

government -- I accused the government of prosecutorial misconduct and all kind of criminal acts, and since 2013 I've been presenting that information to you, and you know I have no problem with presenting that information to you.

Well, I'll take a step:  They apparently were concerned about my well-being and my health at that time, I assume, and the reason they went out and found two well-qualified doctors is to see do I actually have this disorder or do I not.

So I commend Mr. Durham and Mr. Schmeisser at this point in time for doing that because they proved that I did not have, and I appreciate that, because, you know, I can go through life having executive function deficit disorder or not so --

Q.    My question to you is, is it at that point -- I think it's almost immediately after that hearing that you attempt to take back your plea, is that right?

A.    Yes, after the government proved that I didn't have this disorder, that the report from Dr. Filippopoulos was faulty, wrong, not accurate, at least didn't have it at that time, then we had a hearing with Dr. Stoll.

After that, I walk out of the court -- my father was with me that day -- we walk out of the court, Ms. Vargo, Mr. Bergenn, Mr. Chase, me and my father, and I asked Mr. Bergenn, I said, you need to correct some of the

testimony from -- the whole testimony with Dr. Stoll was "Tosha Wade said," Everything Tosha Wade said, which was after we plead, and that was not cross-examined, and it was all wrong and false.  Everything Tosha Wade said was wrong and provably wrong.

Q.   I don't want to get into that.

What I want to know is:  Did the fact that you heard that you didn't have this deficit cause you to question whether you had made a knowing and intelligent plea?

A.   Yes, it did.

Q.   How?  How did it affect that decision?

A.   Well, as Mr. Bergenn correctly said the only reason we got there was because of this deficit, and once I learned that I did not have this deficit, then I needed to -- it was apparent from that hearing that things weren't going to go very well, so we needed to either correct the information or I needed to withdraw the plea; and Mr. Bergenn wasn't going to correct the false information, and because he wasn't going to correct the false information, within moments of getting away from Mr. Bergenn, I get in the car with my father, he gets on the highway, I look up the number for the Court, call the clerk and tell the clerk, I'm withdrawing the plea.  And that happened no longer than ten minutes after leaving the court.

MR. FROST:  I have no further questions, Your Honor.

THE COURT:  Thank you.

MR. SCHMEISSER:  Your Honor, just to inquire as to what the Court's schedule is this morning?

THE COURT:  I can be with you until 1:00.

MR. SCHMEISSER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SCHMEISSER:

Q.   Good morning, Mr. Rivernider.

A.   Good morning.

Q.   I want to take a step back and we're just going to discuss the several-day period leading up to your plea. But in terms of that issue, I just wanted to ask about your dealings with Mr. Bergenn just before and during trial and up to that time right before you pled guilty.

I just wanted to ask:  Was this an attorney who actually responded to emails you sent to him?

A.   Mr. Chase mostly responded to the emails.

As you might recall, at the end of the change of plea hearing, I said that Mr. Bergenn doesn't read my emails and he said he paid deference to Mr. Chase.

Q.   Let me just ask you:  During the time before and actually after trial started, is it fair to say that you

sent to Shipman & Goodwin many, many, many emails?

A.   I was diligently investigating the case and proving everything that your witnesses were saying was wrong and that there was --

Q.   Let me just ask -- a lot of these questions are going to be relatively straightforward yes or no questions and answers.  To the extent you want to elaborate, your counsel --

A.   I appreciate that.  But I remember hearing Attorney General Jeff Sessions a couple months ago state that these are my answers, and I'll use his line.

Q.   Well, Mr. Rivernider, I appreciate that, but there are actually certain rules of the Court and decorum in terms of responding to questions.

     So the question I have is:  Is it fair to say that there were many, many emails that you sent to your counsel prior to trial starting?

A.   I sent many emails, yes.

Q.   And that was in the hundreds, is that fair to say?

A.   Probably more.

Q.   And during the course of sending those emails, you were explaining to them not only how you saw the facts, but also your interpretation of the laws, is that fair to say?

A.   My interpretation of the law, how I saw the facts and

correcting a lot of false testimony and highlighting an awful lot of prosecutorial misconduct.

Q.   And you actually cited many cases to defense counsel when you were going through your analysis, is that fair?

A.   I didn't have access to a law library at the time.  I did gather a lot of cases when I was on diesel therapy at Wyatt for the four and a half months.

Q.   Let's just go back to 2009, you actually took a course in being a criminal defense investigator, is that right?

A.   I did for a year, yes.  It was an internship.  It was unpaid internship; and I did.

Q.   And you actually, during that course, learned to analyze case law, is that fair?

A.   Analyze case law?  It was more investigating, more investigating and doing intake with pretty much indigent defendants.

I worked with the Fourth District State of Florida.  It was a conflict resolution office that I worked with.  And I would go into the prison and do intake information with inmates after they were arrested.

Q.   As part of your dealings with that program, you were coming in contact with lawyers and with legal theories and research and discovery, is that fair?

A.   I met one lawyer the day right before I was arrested

and I had turned in a case -- I never met with the lawyer before -- but I had turned in a case where I investigated an entire case and proved that the guy who was sitting in prison for ten months wasn't guilty of the crime that he was in there for and found out who was and turned all that information over; and that morning, the day before I was arrested in this case, I asked her what happened with the case, and she told me that he pled guilty to time served.

He supposedly shot up a lawn full of people at a house and pled guilty to time served after a year because he had done the time served and that's all he was going to get, so he pled guilty even though he wasn't guilty.

Nineteen years old and now he's a convicted felon.

Q.   And I believe in discussing your experience as a criminal defense investigator and your training, that you learned the importance of reading all the documents turned over to you?

A.   Yes.  I learned the importance of reading all the documents in discovery because one of the things we learned in that class is that you'll get a whole wall full of documents from the government and documents you're looking for are buried down there.  That's the way the government does it.

Q.   So in terms of this particular case, you had many, many, many dealings with defense counsel in terms of

emailing them, talking to them on the phone, providing them with information of your arguments, is that fair?

A.   I had many dealings with defense counsel in this case, correct.

Q.   And we've seen a number of filings that you've made more recently over the years.  You actually have shown the proclivity for doing the legal research, citing documents to the Court, citing law to the Court, is that fair?

A.   I consider Judge Chatigny a pen pal who doesn't often write book.

Q.   And that you've actually been very forceful in your dealings with the Court in those various submissions, is that fair to say?

A.   I've -- in writing, I have been forceful in my submissions pointing out case law as I see it, pointing out the facts of the case and highlighting perjured testimony and withheld evidence which has been clearly evident in this case.

Q.   And it's clear that you have strong opinions about things and you hold, is that fair?

A.   Strong opinions?

Q.   You have strong opinions about this case and discovery.  Many issues, you appear to have strong opinions about that you're willing to actually put down on paper?

A.    You've taken my life, which has created strong opinions, yes.

Q.    But you're able to defend yourself in terms of actually saying, in submissions that you've made, this is your belief, you're adamant about that position, is that fair to say?

A.    I have no problem arguing the positions when I learn what the positions are; and when I learn what the law is, I submit the information to the Court hoping to get a response, yes.

Q.    Now, going back to your dealings with defense counsel, you said you had dealings with Mr. Chase.  Did he respond to your emails?

A.    Yes, he often did.

Q.    Is it fair to say that he spent a consider amount of time responding to emails of information that you proposed to him?

A.    No question he spent a considerable amount of time.

Q.    Is it fair to say that you felt that he actually gave some thought into those responses that he gave to you?

A.    Oh, yes, Mr. Chase definitely gave thought to those responses and we went back and forth on issues quite often.

Q.    Is it fair to say that Shipman & Goodwin retained investigators in this case?

A.   No, that is not fair to say.  Mr. Dolan I believe retained an investigator.  We had a joint agreement with that investigator.

If I'm wrong on how it worked --

Q.   The bottom line is that your attorneys were working with others to actually develop facts for your defense, is that fair?

A.   That is fair.

Q.   And during the course of their preparation, they were reviewing hundreds and hundreds of documents as well?

A.   I certainly would hope so, yes.

Q.   And they were interviewing many witnesses, is that fair to say?

A.   The investigators interviewed witnesses.  I don't believe the attorneys actually interviewed the witnesses, to my understanding.

Q.   To your knowledge, the attorneys were reviewing many, many 302's that were produced in this case, is that fair?

A.   They obviously weren't reviewing them properly, because as I reviewed them, I found all kinds of fraud in the 302's from the FBI agent, Stephen M. West, Junior, who's still out on the street, too.

Q.   And you brought that to the attention of defense counsel and they talked to you about their assessment of that information you provided to them?

A.   They didn't pursue it.

Q.   But their emails that I've seen that they were actually responding to questions you've raised and they were actually providing responses, is that fair?

A.   Are those emails you're referring to before or after or during trial?

Q.   I don't want to get on a separate track and waste time here.

Let's take your attention to Friday, February 2, after the close of trial; do you remember that day?

A.   Friday, February 22?

Q.   Of 2013.

A.   Yes.  Friday night.

Q.   And at the end of trial that day you knew there was going to be witnesses coming the following week?

A.   Monday morning.

Q.   And those witnesses included Carolyn Laporte and Tosha Wade?

A.   That's correct.

Q.   And Carolyn Laporte, who is that?

A.   My sister.

Q.   And Tosha Wade, who is Tosha Wade?

A.   She was a realtor who worked at the Sterling Village Resort for the developer.

Q.   And did both of those individuals have dealings with

you and deal with you directly?

A.   Yes.

Q.   And you would concede that there were various emails, particularly between you and Tosha Wade?

A.   There were emails mostly from Tosha Wade, and I would respond once in awhile to her emails.  She was -- my brother-in-law, Mike Laporte was really dealing with her directly.  I tried to not deal with her on a regular basis.  He did.

Q.   And at that point in time, you're aware that the government had actually listed a number of emails that you had had with Wade or Wade with you on its exhibit list that was to be introduced at trial?

A.   Right, but then none of that had anything to do with why I pled.

Q.   And in addition, there was other documentary evidence that would be related to Carolyn Laporte that was going to be introduced at trial?

A.   I assumed there was, yes, but --

Q.   You indicated before that one of your practices as a defense criminal investigator was to review documents, every document in discovery?

A.   I did.

Q.   So is it fair to say that you have actually reviewed the documents that were coming down the road in terms of

the government's exhibit list?

A.   It's fair to say that I probably reviewed them.  I most likely reviewed them.

Q.   And is it fair to say that you reviewed them with care?

A.   I won't question that.

Q.   And so as you sat there on Friday afternoon, after a week of trial, you knew that there were witnesses that were coming down, including Carolyn Laporte and Tosha Wade who --

A.   Who I was looking forward to because those two witnesses, specifically Tosha Wade, could have been very favorable to us in the direction I believe the trial should have been going.

     And also, had we stayed with Tosha Wade when she said that she basically told the lenders about the incentive program, the lenders would have been taken off the victim list because they now knew and were in on the deal.

Q.   So it's your testimony, as you sit here in this hearing, that you were looking forward to the government witnesses testifying --

A.   I was looking forward to them, I was looking forward to Donna Moore who said before the grand jury that she didn't get her payment in September of 2007.  I was looking forward to showing her bank statement showing

$22,000 going from my account into her account and showing that she committed perjury or lied before the grand jury.

Yes, I was hoping that they would -- I gave that information to my attorneys prior to trial hoping that they would bring it up prior to trial, but they didn't do that.

Q.   But as you had actually finished trial during that day, you had heard a series of witnesses during that past week?

A.   I heard a series of witnesses.

Q.   Did those witnesses testify favorably about what was going on involving their investments?

A.   One, for example, favorably towards where I thought the trial was going.  Like, for example, Lou Carlson, when you asked Lou Carlson three times if he got any money back in March of 2008 and each time he said no, and then I sent an email that night to my attorneys showing that he did get money back and exactly in March of 2008, and then the next day Mr. Chase asked him and he said that when he was prepped to testify, he wasn't -- didn't even know about this and then he did get the money in March of 2008.

So the way the trial was going was that you were putting witnesses on the stand who were lying and we had the evidence to show that they were lying and that they said you were supplying perjury.

So now, just like what happened in the Cliven Bundy case where he walked out of court because of massive prosecutorial misconduct, we had the same thing happening here; and because we had the same thing happening here, had we continued on with trial and all the witnesses lying, and Mr. Chase asked Mr. Carlson, he said, yes, I had to be reminded, so once he was reminded he got the money after I sent this email, he was then reminded by you guys that he did get money back.

So, yes, I would say the witnesses were going favorable to us and favorable to where this case could have gone.

Q.   So that Friday evening when you were actually -- we'll get to that right now -- in terms of when you're talking to your attorneys, they saw the evidence the same way as you, they basically said the trial is going very well; is that your testimony?

A.   On Friday evening?  No.  I don't believe they saw -- I don't know how they actually saw it.  I know they said that some witnesses -- this is when Mr. Bergenn started saying some witnesses were talking about risk.  We have testimony from Mr. Brooks saying he knew the risk, we had testimony from Mr. Reid saying he knew of the risk.  We had testimony from witnesses saying they knew of the risk, but maybe some of them saying they didn't know of the

risk.

And now you fast forward to document 576, pages 27 to 28, where Mr. Durham signs the document, Mr. Schmeisser's on there, and they say that their witnesses may have only believed what they were saying was true. And some of the were saying they knew of the risk. Then it's hard to know which ones were saying what, which ones were saying that they did know the risk, which ones were saying they didn't know the risk.

And when you have Mr. Carlson saying he was prepped and Mr. Bergenn actually saying that the witnesses were obviously coached to testify, that calls into question whether, even if they didn't think the trial was going favorably, how the outcome would wind up being two months down the road.

Q.   So your testimony is that if Mr. Bergenn gets on the stand and testifies that he told you on Friday night that things were not going well and he -- and that you were likely to be convicted on what the jury had heard and what was coming, you don't recall hearing that?

A.   Can I deny that he said that? I don't know that he did or did not say that. He may have said that, but that's just one point in time opinion.

Q.   As you sit here right now, do you recall him saying that to you or not?

A.   I can't honestly him saying that.

Q.   Did he say anything like that to you on that Friday night?

A.   I was drinking the beer and eating the hors d'oeuvres he ordered for me, and he may have said that; but I honestly don't recall.

Q.   He may have said that?

A.   I'm not saying he didn't.  All I'm saying is I wasn't really focused.  If he said that, I'm not going to deny it.  If he gets on the stand and says he said that, and even if he says that and he was going to say it without being coached, then I'm okay with that too.

But even if he said that, that's fine.

Q.   Mr. --

A.   The trial is like a roller coaster.

Q.   Simple question is:  Did Mr. Bergenn on that Friday night tell you that it was his belief that you were likely to be convicted?

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   Did Mr. Chase say anything along those lines?

A.   The only thing I remember Mr. Chase saying, because he's sitting next to me, he leans over like this and he says, "I agree with Mr. Bergenn."

That's the only thing he said to me the whole night.

Q.   When he said he agrees with Mr. Bergenn, was he saying it more than once or --

A.   Mr. Chase only said it once that I recall.

Q.   You testified you went to this restaurant on the evening of February 22.

A.   No, I did not.  I testified we were at the bar.

Q.   At a bar, okay.  A bar or restaurant on the evening of February 22.

A.   We were in the bar.

Q.   All right, you were in the bar.

And your testimony is it was crowded and noisy, or at least you've indicated in your pleadings before that it was crowded and noisy and that you were nodding and appearing to agree, is that fair to say?

A.   That was Mr. Chase's affidavit, what he said, and I recognized it immediately because that's quite often what I do.

Q.   But the bottom line is, is it your testimony to this Court that actually Mr. Bergenn was saying stuff to you and you weren't listening?

A.   Mr. Bergenn was saying stuff.  I tried to listen, I caught some of it off and on.

And he was talking about witnesses, and, yes, he was talking about witnesses, some of them didn't -- weren't

favorable and that we may have witnesses coming up next week that in his view were not going to be favorable.

And there's no question that witnesses weren't going to be favorable, but that's why you cross-examine witnesses and that's why you put on your own case and that's why you do what we were doing for the first week and a half of trial, or two weeks, where you would have witnesses say one thing and we would have -- we would ask the witnesses if it was correct. And we would be bringing out that what they actually were saying wasn't true.

And you documented that what we were showing wasn't true when you said that the witnesses may have only believed what they were saying was true.

Q. So you just indicated now that you heard him talking about witnesses not going favorably; yes or no?

A. Yes.

Q. Is it also fair to say that he had given to you in that conversation, during that discussion we had been talking about, witnesses coming next week that he did not feel would be favorable?

A. Of course. Tosha Wade would be testifying, and based on her proffer session which you sat in on, there were a lot of things she said in her proffer session --

Q. Mr. Rivernider, this is just calling for a yes or no answer at this point.

A.   I'm trying.

Q.   If you want to explore this more, you can do that with your counsel; you understand that?

So let me ask you then:  In terms of that evening, is it fair to say that -- isn't it true that Attorney Chase and Mr. Bergenn discussed with you the trial developments that developed the previous week?

A.   Yes.

Q.   And is it true that he explained to you that they believed that the same evidence of the victims harm would likely be received both by the jury and the judge charged with responsibility of the sentencing later, explained how he believed it was interpreted by the jury and the judge?

A.   Did he explain that?  I honestly couldn't tell you. It's possible that's what he was explaining, but I just don't know.

Q.   But it's your testimony that you weren't listening or that you couldn't hear?

A.   I was drinking.

Q.   You were drinking.  So you were drinking and you couldn't hear, couldn't understand?

A.   Well, we were in a loud, noisy bar, I have a hearing deficit, and they were both sitting to my right, which is my bad ear.

So, I'm looking at somebody, I can try to read what

they're saying, but to take it in and understand it is kind of difficult.

Q.   Is your testimony here today that you actually heard them talk to you about the victims' harm and how it would likely to be perceived by Court?

A.   I heard the testimony just as they heard the testimony.

Q.   Is that a yes or no, sir?

A.   Please repeat the question.

Q.   Isn't it true that you actually heard Mr. Bergenn talk to you about the victims' harm, how they had testified and how they would be perceived by the Court and jury?

A.   I'm trying to recall if I heard that.

I'm not going to deny that I heard it.  I may have heard it, but it really wouldn't have mattered because we still had six more weeks of trial.

Q.   Mr. Rivernider, in terms of the trial developments in the previous week, it's your testimony that you actually heard Mr. Bergenn talk to you about the trial developments for the previous week?

A.   I lost you halfway through.

Q.   You're sitting there at this bar talking with Mr. Chase and Mr. Bergenn, is that correct?

A.   Yes.

Q.   And he's talking to you, is that right?

A.   Mr. Bergenn is talking.

Q.   Yes.

A.   Yes, that's all happens; Mr. Bergenn talks.

Q.   And you were actually listening to Mr. Bergenn talking to you, is that correct?  Were you trying to listen or just drinking your beer?

A.   Trying to listen because I'm not impolite.  Obviously I try to listen.

Q.   Because before you said you were just drinking a beer?

A.   I was drinking a beer.

Q.   Is it fair to say that you could drink a beer and actually listen to what Mr. Bergenn is saying?

A.   It is fair to say I can do both at the same time, yes.

Q.   And when Mr. Bergenn was talking to you, just to get this clear on the record, you heard him talk to you about the trial developments in the previous week and what he was telling you?

A.   Bits and pieces, yes; but I don't deny it because I heard the testimony in court also.

Q.   But is it fair to say also that he actually talked to you about the government's expected evidence for the next week?

A.   I know that we talked -- he mentioned something about the witnesses who were going to be testifying next week. I know we said, okay, Tosha Wade is testifying and whatnot, yes.

Q.   And he also indicated to you the potential victims who might be testifying?

A.   Just Tosha Wade and Carol Laporte.

     I mean, we had a list of people who would be testifying.  I don't think we talked about any others that you referred to as victims.

Q.   In that actual meeting that evening, did he talk to you about the results of the prior neuropsychological test?

A.   On Friday night?

Q.   On Friday night?

A.   No, we did not discuss it Friday night.

Q.   Your testimony is there was no mention of the prior neuropsychological testing on Friday night?

A.   I did not hear him say anything about Dr. Filippopoulos or neuropsychological testing on Friday night in testing.

Q.   Now, again, I just want to get clear for the record what you heard or didn't hear.

     Did you hear Mr. Bergenn say to you that "We explained to Mr. Rivernider that with the evidence before

the jury and the evidence still to come into the record, we did not believe we could win any of the counts at trial"?

A. No, Mr. Bergenn didn't say that; there wasn't even conversation about that, that I can recall.

Q. So there wasn't any conversation about likely success at trial?

A. Not that I recall any conversation about the likely success at trial, no.

Q. And so there wasn't any discussion at all from your recollection?

A. Not about -- you mean whether we're going to win a trial or not a trial, no; it was just about these witnesses are coming in and those witnesses are coming in. That was it.

But I was looking forward to the upcoming witnesses, and that's why I continued to work on the upcoming witnesses.

Q. So during the dinner --

A. What dinner?

Q. During the din -- okay, the Friday evening time at the restaurant or bar, however you want to characterize it.

A. Right.

Q. During that time.

A.   The getting-liquored-up session.

Q.   During that time, is it true or not true that you were better able to understand how your conduct resulted in the indictment and to accept responsibility for your conduct that you had previously chosen to disregard?

A.   You completely lost me on that question.

Q.   Well, Mr. Bergenn says "During the dinner following his experience with his," meaning you, "experience, witnessing the victims' plight, Mr. Rivernider was able to understand better how his conduct resulted in the indictment."

A.   He talked about witnesses who previously testified and witnesses who were coming up.  I don't recall my -- this is the epiphany thing, I guess, which I -- totally is confusing to me and blew my mind that I had an epiphany.

Q.   I'm just asking:  Was there any discussion about the indictment in that meeting?

A.   No, because if there was a discussion about the indictment, I would have done exactly what I did on Sunday morning.

Q.   So the answer is no, Mr. Rivernider?  The answer is no?

A.   And I would have done exactly what I did on Sunday morning and say it's not true.

Q.   But the answer to that question is no, is that

correct?  Was there any discussion about the indictment?

A.   There was no discussion that I recall about the indictment or anything in the indictment or anything like the indictment.

Q.   Was there any discussion as you sit here today of the differences and implications to you between two options for going forward:

One, persisting in going to trial;

And two, a separate option, accepting responsibility for your conduct since you could now honestly focus upon and admit the facts that supported your conviction?

A.   Well, if there were two options, the options would have been move for a mistrial or file a motion --

Q.   Let me just ask you -- again, answer the question, please, sir.

Were there any discussion of those two separate options?

A.   There were no discussions of those options.

Q.   And in terms of that dinner, was there any discussion -- your testimony today has been that you did not decide at that point to pursue a second option, in other words, pleading guilty, is that fair to say?

A.   In 30 minutes sitting at the bar, I did not decide any options or consider any options while Mr. Bergenn was buying my drinks.

Q.   So there was no discussion of you actually admitting facts that you knew were true and that supported a conviction and changing your plea to guilty?

A.   If you're suggesting that Mr. Bergenn was getting me liquored up and then screwed me, then you can use that suggestion.

Q.   Well, sir, it's a simple question.

Again, was there any discussion with Mr. Bergenn about you actually admitting facts that you knew were true that would support a conviction?

A.   On Saturday?

Q.   On Friday.

A.   And not on Friday; on Saturday.

Q.   So as you sat in that bar/restaurant there was no discussion about your admitting those facts?

A.   Not in those 30 minutes, no.

Q.   So as you sit here today, in terms of anything of substance, nothing agreed to happen on Friday night?

A.   As I sat there on Friday night, nothing happened; and as I sit here today, nothing of substance happened, except beer and appetizers.

Q.   So then the next morning you actually went to see Dr. Filippopoulos with Mr. Bergenn, is that right?

A.   No.  The next afternoon I went to see Dr. Filippopoulos after I went to Mr. Bergenn's office.

Q.   That was after a series of emails that you introduced today, Plaintiff's Exhibit 1, 2, and Plaintiff's Exhibit 3, is that fair?

A.   That's correct.

Q.   Now, to your knowledge, over that particular weekend, was Mr. Chase going to be working at Shipman that weekend?

A.   He was there Saturday and on Sunday.  And my understanding was, he was working on the testimony, cross-examination of upcoming witnesses is what he said directly.

Q.   And Ms. Vargo was there actually working on stuff for trial?

A.   I never saw Ms. Vargo, I only saw Mr. Chase.  I'm not saying she wasn't there.

     Her office or her cubicle, whatever she -- I never saw where she works, but it's the other side of the reception area.  It's in a separate closed room.

Q.   So turning to the events on February 22, actually on February 23, the Saturday, you were in Dr. Filippopoulos's office for how long?

A.   We got there sometime around two and we left after six.

Q.   You spent some time with Dr. Stoll initially and after that with Dr. Filippopoulos and Mr. Bergenn?

A.   On that day?

Q.   On that day.

A.   No, we were in Dr. Stoll's office.  He wasn't there. Dr. Filippopoulos had another appointment and we were basically crashing her appointment.

Q.   And when did Mr. Bergenn actually get to that appointment?  Approximately what time?

     You thought it was sometime in the afternoon that you met with Mr. Bergenn there?

A.   No.  I went -- I walked from the hotel over to Mr. Bergenn's office and he drove to Dr. Filippopoulos's office.

Q.   And that was approximately what time?

A.   We got there sometime after 2:00.  So we left his office sometime after 1:00.

     I was only in his office -- I didn't actually go into his office.  I was just in the reception area and he came out and said we were going to Dr. Filippopoulos's office. I said okay, and we left.

Q.   And during that meeting with Dr. Filippopoulos, he actually showed you what you've identified as Plaintiff's Exhibit 4, the initial stipulation there?

A.   He handed me that sheet of paper and I kept it.

Q.   So that was something that he had actually brought with him when he actually drove with you to the appointment?

A.   That's correct.

Q.   So he wasn't actually faxed that while he was at the appointment, it was actually something he pulled out of his pocket?

A.   That he pulled out of a folder, yes.

Q.   So it was something that had been prepared before?

A.   Obviously.

Q.   And you don't know if it was prepared earlier that morning?

A.   I have no idea.

Q.   So you don't know if it was prepared in response to, let's say, an admission that you made to him and let's prepare facts or --

A.   It's something that I'm sure an attorney would prepare in pretrial prep just preparing a -- just in case they were going to have a plea, even before trial.

Q.   So as you sat there in this meeting with Dr. Filippopoulos and Mr. Bergenn, you said that Mr. Bergenn pulled a paper out and was acting as a used car salesman, is that your testimony?

A.   That's the way I characterize it because of the way he presented it and the way he was getting me to agree to what was on there.

Q.   During the course of that meeting in terms of reviewing with Mr. Bergenn, that meeting went on for about

four hours?

A.   From a little after 2:00 to sometime after 6:00.

Q.   So there's a fair amount of back and forth discussion with Mr. Bergenn about the actual facts of the case?

A.   Not until he pulled that paper out.

Q.   But how early in the meeting did he pull the paper out?

A.   It was later in the meeting, sometime later in the meeting.

Q.   And when he actually pulled that paper out, did he actually review the paper with you?

A.   He read it, and I had a copy of it, and I was either -- I was pretty much disputing this and that and telling him to -- that that's not the way things happened, here are the facts, and he would make notes and wordsmith it.

Q.   So you were basically saying what he was showing you wasn't true?

A.   I was modifying it because there were things on there that are not accurate, yes.

Q.   So were you agreeing to plead guilty object on Saturday afternoon?

A.   No.  That Saturday evening, because this was after we spent a considerable amount of time reviewing the report from Dr. Filippopoulos which showed that I had executive

function deficit disorder which I understand we learned I believe means that I don't recognize things when they change.

Q.   So that afternoon or later that evening you said you did agree that you were going to move forward towards pleading guilty?

A.   I agreed we would work on this form and see if there was -- if what we could come up with was something that I could agree to because then that would put an end to all this, that everybody would be happy that we were putting an end to this, and that I'd get home to my kids.

Q.   And he actually, during that pleaing with you, went through this draft stipulation with you, is that fair?

A.   Say it again.

Q.   Mr. Bergenn went through this draft stipulation with you on that Saturday afternoon, is that fair?

A.   You call it a draft stipulation, it's the one-page document.  It's not titled.

Q.   So the one-page document?

A.   The one-page document that I was going to agree to and that the government was going to agree to, everything, and what was on there was what we were all going to agree to.

Q.   But you were actually contemplating working towards a guilty plea, is that clear?

A.   If I could have put an end to this, then the Court would have been happy and the jurors wouldn't have to come in anymore, and I could have gotten back to my kids which was a month at that point, yes, I would have moved forward as I would up doing to pleading to make everybody happy.

Q.   And so you explained that to Mr. Bergenn that you were actually willing to plead guilty assuming that you could have a stipulation that you were comfortable with.

A.   If it was going to make everybody happy, he told me I needed to do it because I have brain damage -- he didn't say brain damage, he wasn't using that term at the time -- but he told me I had to plead guilty because of this.  And Dr. Filippopoulos was agreeing that this is what I needed to do, and they all agreed it was in my best interest to do this and get back to my kids.

Q.   So is it fair to say that as you sat there for those several hours on Saturday afternoon, there was a fair amount of time going through this particular document, Plaintiff's Exhibits Number 4, the admission of conduct?

A.   Yeah, not -- I mean, most of the time was on the other stuff and then we went through this.

     I mean, there wasn't -- there's not much there to go through, so it didn't take much time to go through it.

Q.   He actually handed it to you and you actually read it?

A.    I have the original copy of the three-hole punch documented in 596.

Q.    And you actually read it?

A.    I was reading along with him, yes.

Q.    When you say "reading along with him " what does that mean?

A.    He would read it and tell me what it said, and I would say, yep, that's not the way things worked, and he would make changes and notes and modify it.

Q.    So there was a back and forth discussion for the purpose of coming up with a statement that you were comfortable with?

A.    Yes.

Q.    And there was notes that he was taking about the conversations that you were having with him about that statement?

A.    Yes, if I was going to plea, we had to try to find something that I could agree to that the government could agree to.

Q.    And he was taking notes while talking to you?

A.    Yes, he took notes.

Q.    And then after that time, you actually got with him in a car and you drove off, is that fair?

A.    That's correct.

Q.    And that's where you were actually talking to him

about reaching out to Attorney Chase and relaying to Attorney Chase about the changes you were talking about?

A.   He was dictating to Attorney Chase on different things that we went over, and they were making changes the entire time.

Q.   And so -- well, as he was driving, you heard him actually talk to Attorney Chase and provide him with changes to the version of the offense?

A.   Yes, that's what he was doing.

Q.   Where were you sitting at that time?

A.   In the passenger's seat.

Q.   So it was your understanding that Attorney Chase was actually sitting back at Shipman and putting in these changes that you all had discussed?

A.   That's my understanding.

Q.   And that was moving forward in the direction now at this point of your moving to plead guilty?

A.   Based on what we were talking about and the government agreement to it, yes.

Q.   And at that point in time you were of the mind that if you agreed to a version of the offense that you were willing to plead guilty?

A.   If I could make everybody happy, which he played on the fact that I was going to be making everybody happy, then I would go ahead and do it because I was going to get

home to my kids.

Q.   So in your heart, as of that afternoon when you're actually driving in the car with Mr. Bergenn, you were thinking, I can get this done, I can plead guilty, assuming the facts are appropriate?

A.   Not in my heart.  I was thinking in my head that I would be able to put an end to this.

Q.   But it was "put an end to this by pleading guilty"?

A.   Yes.

Q.   So you weren't saying to Mr. Bergenn that afternoon and as you were driving the car, "I'm not pleading guilty"?

A.   There wasn't an opportunity for me to say that, and even if I said that to Mr. Bergenn --

Q.   There wasn't an opportunity to say that?  You're sitting with him for how many hours?

A.   We were sitting for probably close to five hours.

Q.   I've had a hard time getting out a straight question without you sort of talking.

        MR. FROST:  Objection, Your Honor, argumentative.

        MR. SCHMEISSER:  Let me rephrase that.

BY MR. SCHMEISSER:

Q.   We've had a back and forth, is it fair to say, this morning?

A.   I'm doing my best.

Q.   And it seems to me that if you have a point of view, you're willing to express it, is that fair to say?

A.   At this point in time, yes, but there's a difference between you and Mr. Bergenn.

Q.   At this point in time right now as we stand here, you're very willing to actually express your point of view?

A.   I had my life taken from me, I may not be around much longer, so I'm going to express my view.

Q.   But your testimony is that when you're sitting with Mr. Bergenn for those hours, you couldn't say to him "I'm not pleading guilty"?

A.   I did say that in emails later.

Q.   I'm asking about --

A.   Yes, and I did say that that morning or that afternoon in Dr. Filippopoulos's office before he then convinced me that I had to plead guilty because of the brain damage issue.

Q.   But in terms of when you're going through this stipulation or this version of the offense and talking about different language, you were not stopping him saying "I'm not going to go through with this further, I'm not pleading guilty"?

A.   Once we got to the point where he was committed and

he was --

Q.   I'm just asking about Dr. Filippopoulos's office.

A.   Right.  Once Mr. Bergenn got to the point where he was committed, there's no sense in telling him that because he was committed at that point in time to just, let's see -- let's just see what we can agree to.

And all we were doing at that point in time was, let's just see what we can agree to, and if we can agree to this, then maybe we can move forward.

Q.   But just to summarize, at the end of that meeting in Dr. Filippopoulos's office, you didn't leave that meeting saying, I don't want to review this version of the conduct because I'm not pleading guilty; you didn't tell him that, did you?

A.   I didn't tell him I was pleading guilty.

Q.   In terms of the actual driving in the car with Mr. Bergenn when Mr. Bergenn is actually talking on his phone to Mr. Chase to put in these changes that you all had discussed, you didn't stop him at that point and say, why are you doing this?  I'm not pleading guilty.

There was no conversation in that car ride, isn't that correct?

A.   I didn't have a conversation in the car ride because I was holding on for dear life.

Q.   But you sat there and listened to Mr. Bergenn talking

to Mr. Chase about the changes?

A.   I was actually more concerned about the cars around us.

Q.   Did you sit there and listen to Mr. Bergenn talking to Mr. Chase about the --

A.   I didn't -- I was paying attention to the cars around us.

Q.   A few minutes ago you said you actually were listening to Mr. Bergenn.

A.   He was talking.  I'm not saying I wasn't listening. I could hear him.  I'm sitting next to him.

That doesn't mean I was paying attention to what he was saying.  I was paying attention to the cars around us because he was going 80 miles an hour driving with his knee.

Q.   Is it your testimony as you sit here now that you didn't understand what he was doing in this conversation with Mr. Chase?

A.   It wasn't a focus of mine.  My focus was not getting in an accident and getting killed.

Q.   That's not the question.  The question is:  Did you understand --

A.   Yes, it is.

Q.   Did you understand that Mr. Bergenn was talking to Mr. Chase about making changes to your offense conduct?

A.    I understood that Mr. Bergenn was dictating to Mr. Chase changes that we had previously discussed, but my focus was we're in a car going 80 miles an hour, he's driving with his knee and talking on the phone and reading something to Mr. Chase.

What he was saying really wasn't relevant at that time.

Q.    So in this car ride -- how long was this car ride?

A.    However it took to get from Dr. Filippopoulos's office, I don't know, what is it, 20, 30 minutes?  On the highway, 20 minutes maybe.

Q.    So is it fair to say that you actually talked to Mr. Bergenn about the possibility of pleading to more counts than the one that was initially --

A.    In the car ride?

Q.    In the car ride.

A.    We didn't even talk about pleading in the car ride.

Q.    You did not testify about an hour ago that we may have discussed about more counts in the car.

If I go back and look at the transcript, you didn't say that?

A.    I didn't -- I don't recall saying that.  If it was presented to me, if we did that, I may have said I don't remember if that was part of the conversation, if we had a conversation in the car, because we're going 80 miles an

hour on the highway, I really wasn't focusing on what was going on there.

Q.   So now you do remember actually having a conversation about expanding the number of counts?

A.   I did not say that and, no, I do not remember saying that.

Q.   If we go back in the record and you said that, that was a misstatement?

A.   Mr. Schmeisser, we're going 80 miles an hour in the car with him driving with his knee talking on the phone and reading from the document from his notes, I wasn't focused on what it was he was talking about.

If I said earlier if I was asked if we had a conversation about that, I don't know what we had a conversation about because I'm holding onto the handle and worrying about what the cars around us were doing.

THE COURT:  Mr. Schmeisser, may I follow up briefly?  Because I realize my time is short.

Mr. Rivernider, prior to the meeting in Dr. Filippopoulos's office Saturday afternoon, had anybody suggested to you at any time that you should change your plea?

THE WITNESS:  Not at any point in time.  At that point there was discussion maybe months and months earlier where Mr. Bergenn was standing in his conference room and

he said, Are you sure you want to go through with the trial? And I said, yes, of course. That was the only time that issue ever came up.

THE COURT: So prior to the meeting in Dr. Filippopoulos's office, your counsel never broached with you the advisability of pleading guilty?

THE WITNESS: Only the months earlier in what I just referred to, but not during trial. There was no talk about that; nothing, no.

THE COURT: Please explain how it happened that you wound up taking these neuropsychological tests. How did that come about?

THE WITNESS: Well, I had -- in my office in my house there was some x-rays, and I couldn't remember why I got these x-rays done. I had mentioned it to Mr. Bergenn the first day Mr. Bergenn and I met when he took over the case. Turns out it may have been some sinus thing. I just don't remember why I had done that.

At some point in time later, he told me he wanted me to meet with these doctors. I assume it had something to do with those head x-rays that I had taken.

And also back in 1998, I had fallen off a ladder. Some of the testimony you got was incorrect. I fell straight down, broke my heels and then fell straight back and hit my head. That was in 1998.

So I don't know if that was related to a lot of that.

Why he wanted me to do that, you know, what he says -- he told me to come up and meet with this doctor, it was Dr. Stoll. I said, okay, fine, I'll come up and meet with the doctor.

I don't remember any specific details as to why or what the purpose was.

THE COURT: So did the discussion in Dr. Filippopoulos's office come out of the clear blue? Were you taken by surprise that you were hearing your lawyer tell you that you should plead guilty?

THE WITNESS: Yes. And that happened when he pulled the paper out.

THE COURT: You didn't see it coming?

THE WITNESS: No.

BY MR. SCHMEISSER:

Q. Continuing up on that, so you didn't see it coming, this is on a Saturday afternoon, is that right?

A. Yes.

Q. And you actually indicated that the night before, that you were actually looking forward to going to trial next week?

A. Yes.

Q. And, in fact, you indicated in some emails that

you -- that there were ideas, at least for part of the trial team, that they should be looking at this stuff in the trial continuing next week?

A.   When the trial continued next week, this is what we need to do.

Q.   So your testimony is you came in, Mr. Bergenn whips this paper out, shows it to you and very shortly thereafter you actually decided, hey, I think I might want to plead guilty?

A.   No, I never thought, hey, I might want to plead guilty.

He says, let's see, if you were going to plead guilty, what would it be that we can agree to?  We went over some things that we can agree to.

Yes, okay, we can agree to that, we know some people lost money; yes, we know that.  We can agree that those things happened.

We were going to stipulate that these things happened and the government's going to agree that these things happened, not that I intentionally defrauded anybody, intentionally deceived anybody.

That was never going to be part of any agreement that I was going to make.

Q.   And then you had these discussions but you were actually moving in the direction of actually pleading this

thing out?

A. He was moving in the direction of coming up with some things that we could agree with that if I was going to go ahead and do that, that that was what I would agree to.

Q. As you move on later that evening, you'd indicated that there was an email, now Plaintiff's Exhibit No. 5, and in that email --

(Pause)

Q. So Exhibit 5, you received this email -- it's Plaintiff's Exhibit 5, is that correct?

A. Yes.

Q. And you can see from the bottom section of the email there is a document at the bottom which indicates that Mr. Bergenn had emailed Attorney Schmeisser and cc'd Michael Chase?

A. Yes. He sent this with a stipulation to his client first before sending this to me.

Q. So let me direct your attention to the language where it says, "On the other hand, it is our firm intention to plead on Monday morning and to do all we can to avert the need for further witnesses understanding that we do not control much of anything."

You see that language?

A. Yes.

Q. So it indicates, "It is our firm intention to plead

on Monday morning," is that correct?

A.   It was his firm intention to plead on Monday morning.

Q.   But in terms of your testimony is that you had not agreed that we should move forward as that as a wise course?

A.   I agreed that there were certain things that we agreed to and he was putting together that piece of paper.

Q.   At the top of the document it indicates in the email to you -- from him to you at 7:32 -- he indicates that he is "available with my cell every hour until Monday morning"; you see that?

A.   Yes.

Q.   And he also indicates that Mike is working on the language; you see that?

A.   Yes.

Q.   And then it says, "See below for where we are so far. Mike will work with you more."  You see that?

A.   I do.

Q.   And then there is an attachment where you can actually see the draft stipulation of offense conduct.

A.   That's correct.

Q.   And that draft stipulation of offense conduct is actually longer than the document that you indicate was shown to you earlier?

A.   That's why I sent an email right after that and said

what happened to the letter.

Q.   I'm just asking you a question.  Yes or no, is that longer than the one you received earlier?

A.   That is longer than the one and that's why I asked what happened to it.

Q.   Just a yes or no answer, sir, would be helpful.  It might move this a little quicker.

In terms of your actual review of this document, you actually read through it, is that right?

A.   I read through it and I even responded to one of the -- the example that he used, yes.

Q.   So you were actually engaged in the process of actually working through the language?

A.   I read through it and I questioned what it was that he was referring to, yes.

Q.   So it isn't the case that the language that you saw in Dr. Filippopoulos's office was the last time you saw any written version of this offense?

A.   Well --

Q.   You saw this writing at 7:32, is that fair?

A.   I saw this on Saturday at 7:32, that is correct.

Q.   And you actually read it?

A.   And I read it, and I made -- and I questioned it, yes.

Q.   But part of it you were actually working -- you knew

that Mike was working on the language?

A.   That's correct, and that's why --

Q.   So this was not an actual final document.  It was actually something that was going to continue, is that fair to say?

A.   I never assumed this would be a final document.  I assumed it didn't have anything in there about the real estate in there.

Q.   So it was your anticipation that there would be part in here that would discuss the real estate venture, is that fair?

A.   If I was going to plead to, Count Nine, I believe, entails the real estate program, that they would have to put something on there, sure.

Q.   So this was going to be a work in progress?

A.   I didn't think about it, but yet it says "Mike is working on the language."

Q.   And as you were sitting there Saturday night, you were not sending him an email saying, I am not going to consider pleading guilty?

A.   I'm sending him emails on Saturday night questioning him how I could possibly plead guilty because what I -- what's -- what the charges in the counts are doesn't match up with the law.

Q.   Let me direct your attention to the next email that

you introduced, which is Exhibit 6, and this email is at 8:05 p.m.; you see this email?

A.   Yes.

Q.   And this email that you sent, you're looking at some of the language and you say that "It is likely that I did in fact deal with it"; you see that language?

A.   Yes.

Q.   I'm just asking if you see the language?

A.   Yes, I see the language.

Q.   Is there anything in this email which says "I am not pleading guilty"?

A.   What this email says is --

Q.   I'm just asking you, sir:  Does it say in this document, "I'm not pleading you guilty"?

A.   What it says --

Q.   Does it say the language, "I'm not pleading guilty"?

A.   It doesn't say I am pleading guilty either.

Q.   Sir, that was not my question.

A.   But your inference is that if I don't write in that email that I'm not pleading guilty, that I'm agreeing to plead guilty.

But I'm also not saying that I am pleading guilty, and your inference would be that I didn't write it so, gee, I must have been agreeing that I am pleading guilty.

Q.   Let me direct your attention now to Plaintiff's

Exhibit 7.  I believe that was the next one.

THE COURT:  Mr. Schmeisser, before you leave Exhibit 6, if I may, please?

Mr. Rivernider, what is the meaning of the sentence that appears at the top?

THE WITNESS:  That's what I wrote.  And in Section I, which comes out of that, I just copied and pasted it in there, the inference is that Will Sawran sent this to Joel Borovay explaining how the no more bills program works.

So if the inference is that that's incorrect and he was saying something incorrect, then I'm basically saying that this -- this doesn't happen after that. There's no email and conversation that happens after that. So if it's incorrect, then it must have been dealt with.

That's what I'm referring to.

THE COURT:  The words "since this did not happen" --

THE WITNESS:  Right.

THE COURT:  -- refer to what?  What is "this" in that phrase?

THE WITNESS:  I guess what Will Sawran was saying the way the NMB program works, so he's sending a program out to Joel Borovay explaining how the program works, where we hire foreign exchange traders to invest

your funds and we use your returns generated for trades.

Will Sawran apparently sent that email.

Now, just before this, it says that -- I forgot the other attachment.  In the attachment it says people were believing that about active -- that they were going to be getting paid from active trades.

Well, this here says that we're going to use your money and put your money into a trade, and that's how you're going to get the money back, which is exactly true and exactly what happened.

So if they're thinking that it's active paying trades that are already active when it's either new trades or new money going into other trades, the -- you know, I would assume that the inference that they're saying that this wasn't happening, well, it was happening.

And I was trying to figure out what they were saying too because what this actually says is what we were doing.

THE COURT:  What was your purpose in sending this statement to Mr. Bergenn?

THE WITNESS:  Well, they put it in this stipulation and I just wanted to clarify that if you're going to put this in, that the information is either correct or not correct, but it needs to be clarified.

If you're saying this isn't true and what you

previously said about active paying investments in the line before that, then the active paying investments -- what this is saying is true, if people believed there was active paying investments and Will Sawran was saying something about active paying investments, then I was trying to figure out what they were saying about the active paying investments in the line before that.

THE COURT:  Excuse me, Mr. Schmeisser, but I'm going to try this one more time.

If we look at this sentence, it concludes by saying, "It is likely that I did in fact deal with it." What does "it" refer to?

THE WITNESS:  Well, the email that the government presented was that Will Sawran sent to Joel Borovay; and if I recall, there's an exhibit that they presented, and their reference was, I believe, that the email was wrong, that the information in the email was wrong, and whatever else was in that email.

Will Sawran copied Robert Ponte on that email. Robert Ponte then sent an email to me, and I'm trying to remember going back then.  Robert Ponte sent me an email and something about that he was dealing with it, whatever. Nothing happens after that.

So when on Robert Ponte's email he says he was dealing with whatever it was that Will Sawran was saying,

nothing happens after that, and there's no other emails similar to it to any other potential NMB client.

So whatever Will Sawran was saying, which the government was saying wasn't true or was part of the scheme, that Robert Ponte actually sent me an email saying he was dealing with it.  And I remember sending to my attorneys the information saying Ponte said he was dealing with it and we never see another email that says that.  So I assumed Ponte dealt with it.  Whatever the government was saying wasn't true, that Ponte dealt with.

THE COURT:  This says, "It is likely that I" -- meaning you -- "did in fact deal with it."

THE WITNESS:  Right.

THE COURT:  And when you used the word "it," what were you referring to?

THE WITNESS:  Whatever they say in here that they believe is wrong.

If they believe something in here is wrong or the active paying investments that's in the line above it, whatever they say is wrong.  Because I probably called Ponte and said, hey, tell him not to say something like that or tell him not to do something like that.  I'm trying to remember back to the summer of 2007 when this happened.

Whatever the government is claiming was not

accurate, whatever it was, then it never happens again. So since it never happens again and this was the only email with anything like this in there, then I probably had a conversation with Ponte about whatever it said.

That's all I could make heads or tails out of. Because I was trying to figure out what the government -- I didn't know what the government was claiming was the crime here, because I was doing what I was saying I was doing. So whatever the government -- and there's a lot of things the government says, I don't know, they claim is a crime -- but whatever they were saying that I was doing that was wrong, that's what I did.

The money came in, it went to foreign exchange investment programs. That's what happened. Eventually the money got lost or stolen, but what happened, happened. But that's what happened.

THE COURT: Okay.

BY MR. SCHMEISSER:

Q. So just to return, in terms of the actual version of the offense, the version of the offense: It was your understanding that Saturday afternoon/evening, Mr. Chase was working on a draft, is that fair?

A. Saturday, yes.

Q. And he actually sent you that draft, or actually Mr. Bergenn sent you that draft, and we've been discussing

the language of that draft, is that fair?

A.   After they sent it to you, they sent it to me.

Q.   But you actually reviewed that version?

A.   That stipulation with that version, yes.

Q.   So that was actually another version you reviewed after the first one you reviewed in Dr. Filippopoulos's office?

A.   That's correct.

Q.   And you were actually then working with Mr. Bergenn and Mr. Chase in suggesting what was accurate, what wasn't accurate, so they could actually modify the stipulation?

A.   Yes.

          THE COURT:  Let's leave it there for now.

          Tomorrow we have time to continue.  The weather could be a factor.

          Shall we plan on starting at 10:00 given the weather forecast?

          MR. SCHMEISSER:  That's fine, Your Honor.  I'm not sure where the weather stands right now, but that would be fine.

          THE COURT:  All right.  I'll see you then.  Thank you.

                    (Proceedings adjourned at 12:57 p.m.)

C E R T I F I C A T E


In Re: RIVERNIDER vs. UNITED STATES



I, Darlene A. Warner, RDR-CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/s/_____

DARLENE A. WARNER, RDR-CRR
Official Court Reporter
450 Main Street, Room #223
Hartford, Connecticut 06103
(860) 547-0580