UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - x
                                  :
ROBERT RIVERNIDER,                :   No. 3:14CV1000(RNC)
                                  :
               Petitioner,        :
                                  :
          vs                      :
                                  :
USA,                              :
                                  :   HARTFORD, CONNECTICUT
               Respondent.        :   JANUARY 17, 2018
                                  :
- - - - - - - - - - - - - - - - - x
```

EVIDENTIARY HEARING – VOL. II

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

APPEARANCES:

FOR THE PETITIONER (AS STANDBY COUNSEL):

FROST BUSSERT LLC
129 Church Street, #226
NEW HAVEN, Connecticut 06510
BY:  ROBERT M. FROST, JR., ESQ.

FOR THE RESPONDENT:

U.S. ATTORNEY'S OFFICE–NH
157 Church Street
P.O. Box 1824; 23rd Floor
New Haven, Connecticut 06510.
BY:  CHRISTOPHER W. SCHMEISSER, AUSA

Darlene A. Warner, RDR–CRR
Official Court Reporter

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ROBERT H. RIVERNIDER, JR.

 BY MR. SCHMEISSER:             141

JAMES W. BERGENN

 BY MR. RIVERNIDER: 257

10:10 A.M.

THE COURT:  Good morning.  Mr. Rivernider.

THE WITNESS:  Good morning.

THE COURT:  I'm going to ask the clerk to swear you again this morning.

THE WITNESS:  Sure.  Same way as yesterday?

THE COURT:  Yes.

THE CLERK:  Please raise your right hand.

Do you solemnly swear or affirm that the testimony you shall give concerning the case now in question shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  I certainly do.

THE CLERK:  Please be seated.

THE WITNESS:  Better?

ROBERT H. RIVERNIDER, JR.,

called as a witness, having been first duly

sworn or affirmed, was examined and testified as

follows:

CONTINUED CROSS-EXAMINATION

BY MR. SCHMEISSER:

Q.   Good morning, Mr. Rivernider.  I wanted to continue where we left off to some degree yesterday, and I believe that we were on Saturday, February 23rd, 2013.  Can I take you back to that time?

A.   Okay.

Q.   And just to go through some of that stuff, you testified yesterday about Plaintiff's Exhibit No. 4 and this was the draft of facts that Attorney Bergenn had showed you on that day, is that correct?

A.   This is the way he gave me.

Q.   And that was at Dr. Filippopoulos's or the meeting with Dr. Filippopoulos?

A.   Yes.  And the reason you have this with the unmarked changes is because I posted it in docket 596.

Q.   And you actually reviewed this on that date on Saturday?

A.   Yes, we did.

Q.    And on that date, you also spent a fair amount of time with Mr. Bergenn and Dr. Filippopoulos?

A.    Both of them, yes.

Q.    And you had occasion to actually go through the language in this particular draft that Mr. Bergenn presented?

A.    We went through it and made significant changes to it, yes.

Q.    When you say you made significant changes, you were suggesting looking at the facts set forth here and you had suggested to change it?

A.    Say that again.

Q.    You actually reviewed word for word the draft and you had suggested corrections, is that fair to say?

A.    I had suggested things that needed to be changed in it that wasn't correct.

Q.    And you testified yesterday about going back in this car ride with Mr. Bergenn, which Mr. Bergenn was actually relaying the changes to Mr. Chase, is that right?

A.    He was dictating to Mr. Chase, yes.

Q.    All right.  And then it was clear, I believe, from the emails that as the afternoon and evening went on, that Mike Chase was actually working on the stipulation, updating it and making changes, is that right?

A.    Yes.

Q.   Let me show you what's been marked as -- and it's in evidence -- as Plaintiff's Exhibit 5, and that is several emails.

Let me see if I can figure out how to zoom out or zoom in.

Yesterday the key pad was working.

(Pause)

Q.   And you testified that you received this email from Mr. Bergenn at 7:32 in the evening, Saturday evening, February 23, is that right?

A.   The date (sic) that the email came in was 7:32.

Q.   The date was February 23rd, is that right?

A.   February 23rd, that's when the email --

Q.   And the time was approximately 7:32?

A.   That's when it came into my computer, yes.

Q.   And that's when you had occasion to read this?

A.   I looked over this and then I sent him an email response --

Q.   I'm just asking you, sir, did you have occasion to look at this?

A.   I did, yes.

Q.   And then actually at the bottom of this email, it indicates, and this is Mr. Bergenn, in an email to the government, indicates, "It is our firm intention to plead on Monday morning and to do all that we can to avert the

need for further witnesses."  Do you see that language?

A.   I see the email that he sent to you first before he sent to me --

Q.   The question I have, sir, is did you actually see that language?  Did you read that language?

A.   I don't believe I read the email he sent to you.  I read the email he sent to me, and then I responded on asking him what happened --

Q.   Sir, my question to you is:  Did you have occasion, when you received Plaintiff's Exhibit 5, which is an email chain, did you have occasion to actually go down the email chain and review that?

A.   I can't tell you I went down the email chain.  I know what I did after.

Q.   Answer my question, sir.

Did you have occasion as you sit here today to remember whether you read that or not?

A.   No, Mr. Schmeisser, I don't have occasion whether I sat there and read that.  I know what I --

Q.   That's fine.  I --

THE COURT:  Before we proceed, it would be very helpful if you would please not step on each other, so to speak, and allow the court reporter to make a good record.

But on this point, Mr. Mr. Schmeisser, I'm not sure I understand, are you asking whether on the evening

in question, February 23rd, Mr. Rivernider received and read this email as part of the email chain?

MR. SCHMEISSER:  Your Honor, this email that we have here appears to be part of an email chain, and my question was:  In reviewing the email that says at the top James Bergenn to Bob Rivernider at 7:32 in the evening, did he scroll down and review the email chain, which indicates Mr. Bergenn's note that it is our firm intention to plead on Monday morning.

THE COURT:  Does the document indicate that it was available to Mr. Rivernider that night as part of an email chain?

MR. SCHMEISSER:  Your Honor, we could get a tech person in here, but my understanding, if you look at the email, it's from James Bergenn to Bob Rivernider, but it also cc's various individuals at Shipman; and it's my understanding from this production, as you can see from the bottom is from Shipman.

So that is where we got the record.  And it's my understanding that that would include the email chain.

THE COURT:  So although Mr. Bergenn's email to you at 7:26 doesn't show delivery to Mr. Rivernider, the subsequent email from Mr. Bergenn to Mr. Rivernider would have included Mr. Bergenn's email to you?

MR. SCHMEISSER:  That's correct, Your Honor.

THE COURT:  Okay.

BY MR. SCHMEISSER:

Q.   So my question, Mr. Rivernider, is:  You don't recall whether you read that or not?

A.   I can't recall whether I read that or that was actually forwarded to me along with the other one.

Q.   Let me now direct you to the top of the email.  Does it indicate in the email that was sent to you?

     "I am with my cell every hour until Monday morning"; do you see that?

A.   If you can slide it down a little bit, it would be helpful.  That's better.

     Yes.

Q.   And in fact you read that?

A.   I'm sure I read that.

Q.   In addition, it says, "Mike is working on the language"; do you see that language?

A.   Yes, I do.

Q.   And did you read that?

A.   Yes, I'm sure I did.

Q.   And it then says, "See below for where we are so far, Mike will work with you more"; do you see that?

A.   Yes, I do.

Q.   And then attached to this email on the next page is what's titled "Draft Stipulation of Offense Conduct"; do

you see that?

A.   Yes.  I assume that this was a more legalese typed version of the letter.  I asked him what happened with the letter.  So if Mike is working on this, I would assume they just did it on a legal type form, which this looks more like a legal type form.

Q.   My question to you is:  Did you have occasion to read the draft stipulation that was attached to this email?

A.   I'm sure I did.

Q.   And that's because you indicated before in the testimony you gave yesterday that you, as a former criminal defense investigator, you read every document?

A.   As an intern criminal defense investigator, I was trained to read every document in discovery that was presented from the government, yes.

Q.   So let me direct your attention now to the next day, Sunday, February 24, 2013.

You had occasion to then meet with Mr. Bergenn for a good portion of Sunday, is that fair to say?

A.   We met for several hours in his office, yes.

Q.   And in meeting in his office, you had occasion to review further facts that related to this admission of offense conduct, is that fair?

A.   Mr. Bergenn would talk and read things to me.  He never showed me anything.

Q.   But there would be a discussion regarding the specific facts that you guys felt that you could admit to?

A.   As I wrote, I believe in document 571 or 596, in the motion to state surrender, Mr. Bergenn would come in and he would say, And you marked up the values of the -- the values of the properties were marked up 25 percent or something.  And I said, Well, I never calculated anything like that, we sold them for what the realtors told us or the developers told us what they were worth and then I negotiated a fee for that, and he came up with a 25 percent number.  I said that might be right.

That's all I know.

Q.   But it's your testimony that during much of Sunday, you all were working on sort of redrafting a portion of the stipulation, is that fair?

A.   He would come in and read something on several occasions and go back into Mr. Chase's office, and that's when I learned what a wordsmith was.  And he stood there at the door and said "I'm a wordsmith," I said "I didn't know that was a thing," and he walks out and goes in wordsmiths whatever he did.

Q.   But your understanding, that was not actually further preparing for the trial, that was actually with the interest of moving toward some type of guilty plea?

A.   Mr. Bergenn was committed to going to pleading and I

couldn't say anything to change his mind.

Q. So you actually, did you say to him, I'm not going to plead guilty tomorrow?

A. That night I did.

Q. During the day you did not say that to him as you were going through all this wordsmithing?

A. During the day I do not believe I did or could, yes.

Q. At no point during the multiple hours you were with Mr. Bergenn did you say, Jim, we've talked for a long time, I'm not going to plead guilty?

A. I don't believe I did.

Q. So in fact there was actually a continued back and forth discussing actual facts of the case that might be included in some type of --

A. Facts of the case. Like I said, we discussed algebra, we discussed other things. It was mostly him coming in and saying, Well, can you agree to this? And then going over, Can you agree to this? I said, That's not right, but, you know, if that's what, you know -- and then he went back to Mr. Chase's office and they did their thing.

Q. Is it fair to say that there were a number of things you agreed were true?

A. Yes. When you come in and say, well, people lost money; yes, people lost money, no kidding. I lost money,

everybody lost money.  We all know that.  People lost money.  Properties went into foreclosure; yes, I agree, properties went into foreclosure.  These things did happen.  Much later after the fact, absolutely.

Was that my intention for that to happen?  Of course not.

Q.   And that's your position now, it was not your intention?

A.   No, that was my intention from day one, and Mr. Bergenn says we'll present an email where he actually says he knows I didn't intend for anybody to lose a dime.

Q.   Let me show you now Government's Exhibit 11.

You indicate -- do you see this email?  It's actually Plaintiff's 11, it was introduced yesterday, and that's from Mr. Bergenn to you at 9:20 on Sunday, February 24, is that right?

A.   At 9:20, this is the email that he sent me, that's correct.

Q.   And this email indicates that in the attachment section it says "Rivernider Stipulation Section Draft Doc 2/2.  Do you see that?

A.   Yes.  Stipulation at 9:20.

Q.   Attached to this email that was sent to you on -- let me first ask:

This front part of Plaintiff's Exhibit 11, you had

occasion to read that at approximately 9:20, is that fair to say?

A.   I saw it said "stipulation" and I looked over this and then I -- I'm on the computer, I'm just then flipping through, yes.

Q.   But you had occasion to actually read the entire email?

A.   It's a one-paragraph email, I'm sure I read it. Can't understand some of it, but I'm sure I read it.

Q.   And the next page it indicates -- well, actually let me ask about that.

It says at the bottom of this email, "Call my cell if you want to meet tonight or talk on the phone." You see that?

A.   Yes.

Q.   Was Mr. Bergenn frequently indicated to you that he was open to have you call and talk to him about the case?

A.   Yes.  It was not a problem with calling and talking. I'm sure he would have taken my call.  But calling him wouldn't have accomplished --

Q.   Let me just -- simply, the question was:  He was open to having you call him?

A.   Yes, Mr. Bergenn was open.

Q.   And he actually was willing to hear from you at 6:00 in the morning or 11:00 or 12:00 at night?

A.    Whatever it took to get me to plead, he would have done, absolutely.  There's no question about it.  He was available 24/7 to do that.

Q.    And he was available 24/7 before this last week of February.  In other words, earlier emails indicate he's open to have you call him?

A.    Over that weekend absolutely.

Q.    Even before that.

A.    Even before that, I never really had a problem communicating with him; but I usually communicated with him by email, and as I learned, he didn't read them, Mr. Chase did.

Q.    I see.

So let me direct your attention to the next page of Plaintiff's Exhibit 11, which has a several-page draft proposed admission of offense conduct.  Do you see that?

Do you see that here on the first page?

A.    Yes.  This is a draft attorney/client work privilege document.

Q.    And that was sent to you approximately 9:20 in the evening on Sunday, February 24, is that right?

A.    I would say exactly 9:20 in the evening.

Q.    And that was after many hours actually discussing back and forth with Mr. Bergenn the facts of the case?

A.    That was spending time in his office, yes.

Q.    All right.  And so is it fair to say that you actually have read this draft proposed admission of offense?

A.    It is not fair to say and it's not accurate to say.

Q.    So you actually got this draft proposed admission of offense conduct and you decided to not read it at 9:20 in the evening?

A.    I'm sorry, let me reanswer your previous question because I may have misunderstood.

Q.    Let me rephrase the question.

A.    Please do.

Q.    You saw this draft proposed admission of offense conduct that was attached to this email, did you not?

A.    I saw this, yes.

Q.    So in other words, on the evening, the Sunday evening, February 24, at approximately 9:20 in the evening, you actually looked and saw that there was a draft proposed admission of offense conduct?

A.    And if I can --

Q.    Is that yes or no, sir?

A.    That is a yes, I saw it, and I would be more than happy do expand on the answer.

Q.    When you say you saw it, did you actually click and open up the stipulation, the attachment to look at?

A.    I clicked, opened it up and began reading.

Q.    And did you recognize that it was more than one, two, three, and four paragraphs?

A.    When I actually got to paragraph four, I had an explosion after getting to paragraph 4 where the word "willfully" is written in there.  And that is when I, immediately after reviewing that and seeing the word "willful" in there, which was never discussed at any point in time during the previous weekend, I immediately responded to Mr. Bergenn.

Q.    Let me ask you, sir, you said that you got to the third or fourth paragraph.

So you're telling this Court today that you actually didn't read the entire stipulation that evening?

A.    I never read this stipulation that evening.  I got to the word "willful" and ended it there, because at that point in time he snuck something in there that he knew I wasn't going to agree to and I told him I wasn't going to agree to.

Q.    But your testimony is to this Court today that after working all day long on an actual stipulation of offense conduct, after going back and forth with many, many different changes, you actually didn't read the entire document?

A.    Well, you refer to it as working all day long.  I refer to it as him coming in, asking me a question and

then going back to Mr. Chase's office on several occasions. That to me isn't working all day long, as you put it.

Q. Well, sir, you indicated before that you were diligent at reviewing every single document in discovery, is that right?

A. In discovery? No, I didn't review every single document in discovery because I didn't have an opportunity to because of the late discovery that you guys dropped while we were in trial.

Q. But my point is you believed and you testified the importance of actually looking and reading every single document in discovery if you could?

A. And it would have been important, and I wish I had the opportunity to do it.

Q. Is that a yes or no answer?

A. If I answer yes or no, then you're going to come back 20 minutes later and say I said something previously that I didn't say.

So the answer is that I wish I could have reviewed every document in discovery. Unfortunately, because of the late discovery, documents were not even made available to me, which I haven't seen to this day.

Q. Well my question to you, sir, is that you're trying to tell this Court today that you only read a few

paragraphs of this and you didn't read the entire stipulation?

A.    And in all capital letters, I sent an email to --

Q.    It's a yes or no question, sir.

A.    The answer is, in all capital letters, I sent an email later saying that the deal is off, see you in court at 9:00.  We're going back to trial.  I'm not saying I willfully did any of this because none of it is true.

Q.    Mr. Rivernider, I know it's difficult to answer these questions.

A.    It's very simple.

Q.    The testimony you're giving is you did not actually at this point in time, having spent the day talking about the stipulation, read this entire stipulation?  That's your testimony to the Court today?

A.    That's absolutely true.  I did not read the entire stipulation because I stopped when it was over.

Q.    Now, let me turn to the affidavit of Mr. Bergenn.  We covered some aspects where there may be differences of opinion in terms of certain facts that took place.  I just wanted to cover a few others and ask you about them.

Is it fair to say that during the course of representation, Mr. Rivernider, the Shipman firm, exchanged with you over 4,000 emails?

A.    I would say that's fair to say.

Q.    Is it fair to say that the Shipman firm -- and that would include Mr. Chase, Ms. Vargo and Mr. Bergenn -- had frequent conversations with you in person when Mr. Rivernider was in Connecticut, is that fair to say?

A.    When I was in Connecticut, the only reason I would be here was to have conversations with them, yes.

Q.    And is it fair to say that you would have frequent conversations with one or more of them when you were in Florida by telephone?

A.    Absolutely.

Q.    Is it also fair to say that Mr. Bergenn frequently explained to you evidence?

A.    We had numerous conversations about evidence, yes.

Q.    And did he frequently explain relevant economic facts?

A.    Relevant economic facts?  I'm trying to figure out what that means.

Q.    Let me change the question.

      Did he frequently discuss with you the legal significance of the evidence as it pertained to your case?

A.    Mr. Bergenn and I had numerous conversations about the legalities; and at times after the conversations, I would review information in discovery and my understanding of case law and often make modifications to what we had discussed.

Q.    And you found him receptive to actually talking to you back and forth and discussing issues, is that fair?

A.    We talked back and forth in discussing issues.  But Mr. Bergenn, I'm sure everyone would agree, suffers from perseveration; and because of his perseveration, he gets stuck on his idea and I can't change his mind.

      I remember the word "perseveration."

Q.    Mr. Rivernider, is it fair to say when he characterizes you as wholly engaged with the work of the Shipman legal defense team, is that fair to say?

A.    Can you repeat that?

Q.    When Mr. Bergenn says that you were wholly engaged with the work of the Shipman legal defense team, is that fair to say?

A.    I was wholly engaged in the investigation of this case, absolutely.

Q.    And he also said your legal skills were as good as any non-attorney client he had ever represented.

      Let me strike that question and ask a separate one that you might be able to answer.

      He indicated that you were capable of independent legal research, is that right?

A.    I am capable of independent research, yes.

Q.    And thoughtful commentary on legal issues, is that right?

A.   I have no doubt that that is actually absolutely correct.

Q.   And he said you were always confident and utterly unafraid to speak your mind forcefully and clearly, is that right?

A.   Mostly, yes.

Q.   And he says that -- in fact, he goes on in paragraph 13 of the affidavit to say that you were very strong willed, is that fair to say?

A.   Yes, and this is all before I learned I had brain damage.

Q.   In fact, you've been strong willed for much of your life, is that fair to say?

A.   I wouldn't characterize myself as strong willed for most of my life.  I have strong beliefs in things, and I hold those beliefs like, you know, the Constitution of the United States is supposed to be upheld.  I strongly believe that, and I'll live with that, and I'll take that to my grave when I do.  And when that's being violated, I'm going to stand up and say something about it, absolutely.

Q.   So again, as you'd indicated in the affidavit, which I think you agreed with, that you're always confident and unafraid to speak your mind forcefully, is that correct?

A.   I can't say that.  There's oftentimes on issues that

I don't speak my mind, and especially when there's someone like Mr. Bergenn who is bigger than I am and much more confident in his statements, I do tend to back down at times.

Q.   Mr. Rivernider, literally three minutes ago, or maybe two minutes ago, you agreed with Mr. Bergenn's assessment that you were always confident and unafraid to speak your mind forcefully and clearly.

Did you just now think that this would not help your case and now you're changing your answer?

A.   I don't even think that way, Mr. Schmeisser.  I just try to answer the question as honestly as possible.  And like I just said earlier, you just take something that I said and just twist it and try to wordsmith it around.

You asked me a specific question and I answered that specific question.

Do I at times -- something about do I always speak my mind.  No, I don't always speak my mind.

You asked me a specific question, I answer the questions specifically.

I don't sit here and think, Gee, will this help my case or not help my case?  I don't need help with my case, the Supreme Court already decided and ruled to help my case.

Q.   Let me direct your attention to later on in the

affidavit, and we're now moving to some of the events at issue, and I will try to touch on the ones we didn't touch on yesterday.

But you had this meeting on the evening of February 22, right, Friday evening?

A.    We went to the bar Friday evening.

Q.    And Mr. Bergenn's affidavit says that you discussed the very damaging evidence that had been presented during the second week of the trial at that meeting?

A.    That --

Q.    Yes or no.

A.    If he describes it as very damaging evidence when witnesses are testifying that they know the risk, to me that's not very damaging evidence when they testify that they knew the risk.

So it may be his characterization of the testimony, but I may have a different characterization of the testimony.

Q.    All right.  But is it your testimony today that you actually did discuss evidence that had been presented during the week of trial before that meeting?

A.    Well, as I believe I said yesterday, he was talking about this witness testified, that witness testified; I said, yeah, okay, that witness testified.

What the specifics are of the witness's testimony, I

don't recall any specifics of the witness testimony.

Q.    And the affidavit goes on and says that you, quote, express to us compassion for the victim witnesses.  Is that accurate?

A.    I don't have any doubt that I had compassion for the people who lost money, absolutely.  I intended to make sure that they got every dime that they believed they were going to get.  And when that didn't happen, I certainly would be compassionate for them.

Q.    But my specific question is:  Did you express -- in this meeting on the evening of February 23, did you express compassion for the victim witnesses?

A.    I don't remember having a conversation where I was asked:  Are you compassionate about the victim witnesses?  Where I would have expressed compassion about it.

I was focused on -- I focus on:  What are the facts?  Here's what the facts are, here's what the law is.

Q.    Paragraph 28 of the affidavit Mr. Bergenn says -- now this is again the evening meeting on that Friday evening -- "I discussed with Mr. Rivernider the trial developments of the previous week."  Is that accurate?

A.    I discussed the trial developments?

Well, that's the same thing.  We discussed the trial developments by talking about the witnesses who testified.  That's the same question, isn't it?

Q.   Let me move on.

He also later in that paragraph indicates that you discussed or he discussed or "we spent time discussing," is what he says, what the government's expected evidence would be the following week?

A.   Actually, I believe I said yesterday, we talked about the witnesses who testified before, we talked about the witnesses who are coming up, but that's something that happened over the entire course of the trial.

Q.   And then in paragraph 29, and I think we touched on this yesterday, he indicated that we again -- we explained again, we being Mr. Bergenn and Mr. Chase, the results of his prior neuropsychological testing?

A.   Are we talking about Friday night still?

Q.   Friday night.

A.   I don't believe we had any conversation about neuropsychological testing on Friday night, no.

Q.   All right.  And then later in paragraph 29, Mr. Bergenn says, "We explained to Mr. Rivernider that with the evidence before the jury and the evidence still to come into the record, we did not believe we could win any of the counts at trial."

Do you recall him saying that?

A.   That is just a stupid statement if he said that. We're not going to win any counts.

Q.   I'm not asking --

A.   What difference would it make if you only won one count and lose the other 17?  You're still guilty.  So I don't even understand why he would ask a question like that.  I think he would just put that in for filler in the affidavit.

Q.   Mr. Rivernider, it's a simple question.  It's, frankly, a yes or no question.

The question is:  In his affidavit, Mr. Bergenn says, "We explained" -- so in other words he was talking to you and he explained -- "to Mr. Rivernider that with the evidence before the jury and the evidence still to come into the record, we" -- that would be Shipman, the Shipman attorneys, "did not believe we could win any of the counts at trial"?

A.   That did not happen.

Q.   Now, in the affidavit, it refers to prior conversations with Mr. Rivernider discussing the implications of a guilty verdict with him personally and in terms of his potential sentence.

Do you recall having conversations with defense counsel about the implications of a guilty verdict with him personally and in terms of a potential sentence?

A.   On Friday night or just any time?

Q.   Prior conversations.

A.   The only time I recall, is Mr. Bergenn was in the conference room, Mr. Bergenn was standing along the window over there, and he's saying:  Are you sure you want to go through with this?  And I said, yes, here's what the law says.  And I said, yes, we want to go to trial.

And that was the only conversation we had, and it was in his conference room.

I don't recall any other conversation about anything other than we're going to trial.

Q.   So no discussions of the consequences of if you get convicted and how that might impact your life otherwise?

A.   There's notes in Mr. Chase's affidavit where he asked about consequences and I responded to them.

I only remember from what I'm reading in his notes, and I could imagine that if we had that conversation with knowing the success rate of the government, that I was a lot more optimistic with this case than the national averages of the government.

Q.   That's not my question, sir.  My question is simply: Did you have occasion to discuss pleas, the possibility of a plea -- actually let me strike that.

Before this dinner evening on this Friday the 22nd -- your testimony is that there was just this one occasion when the discussion of the impact of the verdict came up, or impact of the verdict on you came up?

A.   Yes, when Mr. Bergenn was standing along the window in the conference room and I was sitting in the chair. That was the only time I recall.

Q.   And was there any discussion at any point before Friday, February 22 or -- let me strike that.

Was there any discussion before this weekend time period that you had with Mr. Bergenn about the possibility of pleading guilty?

A.   No, we had no discussion of pleading guilty any time before that.  Or that night.

Q.   And actually Mr. Rivernider, you repeatedly referred to Mr. Bergenn at different points in time as 6-foot 5-inches, 6-foot 3-inches.  Maybe he's shrinking, but is it fair to say that he's actually more like 6 feet tall?

A.   You know, I've never measured him, but to me, I assumed he was around -- he's pretty tall.

I'm 5-foot 7-inches.  I note at that time I was sitting on the chair and he was towering over me and he slammed his fist on the desk, he appeared over 6 feet tall at that time.

Q.   But as you sit here today, you actually haven't determined his actual height?

A.   That's absolutely true.

Q.   So it just actually helps the written record to make it sound like he's this 6-foot 5-inch giant, is that fair

to say?

A.   I think he's at least 6-foot 3-inch.  If somebody wants to tell me something different, I'll accept that.  I just don't know.

I've never measured somebody, it's not my thing.  I couldn't tell you what his weight is.  That's not what I do.

I would be working at a carnival if I could do that.

Q.   Let me turn to paragraph 31 of Mr. Bergenn's affidavit, and I believe this relates to the evening of February 22, and he indicates "Notwithstanding our view, the outcome of the trial, we" -- that's the Shipman attorneys -- "reiterated that the decision to change his plea was Mr. Rivernider's alone."

It's your testimony there was no discussion about you pleading guilty on that Friday night?

A.   There was no discussion about pleading guilty on that Friday night.

Q.   So the fact that he claims to reiterate that the decision to change your plea was Mr. Rivernider's decision alone, the reiteration you're saying never happened?

A.   If Mr. Bergenn's suggesting that in 30 minutes sitting at the bar I decided to throw away my life, destroy my kids, cause my mother to die laying on the floor after having a stroke, that I decided to do that

because somebody said that they lost money two days earlier, which I knew about five years earlier, that to me is a totally ridiculous idea that I would not have agreed to do it after spending three years working on this case day and night proving that everything was false.

Q.   Sir, let me just ask the question again, it's a simple yes or no answer:  When Mr. Bergenn says "We reiterated that the decision to change his plea was Mr. Rivernider's alone," you're saying that did not happen on that evening?

A.   I'm saying that did not happen on that evening or any point in time.  It was not my decision to change my plea, it was Mr. Bergenn's decision.

Q.   And that when Mr. Bergenn says that they expressed the position to you that -- and actually reiterated to you -- that they were prepared to continue putting on our case in his defense at trial, did they say that to you on that evening?

A.   On Friday night --

Q.   It's a yes or no, sir.  Do you recall?

A.   No, I don't recall him saying anything like that.

Q.   All right.  So in terms of paragraph 32 of the affidavit, Mr. Bergenn indicates that it made much more sense to -- actually let me back up.

It says, "We explained that in light of what he was

now expressing" -- he being you -- "that it made much more sense to acknowledge what he did, show remorse and accept responsibility for his conduct by changing his plea," you're saying that that conversation did not happen on Friday night?

A.   That conversation did not happen on Friday night or any other time.

Q.   So continuing on in paragraph 32 where Mr. Bergenn indicates that "We," in other words, Shipman, "pointed out the potential benefits of agreeing to a guilty plea, including being in a stronger position to argue for a better sentence."

When he says "we pointed out," basically pointing out to you, did that happen on Friday night?

A.   We did not have conversations like that on Friday night because we did not have any conversations about pleading on Friday night.

Q.   So that answer is no, that did not happen?

A.   The answer is absolutely no.

Q.   Thereafter, did you have that actual conversation?

A.   Can you repeat the conversation?

Q.   Mr. Bergenn indicates that "We pointed out the potential benefits of agreeing to a guilty plea, including being in a stronger position to argue for a better sentence."

A.   That may have happened Saturday at Dr. Filippopoulos's office.  Maybe that was the reason why he got me to agree, not a better sentence, basically because I got brain damage that I'd get home to my kids, because who's going to put somebody in prison for life with brain damage.

Q.   Sir, let me ask the question again.  We're not talking about the mental issue, we're talking about this actual sentence where he says, "We pointed out the potential benefits of agreeing to a guilty plea, including being in a stronger position to argue for a better sentence."

A.   Right, but then you asked me if it happened after and --

Q.   Did that specific comment about pointing out potential benefits of agreeing to a guilty plea, including being in a stronger position to argue for a better sentence --

A.   No, because we -- I didn't plead for a better sentence.

Q.   Was there any statement on that Friday night that "We," being Shipman attorneys, "made clear," as is their duty, "that continuing to defend the case would adversely affect our ability to reduce your incarceration time at sentencing"?

A.    Well, defending the case could have led to an acquittal, so there wouldn't be an incarceration or sentence.

Q.    Well, sir, my question is simply:  Did counsel make clear, as was their duty, that continuing to defend the case would adversely affect their ability to reduce your incarceration time at sentencing?

      Did that happen on Friday night?  Did they make clear to you?

A.    Nothing like that happened on Friday night.  On Friday night we talked about this witness, that witness, drank beer for thirty minutes and then I left.

Q.    In terms of that statement about making it clear to you that continuing to defend the case would adversely affect their ability to reduce your incarceration time at sentencing, that statement -- was that statement made to you at any time after that Friday night?

A.    I wish it was and I wish -- if we have it in writing --

Q.    Is the answer yes or no?

A.    Can you repeat the question?

Q.    The question is --

A.    I wish I had it in front of me.

Q.    The question is whether at any point after that Friday night, did defense counsel make clear that the

continuing duty to defend the case would adversely affect their ability to reduce your incarceration time at sentencing?

A.    When it comes to the last part of it, the answer would be no.

Q.    Now, in terms of other things that the affidavit indicates -- and this appears relating to Friday, February 22, again that dinner engagement -- the affidavit indicates that you made a choice to pursue accepting responsibility by admitting those facts that you knew were true and that supported a conviction and to change your plea to guilty.  You're saying that never happened on Friday night?

A.    We were at the bar, we drank beer, I talked about witnesses who testified before and after, and I left; we never had a conversation like that.

Q.    Sir, again --

A.    The answer is no.

Q.    Thank you.  Why don't we start with the answer being no?

A.    Because then you would cut me off.

But you also started the question with calling it a dinner meeting when we were at the bar.

Q.    Sir, let me ask you as to any time after that Friday evening meeting, whatever you want to call it, whatever

happened on that Friday night, did you decide to accept responsibility by admitting those facts that you knew were true and that supported a conviction and to change your plea to guilty?

A.   That never happened.  Accepting responsibility was never an issue of accepting responsibility because that indicates that I actually committed a crime, so there was no accepting responsibility issue discussed.

Q.   All right.  Now moving on to Saturday, February 23, the time you spent with Mr. Bergenn on the 23rd, Mr. Bergenn explains that he explained to Mr. Rivernider why we believed, Shipman believed, he, Mr. Rivernider would benefit if he were to admit to the true facts that were sufficient for a conviction without making any agreement with the government?

A.   Yeah.  That -- Mr. Bergenn said that if you can -- if we can just come up with whatever it is that you could admit to.  Basically just -- just whatever the minimum things that you could admit to, and then that would be it, just whatever those few things are.  And then that's why there were only a few things on that sheet, and I said, okay, well can I can stipulate that these things happened?  Not that I was the responsibility or the cause of them happening, but we would stipulate these things happening, and the government would agree to that and stipulate as

well.

Q.   It indicates in the affidavit they explained to you why you would benefit if you were to admit true facts that were sufficient for a conviction without making any agreement with the government.

A.   And that's what he says.  And he did say we're not going to worry about the government, we're going to go right to the Judge.

And he indicated to me that the Judge was going to now agree and understand that, okay, here's a few things that happened, not that big a deal, a few things happened, not going to put this guy in prison for any long time. We're going to get him back to his kids because he has brain damage.

We're not going to worry about the government because, as the government is presenting their case, the government obviously has false evidence and misrepresentations, and maybe it's because their FBI agent Stephen M. West, Junior, has lied to them on numerous occasions and maybe they didn't even know it.

So instead of trying to even overcome what they don't understand and what they've been lied to about, we would just go right to the Judge and the Judge would understand it.

Q.   So as it related to Saturday, it was your

understanding that the approach would be not to have an agreement with the government as to an overall set of facts but to basically tell your story as to what you believed happened?

A.   Well, the government was going to stipulate as to what the agreement was and what the stipulations were, but we weren't going to have any type of agreement with the government as far as anything else.  Just a stipulation, that's my understanding, because that's what it says on the form, "Government stipulates," and that's what was supposed to happen.

Q.   Let me direct your attention to -- let me just actually follow up on that for a moment.

You just said that one of the purposes was actually to be able to tell your story and be able to present it to the Judge without worrying about the government that was somehow misled.

Didn't you just say that?

A.   The government who was misleading the Court and the jury and who was apparently misled by the FBI agent, rogue FBI agent.

Q.   So -- and so was it your understanding that you were going to be going forward setting some facts that may be at odds with the government's perception of the case because they may have it wrong?

A.   Well, the government still thinks I sold the one bedrooms at the Sterling for $220,000, and that's been proven wrong, which means the government had Tosha Wade, their star witness, commit perjury on the stand.  And Judge Chatigny still believes that too, and it's perjured testimony.

So the government obviously has been misled by fraudulent information.

Q.   Again coming back to the question, if you'd just answer yes or no:  As you just stated before, it was your understanding or impression that you were going to be coming up with a set of facts to present to the Judge that may be different from the facts understood by the government?

A.   Well, the government was going to stipulate --

Q.   Yes or no, sir.

A.   The government was going to stipulate to the set of facts that we came up with.

Q.   So, in other words, agree with your version of the events?

A.   That's what the form says, "the government stipulates."

Q.   Was that your understanding?

A.   That the government was going to stipulate to what the version of the facts are.

Q.   No, but my question, sir:  Was that your understanding as you sat in Dr. Filippopoulos's office? Is that what you're claiming now?

A.   That the government was going to agree to the stipulations, yes.

Q.   So, in other words, agree with your version of the facts?

A.   That the government was going to agree to whatever was stipulated, yes.

Q.   I see.

So let me direct your attention now to paragraph 38, and that has to do with again the Saturday meeting -- actually the Saturday proceedings, just in -- let me just strike that.

As to what went on Saturday, the affidavit indicates that after you left Dr. Filippopoulos's office, Attorney Chase, you and he spent several more hours reviewing by phone, in person and email messages, the many specific core facts of each Count of the indictment; true or not true?

A.   Not true.  Well, to qualify it, we drove back to the hotel, sat outside the hotel for 20 or 30 minutes, and he sat dictating to Mr. Chase over the phone, Mr. Bergenn.  I get out of the car, Mr. Bergenn leaves, and we didn't -- I didn't speak to him, as I recall, the rest of that night.

There were several emails.  So if he's referring to emails, then it would be true.

So there's different parts of the question and different ways to answer it, whether it's email.  It wasn't in person until after Mr. Bergenn drove away.

Q.   On that Saturday, Mr. Bergenn indicates that, "We went over the draft stipulation of offense conduct word by word to make sure that it stated the facts to which Mr. Rivernider could agree.  Mr. Rivernider expressed his unequivocal agreement with each of those necessary critical facts."

A.   I would agree to parts of that where on Saturday he would read it to me, I had a copy of it while in Dr. Filippopoulos's office, and I would say, no, this isn't true, and then make changes, okay, yes, this happened, I agree that this happened; and then he would make the changes that what happened.

But that's the only word for word type of way things happened.

Q.   Let me direct your attention now to Sunday, February 24.

In the affidavit at paragraph 40 it indicates that "Mr. Rivernider, Attorney Chase and I met again in our offices for approximately seven hours."

A.   Mr. Bergenn asked me to come over to his office.  I

wasn't planning on doing that.  He emails me, asks me to come over to his office.  I said, I have to shower, I'll be over at 9:48.

So then I went over there at some point in time.  We were over there for several hours, yes.

Q.   It indicates in the affidavit it was approximately seven hours.

A.   That may be true.  I don't believe that to be true.

I probably got there -- and this is just a guesstimate.  I was going to ask Mr. Bergenn this, and I wouldn't -- I can't tell you one way or another -- but I got there probably sometime around noon, maybe just before noon, and left sometime in the late afternoon time.

Q.   And in the affidavit it indicates "Mr. Rivernider, Attorney Chase and I reviewed word by word each of the facts in the various drafts of the stipulation of offense conduct."

So, in other words, you, Mr. Chase and Mr. Bergenn?

A.   Mr. Bergenn would come in, he would read something to me or ask me a question and then go back into Mr. Chase's office.  Mr. Chase would then come into the office, would hand something to Mr. Bergenn, would never look at me, didn't talk to me.

And I'm not slighting him for anything.  He just didn't -- that just didn't happen.  He just would come in,

hand it to Mr. Bergenn, walk back out, but didn't say a word to me all day.

Q.   Hand him a document?

A.   Hand him something.

That happened a couple of times.

Q.   During this multi-hour period?

A.   During this time period that I sat in his office, yes.

Very grueling day.

Q.   Now, in paragraph 43, it says, "After Sunday's work, Mr. Bergenn reviewed with Mr. Rivernider each word of the proposed admission of offense conduct in assuring that he agreed with the truth of all the facts contained therein." Is that true or false?

A.   That's false.

Q.   And we've gone over this before, but later in the affidavit, paragraph 43, it says later at 9:20 p.m., Mr. Bergenn sent a copy of this draft stipulation to Mr. Rivernider?

A.   Yes.  After he sent it to you and all the other attorneys and made multiple changes that evening, after I had left his office, he then sent me a copy of it and I responded that I was not pleading.

Q.   Mr. Rivernider, if we go back to February 2013, your father was still alive at that time?

A.    Still alive to this day.

Q.    And at some point, he came down to trial, is that fair?

A.    No.  Well, he came -- my sister was going to be testifying on Monday, so because he was working and he lived in Massachusetts, he figured it was going to be a long trial, so he picked a date to come.  So he said he'll come that day.  So on Sunday he drove up.

Q.    Who contacted him about coming down on Monday?

A.    It was -- I talked to my father on a regular basis, so he wasn't contacted about coming down on Monday, he just decided because my sister was going to be testifying that he would come that day.

Q.    When was the last time you talked to your father about coming down on Monday?

A.    When was --

Q.    In other words, did you talk to him over the weekend about coming down on that Monday?

A.    He was going to come that day because my sister was testifying that day.  It wasn't like, come this day for any other reason; it was come this day because he decided that he was coming.  I didn't ask him to come.  I wasn't going to tell him to take a day off from work to come and sit here for any reason.

      He was coming that day because my sister was

testifying because he thought that he would be able to come into the court while she was testifying just to be here for her while she was testifying.

Little did he know there was going to be an armed FBI agent standing at the door preventing him from getting into the courthouse, into the courtroom, so that he couldn't come into the courtroom.

Because he used to be a cop in Philadelphia where they had open trials and he would be able to go into, and the public would be able to enter the trial back in Philadelphia; but apparently that's different here.

Q.   Sir, again, it's a simple question:  Did you talk to your father over the weekend about the proceedings on Monday?  About trial on Monday?

A.   I don't recall having a conversation with my father -- I talked to him over the weekend when he came, but the question --

Q.   Did you talk to him about --

A.   On Sunday when he came we went and had dinner.

Q.   Did you talk to him before that Sunday, let's say, Friday or Saturday prior?

A.   I don't recall.  It would have been nothing important, for no reason; but he was coming on Saturday.

Q.   Coming on Saturday or Sunday?

A.   I'm sorry, he came on Sunday for Monday.

Q.   And then was he there on Monday?

A.   He was there on Monday, yes.

Q.   Did he stay for Tuesday?

A.   No, he went back.

Q.   So when did he go back on Monday?

A.   Well, Monday evening he went back, I assume.  I just don't recall.

He stayed in the hotel with me Sunday night and he went back because he had to go back to work.

Q.   And you had pled by that point?

A.   I had pled on Monday, yes.

Q.   Now, on paragraph 46 of Mr. Bergenn's affidavit, it indicates that "We went to court Monday morning with Mr. Rivernider having again affirmed his decision to enter a guilty plea."  Is that true?

A.   I'm sorry, say that again.

Q.   "We," and I believe he's referring to you and Mr. Rivernider -- you and Mr. Bergenn -- "went to court Monday morning with Mr. Rivernider having again affirmed his decision to enter a guilty plea.

A.   That's correct.  We went late Monday morning at some point in time before noon because at that point in time there was no other option.

Q.   And is it fair to say that during the morning before your change of plea that Mr. Bergenn sat with you in

another courtroom reviewing the extensive form the court used for guilty pleas?

A.   We sat in the same courtroom where we had the Rule 11.  After we arrived there, we were there for, I don't know, maybe 20, 30 minutes before the Judge came in and we started.

Q.   And that was when you were reviewing the plea petition, is that right?

A.   That's when they brought the plea petition and he handed it to me, and said, basically, fill this out, and I filled in the blanks.

Q.   So Mr. Bergenn also says that he met briefly with Mr. Rivernider's father whom Mr. Rivernider had called over the weekend to come in and attend his change of plea; is that not true?

A.   My father did not come in to attend the change of plea, because when he was coming and planned on coming for my sister's testimony, there was no change of plea.

And when Mr. Bergenn met briefly with my father, he turned around and my father was at the bench there, he turned around, I said, "This is my father.  He said, "Nice to meet you.  Sorry we have to meet under these circumstances."  And that was the entire meeting.

Q.   So when Mr. Bergenn indicates that you had called him over the weekend, called your father over the weekend, to

come in to attend your change of plea, that is not correct?

A.   I don't know how Mr. Bergenn would know that, it's --

Q.   Sir, it's a yes or no answer.  Is that not correct?

A.   That is not correct and that did not happen.

Q.   Now, in terms of your demeanor during this September -- during the Saturday meeting with Doctor -- with Mr. Bergenn and Dr. Filippopoulos, were you actually calm during that meeting?

A.   Which meeting was this with Dr. Filippopoulos?

Q.   On Saturday.

A.   On Saturday with Dr. Filippopoulos?

     I just learned that I had a brain deficit disorder, so I was -- I assume I was calm.

Q.   Calm.

     So, for example, you were not yelling or screaming or anything like that?

A.   No, I don't typically yell or scream.

Q.   So you presented yourself as a reasonable person at that time?

A.   I would say I presented myself as a reasonable person.  Not that anybody here would believe that.

Q.   Now Sunday, when you're dealing with Shipman for a number of hours, during that time is it fair to say that you were actually having a calm conversation back and

forth with Mr. Bergenn at that point in time?

A.   Sunday was a trying day, as you could imagine, that he's going over this pleading thing and I'm having -- it was just a very trying day.

Q.   You say trying, but in terms of your actual physical appearance to others, is it fair to say that you were calm and having a calm discussion during this process?

A.   I wasn't yelling or screaming.

Q.   Was it fair to say that you came across as calm and reasonable?

A.   I wouldn't doubt that.

Q.   Now, returning to the actual day of the guilty plea after you all had arrived at the courthouse, when Mr. Bergenn indicates in his affidavit "Our conversations" -- in other words, conversations between him and you -- "were temperate," is that fair to say, that you had temperate conversations, that they were not heated at the time you were at the courthouse?

A.   Yes.

Q.   And at the time you were at the courthouse, "At no time was Mr. Rivernider visibly upset about anything," is that fair to say?

A.   Well, I broke down and cried during the hearing, so I would say I was visibly upset at that point in time.

Q.   Let's say up to the time of the hearing while you

were at the courthouse.

A.    While at the courthouse for that short period of time, my father was there and Dr. Filippopoulos was there, and I had a couple of conversations with Dr. Filippopoulos; and I was trying to keep myself together.

Q.    In the affidavit at paragraph 48, it indicates that during the time before the court session on his change of plea, Mr. Bergenn -- I, Mr. Bergenn, reviewed with Mr. Rivernider the final typed version of the admission of offense conduct as revised that morning prior to your signing it.  Is that true or false?

A.    We reviewed the admission of offense of conduct several months after pleading for the first time, after I had read it for the first time, several months, and saw what was -- blew my mind; and I sent an email to Mr. Bergenn and Mr. Chase saying, I can't believe you made me sign that; and Mr. Chase then three-wayed with Mr. Bergenn, and we start going over it.

And at that point in time we had a very heated conversation.  Mr. Bergenn couldn't get through the first page before he had to get off the phone.  And then Mr. Chase just continued, then he was supposed to discuss at that point in time.

Q.    Mr. Rivernider, I know this is about the 70th time I

asked you, but the question relates to the specific question alleged in the affidavit.

A.   Right.

Q.   And that question is:  During the time before the court session on your change of plea, Mr. Bergenn reviewed with you the, quote, final typed version of the admission of offense conduct as revised that morning?

A.   Right, and --

Q.   Is that true or false, sir?

A.   It did not happen that morning; it's false, and I told you exactly when it did happen.

Q.   Now paragraph 50, Mr. Bergenn indicates in the affidavit, quote, "I never at any point said or indicated that we would not go back to trial."  True or false?

A.   When he slammed his fist down on the table, he yelled, I can't go back there to trial because of ethical obligations or ethical reasons that he had because I assume because I had brain damage.  So he said he can't go back at that point in time.

Q.   So when it says, "I never at any point said or indicated that we would not" -- we being Shipman, "would not go back to trial," you're saying that's not true?

A.   I'm saying Mr. Bergenn never said that, and Mr. Chase was at the courthouse so he could not have heard it as Mr. Bergenn stated in his affidavit.

Q.    So let me continue with paragraph 51, Mr. Bergenn states, "At no time did I," Mr. Bergenn, "or Attorney Chase in my presence suggest that he," Mr. Rivernider, "was guaranteed a sentence to a camp."

Is that true or false, sir?  Did he guarantee you a sentence to a camp?

A.    See, in the wordsmith world that you people live in, did he guarantee me a sentence to a camp?  No, he didn't in the wordsmithing world that you live in guarantee me a sentence to a camp.

He said, You'll go to a camp.

Is that a guarantee?  It all depends on how you interpret it.

To me, I'm going to a camp for a short period of time, I'll be able to see my kids and then I'd get home to my kids.

Q.    You've now added you're going to a camp for a short period of time.

Did he indicate to you how long you were actually going to serve a period of incarceration?

A.    He did not or could not give a specific time or date, but it would be getting back to my kids as soon as possible.  To me that meant much less than David Praise got, which he did 37 months.  To me it meant much less.

And we learned later Ivy Woolf Turk took $29 million

from real people, and that was the loss that -- that was the case that was used to calculate the loss, and she wound up doing a full 60 months. I've already exceeded that with good time.

So it would be much less than any of that, and much less than even David Praise who actually stole $14.7 million from people.

Q. Sir, you've just testified under oath that he could not give any time or date for the amount of time that you would be incarcerated, is that correct?

Is that what you just said?

A. I just said he could not give me a specific time or date, but the inference and the assurances were that it would be much less than those, because I have a brain damage issue, and of course I didn't intend to defraud anybody or take anybody's money, so it would be much less than those.

Q. So when you say "assurances," are you telling this Court that Mr. Bergenn said to you you will get a sentence shorter than Mr. Praise?

A. No, Mr. Bergenn doesn't say things like that, he wordsmiths things that leads me to believe I would get a sentence much less than Mr. Praise because of the issues that we just learned about. After two days and 17 tests, I just learned from a neuropsychologist that I had this

brain disorder and it wouldn't make sense that somebody would put somebody in prison for an extended period of time when they got two little kids that they need to feed who are now, because they're crime victims, having to grow up in poverty.

Q.   So, again, just to reiterate what you said a few minutes ago, you had indicated under oath that Mr. Bergenn could not give a time or date of how much time that you were going to serve in prison?

A.   No one could give a time or date.

Q.   In fact, that's what the Court told you when you actually had your plea taken, was it not?

A.   I believe the Court said that, yes.

Q.   In fact, you were actually told that you could be exposed to I believe it was over your lifetime in your sentence it could have been hundreds of years.

A.   Could have been hundreds of years.

And why would it make sense, right, to plead to hundreds of years?

I specifically remember Judge Chatigny staring at me and going like, nodding, like that's not going to happen.

So if it's going to be hundreds of years, guess what, we're back in trial on Monday, aren't we?

Q.   But you knew at the time you entered your plea there were no guarantees as to the amount of time that you were

going to get, is that fair to say?

A.   It's fair to say that I knew there was no guarantee on the amount of time, that's correct.

Q.   Now, turning to the affidavit, it says at paragraph 52, Mr. Bergenn says, "There was no discussion about promises to get to see his kids as soon as possible."  Are you saying that didn't happen?

A.   I love the wordsmithing in there, "as soon as possible."  Because I said "Get back to my kids as soon as possible."  He changes the words to, "See your kids as soon as possible," as though I'm looking to seeing my kids in prison as soon as possible.

No, I was looking forward to getting back to taking care of my kids and feeding my kids as soon as possible.

Q.   But as you just acknowledged, you had indicated that he did not give you any time or date as to how long this period of incarceration would be?

A.   It would be a short period, yes.

THE COURT:  Mr. Schmeisser, let me interrupt, if I may.

With regard to our schedule, we've been in session now for about an hour and 20 minutes, and I'm wondering how you would like to proceed.

I think we do need to take a short break for the benefit of the reporter at this point in time, and I'm

wondering how we should set up the rest of the day.

MR. SCHMEISSER:  Well, Your Honor, I don't anticipate having more than another 45 minutes to an hour. I've gone through the affidavit.

After that it's my understanding from defense counsel that their intention is to call Mr. Bergenn as a witness and for Mr. Rivernider to conduct direct examination of Mr. Bergenn, after which point the government would reserve its right to undertake its examination.

THE COURT:  Okay.  In terms of timing, can anybody give me any guidance?

MR. FROST:  Based on my discussions with Mr. Rivernider, his examination would be certainly at least an hour and probably closer to an hour and a half, I would think.

THE COURT:  So if we take a short break now -- well, let me put it to you this way.  Shall we take a lunch break now, shall we take a short break and continue with this line of questioning and then take a lunch break? What would you suggest?

MR. FROST:  Your Honor, I would suggest that we take a short break and then come back, allow me to finish with this witness, take a lunch break, and then resume with Mr. Bergenn.

THE COURT:  Okay, then, why don't we take 15 minutes at this time.

(Whereupon, a recess followed)

BY MR. SCHMEISSER:

Q.   We've had occasion to go through various statements from Mr. Bergenn's affidavit.  I want to go through a few in Mr. Chase's affidavit and ask for your comments.

On paragraph 12 of Mr. Chase's affidavit, this is the November 14th affidavit, 2017, he indicates that Attorney Bergenn, Ms. Vargo and Mr. Chase spent over 2,400 hours in pretrial preparation alone in this case; is that, based on your assessment of how much work they were doing, a fair estimate of the time they spent?

A.   They didn't share the billing with me, so I really can't confirm or deny that, but I wouldn't doubt that they spent a lot of time on the case.

Q.   Paragraph 13, Mr. Chase indicates that he personally reviewed each of the more than 90 FBI form 302's produced by the government in pretrial discovery and other materials.

Do you have any doubt when he represents that?

A.   I don't doubt that.  I didn't count how many 302's there were.  If there were 90 of them, there were probably 80 fraudulent ones.

Q.   Paragraph 66 of the affidavit, Mr. Chase indicates

that even before trial had begun, Mr. Rivernider had expressed his recognition that a conviction was likely.

Is that true or false?

A. Taken in context, it's possible that I may have said, sure, the government convicts 97 percent of the time. According to his notes, it's 50/50, so I was much more optimistic.

And you have to realize what this is in context where I met Mr. Chase and Mr. Bergenn in 2012. By that time, I had already been arraigned, we're sitting at the arraignment, we're listening to you lie to a federal magistrate judge about me having a passport where you have Steve West who took my passport 18 months earlier, you're telling the judge I have my passport.

Q. Sir, it's a yes or no --

A. The answer is when a prosecutor can lie to a federal judge and get away with it, what are the chances of winning a trial when the same prosecutor is going to be trying you, would indicate that you're going to have a low possibility of success.

Q. So when in his affidavit Mr. Chase says: Even before trial had begun, Mr. Rivernider had expressed recognition that a conviction was likely. Is that true?

A. I would have said that based on knowing that the indictment contained multiple fraudulent statements, that

if the government can get a grand jury to indict based on fraud, which we now learned later when we got the grand jury transcripts that you did in fact suborn perjury before the grand jury, that the likelihood of success at trial would have been lower than it would have been had there been a constitutionally required fair trial; absolutely, yes.

Q.   That was a very long answer for a very short question.  So let me ask it again.

Yes or no, "Mr. Rivernider had expressed his recognition that a conviction was likely," had you expressed your recognition that a conviction was likely, yes or no?

A.   Because of the fraud --

Q.   Sir, it's a yes or no question.

A.   And this is my answer:  Based on the fraud that you were presenting and the crimes that you were committing, it is likely that we could be convicted, and that's why I said that we would be appealing because then we can address those issues.

Q.   And Mr. Chase also says in his affidavit that you'd expressed that -- the following:

He said to us that you believed the odds that a jury would unanimously acquit him were, quote, probably none, is that correct?

A.   And the word "unanimously" is in there because now you have 12 people.  Unless we have the 12 angry men who where one is getting the other 12 to say that this is not accurate and they vote to acquit, then all 12, it's possible that all 12 could have bought into what you were presenting.

Judge Chatigny still believes it and most of the people still believe that I sold one bedrooms for 220 and Donna Moore didn't get her payment in September of 2007.

If people can still believe that stuff or that I cursed in front of a three year old, if people can still believe that stuff, then, yeah, you could get a jury that wouldn't unanimously acquit me.  Absolutely.

I could get a jury to not unanimously acquit me.

Q.   Sir, that's not the question, and I think your answer is in the record, but again, let me ask you:

When Mr. Chase in his affidavit says that you said to the Shipman attorneys that you believed the odds a jury would unanimously acquit you were probably none, did you say that -- say that to Mr. Chase or not?

A.   Did I say they would unanimously acquit me?  It's possible that I said that the jury would not unanimously acquit me.

Q.   And then Mr. Chase says:  "He also expressed" -- and this is in the time before the trial had begun -- he says

that "Mr. Rivernider also expressed that he believed the likely consequences of a conviction would be 10 to 12 years of imprisonment."

Did you say that to Mr. Chase?

A.   In the context of 10 to 12 years, there's a reason for that, and the reason for that is --

Q.   So the answer is yes, you said it?

A.   Counsel told me that a conviction after trial could be as much as 10 to 12 years.  That was after trial.  That is what I was told by counsel.

Q.   So when Mr. Chase in his affidavit says "Mr. Rivernider also expressed that he believed the likely consequences of a conviction would be 10 to 12 years of imprisonment," you expressed that to your counsel?

A.   I expressed it based on counsel's advice that likely would be 10 to 12 years based on the exact timeframe that counsel told me.

Q.   So directing you to paragraph 69 of the affidavit, it says, "During that meeting" -- and it's in reference to the Friday evening meeting, it says, the affidavit says "Attorney Bergenn and I each expressed to Mr. Rivernider our belief of the best course of action would be for him to enter a plea to the facts he believed to be true and to accept responsibility for his conduct."

Did Mr. Chase or Mr. Bergenn express that to you?

A.   Only the first part about just what you need to say -- just what you can stipulate to be true.  And if you stipulate -- just to what the stipulations are.

THE COURT:  This is a reference to the Friday evening meeting?

MR. SCHMEISSER:  Yes.

THE WITNESS:  Wait a minute, I'm sorry, there was a reference to the Friday evening meeting?

BY MR. SCHMEISSER:

Q.   Yes.

A.   See, that's what you do, you throw this thing out and then I answer the question --

Q.   There's no question pending, Mr. Rivernider.

A.   Right, but you just misled the Court because Friday evening we did not have any conversation about this, but you just threw it out and you caught me on it.

He caught me.

We didn't have this conversation on Friday.  You got me, and it's probably in the record.

Q.   Mr. Rivernider, all I'm doing is going through sequentially the affidavit.

A.   You're a wordsmith, I understand.

Q.   So let me ask the question again regarding paragraph 69 of Mr. Chase's affidavit.

So "Attorney Bergenn and I each expressed to

Mr. Rivernider our belief that the best course of action would be for him to enter a plea to the facts he believed to be true."

Now, as it related to Friday evening, is that correct or not correct?

A.   Could you please re ask the question?

Q.   "Attorney Bergenn and I each expressed to Mr. Rivernider our belief that the best course of action would be for him to enter into a plea to the facts that he believed to be true."

Is that true or not true?

A.   Friday evening we did not talk about anything other than witnesses who testified previous and witnesses who testified -- who were going to testify the upcoming week.

And that's my recollection now from what I remember hearing while drinking beer at the bar on Friday night.

Q.   So on paragraph 72 of the -- of Mr. Chase's affidavit, it indicates that sort of -- or basically it's referring to over the course of the time period before the plea -- "the admission of offense conduct ultimately submitted to the Court was drafted, discussed on a word-by-word basis with Mr. Rivernider and revised and edited in progressive interim draft with Mr. Rivernider's input to ensure it's true."

A.   I had no conversations with Mr. Chase on Saturday or

Sunday or Monday about this.  We never discussed the admission of the offense of conduct or the stipulations or your modifications and changes that you made to it.

Mr. Chase never had a conversation with me about this at all.  We never discussed any word-for-word changes.

Mr. Bergenn would come in the office, he would make a speech and then he would leave.

Q.   Let me turn your attention now to Monday, February 25 of 2013.

Now, you were aware that your sister was considering pleading guilty, is that fair to say?

A.   When is this now?

Q.   This is Monday, February 25th, 2013.

A.   No, I was not aware my sister was considering pleading guilty at all.

Q.   You were not aware that over the weekend Attorney Bergenn had been consulting with counsel for Ms. Seneca about her pleading guilty?

A.   I was not aware of that at all.  I learned my sister pled sitting in Mr. Bergenn's office when he turns to me and says, well, your sister just pled.

Q.   It's your testimony to the Court today that you were not aware that your sister pled guilty and said in court that "I entered into an illegal agreement with my brother, Robert Rivernider, and others to defraud banks to lend

money by misstating or assisting others to misstate the origin of earnest money payments for real estate transactions. In addition, I assisted others in misstating income on loan applications, including Donna Moore."

You were not aware that your sister was going to say that in court?

A. My sister didn't do that, and if she was made to do that in order to plead, that's this corrupt system that you people have developed and designed in order to get people to plead and get judges to buy into the pleas.

I think it's despicable.

Sorry.

Q. So you were not aware that your sister actually was going to say that in court the morning of Monday, February 25 of 2013?

A. Mr. Bergenn turned to me and said "your sister just pled."

I have never read her transcripts, I have never been given a copy. It was that morning I understand, and the only way I know is Mr. Bergenn turned to me and said that she pled.

Q. So you indicated that you learned from Mr. Bergenn the morning, that Monday morning, that she had pled guilty?

A.    And I'm sure you're the one who told Mr. Dolan what he had to put in whatever agreement she had to sign.

Q.    That's not the question.

A.    That is the question.

Q.    The question is -- well, let me rephrase it.

Mr. Bergenn told you in the morning, that Monday morning, that your sister had pled guilty?

A.    Mr. Bergenn in his office turned to me and said "Your sister just pled guilty."

Q.    Did he then describe who took the plea?  Who took the plea?  Which judge took the plea?

A.    No.

Q.    So you didn't know that actually Judge Chatigny was spending time that morning actually taking her guilty plea?

A.    I had no idea.  All I know is he turned to me and -- no idea that she was going to be pleading guilty.  He turned to me and said that -- he was sitting in his chair and he was facing the window, I guess he got an email that came in -- and said that your sister just pled.

Q.    And were you aware that the proceedings adjourned for that guilty plea at approximately 10:30 in the morning?

A.    No, but thank you, I needed that time.  10:30 a.m.?  How would I know that?

Q.    Now, that morning you then came into court and you

actually sat down and sat with Mr. Bergenn and went through a plea, a petition to enter a plea of guilty, did you not?

A.    After we arrived into court, which would have been obviously after 10:30, because as Mr. -- as you just said now, I know it was 10:30 that that ended, that Mr. Bergenn then turned to me and said "Your sister pled" and then he then continued to persist to get me to come down here.  So it would have been clearly sometime after 11:00 that we would have gotten here, and he gave me that piece of paper and asked me to fill out that piece of paper.

Q.    I'm marking the petition to enter a plea of guilty as Government's Exhibit 1.  Let me show it to you.

Do you see this document?

A.    I do.

Q.    Do you recognize this document?

A.    I do.

MR. SCHMEISSER:  Any objection to its admission?

MR. FROST:  No.

BY MR. SCHMEISSER:

Q.    Now, in Government's Exhibit 1 -- actually, let me strike that.

So when you saw this document, you were sitting down and reviewing it with Mr. Bergenn?

A.    No.

Q. Were you actually sitting down when you first saw the document?

A. I was sitting down, yes.

Q. And then you actually received the document, is that fair to say?

A. Yes. And if we had the video that I asked for, we'd be able to see all of this.

Q. But you were actually sitting when you got the petition, is that fair?

A. He handed it to me and I was sitting, yes.

Q. Who handed it to you?

A. Mr. Bergenn.

Q. So then you had occasion to review the document, is that fair to say?

A. I had occasion to. I probably started looking at it, sure.

Q. And going down the first page of that document, it says "The above-named defendant respectfully petitions this Court to permit him or her to enter a plea of guilty"; do you see that?

A. Yes.

Q. Then it goes on and says "In support of this petition, the petitioner represents to the Court as follows." And then it says, "My full and legal name is Robert Henry Rivernider, Junior."

Do you see that?

A.   Yes.

Q.   Whose handwriting is that?

A.   I filled out the form.  I was told to fill out the form and was handed a pen by Mr. Bergenn.

Q.   So that's your handwriting?

A.   Yes, it is.

Q.   The additional writing on that page where it says 47 years of age, when you were born, where you were born, that's your hand writings, is that fair?

A.   And these are even questions that I was able to answer on my own, yes.

Q.   And so you were then reviewing this document and got to the second page, is that fair?

A.   That comes after the first, yes.

Q.   And on this page, it indicates that you have -- you were represented by counsel, does it not?

A.   It asks the question in number 6 if I am represented by counsel and the names of the attorneys, and I wrote in James Bergenn and Mike Chase.

Q.   And as it goes further down, there's additional language, including 8A, which says, "I have given my attorney a full statement of all the facts and surrounding circumstances as known to me concerning the matters mentioned in the indictment information, and I believe

that my attorney is fully formed as to all such matters,"
do you see that language?

A.   Where is that?

Q.   8A.

A.   Yes, I see the language.  I didn't -- yes.

Q.   Is it fair to say that actually you were reviewing
this entire petition as you were signing it?

A.   No, it is not fair to say.  I was told to fill in the
blanks.  I filled in the blanks.

Q.   So your testimony to this Court is that you actually
were just filling in blanks that you were pointed to fill
in?

A.   That's correct.

Q.   That you actually did not read the language on page 1
or page 2 to fill it out?

A.   You know, when I went to the hospital last week to
have a nuclear stress test done, they handed me a
clipboard and said, this is a release, you need to sign
it.

    I signed the release, didn't look at the release and
gave it back to them.

Q.   With all due respect, Mr. Rivernider, is it your
testimony that you did not read page 1 and page 2 to fill
it out?

A.   I was told to fill out the lines --

Q.   Your testimony is that no, you did not read every word on page 1 and page 2?

A.   Correct, I did not read every word on page 1 and page 2.

Q.   And this, I remind you, at the top was a "Petition to Enter a Plea of Guilty," is that right?

A.   It is a petition to enter a plea of guilty, that's what I just told --

Q.   And you knew that when you were actually filling out this document?

A.   That's what I was told to do.

Q.   And it's your testimony to this Court today that you did not believe it necessary to read all the language on page 1 and page 2, this document that you were filling out and submitting as a petition to the Court; that's your answer?

A.   I came here to plead guilty because I had brain damage and I was told I would get back to my kids.

Q.   So your testimony is you did not read all of page 1 and page 2?

A.   I did not read any of this document.  I was told to fill out the spaces.

Q.   When you turn to page 3 and there is writing on that page, is that your handwriting on page 3 of this petition?

A.   It's my handwriting on the entire document.

Q.    So on page 3 specifically that would be your handwriting, is that fair to say?

A.    Absolutely.

Q.    So is it your testimony to this Court when it says that there was potentially a maximum of 420 years imprisonment, and there's handwriting of 420, that you didn't read before it where it said "a maximum of" or the word "imprisonment" after; is that your testimony to this Court?

A.    Four twenty was the word I was told to put in the line.

Q.    So you just put that number in without actually reading the several words before or the word after?

A.    Actually I asked Mr. Bergenn, what goes in here?  And Mr. Chase calculated or gave us the number, and Mr. Chase calculated or gave us the number; and Mr. Chase says 420, and I wrote 420 in there.

Q.    So is it your testimony to this Court that you saw a space and someone told you to put 420 down and you wrote 420?

A.    It's my testimony to this Court that it didn't matter what any of this said because it didn't matter what any of these numbers were.

Q.    Sir, that's not my question.  My question is as it just simply relates to that one line, a maximum of 420

years imprisonment.

Is it your testimony that you saw a blank and someone told you put the number 420 in that blank?

A. Well, I didn't put years, and you just said years. And "years" isn't there.

Q. So I just want to understand your testimony. Your testimony is you did not read the words, a maximum of blank imprisonment?

You were just told to put the number 420 in and, without reading anything around it, you put the number 420.

A. I don't remember if I read it but it didn't matter, because I was told by Mr. Bergenn, assured, that it would be a couple years, 24 to 30 months, somewhere in that neighborhood, which is what he put in his sentencing memorandum, and what had to go in here was just what had to go in there.

Q. So your testimony is you don't remember whether you read it or not?

A. No, I don't remember five years ago whether I read this specific wording on this specific page sitting here today. I can't honestly tell you five years ago whether or not I did do that.

Q. Sir, just a moment ago, you just said that Mr. Bergenn assured you that you were going to get two to

three years in prison, isn't that what you just said?

A.    Mr. Bergenn assured me that I'd be getting back as soon as possible and the timeframe was a two- to three-year timeframe because of the brain damage and I was pleading guilty.  And because I'm pleading guilty you'd get half the time than we expected, because that's what they do in Connecticut, which is what I was told by counsel, about 50 percent of the time.  And then we got the brain damage, so you're not going to be doing anything more than anything like that.

Q.    So did Mr. Bergenn tell you that you were going to get two to three years?

A.    Mr. Bergenn won't give that time, but 24 to 30 months was what the suggestion was.

Q.    So when you just testified that Mr. Bergenn assured you that you were going to get a two- to three-year sentence, that wasn't true, was it?  Your testimony was not true?

A.    My testimony was true.  Mr. Bergenn was assuring me that it would be a short period of time, somewhere in the neighborhood of two to three years.

Q.    So now your testimony is that he told you it was going to be in the neighborhood of a two- to three-year sentence, is that your testimony now?

A.    That's what he assured me, yes.

Q.   He expressly told you you were assured a two- to three-year sentence?

A.   If I was going to get a 12-year sentence at the same time I had gone to trial, why would I plead?

Q.   That's not my question.

A.   That's my answer.

Q.   I know.  But it's not answering the question.

My question is:  You were assured by Mr. Bergenn that you were getting a two- to three-year sentence?

A.   Yes, I was.

Q.   And yet just, I don't know, 30 minutes ago, you indicated that it was something that Mr. Bergenn had never told you the length of time that you were going to get in a sentence.

You remember that conversation that we had --

A.   No, because I never said "never," as far as I can recall.  I said that he wouldn't -- he assured me that it would be a short period of time.  That's what he assured me.

This is a very trying time for me, as you wouldn't imagine, but maybe in the future you will.  When someone is telling you you need to plead guilty, when someone's telling you you got brain damage.

That's what he assured me, that I'd be getting home to my kids.  Why else would I plead and go to prison for

the rest of my kids' childhood?

Q.   In terms of your discussions with Mr. Bergenn about sentencing and the best way to approach sentencing, was one of his suggestions to you that you be contrite and acknowledge your wrongdoing?

A.   When are you referring to?

Q.   Just as a general matter.  Did he on more than one occasion suggest that, don't hurt yourself by not appearing to be contrite?

A.   He emailed saying that -- well, contrite, I don't know, did he ever use the word "contrite," but he did say in some emails that you're going to hurt yourself if you don't plead, that kind of thing.

Q.   Let me go back to the petition.

So we talked about the 420.

So it's your testimony when you go down there and say a maximum fine of 40,000,000, you just saw the blank and you were told to put 40,000,000 in?

A.   When you're broke and someone tells you you owe $40 million, it doesn't really matter if it's 40,000,000 or $400.

Q.   My simple question is:  Did you read the language that says "a maximum fine of."

A.   I can't tell you.  I asked to have the video, it's been destroyed, which would show what happened that day,

because then it would also show that you made changes to the admission of offense of conduct, so the plea would be unintelligently made, so the video was destroyed.

Q.   Directing your attention to page 6 of the petition, Government's Exhibit 1, it indicates, "I declare that no officer, agent of any branch of government nor any other person has made any promise" -- top of the next page, page 7 -- "has made any promise or suggestion of any kind to me or within my knowledge to anyone else that I would receive a lighter sentence or probation or any other form of leniency if I would plead guilty except to the extent that my plea of guilty may be a factor considered by the Court in determining whether I have accepted responsibility for my criminal conduct within the meaning of the Guidelines."

Do you see that language?

A.   Yes, and if I read this language, I may have turned to the neuropsychologist and asked her to explain it to me.  Because I had a neuropsychologist sitting behind me.

Q.   My question is:  Did you actually read this language?

A.   What page are you on?

Q.   Page 7.

A.   Okay, I went to page 6.

Did I read this language?  I can't tell you whether I read the language or not, Mr. Schmeisser.

Q.   So then paragraph 21 on page 7, it says -- and it's

actually underlined for emphasis -- "I declare that I have not been threatened or forced in any way to plead guilty at this time or at any other time."

Do you see that language?

A.   I see the language and I'm sure that based on case law, you all have got this whole thing set out and the entire thing is just a cookie cutter process, and this is a cookie cutter process; and if you think that most people read this stuff, you could fool yourself all day long, but if you think most people sit there and read this stuff and knew what this said, I'm embarrassed for this system, I really am.

Q.   But is it your testimony that you read it or did not read it?

A.   No, Mr. Schmeisser, you don't sit there reading all this stuff and agreeing to it.  If you think somebody did -- if you think most people sit here in a Rule 11 hearing and sit here and read all this stuff and understand all this stuff, you really need to think that through.

Q.   Let me direct your attention then to page 9 of this agreement.

Now, page 9 of this agreement, you see paragraph 30, it's the only paragraph on this page.  Do you see that?

A.   I see the only paragraph, yes.

Q.   And so you actually had writing on this page; is that your writing?

A.   That is mine that says "see attached."

Q.   In terms of the actual language says, it says, "The following is my own statement as to what occurred which shows that I am in fact guilty of each charge of which I am now offering to plead guilty."

Do you see that?

A.   I see that.

Q.   And then, so, did you actually read that?

A.   I can't honestly sit here and tell you today that I read it or didn't read it.

Q.   So your testimony to this Court is that when you were actually filling out this plea petition, you wrote the words "see attached" under a six-line paragraph and you actually didn't read that paragraph?

A.   I can tell you that I don't recall sitting here reading it.

Did I read it and said, what goes in here?  I may have read it and said, What goes in here, and they just said "see attached" in there.

Q.   And then the attachment is an admission of offense conduct.  Do you see that?

A.   The attachment of the Schmeisser admission of offense conduct that you made changes to, yes.

Q.   And on that admission of offense conduct, it sets forth a conduct that -- let me strike that.

On this document, it has your signature, is that fair to say?

A.   I was told -- just like when I went to the hospital to sign that document -- by the Judge during the hearing.

Q.   And so your testimony to this Court is you actually did not read the admission of offense conduct during the morning before you went to court and pled guilty?

A.   The admission of offense conduct wasn't even completed when we were --

Q.   Is it your testimony that you did not actually review the admission of offense conduct before you plead guilty?

A.   That's correct.

Q.   So you actually signed this document and did you avert your eyes from the actual contents of the --

A.   No, it was slid in front of me and I just signed it.

Q.   And you actually did not look at this document that you had actually been working on for the past two and a half days; is that what your testimony is?

A.   That you, Mr. Bergenn and Mr. Chase had been working on for the past couple of days that I was asked questions about and that you made changes to that morning right before the hearing.

Q.   But you actually reviewed a version of the admission

of offense conduct Sunday night.  Is that fair to say?

A.   I was emailed at 9:20 the admission of offense of conduct.  I went down to the fourth paragraph where it said "willful," and I refused to plead as soon as I saw the word "willful" on the document.

Q.   So your explanation is the night before, Sunday night, you read a couple paragraphs of the admission of offense conduct, and the actual day of the plea when you're pleading guilty and you're presented with this admission of offense conduct, you averted your eyes and did not look at the document?

A.   I didn't say I averted my eyes.

Q.   You did not read the document?

A.   I was handed the document and was told to sign the document.

It turns out there are two more pages to the document I did not sign.

Q.   So your testimony is you did not read this document at all?

A.   My testimony is I did not read this document before you made the changes or after you made changes to it.

Q.   And you're the individual who actually, we've seen in a series of emails, was actually scouring the individual sentences to correct it so Mr. Bergenn gets it right.

A.   That wasn't when I knew I had executive function

deficit disorder -- or when are you referring to?

Q.    I'm referring to Saturday night.  There were emails where you were suggesting language.

Do you recall those emails?

A.    Right.  I was reviewing all that because Saturday night I didn't agree to plead because I had executive function deficit disorder.

That's why I was reviewing all that stuff.  And that's why I was continuing to send emails to Mr. Bergenn telling him that what he was saying in his emails to me wasn't true.

Q.    So the bottom line is that your explanation for not reviewing is that you simply did not read the admission of offense conduct that you actually signed?

A.    It was handed to me, I was told to sign, and I signed it.

Q.    Let's go now to the actual change of plea hearing.

That happened shortly after the time that you were actually reviewing this petition, is that fair?

A.    That's correct.

Q.    And I believe the transcript is already in evidence as Plaintiff's 15.

So directing your attention to Plaintiff's Exhibit 15, and just in terms of the time in the record, do you see the top of page 3 of the transcript where it

indicates 12:15?

A.   Yes.   Mr. Bergenn told me that the hearing was scheduled for 8:00 in the morning, and it began at 12:15 p.m.

Q.   But as you learned from Mr. Bergenn later that day that Ms. Seneca was actually pleading guilty on Monday morning as well?

A.   I learned after she pled that she had pled guilty.

Q.   But you did not know whether or not Judge Chatigny was actually taking that plea?

A.   I have no -- I didn't even know she was intending to plead guilty.   I could not call her because she was in the courthouse and she didn't have her phone.

Q.   So you were actually in the Judge's courtroom at the time ready to plead guilty, is that fair to say?

A.   I came here to plead guilty because I had brain damage, and that's the way I had to get back to my kids.

Q.   And beginning on the first page of the transcript, it indicates that the Court asks Mr. Bergenn:

     "It's my understanding that Mr. Rivernider's prepared to change his plea with regard to the indictment."

     You see that language?

A.   Mr. Bergenn was committed to me changing my plea, yes.

Q.   And then the Court asked you, "Mr. Rivernider, is

that what you would like to do?"

And your answer was, "Yes, sir."

Is that correct?

A.   It wasn't what I would like to have done, but it was what I was there to do.

Q.   So the court reporter got it right in saying, "yes, sir," that was your answer?

A.   That is my answer.

But of course it wasn't what I would have liked to do after years of fighting this case.

Q.   And the next page, the Court goes on to warn you about certain things, and it says -- and the Court said, "Under the law, Mr. Rivernider, I'm required to warn you at this time that the oath you have just taken requires you to tell the truth and if you were knowingly making a false statement during this proceeding, that would be a crime."

Do you see that language?

A.   I see the language and I have no doubt that the Judge did everything he's legally required to do.

Q.   And underneath that, the Court says, "Do you understand?"

Do you see that?

A.   I do.

Q.   And you answered, "I do"; is that right?

A.    Same thing.

Q.    And the Court then actually repeated the point and said, "So it's very important that you tell the truth."

      You see that language?

A.    Yes, I do.

Q.    And it says, "If at any time you have difficulty understanding what I'm asking, please don't hesitate to let me know.  I'll be happy to clarify."

      Is that what the Court told you?

A.    And I did on several occasions when he asked me questions, I had to check with my attorney.

Q.    So let me direct your attention to page 8 of the document.  And the Court went through a series of questions.

      Asked you on the top of page 8:  "Okay, so your mind is clear?"  And he was directing that question to you, is that right?

A.    Yes.

Q.    And your response was:  "I would say my mind is clear."

      Is that what you said?

A.    That's something I would say.

Q.    And the Court then said:  "All right, do you feel capable of making important decisions today?"  And you said:  "I believe that would be true."

Do you recall saying that?

A.    I believe that's what it says on there, yes.

Q.    And then the Court asked further:  "Are you having any difficulty understanding me?"  And you said, "No, I understand."

A.    I could understand what he was saying, yes.

Q.    And then the Court went on to say:  "Are you satisfied with the legal services that are being provided to you by your counsel?"

You see that?

A.    I absolutely see that.

Q.    And then your response to that was: "They've been wonderful."

A.    They've been wonderful.  I'm staying in the hotel with Mr. Bergenn's credit card.  They bought me drinks on Friday night.

Q.    So your explanation in a guilty plea hearing when a federal judge is asking you a question about if you were satisfied with the legal services provided to you by your counsel, and you've said "They've been wonderful," your explanation of what "wonderful" means in that context is they bought you some drinks and put you up in the hotel?

A.    He was also able to successfully diagnose me with executive function deficit disorder and convince me from a legal standpoint that I needed to plead guilty because of

this brain deficit that I have and this mental deficit, that I'd be able to get home to my kids so that's -- very few attorneys would be able to do that, so that's a wonderful thing.

Q.   And perhaps anticipating your new found definition of "wonderful," the Court says:  "Do you have any dissatisfaction with their services whatsoever?"  And you responded: "None at all."

A.   No.  And actually when I read this, and I read it in the Second Circuit's rulings and a lot of Judge Chatigny's rulings, I kind of take pride in the fact that you all consider me a constitutional scholar, because what you're saying there is that on a Sixth Amendment basis that I'm saying that they were constitutionally effective.

If that's the implication that they're constitutionally effective and they met their constitutional requirements under the Sixth Amendment and I'm saying they're wonderful, then you're considering me a constitutional scholar, so thank you.

Q.   So when the question came to you "Do you have any dissatisfaction with their services whatsoever," your response was, "none at all."  Is that what the transcript says?

A.   That's what the transcript says.

Q.   And this was supposedly after, as you've indicated,

hours of being badgered, and I believe in one of your filings you said tortured, is that right?

A.   Did I say tortured in one of the submissions?  But it's possible that I did say tortured because --

Q.   Directing your attention to your traverse, document 132, on page 3 you say that dealing with Mr. Bergenn that morning was, quote, torture.

A.   Yes, I would say dealing with Mr. Bergenn that morning, because he was committed to me pleading, I was committed to me not pleading, and he won.

Q.   So when the Court asked you:  "Do you have any dissatisfaction with their services whatsoever," and you said "None at all," your testimony today is that you weren't being honest to the Court back then?

A.   My testimony -- well, at the time I didn't have any dissatisfaction with their services having been convinced that I had executive function deficit disorder and that I had to plead because of to get home to my kids.

     That was their services that Mr. Bergenn provided for me.  Turns out that the service and the diagnosis was faulty.

Q.   So your claim that you were being tortured at the time and that somehow you could then state truthfully back then, if that was the case, that when you were asked "Do you have any dissatisfaction with their services

whatsoever," you said "none at all."

A.   They said successfully diagnosed me with executive function deficit disorder with like maybe point 4 percent of the people in the world have, and for any attorney to even come up with that is remarkable, quite frankly.

Q.   And then you continued to respond to questions, and the Court went on to say:  "Are you satisfied that your counsel has devoted enough time to this case to provide you with effective assistance?"  And you testified:  "Yes, I am."

A.   They did provide a lot of time and put a lot of time into this, and we were working towards getting this -- working towards an acquittal.

We had defenses, we were fighting the case, and then all of a sudden I have executive function deficit disorder and I had to plead mid trial.

It's crazy.

Q.   And then it says, the Court asked:  "Are you satisfied they spent enough time speaking to you about your options, and you replied:  "Yes."

A.   We spent the entire weekend going over this and speaking about my options, yeah.  I'm saying, no, I'm not pleading and Bergenn is saying, yeah, I've got to plead because he can't go back into court.

So, sure, we spent a lot of time talking about my

options, but there wasn't an option for him, there was only an option for me.

Q.   And the Court goes on to ask you:  "All right, are you ready to go forward with the change of plea at this time?"

Do you see that language in the transcript?

A.   Yes, I was.  That's what I came here to do.

Q.   And you said:  "Yes."

A.   That's what I came there to do.

Q.   So you didn't say, No, Your Honor, I don't want to plead guilty, Your Honor.

A.   I said no in Court twice prior to that, and on that day, I came there with the purpose of pleading guilty because I had executive function deficit disorder and I was told I could get home to my kids.

Q.   And the Court then asked:  "Do you need a postponement for any reason at all?"  And you said: "No." Is that correct?

A.   I didn't need to use the bathroom or anything, so I said let's just get this over with, basically.

Q.   Now, let me direct your attention to further on in the proceeding at page 12, and the Court says at the bottom:  "If you plead guilty and the plea is accepted, you might also be giving up any defenses you have of these charges.  A guilty plea constitutes a waiver of the right

to object or appeal on the basis of anything that has transpired before today.  Therefore if you believe that your rights have been violated in connection with the investigation of the case or the prosecution of the case, you will be giving up any and all such claims by pleading guilty; do you understand, sir?"

And you said:  "Yes, sir."

Do you see that response?

A.    I heard what Judge Chatigny said, however, I also believed that constitutional violations like suborning a perjury before the grand jury pretty much nullified everything that happened after that.

So because you had constitutional violations and you having suborned perjury with several witnesses, that that is something that could have and should have been argued and could have still been argued up to this day for various reasons, which I put in I believe in number 52 in my 2255, where we could still argue the constitutional violations because of the perjury before the grand jury.

Q.    Sir, simple question is:  Do you recall Judge Chatigny asking that question and you giving that answer where you said, "Yes, sir"?

A.    Yes, and immediately after that --

Q.    That's a simple question.  Not a broader question. It's simply a yes or no question.

A.   Yes.  And the fact that I had discussions with Mr. Bergenn right after this, the day after in order to argue the grand jury issues, would indicate, I believe, that we were going to continue on.

Q.   And the Court said:  "Are you willing to give up these rights?"  And you indicated in the transcript: "Yes, sir."

Was that your testimony back then?

A.   I believed I was giving up rights dealing with things involved with going to trial.  I didn't believe I was giving up my First Amendment right, which should still be violated as far as I know to this day, which I put in document 23, asking you still to reply to me, because you still violated my First Amendment right, and I have been doing so since 2011.

Q.   Now, let me direct your attention to page 16 of the transcript.  At the top it says:  "Mr. Rivernider," and this is the Court, "Mr. Rivernider has anybody made any promises to you to cause you to want to change your plea?"

And you say:  "No, sir."

Do you recall that response?

A.   I recall the response.

Q.   And then the Court goes on and says:  "Has anybody threatened you in any way to get you to change your plea."

Do you recall that question?

A.   I recall Mr. Bergenn not having a gun to my head and forcing me to come down to plead, and when someone says "threaten you," that would indicate to me a physical threat, and no, no one physically threatened me.  It was mental coercion.

Q.   And you said:  "No, sir," is that right?

A.   And I had said:  "No, sir, no one physically threatened me."

Q.   Let me ask you, you've now come up with that interpretation of this sentence, but it says:  "Has anybody threatened you in any way to get you to change your plea?"  It doesn't say "physically threatened," it says "threatened you in any way."

     Do you see the language, sir?

A.   When I hear "threatened," I take that as a physical threat.

Q.   So then the Court goes on to say:  "Is anybody putting pressure on you to plead guilty?"  Putting pressure on you.

A.   Uh-huh.

Q.   And you said:  "No, sir."

A.   I answered the questions as needed in order to have the plea go forward, because that's what I was there to do, as I'm sure everyone else did.

     Go read the transcript for Jae Lee v. United States.

I'm sure he answered all the questions.  Or Calvin Harris, in the Second Circuit.  I'm sure they all answered those same questions.

Q.   And then the Court went on to say:  "Do you believe that changing your plea is in your best interest?"  And you said: "I believe it's in my best interest and the best interest of everyone involved."

A.   That's right.

Q.   Do you recall that answer?

A.   I believe it was in the best interest of everyone involved, including the Court, because the Court wanted to end the trial, including the jurors to be able to go home sooner, and it turns out it was in the best interest of Mr. Bergenn because he had a meeting with a new client the next day.

Q.   Let me direct your attention now to page 34, and the transcript indicates at the top: "At this point then, Mr. Rivernider, I understand that you have discussed with your counsel a draft admission. I was handed this draft this morning. Have you had a chance to read this document?"

Do you see that language?

A.   Yes, the Court was handed a draft that morning.

Q.   But in terms of the question "Have you had a chance to read this document," do you see that language in the

transcript?

A.   I didn't know what document he was referring to, but I said I do see the language, yes.

Q.   But you then responded:  "I have, sir."

Do you see that language?

A.   I have.

Q.   And then the Court actually pressed you and said, "In detail?"  And you responded: "Yes."

Is that what you said?

A.   I received it on Sunday night at 9:20, and that was the last time that I received it; and that was before you made your changes.

Q.   So notwithstanding what Attorney Bergenn has said in his affidavit, it's your admission that you had actually read this document in detail the evening of -- Sunday evening at 9:20?

A.   I'm sorry, repeat the question.

Q.   Despite Attorney Bergenn's testimony where he reviewed in detail the final admission of offense conduct with you, your testimony is the last time you had reviewed this document was at 9:20 Sunday evening?

A.   I only reviewed the first couple paragraphs until I saw the word "willful" and blew up and refused to plead.

And as far as the final, which you call the final, the Schmeisser admission of offense of conduct, that was

never reviewed with me.

And that's why I asked for a copy of the video because it would show you taking the document out of the courtroom and then bringing it back right before the hearing started and that document is then put in front of my to sign, which had major changes, that had I known what was in those changes, I would have never pled.

Q.   I'm looking at the -- let me ask you again.

Back at the time of this guilty plea hearing, you had sworn to tell the truth, is that fair to say?

A.   That's correct.

Q.   And actually the next day you had had occasion to email your counsel on February 24, 2013, did you not?

A.   I can't hear you.

Q.   Let me show you what's been marked for identification as Government's Exhibit 2.

MR. SCHMEISSER:  There's been no objection?

MR. FROST:  No objection.

BY MR. SCHMEISSER:

Q.   So do you see this email that's dated Tuesday, February 26, at 2:36 p.m.?

A.   Yes.

Q.   And that was an email from you, is that right?

A.   That is an email from me, correct.

Q.   And that was an email that you sent actually the day

after the guilty plea, is that true?

A.   That's correct.

Q.   In this email you talked about the under-oath hearing, is that correct?

A.   Yep.

Q.   And in that email you say, "Not sure if this matters or not, but since I was under oath, we should inform the Judge of a few things."

You see that?

A.   I do.

Q.   In other words, because you were under oath and you thought the oath was important, you felt it was important to actually make sure the Judge had the complete picture?

A.   This information wasn't brought forth, and I thought it might be necessary or a good idea to bring forth this information just in case, just so it's not left out.

Q.   So in the bottom of the email it says, "Not sure if this was required, but since I was under oath and all this was recent, should I have mentioned it or not?  I wasn't even thinking about it at the time and I don't want to be accused of misinforming the Court."

Do you see that language?

A.   Yes, I wasn't thinking about this stuff at the time because I was sort of distraught having just learned I have executive function deficit disorder, and here I was

for a Rule 11 hearing, and there's a lot of things I wasn't thinking about at the time while this was going on. All I was thinking about was that I have this disorder, I got the doctor with me and I have to do this to get home to made kids.

Q.   So this is the day after you actually pled guilty, is that correct?

A.   The day after I actually pled guilty and --

Q.   Sir, it's a yes or no answer.

A.   Yes, this is the day after.

Q.   And this email is actually emphasizing your commitment to the oath that you had taken?

A.   It is -- I guess that you can characterize it as that, sure.

Q.   So let me go back again to page 34 of the actual transcript where you were asked by the Court:  "I was handed this draft this morning.  Have you had a chance to read this document?"  And you said, "I have, sir."

Is that correct what you said?

A.   I didn't have the draft that the Judge was holding in his hand, so I didn't know what the draft was.  I read the draft on Saturday night, as you know.  I received it on Sunday, so I did read some draft.  I didn't know what he was holding in his hand.

Q.   But you went on to affirm that you read it in detail.

He asked -- the Court asked "in detail" and you said "yes," is that correct?

A.   I didn't know what the Judge was holding in his hand.

Q.   And again going back to the importance of the oath that you had taken for this guilty plea, on page 16, again you had affirmed that no one had threatened you, no one put pressure on you and that you believed pleading guilty was in your -- or changing your plea was in your best interest?

A.   And even at that time when I sent that email, I had no idea that changes were made by you to that document, so there's no way I could have even known what the Judge was referring to.

Q.   And then continuing on, actually on page 34, the Court says:  "All right, Mr. Bergenn."  And Mr. Bergenn says, "This is the product of hours and hours of work, first on our part, and then working with the government to ensure that we were going to be square with the Court.  So what is before you is word for word the result of extensive processing with Bob Rivernider and with the government and is complete, and we think succinct, as succinct as you can when there's 18 counts."

You didn't disagree with that.  You didn't correct Mr. Bergenn's representation to the Court, did you?

A.   There is no correcting Mr. Bergenn.  He says what he

says.

Q.   Now, the Judge didn't stop asking you about the draft stipulation.  On page 34 -- he actually returned to it on page 42.  Let me direct your attention to page 42.

And the Court there asks, you see the language where the Court says:  "Mr. Rivernider, for the record, would you please confirm that you have read the petition to enter a plea of guilty," and you said: "I have."

So had you read the petition?

A.   I had the document here, I filled it out.

Q.   But the question was:  "Please confirm that you have read the petition to enter a plea of guilty."  And you indicated you had.

Were you telling the truth then?

A.   I was answering the question.

Q.   And then the Court went on to say:  "And it is true and correct to the best of your knowledge and belief?"  And you said:  "It is."

You see that language?

A.   I was answering that question.

Q.   And then it goes on to say, the Court asks:  "Including the attached statement entitled Admission of Offense Conduct?"

You see the Court asking you that question?

A.   Yes, I see the Court asking that question.

Q.   And your response to that was:  "Yes."

A.   Answering the question to get through this.

It's all part of the show and part of the game you that you guys play.

As Mr. Durham likes to say, "It's part of the game."

THE COURT:  I don't view it as a game.

THE WITNESS:  I don't view it as a game either, it took my life.

Unfortunately you just have to do what you have to do.  And Mr. Bergenn says you're going to plea, you've got executive function deficit disorder, you've got to go plead.

That was a quote from Mr. Durham, I'm just repeating.

BY MR. SCHMEISSER:

Q.   Now, you've made various representations in your papers that you were, quote, conned by Dr.'s Bergenn and Filippopoulus into believing that you suffered executive function deficit disorder or brain damage.

Do you recall indicating that in your traverse?

A.   It turns out the diagnosis was wrong.

Q.   Do you recall making that statement?

A.   I believe it's in the traverse, and it's because the diagnosis was wrong that I believe I was conned into believing that, yes.

Q.   Let me ask you about the mental condition issue.

Did the attorneys explain to you that making an argument regarding the mental condition might be an argument for mitigation of your sentence, reducing your sentence?

A.   We never discussed mitigation of sentence or Sentencing Guidelines or anything like that.  What they said -- or what Mr. Bergenn said was that you got this disorder, you'll get home to your kids.

Q.   But taking you back to the time period around the time of the plea, you saw this mental issue as something that you could use to your advantage to explain your past conduct when you were dealing with the Court at sentencing, is that fair to say?

A.   I never thought of it that way, use it to my advantage.  I don't see using a mental disorder to an advantage in any way, or having a mental disorder to an advantage.  I'm sorry you do.

Q.   I believe we're up to Government's Exhibit 3.

I'm going to show you what's been marked as Government's Exhibit 3.

MR. SCHMEISSER:  Is there any objection?

MR. FROST:  No objection.

MR. SCHMEISSER:  My touch pad has gone to sleep.

BY MR. SCHMEISSER:

Q.   So Mr. Rivernider, this is an email, it looks like that was from you to Mr. Chase sent on Wednesday, February 27, 2013.  Do you see that?

A.   Yep.

Q.   And it was 4:00 p.m. in the afternoon?

A.   That's correct.

Q.   And this was two days after your guilty plea?

A.   Two days after I did it, yep.

Q.   And you're asking about sort of what is happening with testimony by Carol or Wade, is that correct?

A.   Yep.

Q.   And the email reads, "Curious, did the government ask Carol or Wade about me flipping out on them?"

And then you go on to say, "If so, that could fit into the nutso stuff with Nellie.  If not, that could be the government" -- the G -- "doesn't want to exploit it in front of the Judge."

So you typed in an email to Michael Chase, "If so, that could fit into the nutso stuff with Nellie."

A.   Yeah, because they're telling me I'm nutso and have brain damage, and that would indicate being nutso, and having a mental disorder would be referred to in some ways as nutso.

Q.   Right, and it could help explain to the sentencing

Judge your flipping out with Carol and Wade --

A.    If the government had them testify falsely, as they did on many occasions, that I flipped out on them and said things and yelled and screamed, then maybe that would explain or this would explain this stuff.

Maybe if I had this disorder, which it turns out I didn't have -- thank you for proving that -- that that would explain any of this -- any testimony that would be coming forth that you brought out.

Q.    Let me ask about your attorneys, Mr. Bergenn and Mr. Chase.

Did they proceed to then, after this guilty plea, to prepare for an actual sentencing hearing that involved putting on testimony of Dr.'s Stoll and Filippopoulus?

A.    They proceeded with that, they proceeded with --

Q.    Is that a yes or no?

A.    The answer is yes, we proceeded with that, yes.

Q.    And they actually met with Dr.'s Filippopoulus and Stoll to prepare them for this hearing, is that fair to say?

A.    I don't know that, I didn't --

Q.    But you did actually attend two days of hearings in front of the Court where the defense, I would say -- well, two days of hearings before the Court involving the mental issue, is that fair?

A.    Yes.

Q.    And during that hearing on the mental condition issue, is it fair to say that Attorneys Bergenn and Chase particularly Attorney Bergenn, was advocating the position?

A.    Mr. Bergenn was passionate about the position as he was on the day of the pleading.  And that weekend he was just as passionate that day and trying to continue his passion.  And he did the same thing at sentencing.  He continued with that one issue demonstrating his perseveration.

Q.    And he'd actually heard two days of testimony by your own expert actually confirming his position, is that right?

A.    No, we heard one day of testimony by your experts, Dr. Kaplan, I think it is, and Dr. Lewis, whose transcripts you did not include in your 1,080-page document that also I don't believe went to the appellate court, because you might have an issue with Dr. Lewis saying I'm honest, trustworthy, I didn't malinger.  So you didn't want that put before the appellate Court so it's not in the current documents.

But the Dr. Stoll documents are in there now, or the transcripts from that day.

Q.    But your attorneys, Chase and Bergenn, didn't show

any indication that they weren't going to strongly advance this position that they were putting forward in those hearings?

A.   Mr. Chase I don't think put forth anything regarding this.  He may have done so in writing.

Mr. Bergenn put forth his argument, strongly, strongly advocated for it, and probably will continue to this day to advocate for it because that's his passionate belief.

Q.   And you were actually at the ultimate sentencing of your case; that's obviously true, right?

A.   It's obviously true, I was permitted to attend my own sentencing, yes.

Q.   And you had heard Judge Chatigny discuss the mental condition issue.  And in that description, having heard these experts, Judge Chatigny said "This is not to suggest that" -- this is on page 203 and 204 of the sentencing transcript -- "this is not to suggest that I think you are as culpable as one who would be who does not have a mental or emotional condition that might entail some impairment of executive functioning.  I think that there is something wrong with you, Mr. Rivernider, and I say that respectfully, not to insult or degrade you, but to tell you what's on my mind.  I believe you do have a mental or emotional condition, and I do think it attributed to your

offense conduct."

Do you recall Judge Chatigny saying that?

A.    I recall Judge Chatigny saying that, and I recall Dr. Lewis saying I did not suffer from the disorder that I pled guilty, and Dr. Kaplan also saying I did not suffer from that mental disorder.

Q.    And Judge Chatigny goes on at the sentencing to say he just doesn't know what that mental condition is.

And he goes on to say that "Dr. Lewis says you have narcissistic traits but not narcissistic personality disorder.  She is a psychiatrist with a lot of experience, and I'm not going to second guess her opinion, but it seems to mean that your behavior was very abnormal and I think that it must be due, at least in part, to a mental or emotional condition that needs to be addressed.  I hope it will be addressed."

That's page 204 and 205 of the transcript.

And he goes on to say "because I'm concerned that without treatment, you're at a risk to reoffend."

And then continuing on on page 216 of the transcript, he goes on to sentence you where he says, "I want to impose a sentence that reflects the record with regard to your offense conduct and its consequences without over punishing a 47-year old first offender who appears to me to suffer from a mental or emotion disorder, one that I

think did contribute to your offense conduct."

So the Judge listened to the two days of hearing on mental testimonies, is that fair to say, from the sentencing?

A.   Yes.

Q.   And, in fact, you got a sentence substantially below the guidelines range that was included in the presentence report, is that not true?

A.   The Guideline range that was included in the presentence report was unchallenged by counsel and Judge Chatigny was -- suffered from -- one of the problems that have never been corrected is that he still believes all the fraudulent testimony that you put forth to the Court.

And based on that, Judge Chatigny believes that maybe I suffer from some disorder, and that's why he possibly sentenced me to whatever he sentenced me to, any prison time, because he believes the fraud that was before the Court.

In addition to that, when you take into consideration Judge Chatigny's being misadvised by you regarding the information for sentencing, then you really can't blame him for what sentence that he imposed, whether it was above or beyond, because we didn't start at the actual and correct Guideline range because it wasn't challenged by my

attorneys, which could have been challenged and should have been.

Q.   But Mr. Rivernider, at the end of the day, Attorneys Bergenn and Chase explained to you that they believed that the psychiatrists or experts suggested that you had some mental condition, is that true?

A.   Mr. Bergenn did.

Q.   So Mr. Bergenn did.

A.   Mr. Bergenn explained --

Q.   And then Mr. Bergenn proceeded to prepare for an extensive hearing on this mental condition, two days of hearing, is that right?

A.   Yes.  And one of the things --

Q.   It's a simple question.

A.   It's a simple question, but here's the answer:

Judge Chatigny believes that I may have some disorder.  Dr. Filippopoulos gave us an interim report, which means none of this has ever been finalized or determined, because even at sentencing, we're not sure whether I suffer from any mental disorder or not, yet that's why I pled.

And since that's why I pled, I pled based on information that was not complete at the time and still to this day, unless we take Dr. Lewis and Dr. Kaplan's final determination if it was that, that I did not suffer from

this disorder at the time, then the plea was unintelligently made from day one because I did not suffer from this at the time that it happened, which is the determining factor.

Q.   Are you finished now?  Because it was a yes or no question.

So your defense counsel, we talked about, I believe this, they prepared for this hearing and there was a two-day hearing.

And then after that, they argued vehemently at sentencing for a reduction in your sentence, isn't that true?

A.   Mr. Bergenn is stuck on this fact that I suffer from this mental disorder, and I'm sure Judge Chatigny took that into consideration when he sentenced me.

Q.   And at the end of the day, as indicated by the Judge's sentencing transcript, the Judge recognized some mental condition and actually believed you to be less culpable as a result?

A.   Based on Mr. Bergenn's determination; but since Dr. Filippopoulos didn't have a chance to testify, and since all the questions for Dr. Stoll were "Tosha Wade said" and "from the transcript of Tosha Wade" all of the false testimony that you brought out at trial you then used with Dr. Stoll to determine that I did not have this

disorder.

So you create false testimony during trial and then you used the false testimony.

MR. SCHMEISSER:  Am I up to Exhibit 4?

Q.   Let me finish up here, Mr. Rivernider, with Government's Exhibit 4.

Months after the guilty plea, you proceeded to have conversation with Attorneys Bergenn and Chase on or about September 5, 2013, is that true?

A.   I proceeded to have conversations with them throughout the time period.

Q.   All right.  And let me show you what has been marked as -- actually marked as Government's Exhibit 4.

MR. SCHMEISSER:  Is there any objection to its admission?

MR. FROST:  What is it?

MR. SCHMEISSER:  Government's Exhibit 4.

Any objection?

MR. FROST:  One moment please, with government counsel, Your Honor?

THE COURT:  Okay.

(Pause)

MR. FROST:  No objection.

THE COURT:  It will be admitted.

BY MR. SCHMEISSER:

Q.   Now, let me -- I'm showing you Government's Exhibit 4, it's a document dated September 5, 2013; and that's a communication between James Bergenn, Chase and you.

Do you see this letter?

A.   I see the letter, but that is not a communication between James Bergenn, Chase and me.

Q.   Okay.  So at different points in time, you've had occasion to review this letter.

Well, let me just strike that.

As you sit here today, have you had occasion to actually review this letter?

A.   When I received it in their draft affidavit, I reviewed it and was shocked, yes.

Q.   Shocked?

A.   Yes.

Q.   Absolutely shocked?

A.   Yes.

Q.   And that was the first time you'd actually seen the letter?

A.   Yes.

Q.   So when I direct your attention to page 2 of this document --

A.   How do you know it's page 2?  I don't have the

document, I'm sorry.

Q.   I'll show you the original exhibit.  It would be easier for you if you have it.

A.   Okay.

Q.   Ask you to turn to page 2 of the document.

A.   I can't find it.

Q.   You can't find a page 2?

So let me ask you to actually turn to the second page.

A.   The second page, okay.  I see there's three pages. I'll turn to the second page.

Q.   You're now turning to the second page, and the document has three pages in front of you, is that fair?

A.   Yes, but there's no "page 2" on the page.

Q.   Okay.  So turning to the second page of Government's Exhibit 4, do you see the language in the second paragraph and third paragraph, second full paragraph and the third paragraph of the document?

A.   I see the whole document and a bunch of paragraphs. I see the whole document.

Q.   All right.  I'm not sure how to wake up the zoom-in, but maybe it's clear enough.

A.   I can see the document.

Q.   The paragraph that's the first full paragraph says, "During those telephone calls," -- let's see.

It says, "During those telephone calls, as we discussed your several earlier suggestions that, one, you had not read the admission of offense conduct before you signed it and confirmed to the Court that you had read it, and, two, that the admission of offense conduct was not a true and correct statement.  You have confirmed in at least three different settings that the admission was a factually true statement, in our office before we submitted to the Court, again during the change of plea proceedings and colloquy, and again if various telephone conversations with myself and Michael Chase since."

Do you see the language?

A.   I see the language, and obviously the language can't be corrected.  Because as it says here "in our office before it was submitted," well just before the hearing, you made changes to it.  So I couldn't have confirmed it was a true and correct statement in their office because you made changes after that.

Q.   I'm just asking if you see the language.

A.   I see the language, and if you're inferring that the language is correct, it's obviously not because of your changes.

Q.   Then it goes on to say, "In our telephone calls, you again confirmed that you did read the admission of offense conduct prior to its submission to the Court.  You also

explained that the document reflects a true and accurate statements of facts."

You see that language?

A.    We had no telephone calls where I said that.

Q.    And then on page 3, or the third page, however you want to term it in this document, can you turn to that?

A.    I can turn to the last page.

Q.    It says, "If you have read this letter and you agree with its contents, please indicate this by signing below."

Do you see that language?

A.    I see the language.

Q.    And then you see your signature below?

A.    I see a copy and pasted signature electronically that is placed on that piece of paper.

Q.    All right.  So your testimony to this Court is that you never signed the September 5 letter that is reflected as --

A.    Anyone who has ever signed a document knows that you don't have all those dots around the letters, knows that the line under my name would be straight just as the line is on the first page of the document, and there's no line under Mr. Bergenn's name because when they put his name on there, there was no line -- apparently whatever they copied his name from didn't have a line.

So those signatures, we can get a computer expert who

will sit here and tell you that that is not an electronic -- or that that is an electronic signature placed on there.

Q. So as you sit here in court today, you're telling Judge Chatigny that, first, you never saw this document until several weeks ago?

A. The document is dated September 5. I was on a flight at 11:10 in the morning out of the Hartford airport on September 5.

Q. So your testimony is that you never saw this document before a couple weeks ago?

A. That's correct.

Q. And your testimony is further that you did not review this document with Mr. Chase and Mr. Bergenn?

A. That's correct.

Q. And your testimony is also that you did not sign this document in the presence of Mr. Bergenn or Mr. Chase?

A. I wasn't in the office that day.

Q. In fact, you never even signed a document ever, is that right?

A. This document or --

Q. This document.

A. This document does not have my signature on it. There was a different document on September 4 in their office where they had me sign a document saying that

they -- that they didn't pursue the perjury that you committed before the grand jury before trial because they didn't think it would be helpful.

That's the document they had me sign in their office on September 4.

Q.    So as you look at this document here, which has this language about confirming that you had signed and it was a factually true admission of -- well, you confirmed the admission of offense conduct was factually true and that you signed it, those admissions you never saw in a letter until you saw this letter a couple weeks ago?

A.    Those admissions were not in the September 4 letter or any other letter.  And when I went in on September 4 after Mr. Chase sent me an email when he asked to meet at his office at 11:30, we had the loss hearing that day at 2:00, I go in there at 11:30 and the first thing they do is they present a letter to me, because Mr. Bergenn said he was afraid of an ineffective assistance lawsuit.

I didn't know that was a thing at the time.  But that's when I learned it was.

And I'm sitting in the conference room on the 19th floor, the one by the window, my back is to the window, Mr. Bergenn is sitting across from me.  Mr. Chase comes in, sits at the end of the table and he passes the document down to me.  I signed it -- after I asked them to

make some changes to it, they make changes to it, I signed it, slide it back to Mr. Chase and he signed it.

Q. So as you sit here today, you've seen this paragraph, and you're stating that that was not something that you reviewed and not something that you agreed to?

A. That statement has nothing to do with the grand jury that --

Q. Sir, the question is: The statement about you signing and affirming the accuracy of the offense conduct, that was something you had not seen in letter form and you did not agree to its accuracy?

A. I could not agree to its accuracy and we had a heated conversation.

Why would I have a heated conversation with them one night about the admission of offense of conduct and going over what was not accurate in it and what is not true in it and then say it's true?

Q. So, for example, if you had a heated reaction one night, let's say late at night, and then happened to change your mind the next day and do something completely different, your testimony would be that that is completely unlike something you would do?

A. The conversation that we had wasn't late at night when we discussed that because Mr. Bergenn said he has to get off the phone because his wife is waiting downstairs

to go to dinner.

Q.   But you believe this is not your signature, this is not a document that you saw and that you did not see this document until several weeks ago, is that fair?

A.   That's correct.

MR. SCHMEISSER:  No further questions.

THE COURT:  Thank you.

We'll take our lunch recess now.  We'll resume at 2:00.

(Whereupon, a recess followed).

THE COURT:  Good afternoon.

MR. RIVERNIDER:  Good afternoon, Your Honor.

THE COURT:  All set to proceed?

MR. SCHMEISSER:  Your Honor, just before we begin, it's my understanding, just sort of the rules of road here, that the hearing is going to be focusing on the coercion issues relating to the plea, so if there are questions far afield -- I don't plan to do much objecting -- but if there are questions that do get far afield, I will plan to object.

THE COURT:  That's fine.

MR. RIVERNIDER:  Your Honor, I'm going to conduct from here; is that all right?

THE COURT:  That's fine.  We're going to swear the witness.

JAMES W. BERGENN,

       called as a witness, having been first duly

       sworn or affirmed, was examined and testified as

       follows:


              THE CLERK:  Please be seated.

              Please state your name and spell your last name

for the record.

              THE WITNESS:  It's Jim Bergenn, B-E-R-G-E-N-N,

formally James W.

              THE CLERK:  Your city and state of employment?

              THE WITNESS:  Hartford, Connecticut.


                        DIRECT EXAMINATION

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, can you hear me okay?

A.   Very well.

Q.   Thank you for raising your hand to remind me that you

need to be sworn in.  I appreciate that.

     You've been actually teaching this.  You're well

informed about these proceedings, right?

A.   I am.

Q.   You've been teaching this for years, right?

A.   I have.

Q.   How many years have you been teaching?

A.   Teaching what?

Q.   Teaching trials and courtroom proceeding; is that what you teach?

A.   Well, it's trial advocacy at UCONN since 1986.

Q.   And just -- I just wanted to get on the record, this is my first time, so this is -- so you're probably going to learn an awful lot of stuff and go back and teach your students what not to do here today.

So you've been teaching this for a long time. Probably well experienced in this.

And something happened last week that just caught my attention, and I just want to ask you if you can -- if this is something normal.  Because when an attorney -- we heard that you got a lawyer and Mr. Chase got a lawyer, and now last week we found out that Dr. Filippopoulos lawyered up.

And it's just -- a question came to my mind that an attorney told me that when somebody accuses him of doing something like -- something wrong and there's going to be a habeas petition, he just goes in and says what happened.

So my question to you is -- he says let the chips fall where they may.  My question to you is:  What happened on or before or after that weekend that has now caused you, Mr. Chase and Dr. Filippopoulos to have to

lawyer up where you're all so concerned about?

Can you just briefly explain to the Court.  I think it may be helpful.  Just, what happened over the weekend that you all have to lawyer up?  If you could just tell us what happened?

MR. SCHMEISSER:  Your Honor, I'm going to object on the form of the question.  I guess it's not clear as to what weekend we're talking about?  Is that the plea weekend.

And second, if it relates to why they have counsel, it seems that's far afield of the actual issues here.

THE COURT:  Mr. Bergenn, I'll give you an opportunity to answer if you wish.  Otherwise I'll ask Mr. Rivernider to rephrase.

THE WITNESS:  I think a rephrased question will allow me to focus on an answer.

MR. RIVERNIDER:  I'll be happy to rephrase it.

BY MR. RIVERNIDER:

Q.   You, Mr. Chase and Dr. Filippopoulos all have now lawyered up against an indigent defendant who is sitting at a maximum security prison.  So my question is:  What are you all concerned about that happened that weekend that caused you all to have to lawyer up?

A.   I cannot speak for the other two, and I can only say

for myself, we have a practice at my law firm that any time there is a matter that calls into question anything in connection with our work, the law firm provides us counsel, and Chuck Howard is the general counsel of Shipman & Goodwin, and he volunteered, came to my door and said he'd like to be my lawyer.  But I can't talk further about our conversation.  I think you know that much.

But there was nothing in particular, other than the fact that you had identified me in your papers as having done some things which would suggest that I might be a witness.

Q.   So that's the only thing, because you're a witness?  Not because you're concerned about something that happened over that weekend?

A.   Correct.

Q.   And you're aware Dr. Filippopoulos now has not only lawyered up but has essentially disappeared, won't be available for a couple months?

A.   I am not.

Q.   You're not aware that Dr. Filippopoulos will not be available for a couple of months according to her attorney?  You're not aware of it?

A.   I have not spoken to her attorney.  I do know him. I've heard his name mentioned, but I have not spoken to him in probably a year; not about this certainly.

Q.   That morning, February 25, 2013, you emailed Dr. Filippopoulos and she made herself available for that entire day, correct?

A.   No, that's not correct.

Q.   Did she not make herself available to come to your office and to come to court and then you guys went to lunch after that?

A.   I don't know about lunch.  I do know that I saw her that morning when I sent an email to you and to her simultaneously asking if you wanted to come to my office.

Q.   And she didn't come over -- did she then come to your office?

A.   She did come to the office sometime between 8:00 and 8:30.

Q.   She was at the office between 8:00 and 8:30?

A.   She arrived sometime between 8:00 and 8:30.

Q.   How long was she there for?

A.   I think -- I don't really know for sure.  Somewhere in the 20 minute -- maybe half hour, but I think not.  I think about 20 minutes.

Q.   So she was only in your office that morning until about 9:00?

A.   I think we had to be in court by 9:00.

Q.   So you're saying that we left your office that morning around 9:00?

A.   Well, if I had to be in court at 9:00, I've never been late for court, so I would have left in enough time to allow me to be there at 9:00.

Now, I don't have a perfect memory this many years later, but I did refresh myself of some things, and I do recall communicating with you by email, and in those communications, and with Dr. Filippopoulos, making reference to 9:00 and 8:00 as the times that we were supposed to be in court.

So my best memory today is that we had to be here by 9:00, and I -- and my memory is that we were on time, and it wasn't clear what was going to happen first.  It wasn't clear what was going to happen, much less what the order was.

Q.   What did we have to be here at 9:00 for?

You sent an email the night before, which is in the record, that we're due at 8:00; what were you referring to?

A.   We had to be in court because we were in the middle of a trial and the trial time, I believe, was gavel strikes at 9:30, and so I believe my -- the reason I would have thought it would be 9:00 or 8:00 was to be timely for court.

Q.   Are you saying we got here at court but you don't recall all these years later, almost five years later,

what time we got here at court or why we needed to be here at court or what was going on that morning?

A.   I can't answer that question the way you've posed it, but I'm trying to cooperate.

I can tell you my best memory is we were here by 9:00, before 9:00.  I have a very good memory as to what we anticipated, but that was not your question.

Q.   We'll get back to that.

Can you please confirm Mr. Chase in his affidavit at number 82 on page 18, it says "AUSA Christopher Schmeisser expressed to us some changes to the admission of offense of conduct should be changed to acknowledge certain elements of the offense had be made."

And the it says:  "AUSA Schmeisser left to make changes."

We had discussed the version of the draft admission we had sent to the government that morning and then at number 83, page 19, it says, "AUSA Schmeisser made changes to the admission."

Can you confirm AUSA Schmeisser made changes to the admission that morning?

A.   Yes.

Q.   Thank you.  Now, can you please confirm for the record that this case did in fact go to trial?

A.   Yes.

Q.   And we were in trial for weeks?

A.   I think it was about two weeks.

Q.   Okay.  And we went to court every day and on time every day; like you just said, you were never late for court, is that right?

A.   That's correct.

Q.   And every day we came here with the goal to attempt to win, correct?

A.   Every day we came with the goal to do the best job we could that day.

Q.   And it wasn't our goal coming here to win the case?

A.   I would say that was our aspiration at all times.

Q.   And we had defenses and we cross-examined witnesses, didn't we?

A.   We cross-examined witnesses and we had evidence that we brought out that was helpful to the defense of the case.

Q.   So then, you were prepared to defend the case and you were taking the case to a jury, full trial, that was the estimation and that was the anticipation, correct?

A.   Any time you start a trial, you must be prepared for a full trial, and this was no different.

Q.   So you were prepared for a full trial to take it to the jury for the jury to get a jury verdict?

A.   I was.

Q.   And I was exercising my constitutional right to be tried by a jury, correct?

A.   Yes.

Q.   Did you believe we had all the information we needed in order to try this case as far as the witnesses for the government?

MR. SCHMEISSER:  Your Honor, again, that goes beyond the scope of --

MR. RIVERNIDER:  I'll rephrase, Your Honor.

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, when you recommended that I plea, did you believe you had all the information that you needed in order to make an intelligent recommendation for me to plea?

A.   At the time I recommended that you plead guilty, I had in lot of time and had spent a lot of time studying all of the discoverable evidence, digesting it, discussing it with you, preparing cross-examinations, preparing how to work with that evidence, and there was nothing that impeded my doing that.

Q.   So you believe you had all the information that you needed in order to make an intelligent decision to recommend that I plea?

A.   I have to answer it the same way I did, which is:  I had access to and had reviewed all of the available,

legally discoverable evidence that we had sought and, in my view, obtained.

Q.   And by pleading, I was deprived of an entire judicial proceeding, including a jury verdict, and the jury was denied the opportunity to decide this case, isn't that correct?

A.   No.

Q.   Did the jury have an opportunity to decide this case?

A.   It's just not -- your question doesn't really fit. What happened --

Q.   This isn't trial advocacy class.

A.   I'm going to do my best to answer your question.

Q.   Right.  My question is:  The jury didn't have an opportunity to decide this case, correct?

A.   The jury, once you chose to plead guilty, was dismissed.

Q.   So they didn't have an opportunity to decide the case whether I was guilty or not?

A.   Based on your choice, correct.

Q.   And I didn't have an opportunity for them to make the decision whether I was guilty of federal crimes or not?

A.   False.

Q.   They didn't have an opportunity to make the decision and because I had to plea, they weren't given that opportunity, correct?

A.    That's false too.

Q.    Okay.  And the purpose we spent -- getting back to going into Dr. Filippopoulos now.

MR. FROST:  Your Honor, I'm putting up on the Elmo what is in evidence as Plaintiff's Exhibit 15, which is a copy of the change of plea transcript.  I believe Mr. Rivernider has questions about page 53 of that transcript.

THE COURT:  Thank you.

BY MR. RIVERNIDER:

Q.    Mr. Bergenn can you please read page 53 of the change of plea proceedings, lines 8 to 13.

A.    "But it will assist the Court, and that's the only reason we got here today.  I don't think we could have been here today were it not for the four hours we spent on Saturday reviewing this information because it was very significant to and directly corresponding to the conduct in the period of this case."

Q.    Now, you just read into the record your statement from the change of plea hearing, correct?

A.    I believe so.

Q.    In your statement from the change of plea hearing you just said, And the purpose of spending the four hours on Saturday with a neuropsychologist -- or the purpose we spent the four hours with the neuropsychologist,

Dr. Filippopoulos, was to review her report which claimed I suffered from a deficit called executive function deficit disorder, is that correct?

A.    No, but you're close.

And to help:  The purpose of consulting with Dr. Filippopoulos was because I have no medical training and because I needed to understand some things and, with the Court's permission, was given the opportunity to consult with two experts.

At the end of which consultation when they ran 17 tests over two full days with your helpful cooperation, they had data and interpretation of that data.  And it was necessary at the time of doing the tests for me to better understand certain dynamics of our relationship as lawyer and client.  That was reported out in November.

I spent hours with them to understand it and then a couple of hours with you to help explain it.

It did not provide a defense.  It did provide me with a deeper understanding of you because I don't know that information.  I'm not trained.

So mid-trial, after a Thursday and Friday of evidence, you said things to me which revealed --

Q.    We're just talking about the Saturday or the four hours spent on Saturday.  So if we could focus on that.

Why did we go to Dr. Filippopoulos's on that Saturday

and sit down?  What did we do when we got there?

A.   The purpose was to follow up and provide to you directly, instead of through me, the information she had provided to me, which was helpful for preparing for trial, but was not going to be useful at the trial itself.

I needed you to understand what I was given to understand so that you could understand the answers to your questions to me on Friday after trial.  You had expressed some thoughts and feelings, and it matched what they taught me.

And when I explained it to you, I said it would be better if you could spend the time with the doctor herself.  I will be with you and she can explain what I had summarized to you about two hours two or three months earlier, and what I had explained to you Friday during about a three-hour meeting that you and I had.

Q.   Friday --

A.   Friday after trial.

Q.   After trial Friday?

A.   Yes.  So after I had explained during those three hours --

Q.   But let me stop you for a second.

A.   Sure.

Q.   Are you saying on Friday we had a three-hour meeting after trial?

A.    That's my best memory.

Q.    Your best recollection.  And where were we when we had this meeting?

A.    Peppercorn's.

Q.    What is Peppercorn's?

A.    It's a restaurant across the street from the courthouse.

Q.    So this is the bar that we talked about?

A.    It's not a bar.

Q.    Tell me if this fits your memory:

As you walk in, there's a podium, and on that side there's a restaurant, there's a makeshift wall, on the left side there's a bar along the wall, and then there's a couple of tables there; and we sat at those tables in the bar, is that correct?

A.    That's exactly right.

Q.    That's exactly right?

A.    Yes.

Q.    Thank you.  We're sitting at the bar?

A.    That's not -- I don't want to interrupt you -- we never sat at the bar, we never got near the bar.

Q.    We sat at a table near the bar?

A.    We sat at a table in the front of the restaurant.  They now actually have three sides to the restaurant.  But when you walk in and you take a left, there are two tables

where you can dine, and I have done that before, and you and I and Mike Chase sat at the table in the front by the window, which was a place to eat.  And we were the only people in the bar other than someone who was preparing the fruit for the drinks later.

And so we sat at that table, to the best of my memory more than two hours.  And my time that I refreshed myself with indicated that I spent three hours conferring with you.

Q.    Is this what you billed when you put down in your billing three hours?

Is that why you remember that time?

A.    You're virtually correct.  I remember it because I had examined a record to refresh myself, and my --

Q.    So you're saying you billed the government or CJA billed for three hours while we were sitting there at the bar/restaurant, whatever you call it?

A.    I can't say the three hours were entirely for at the restaurant because what I billed is for conferring with you.

I remember being there with you for a long period of time, but I don't remember if it was two or three hours or whether when we left I continued to talk to you.  I just don't know; but I do know I spent three hours.

Q.    Are you saying for three hours or two and a half

hours, we're sitting at this bar/restaurant drinking for two or three hours, and at this bar/restaurant I had an epiphany while we're drinking and that's when I decided to plea while we were drinking?  Is that what you're saying?

A.   No, that's entirely false.

Q.   Who paid the bill?

A.   The reason it is false is because we sat, we ate, I believe you had a drink, I believe I had a drink, and we ate some meatballs and I think some calamari.

Q.   So meatballs and calamari.  I've been trying to rack my brain what the appetizers we had there.  So we had meatballs and calamari, which I don't eat calamari, so I probably had a couple of meatballs.

You're saying that was our dinner?

A.   Let me just try to keep it succinct.

We arrived immediately after court.  Court ended around 4:30.  It's right across the street.

From the time we got there, I think we were the only people in the restaurant.  It's February, it's a Friday, it's not a hopping place, it's not a place that people go to hang out at a bar.  And we sat.  And then they started bringing out appetizers, asked if we wanted to have a drink, and we sat there for no less than two hours, but I can't tell you if we stayed for three.

I just know that I talked to you for three hours.

Whether the whole time we were there, I don't know.

Q.   So if court ended --

A.   One drink in the two plus hours.

Q.   If court ended at 6:00 that night, then we would have been there after 6:00, correct?

A.   I --

Q.   There's a record, so I guess we can check the record to see what time court ended.

A.   I have checked the record and the court ended at 4:35.

Q.   Thank you.  So we were sitting there for two or three hours drinking, and that's when I decided to plea, is that what you're saying?

A.   No.  Please listen to the answer.

You had a drink, I had a drink during the course of two plus hours.

Q.   I had one drink in two plus hours sitting at a bar or a restaurant?

A.   Again, we were at a restaurant table and we were talking, and it was a very meaningful conversation and we were very engaged, and so it wasn't -- we weren't there to drink, we were there.

It was a Friday and you ordered a drink and I ordered a drink, but what we did besides eat meatballs is we talked and we had, I'm sure -- I know I had multiple

glasses of water, because that's what I do.

Q.   And you're saying we're sitting there for several hours and it was quiet, there was nobody coming into the bar, nobody there, and from 4:35 when court ended, you say, we went there after that.

And we went there after that and we would have been there in the 6:00 hour and nobody was coming into the restaurant?

A.   I did not address that.

When we arrived there was nobody there and it was quiet.  At no time did it ever get busy.  That I know. There may have been another couple of people, at most a handful, that came in.

It was just us, and I even believe the bartender came around to serve us, but it could have been a waiter.

But that's it.  It was very quiet.

Q.   Now, Mr. Chase, he says in his affidavit that I nodded and seemed to agree.  Is that pretty much what I was doing while we were there?

A.   I'm sure that's part of what you were doing there. There was also discussion.  But for the most part, I was explaining to you, as I've described earlier, the answers to questions that you had had.

You had made a comment to me as we left court, and you were a little stirred, meaning really engaged at a

different level than your pure intellectual level.  You were moved, and you said to me, That was like looking in a mirror; and I knew from the tone and the content that it was a pretty important thing to you.  So that's why I said, Let's go sit down, and invited Mike Chase.

And we sat down and you explained, because I asked: What do you mean like looking in a mirror?

The witnesses that day and the day before had testified to their experience, and you said, When I looked at them, that's what I mean, it was like looking in a mirror, that's what happened to me.

And I knew that that was an opening for me to now explain to you, because you were a little stirred, why is it that when you looked at these people and listened to these people, why did it seem to you like looking into a mirror.

Because when you answered that you identified with them, it came out in further discussion, it was the fact that they had been duped and you had been duped, and I realize that that was the first time from the time I had met you that you had focused instead of your enthusiasm to earn money from investments, that you focused on your clients.

Under oath, you recognized that your clients got duped.  They didn't understand, just like you.  For almost

all, if not all of your investments, you got duped, and they didn't work out because you didn't know some things that you wished you knew.  And that's what happened at trial.  On Thursday and Friday the witnesses explained what they didn't know.

And so I used that as an opportunity to explain to you why you might be feeling what you're feeling, and then I explained to you why the test results mattered, and that's when I gave you the explanation about the executive function issue.

Q.   And then you're saying that based on, what, a couple of witnesses who testified that day, that I decided to throw away three years worth of work, all the hours which are probably three or four or five times what you guys put in, I decided to throw all that away and I decided to plead guilty?

A.   No, that's not what I'm saying.

What I'm saying is:  You didn't make any decision right then.

Q.   So you're saying I didn't make a decision on Friday night?

A.   No.

Q.   Okay.

A.   I'm saying you didn't make a decision right that moment as your previous question suggested.  Instead, you

literally were stirred, you were moved, and you expressed how you felt, and you said, I feel like I was looking into a mirror.  And I asked you to explain it and you did, and I've now just summarized it.

So you didn't make decisions rights then, you were expressing yourself openly, honestly.  You were very receptive and engaged.  And I knew this was an opportunity to explain to you what I tried to explain in November but which I didn't want to belabor back then, because it wasn't a defense to the case, and I wanted to keep your confidence.

So back in November when I explained it to you -- I felt a duty, you spent 16 hours taking tests -- to tell you what the tests were.  I did my best to summarize them.

Q.   But now when you explained the tests, one of the things on the screen here --

THE WITNESS:  I think the page may have rolled.

MR. FROST:  I'm going to fix that.

BY MR. RIVERNIDER:

Q.   This is what you're referring to on page 52 of the transcripts.

You went out undertook two full days of testing on 17 different methods of learning things that I didn't know and were still mid that process.

Is that what you said at the Rule 11 hearing?

A.   The part that you read is from the transcript, and it is part of a paragraph of my speaking.

Q.   And line 7 says "still mid that process," correct?

A.   That's correct.

Q.   So there was no final determination?  We were still mid the process.

At the change of plea hearing, there was no final determination that I actually suffered from the disorder on that day, is that correct?

A.   No, because that would be misleading to answer that question as phrased.

What happened was the tests -- the 17 tests were done.  They had been analyzed, they pointed to conclusions.  Those conclusions were explained to me in three and a half hours back in November.  I explained them to you in just over two hours at that time.

Now, mid that process suggests that there was still more that could be done to learn about what the tests already indicated to the neuropsychological professionals, and they were very concrete.  Each test produced different information, but the salient information we discussed that Friday at some length.

Q.   At the bar?

A.   No.  At the restaurant at the table eating meatballs.

Q.   Did we have more than one order of meatballs or two?

A.    I think we had a couple orders of meatballs is my memory.

Q.    I only recall one; but anyway, let's go down to line 12 to get this on the record.

Can you read line 12 and 13?

A.    "The Court:  Where is the doctor located?

"Mr. Bergenn:  Right here on the front bench for now."

Q.    And who is the doctor that is referred to?

A.    Dr. Nellie Filippopoulos was sitting right there, right behind you.

Q.    I don't think we were in this room; but again, she was sitting right behind me.

We were in court, she's sitting right behind me for the entire time of the Rule 11 hearing, correct?

A.    I don't know about the entire time, but she may have been.  I don't know that it was that long a time.  I'm going to estimate we were there for about an hour.

To answer your question, she could have been there a whole hour.  I was engaged with His Honor and you, so I can't tell you.

Q.    So Dr. Filippopoulos was there and we were there, you said, in court for about an hour?

A.    I don't know.  Whatever the transcript tells us I would trust.

Q.   Hearing started 12:15, and so the hearing lasted probably until 1:08 was the actual time.  So close to an hour we were sitting there and Dr. Filippopoulos, she was there in court; she didn't leave early, right?

A.   I don't know.  I know she was there a period of time, but I can't tell you how long she was there.

Q.   She came over to court with us that day?

A.   She did.

Q.   And she drove over in your car, right?

A.   That's probably what happened.  I don't have a clear memory.

Q.   And when you left, you were in the parking lot and you, Dr. Filippopoulos, Mr. Chase and Ms. Vargo all went to lunch together, right?

A.   I can't remember, I don't know.

Q.   When I wave to you and you're all driving off together, and you're all going to lunch, you don't recall that five years later?

A.   I don't.

Q.   Did you discuss with Dr. Filippopoulos the case at lunch?

A.   I can't remember lunch.  I do remember many times talking about the case.  That was the whole point of my engagement of her.

Q.   Your memory isn't very good from that day, is that

what you're saying?

A.   No.  I'm specifically telling you I do not remember lunch that day.

I'm also specifically telling you very clearly that day facing His Honor and talking with you.  And for that reason I was unable to keep an inventory of everybody else in the courtroom.

Q.   But you don't recall Dr. Filippopoulos even driving over with us, is that correct?

A.   It's my best memory that I can reconstruct, but it was not a meaningful event that anchored itself.

I do know that she got to the firm somewhere around 8:15.  I do know I had to get here by 9:00.  It was my custom to drive here and bring those who were coming with me to court.

So I'm inferring, rather than specifically remembering, her being in the car.

Q.   Now, going back to your "only reason," the "only reason" statement that you made; you made that statement, correct?

A.   I'm going to have to see the statement.

If it's in the statement, I definitely made that statement.  But if you're going to ask questions about it, it would be helpful for me to see it.

Q.   Line 9.

A.   Yes.

Q.   So you made that?  You said "the only reason we got here," right?

A.   I made that statement.

Q.   Prior to this case, had you ever had a neuropsychologist assist at a change of plea proceeding?

A.   That's not what she did.

Q.   She was there with us for the entire time, right?  As far as you can recall?

A.   I've already testified, I don't know.  I know the 48, 50 whatever minutes what I was doing.  I don't know what she was doing.  And she was not there to assist with the plea at all.

Q.   But she did come to court, a neuropsychologist.

     Is this the first time you ever had a neuropsychologist at a change of plea hearing on a criminal case?

A.   I don't remember.  I've been doing this a long time, I've worked with a lot of neuropsychologists, I've engaged them frequently; so I can't answer your question, I don't know.

Q.   And would you agree with me that the participation and input of Dr. Filippopoulos was a significant factor in my decision to plead guilty?

A.   I wouldn't use those words.

Q.   You said you consulted with Dr. Filippopoulos regarding this executive function deficit disorder, correct?

A.   No, that's not correct.

What I did is I asked the Court's permission to engage professional assistance and I followed their advice.  Dr. Stoll suggested I work with Dr. Nellie Filippopoulus because of your answers to the first day's battery of tests.  He said he thought she would be more suitable to helping you given what the first set of tests revealed.

I decided to follow his advice, I had no better ideas.  So I came back to the Court and asked for permission for the doctor he recommended.  I then got permission, and the purpose of it was to finish the tests and tell me whatever they told her.

Q.   And the four hours you spent with Dr. Filippopoulos was reviewing this information?

A.   To help you understand what your 16 hours of testing revealed according to the standard battery of tests that the professionals use in the field.

So her four hours were principally focused on making sure you understood what the tests revealed.  That is it.

Q.   Tell me if this helps refresh your memory or if this fits your memory:

We get into Dr. Filippopoulos's office, she then starts making copies of her report and she has a single copier and she makes a copy single page each time and then she sorts it out, and then we each take a copy, we go into Dr. Stoll's office and start reading it.  Does that fit your memory?

A.   Well, until you just said all those things, that had not been my memory, but I couldn't disagree with anything there.

I don't have a specific memory of her having a small copy machine, but it would fit.  It was a small doctor's office.

Q.   Do you recall sitting in the two big leather chairs, I was in one and Dr. Stoll was in the other one, and we had our feet up and we were sitting there reading the report.  Do you recall that?

A.   I don't recall Dr. Stoll was there.

Q.   He was not there, that's correct, but do you recall us sitting in his office while Dr. Filippopoulos had an appointment with another client?

A.   I recall at one point sitting in Dr. Stoll's office, absolutely, and I recall sitting there with you and with no one else.

You have, by your earlier question, refreshed me that we were viewing the actual test results.

Q.   And when we were reviewing the actual test results, it was you actually who was doing all the talking and Dr. Filippopoulos was agreeing with everything that you were saying, is that correct?

A.   No, not at all.  I was reviewing the results -- remember, I had spent three and a half hours with the doctors back in November.  I was familiar with the results, and I was with Dr. Filippopoulos because she's better than me at this.  I'm not even a rookie.

So what I was doing with you when we were alone for a time was, you were reading, I was reading, and I'm sure we engaged regarding the various test results.  There were three or four that were most important to me, and I'm sure that's what we focused on.

But then the time that we spent with Dr. Filippopoulos was, she was talking about the meaning and significance of the results; and when I was doing the talking, it was when we finished that process.  And I was then focusing on what you had just revealed to me the day before, which was why you felt the way you did and expressed yourself the way you did.

And I was using these test results that she, the results themselves, and I had explained, and putting them in the context of what happened the day before.

Q.   Would you agree that if there was a flaw in her

opinion or an analysis was incorrect, that the plea would be somehow tainted?

A.    Not at all.  Because, first of all, that hypothetical just doesn't apply here.

The tests were standard.  The results were following the proper protocol.

Q.    Would you agree it was something I relied on in order to get me to the change of plea hearing?

A.    I can't -- I wouldn't use those words.

But I would say that your understanding of yourself that emerged from the conversations about what the tests objectively revealed helped you to understand what you'd already experienced without any test results on Thursday and Friday.

Q.    If it wasn't for that four hours we spent with Dr. Filippopoulos, as you say here, the only reason we got to the Rule 11 hearing, if it wasn't for those four hours, would we have ever gotten to the Rule 11 hearing?

A.    I don't know.  But I do know we did have those four hours and I saw how helpful they were.

Because when I talked to you on Friday, I was really dialoguing -- I wasn't trying to force anything at that time with you at all.  I was trying to make sure you could understand what you were telling me and how it fit.

And I said if we talk to Dr. Filippopoulos and you

talk directly yourself and she has a chance to explain it to you --

Q.   Is feeling bad for witnesses who testify a federal crime?

A.   I don't understand that question, but I can tell you --

Q.   You said I felt bad for the witnesses and then based on that you said I then pled guilty?

A.   That's not what I said.  I did not say you felt bad and then pled guilty.

What I said is you specifically told me, the phrase is as clear as a minute ago --

Q.   Tell me what it is, because I don't know what it is.

A.   "I felt I was looking in a mirror."  And I asked you what that meant.  And you then explained to me how you could see how they felt, and that's how you felt when you got duped.  And you could see those people were generally unaware of things, and that's how they lost their money. And you said, That's what happened to me.

So you could for the first time understand that what happened to you you had done to them, and understood that, you actually -- that's one of the things that you nodded about.  You understood that to my observation.

Q.   Are you claiming that by, like, when David Praise took the money knowing that he wasn't going to pay it

back, that I believed that I took their money knowing I wasn't going to pay it back and that's what I expressed to you that night?

A.   No, not at all.  In fact, I'm glad you say that. That's exactly wrong.

What happened was David Praise took his money from you promising you something that was not true.  I don't remember the details, but I believe it had something to do with some investments that he was going to make, and he was going to give you money from those investments.

And in fact, sir, that's exactly what you had done with every one of the victims.  You had taken money from them, you had never paid them anything out of investment returns.  The only thing you ever paid them with were other clients' money.  And you knew that.  That was something that you weren't looking at, but you knew it.

And so when I learned that you had this issue of executive function deficit, it meant that you were so focused on earning and trying to make money from your investments, you just stopped looking at the other facts that you knew, which were all of your investments had yet provided you return to give to clients.  On the other hand, you kept getting more clients.  And so you knew --

Q.   Thank you, Mr. Bergenn.  I think we got the point and we're going to address this in a moment.  I just want to

cover a few other areas.

A.   Sure.

Q.   Now, to your recollection --

MR. SCHMEISSER:  Your Honor, can the witness finish his answer to be complete?

THE COURT:  If there's more to be said, yes.

THE WITNESS:  I'm just trying to explain.  I could wait until the next question.

THE COURT:  Okay.

BY MR. RIVERNIDER:

Q.   Are you finished, Mr. Bergenn?

A.   I'm ready for your next question.

Q.   I just want to cover a few other things.

To your recollection, Dr. Filippopoulos wasn't asked any questions by the Court, was she?

A.   Well, I did read the transcript of under an hour and she does not appear to have been asked anything.

Q.   And we just reviewed where you told Judge Chatigny -- Judge Chatigny asked you where the doctor was, and she was right there on the front bench, and she wasn't asked any questions, correct?

A.   I believe that's correct.

Q.   And the Court didn't ask you any questions regarding the doctor's presence, correct?

A.   I can't speak specifically to that.  Whatever's in

the transcript I would trust.

Q.   So if the transcript doesn't reflect in here the Court asking you and questioned, why is there a neuropsychologist here at a Rule 11 hearing, you wouldn't have any recollection of that?

A.   Oh, I know exactly why.

Q.   But the Court didn't ask any questions like that?

A.   It wasn't the Court's concern.  It was my concern as an ethical lawyer.

You had expressed yourself to me Monday morning as well as, I believe, Sunday night, in ways that suggested we were going to go back on trial, and that was inconsistent with the several hours, probably about 15 or so, preceding couple of days or three days, with what you had worked with me word by word to understand.

So when you said you wanted to go back to a trial and I knew you had -- you were below the first percentile for executive function, and the term I learned, perseveration, which is to persevere.  Once you start thinking something, which in this instance was your focus on trying to earn money for these people -- it was well intentioned -- trying to earn from your investments, that's all you focused on.  And when you were not interrupted from that perseveration, you would go right back to it.  That's all you thought about.  And when you were interrupted from

persevering on that subject, you well followed and understood, and even to me, revealed your own thinking about your clients being duped.

So I had a duty to you to make sure you kept focus on not just part of the facts but all of the facts. And that was something I could do as a lawyer, but I wasn't experienced with people who had this condition of below the first percentile. And, ethically, there's a duty of lawyers, when there's some kind of a diminution of some kind, some lesser capacity than others, to keep treating them like a regular client, but on the other hand seek to understand.

And so when you expressed yourself, after spending hours with me on Sunday, following word for word the facts that you knew were true, and then after you parted, you went back to focusing on your investments, I realized that I had a duty to you, and that duty was to keep you focused on both options: A and B.

And whenever you perseverated, you went back to A, and whenever I interrupted your perseveration and reintroduced to you that which you already exhibited you understood, which was how you knew that your clients believed you were paying them out of your investment activity and you knew that had not yet ever happened, and instead you were paying your clients with other clients'

money and you knew that no clients knew that, and you knew that was important to some people.

I knew the law, and the law was, it's objective.  And if it means something to some people that I'm not making any money from my investments, I'm just using other people's money --

Q.  We can get into --

A.  I have to finish this answer.

Q.  We were talking about --

MR. RIVERNIDER:  Your Honor, if I can interrupt him, he's talking about the crimes and all that, and --

THE COURT:  I'm going to have him finish the last answer.

BY MR. RIVERNIDER:

Q.  Okay.  Then go on.

A.  The focus of this question is why did I connect with Nellie Filippopoulos, a neuropsychologist who had done half the testing and a good amount of the reporting and explaining to me.  And it was because I didn't have experience, specific experience, with someone with this specific limited capacity that you have, and I wanted to be sure that I was discharging my responsibilities and duties to you.  Because you understood that we were facing what was going to be either 26 years or 12 years, give or takes.  And you knew and I'd already told you, I thought

for certain you were going to lose on all counts.

And I knew there was so much at stake, that if you were doing something, backsliding or snapping back or, you know, going back to your perseveration, if that was going to happen and I didn't understand it, I wanted to be able to consult with somebody to figure it out.

And as it turned out, Monday didn't present that problem.  When we were back together again on Monday, you were once again saturated with both sides of the facts: The investments and the fact that you knew that the people had been duped.

And with that knowledge and knowing that there was a huge difference between 26 years and 12 years -- and I thought I had a shot at getting you better than that -- it made sense to continue with the facts word by word you already agreed you knew were true.

So she was there as a potential resource; and it turned out, I didn't need her.

She was also there because your father was there, and part of the midstream work she was doing to complete her analysis was to interview immediate members of the family. They were going to provide insight to her about you.

And, in particular, she had a belief in your traumatic brain injury from records we could not locate. We went all over Florida, the hospital went away.

Couldn't get the records of the TBI.

So she had to do what I know from my other TBI experiences, all professions in that field do, you talk to the person to learn their before and their after. And your father was coming and it was a good opportunity for her to meet your father, spend a little time, and she did. And later she followed up on that having had that relationship.

So those were the two reasons she came: To meet your father, I think also to meet your sister, and to be there in case something happened that was outside my understanding such as what had happened late that night and first thing that morning.

That's why Nellie was there.

Q. Good?

A. That's the answer to your question.

Q. Okay. If we were in court 9:00 in the morning, Mr. Ponte was at my change of plea hearing, why didn't we go in while Loretta was changing her plea?

A. Because you and I had more work to do.

We had already discussed at extraordinary length on Saturday, on Sunday, what the facts were; and that morning we had to review the language that I had tried to negotiate away and was unsuccessful with the government, "the intent to deceive." We had spent a long time --

that's the core of the case:  The intent to defraud and intent to deceive.

You and I spoke about it so much, but Kit Schmeisser, apologize, Attorney Schmeisser from the federal prosecutor's office, had essentially said it was important that that specific language be put in there, and it didn't change the meaning, and I did not want to have the appearance in front of the Judge that we were resisting acceptance of responsibility about something we had already covered.

So he came down, he made those changes, and we knew that we were going to have to spend time on this, and that's what we did.

We spent from 9:00 until noon going over nothing besides the acceptance of responsibility, acceptance of offense conduct, and the form that is used by this court. There was nothing else for us to do, but that's what we did.  We went over that word for word.  And then each of us said that to the Court.

Q.    And we were doing that in court?

A.    Actually, the physical location is not as clear to me.  Where ever we were, I remember there was nobody else around, and I believe it was an unused courtroom at the time.  I can't specifically say.  I'd have to go down and see if I could refresh myself, where were we sitting, but

we sat there, and there was some time I spent with your father.

But for the most part, it was just you and me, because Mike Chase was in watching the change of plea for your sister.

Q.  Okay.  So we were in court and I had asked, as you probably know, I'd asked for a copy of the video of the courtrooms to show where we were and they've been destroyed, right?

A.  I saw that.  I didn't know there were video, I didn't know they were destroyed.  I didn't know anything about that.

Q.  The surveillance video wasn't available to show whether or not we were here and the surveillance video showing if we were in the court after 11:00 wouldn't be available, correct?

A.  I couldn't speak to that.  I didn't know there was surveillance video until I saw you making some point in this case.

What I can tell you is I know what I did that morning.  It was a very important morning, and I know you and I did not separate, except for perhaps to go to the restroom.  From 9:00 until 12:00 you and I were together.

Q.  And we weren't in your office?

A.  Well, we may have been in my office for a short time

in the morning.  I believe you arrived about 20 minutes or so before Dr. Filippopoulos, and no doubt I would have expected you to come up to visit with me while we waited, and it may even have been that Dr. Filippopoulos came upstairs.

But I know that there wasn't much time from her arrival, which is around 8:15, and the time we had to leave.

Q.   So after my sister pled and you're sitting in your office chair and you say my sister just pled, you don't recall that?

A.   Yeah, that's just not true.

I mean, look, anything's possible.  My memory is -- and I looked at all the documents I could to refresh myself so I could be as helpful as I could to the Court -- and my memory is that you came in just before 8:00, she came in after 8:00, and that I still wanted to get here and I was not going to be late.

I wasn't sure with the government, the government was not all that comfortable with all the goings on.  And, frankly, I did not want to be in a position of the Court thinking that I was going to stay in my office and the Court was going to be vulnerable to me.  That's not appropriate.

I was going to be here come what may.  I didn't know

what the proceedings order was going to be.

I did know I needed more time with you.

Q.   Do you recall telling me throughout the weekend that I had to plead on Monday because I just learned of this diagnosis?

A.   Absolutely not.

Q.   You didn't tell me I had to plea on Monday because I had just learned of this diagnosis on Saturday from Dr. Filippopoulos?

A.   That's -- no.

What happened specifically on that subject was you, for the first time, understood it.

And one of the best things that came out of this testing was that you came out better than average on a socially responsible person.

Q.   I appreciate you telling me so.

A.   The reason I'm telling you is if in fact we continued with the trial after you now actually understood that you do perseverate and that when you are interrupted you are able to focus on both sides and what --

Q.   So let me ask you this --

A.   I have to finish the answer.

Once you understood both your own consciousness of "got to make money," that's what you focused on all the time.  You were very good and you wanted to make money for

everybody.  You were very good about that.  You were so focused on that below the one percent, you were unable to just shift and look at, by the way, the way you're making this money, all these people are giving you money not knowing that you're just giving them other people's money.

And once you understood it, at that point if you persisted in going to a trial, one that you and I both knew you were almost certainly to lose, at the end of that trial there would be nothing for me to tell the Judge.

I couldn't tell the Judge what a good guy you are if you just stubbornly insisted on ignoring all of their plights and instead focused on yourself, yourself, yourself, look I'm trying to make money, which was laudable, but it was only half the story.

And once you understood both halves of the story, it was very stark and obvious that if we kept going, you were going to get your 26 years, plus or minus, and if we stopped now, now that you understood it, we really had something to talk about for this Judge.

Q.    And the fact that we're here five years later, does that prove or disprove your point?

A.    Good question.  I will leave that to the neuropsychologist who can study this record.  It's certainly not inconsistent.

And, frankly, the days after the plea we communicated

about a lot of things.  You didn't bring any of this up, for the months after, you didn't bring any of this up.

Q.    Any what?

A.    These things that you're claiming now.

You seemed to me so at peace during that plea, you actually cried during the plea.  I don't know if you remember that.  But when you cried, it was so important to me because I knew this Judge had only seen you the way these gentlemen over here portrayed you, and I saw another part of you.  The tests proved the other part of you I saw, and you're a good guy and you intended to do the right thing.

So when you did plead, when you were still aware of both sides of the case, and you were very sincere, all of our engagements in the ensuing days, you didn't bring up any of this stuff about the stuff you're bringing up now. And for a few months, nothing came up.

But I knew there was going to be that risk where you were going to snap back like a rubber band, you were going to backslide into focusing just on your side of the case. I knew that was a risk.  But I decided I had a duty.  It just didn't permit me to be passive.  I had to make it clear to you, and that's what I did that weekend.

Q.    And you believe passionately that I had this disorder, and you believed passionately that this

information was accurate; and that's the way you presented it, correct?

A.   Wrong, I didn't believe it passionately.  I believed it because it completely fit every minute I had ever spent with you.  There was nothing about the test results that were contrary to my abundant experience with you, and it really explained everything.

So I certainly believed it.

And what I believed passionately was my duty to make sure I did my job, which was to interrupt, if you were going to start getting fixated again, at that point I had a duty, because you had to be knowing and intelligent and voluntary, and that includes going to trial.  That had to be knowing and intelligent and voluntary.  Not just because you perseverated and you just kind of snapped back.  I wanted you to be sure you understood what you already showed me on Thursday and Friday you understood.

Q.   And you believe passionately I had to plea?

A.   No.  I believe passionately that if you didn't plead you were going to get 26 years, and if you did plead, I had a really good chance of doing way better.

And as it turns out, even after you were at peace with your plea, certainly day by day for that week, and then for months, I really was very hopeful.

But when some of the things that you're saying now

started emerging, I was prepared for it, but I do believe it did not help you because the nice clean version of you as a socially responsible person who could hold on to your concern for other people, it got a little bit lost at the time of sentencing.

So I was very pleased that I got you to 12 from 26, but my ambition was to get you into single digits.

Q.   And you believed that that's what I wanted?

A.   Oh, I knew.  There was no belief there.  I knew that's what you wanted during all those hours that you told me that's what you wanted.

Q.   And for the --

A.   I also knew that when you were off by yourself and away from the evidence and someone who could be aware of how you were backsliding and going back into your perseveration mode, anything could happen; and I was prepared if I had to, I guess we're going to go back to trial.

But it would have really, really hurt you, and it was contrary to what you told me you wanted to do.

Q.   And just to remind everybody, if you can, executive function deficit disorder basically means you don't recognize change when change happens?

A.   No.

It's in the same ballpark, I'll give you that.

It's a little more sophisticated than that.

Q.   So when Mr. Schmeisser made changes to the admission of the offense of conduct, I wouldn't recognize those changes if they happened shortly before the hearing, correct?

A.   No, that's not correct.

Let me -- I can make it succinct for you.

Once you form a conclusion about something, once you have that conclusion, you can follow new evidence and you can understand it, but you can't fully process it, and for whatever reason, you snap back to your original conclusion and you do it to a degree that is off the charts.

And it's based on a Wisconsin Card Sorting Test, which the government's experts themselves don't argue with.  Nobody argues with this key issue.

And that is, the way that test works, the Court will recall, is they change the rules of the game, and everybody eventually figures out, oh, we're now not just picking out cards with shapes, we're picking out cards with colors, and everybody eventually figures it out, except you.  Once you figure out the rules of this game are shapes, they can change the rules so you win when you recognize colors.

Q.   So when you stuck in or Mr. Schmeisser stuck in that I intended to deceive people when I was specifically

telling you and very adamantly telling you I was not going to agree to that, when he changed that, did you go over that with me?

A.   At great length on Sunday as well as some on Saturday.

The concept of "intend to deceive," is the same concept as "willfully."  It's covered abundantly in the law, you cited the law to me, and you would look at certain of the language of the cases and not at the other language of the cases.

And this is what it is:  I know what you were thinking.  You were in your conscious mind intending to make everybody rich.  That's clear.  You weren't intending personally in the colloquial sense to deceive anybody.

The fact is that you knew that it would be important for them to know that you had never paid anybody out of any investment returns ever, yet you kept paying 10 percent a month for all the money you got, and you knew you were getting that from other people's money.

Those facts you knew and the fact that they all didn't know, that was something you knew, and so since you knew those things and that is deceptive and you intended to keep going, under the law, I don't like it, but under the law that means you intend to deceive.  And you and I had been through that at some length.

I didn't want to have it in there.  I tried to negotiate it away because I knew how much it bothered you, the language, but I knew the concepts did not disturb you. It was merely the way the language sounded.

And in your papers I've read since, you still have that view.  "I never intended to deceive anybody."  And in the vernacular, you never did, you wanted everybody to be rich.  But you knew what you were doing.

Q.   And it's your testimony that I didn't intend to deceive anybody and I didn't intend anybody to lose any money, is that correct?

A.   No.

MR. SCHMEISSER:  Objection, Your Honor.

A.   No, that's not correct.

But the fact that you asked that question, other than the fact that you got a job is kind of the point here.

You wanted everybody to succeed.  That's what you kept your mind focused on.  I think you worked about 14 hours a day trying to get everybody money, and you really thought you were going to hit it.  The whole time you thought you were going to hit it.  You thought you were still hit it during the trial.  You were still waiting for some money to come in.  So that's to your credit.

The problem is, you're a very bright guy, you were the only one who knew where this money was going, you knew

that you weren't paying people out of that money, and you knew the whole plan, the very cornerstone of the plan is to pay people regularly out of your investments.

Where else is the money coming from besides investment success?  That's what everybody thought, just like that's what you thought with Praise, just like that's what you thought with all the other places you invested money where it didn't come back.

And, by the way, there's a lot of doctors and lawyers and professionals and very rich people that also fell for it.  It doesn't mean you're not bright.  You're bright, but you fell for it and people, you know, they got duped by you as well.

THE COURT:  Why don't we take a break.  We'll be in recess until quarter of 4:00.

(Whereupon, a recess followed)

THE COURT:  We're going to continue until we have to conclude at 4:30, unless we're done before then, which I gather is unlikely to happen.

Mr. Rivernider?

MR. RIVERNIDER:  Thank you, Your Honor.

We have a couple of exhibits.

While we're doing that --

MR. FROST:  They're both marked.  The government has no objection, Your Honor, to Plaintiff's Exhibit 16,

which I'm putting on the Elmo, and I'll let Mr. Rivernider

question Mr. Bergenn on this.

Can you read that, Mr. Bergenn?

THE WITNESS:  I can.

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, can you identify this document?

A.   Can I identify this?

Q.   Does this appear to be an email you sent?

A.    It appears to be an email that I sent on September 12, in the morning, to you and copied Mike Chase.

Q.   Can you read the subject line?

A.   "Our conversation".

Q.   And can you go ahead and read the email for us?

A.   Sure.  "It was hard to go through it for all of us. We know very clearly you did not intend to harm NMB participants by having them lose even a dime, but after our conversations, do you understand enough to articulate yourself the, quote, harm, that underlies the charges".

Q.   Basically as you sit here, we note very clearly "you did not intend to harm participants in the NMB participants by having them lose a dime"; is that what you said in this email, correct?

A.   Absolutely true.

Q.   Okay, thank you.

And you believed that from day one that I never

intended to harm anybody and I never intended for them to lose even a dime, correct?

A.   You never intended them to lose even a dime.

Q.   Thank you.

A.   But you said --

Q.   Thank you.

MR. SCHMEISSER:  Objection, Your Honor, there's an answer to "definition of harm," which I believe counsel was going to answer.

A.   I was just getting there.

Because as you know, we discussed it at length many, many times, harm that you are charged with intending, and admitted to, was the harm of taking money from people without letting them know that you had never paid out anything from investment returns and instead you paid out to all your clients with other clients' money.

The harm was not letting them know that that's what they were parting their money for.  That was the harm. Not that they were going to lose money.

BY MR. RIVERNIDER:

Q.   And you spent a good portion of your time testifying about what your version of the crime was, which was that -- not what the government's version of the crime was, where the government's version was that as far as the NMB program, that the government's version was that the

money was stolen by David Praise in September of 2007 and we knew that?

A.   I cannot understand your question.

Q.   Okay.  The government during trial said that their version of the crime was that we knew that the money was stolen September 2007, is that correct?

A.   I don't have that memory.  It may have been.  I didn't go back and study the whole transcript.

The government's version, to my understanding, that which I knew we were going to lose, is that you intended the harm as per what we tendered at the plea, which is you intended the harm of taking money knowing that people didn't understand this core feature.

That was the harm that was intended, because the government agreed when we articulated that in the articulation of offense conduct.

Q.   And your version is now everything that you've written and put in the admission of the offense of conduct, is that people didn't know the real risk, right?

It was all about risk, wasn't it?

A.   Yes, I think that's a fair statement.

Q.   And you're saying that I had the epiphany because of witnesses who testified on that Thursday and that Friday, is that correct?

A.   Well, the epiphany wasn't Thursday and Friday, I

might describe this as a denouement, you kind of realized something new was happening and you wanted to talk about it.  It stirred you, you said you were looking into a mirror.  And I asked you to explain and you explained as I've described.

So, yes, you at that time -- the epiphany was to me when I described why it was, you for the first time experienced those feelings on Thursday and Friday, because the people were actually there.

Q.   They were testifying about the risk, and that's what you testified earlier, and that's what your affidavit said, it was all about the change, they didn't know the risk was higher than the risk was?

A.   You've asked about five or six different questions in that remark, but I will say:  My best way to move this along was, it was clear that the material information on risk was deprived of them, and that you knew that they were parting with their money to get into the NMB program on the real estate side.  So you knew they were parting with their money to get regular 10 percent payments every month, and that was going to be because of your capacity to invest, when in fact the risk was, well, actually, I've never actually had any returns and I've only been paying --

MR. RIVERNIDER:  Your Honor, this is nothing

that is in evidence, this is Mr. Bergenn's opinion.  I just want to make that point clear.

He keeps saying it over and over again.  It's not in evidence, nor has it ever been litigated.

He just keeps saying it over and over again, as the record is clear.  The record is not clear.  I just wanted to get that point out.

I'd like to get some further --

THE WITNESS:  Right.  But it is also true, as I was saying, that we studied, we spent thousands of hours combing through all of the evidence, and every piece of evidence we found failed to disprove that, and all of the evidence that we found that lent proof to the issue was the money went in and didn't come back.

BY MR. RIVERNIDER:

Q.   And you said all the evidence that you were able to review, and going back to my original question, did you have all the evidence -- now that you just said "all the evidence" -- did you have all the evidence that you needed in order to review so that I could make an intelligent plea?

A.   As the law defines it, law defines available evidence --

Q.   It's a yes or no question, sir.

A.   It isn't actually.

Q.   Did you have all the evidence that you needed to review, yes or no?

A.   I can't answer that yes or no.

Q.   Okay, then let me read from transcript, 106, where you said to the Court starting at line 23 and 25, "We're being provided documents that are in the massive 489,000 but were not identified by the government on their exhibit list and we're being handed them and these are witnesses that are being -- you know, we got some 8:00 last night and some now."

A.   Is that something I could read?

            MR. RIVERNIDER:  This is not a document, it's actually from the transcripts, but it's handwritten notes.

            I don't have access to the transcripts, Your Honor.  I've asked for them but haven't been given them here.  I have them back in South Carolina but haven't been given them.

            So just continuing on from where we were.

                (Pause)

BY MR. RIVERNIDER:

Q.   All right, I'm not going to go ahead and read everything here.

     Mr. Bergenn, were you frustrated by last minute disclosure by the government during trial when they were dumping documents?

MR. SCHMEISSER:  Object to the characterization. The actual trial record will explain the reason for production.

A.   And I've been a defense lawyer for 37 years.  It is part of our day-to-day experience to be frustrated, not just by that, but that does happen rather frequently.

Compliant with the rules, Jencks Act itself says you only get them when they testify, which is ridiculous; and the Courts here have been more generous in pushing the government, and the government typically gives us better than what the minimum is under the law.

Here I absolutely just got frustrated also by reading 489,000 documents.  Not that I read them all.

It was a lot of work, everything was frustrating.

BY MR. RIVERNIDER:

Q.   So said transcript, 107, says, "We were obviously being somewhat hampered by our abilities to absorb and prepare because honestly there's no way we're going to read 489,000, so we only looked at all of the things that were on the government's witness list."

So based on that, Mr. Bergenn, you didn't read all of the documents or go through all of the documents that were in discovery, correct?

MR. SCHMEISSER:  Objection, Your Honor, to form. We're reading from a document that is his own pleading, we

don't have any actual transcript, and there's no context being given.

My recollection of the trial transcript is that there were times when there was late production because a bank actually provided a re-provided documents that they had provided previously just before trial as the witness would testify.

I don't remember if that is the context, but I think the question is misleading. I don't think that Attorney Bergenn can accurately answer without the proper context.

MR. RIVERNIDER: Your Honor, I withdraw the question.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, isn't it true you didn't read, as you just stated, all 489,000 documents?

A. That is true.

Q. Because you didn't read all 489,000 documents, you don't know if there were documents in discovery that was turned over that would disprove everything that you just said regarding the information you researched?

A. I had enough to make a judgment from the evidence that I did see, and evidence that we sought and obtained apart from the government.

In fact, the 489,000 apparently were not enough, we

went out and found some, and you provided us some.

And all the evidence that I reviewed made it essentially no dispute about there being assets of a dollar -- a set of dollars that went back into the NMB bank accounts that was then used to pay people.

So whatever was in the 489,000, we did see your bank accounts, bank records, for a period of time, and those records failed to reveal any payments coming in from investments that would then get paid out to people.

So, you know, I could look at the Encyclopedia Britannica and it's not going to change the facts that led to the guilt.

Q.   Let me just go over a couple of things on risk level, putting this up.

MR. FROST:  I'm putting on the Elmo Plaintiff's Exhibit 17, government has no objection, so we'd ask it be admitted as a full exhibit.

THE COURT:  All right.

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, this is an email exchange between me and you.  Do you recognize this?

A.   I do.

Q.   And starting down at the bottom -- I don't have another copy of it so just go down.

Let me just start here.

If we just start at February 24 at 8:41, you go through the -- basically the scenario that you've just been given.

Now, I write a response to you at 8:51, and if you can on my response, if you could go down to 8:51, where it says "several said they knew the risk," and read the rest of the response?

A.    "What Ponte knew in October of 2007 is that we were waiting for the $15 million to come in as he was involved with the Praise deal.  And in November, that I was increasing a $10 million CD to $100 million to put into a trade.  He had Moore and Reid send the fee to Martin Porter directly."

Q.    And then the next line?

A.    "I don't know what you're talking about regarding Kemp.  Her husband bought two cabins after this."

Q.    All right.  So basically what I'm responding to, based on everything that you said earlier, which is pretty much exactly what's below there, is that nothing what you're saying is actually accurate and a lot of what you're saying is that people did know the risk.  Or what I'm saying here, people did know the risk and I don't know what you're talking about when you're talking about Kemp.  Because based on what you're saying, some of it isn't accurate.

So I'm challenging at that time -- on Sunday morning, I'm challenging what you're saying went on.

A.    You are, but you're missing it.

This is one of those situations where until you got back with me, which was shortly after you showered and came over, you had accepted that may be correct in 2007; which, by the way, was the foundation for the plea.

So that was kind of important to me that you actually were with me enough --

Q.    Okay.

A.    Sir, I have to answer the question.

Because the response at 8:41 was to your having cited Circuit Court of Appeals case law, articulating the law; and you had misunderstood the cases, and maybe that's why you started your response with "This is way above my pay grade, but I'll attempt to weigh in."

But what I was trying -- I was trying to capture in a paragraph -- and it's not well articulated here -- that the harm issue, and the fact that some people -- you were focusing on:  Well, wait a minute, see these investments? See these investments?  And that's the perseveration.  And I was trying to interrupt the perseveration and bring you back to the other side, bring you back to the investors, the customers, the clients.  Because it wasn't that they didn't know what you were doing or that they didn't know

there was some risk, it was that they didn't know specifically that up to that point in time you had not actually earned money.

Q.    Okay.

A.    Let me finish.

And used that money, real money, not stated money, but cash that came back, and paid it out to people.

Instead, what you understood and explained to me, and the records revealed to me to be true, that there was hope for earnings, there were lots of machinations for earnings, there were so many things you were doing to earn money, but it wasn't earning money, or if it was earning money, it was earning money on paper.  Somebody decided, look at that, it went up 150 percent.

But the money didn't come back.  We didn't know it was real, you didn't know it was real.  We later found out it never actually came through.

So what happened now, we had -- my duty as a lawyer at that moment, was to get you out of perseverating on your investments and focus on the other side, on the harm.

And the harm to the victims was that they were not getting money out of returns.  They were parting with their money expecting exactly that, and that wasn't happening, and you knew it and you also knew that they didn't know it.

Q.   Can you read the first line of that response, my response?

A.   "That may be correct in 2007 because I only withdrew what was needed from the overseas investments that were running at the time, but it is not true in 2005 or 2006.

Q.   So I'm disputing everything you said for '05 and '06 and I'm telling you there are investments overseas.  And I'm telling you that I didn't withdraw the money to pay.  And so maybe you didn't see money coming in from overseas investments because we kept it overseas in investments.

That's what I'm saying, correct?

A.   I'm not sure if that's what you're saying.  But I do know that there was never any payments made to the clients from those overseas.

The fact that somebody said that there was money overseas --

Q.   No, the fact that I said in that email response, correct?

A.   No, you said "I only withdrew what was needed that were running at the time."  But it is not true --

Q.   Right.  Overseas investments?

A.   Right.  But we had already discussed that whatever you withdrew in your mind on paper actually was not money that went into your bank accounts that then went out to people.

Q.    That you were able to verify, or no?

A.    That I was able to see, much less verify.  Yeah.

No, I could verify that you might have had some piece of paper that said, hey, congratulations you just won $10 million, or it's grown.  I mean, that's not verification.

For me, I have to deal with the fact that people parted with real money.  They gave it to you, and you knew when they gave it to you that they were expecting that they were going to get paid, like everybody else, out of investment returns, and nobody of those people who gave real money got real money back.  Nobody.

Q.    In your view?

A.    No, according to the evidence.  It wasn't a view.

Q.    The view -- the evidence that you were able to view?

A.    All I can look at is evidence.  I looked at a lot of evidence.  I never saw any evidence -- and I asked you and we worked on it hard -- never saw any evidence of money, actual real money, coming in.

Q.    So now here's transcripts regarding risk, because risk was your main issue.

Read at transcript 1455, 12 to 14, Mr. Bergenn asked a question:  "And you always knew what you -- you always knew when you bought the property there was some risk?"  Answer:  Yes, I suppose."

So Eric Reid is saying he knew a risk when he bought the property, correct?

A.    Yeah.  In fact, our whole defense team was to point up all the risk everybody knew.  The problem was that's not the case.  The case is the risk that was specifically withheld was not just general risk, it was a very clear, specific risk.  The risk that you were letting them think you're getting money out of what you're doing by way of investments.  Not the risk that, hey, investments sometimes go bad.  The risk that you might know that in fact all the money that went out to the customers and the clients was other money from other customers and clients.  That's what the facts were.

So that risk was a risk that I couldn't develop out of Mr. Reid.  Instead, I had to do what defense lawyers do, I got the best I could out of him, and I thought it was pretty effective, but I knew it wasn't going to acquit you.

Q.    Questioning Mr. Brooks at 1544, Mr. Bergenn asked the question:  "So from your experience as an investor, this would have a higher risk than the more traditional places that you've put your money?  Answer:  Yes.

Correct?

MR. SCHMEISSER:  Objection, Your Honor.  We are starting to go down the road where we're turning this from

an issue about coercion on the weekend that the defendant decided to plead guilty to exploring all the issues that took place at trial.

So unless we want this to be a re-litigation of everything that happened during this entire investigation at this point in time, I would respectfully request that the scope be limited to actually the coercion issue that happened over that week.

THE COURT:  Your request is appropriate and I grant the request.

Please, Mr. Rivernider, let's keep the focus on the coercion claim.

MR. RIVERNIDER:  Your Honor, that's exactly what I was trying to do an hour ago when he was just running off on what the crime was.  I tried to stop it.

Okay.

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, we talked about the executive function deficit disorder and the only reason that I pled, correct?

A.   No.

Q.   The only reason you said, that's in the transcripts, "the only reason that we got there is the four hours that we spent with Dr. Filippopoulos.  That's the only reason that we got to the Rule 11 hearing"?

A.   We actually just jumbled in a whole bunch of

different thoughts in one question, and that's just not what the transcript said and that's not what I'm saying, no.

Q.   You used the words "only reasonable"?

A.   Yes.

Q.   Mr. Bergenn, on Sunday night at 9:20, we covered this earlier, where I received an email from you on Sunday night which had initiative offense of conduct; you remember sending that at 9:20 on Sunday night?

A.   I'd have to see it, but I wouldn't argue with you that around that time we were going back and forth about the same subject matter of what we had spent hours on during the day.

Q.   And that's the first time you emailed me anything regarding that?

A.   Wrong.

Wait a second.

It may have been the first time I emailed you.

Q.   That night.

A.   But I had spent hours with you that day going through the terms word by word with Mr. Chase.

So the concepts and the terms were not new.  The actual document contained in that attachment may have been new.  I don't have it in front of me.

But there was not any material new information from

the time we spoke during Sunday until after the plea and for months.

The first time -- well, so, at the time it was specific language that was being used by the government to address the concepts that we had been through for hours and agreeing to.

Q.   And when was the last time you went over that in the office, do you recall?

A.   Went over what?

Q.   The admission of offense of conduct.

MR. SCHMEISSER:  Your Honor, just to be clear, it makes sense to perhaps show him which version he was talking about.  There were a number of iterations.

THE WITNESS:  Right.

MR. FROST:  Plaintiff's Exhibit 11.

BY MR. RIVERNIDER:

Q.   Do you recognize this email, Mr. Bergenn?

A.   Yes.

Q.   Did you go over -- attached to this email is a version of the admission of offense of conduct.  Did you go over this version with me?

A.   Yes.

Q.   And when did you do that?

A.   That would -- first of all, I sent it to you that night.  And the next day when we were over here for about

three hours before the plea, we went through every word. And then even that morning there were words that were tweaked, and we went through those words.

So I can't say specifically when in those three hours or when --

Q.   I'm sorry, sir --

A.   Let me answer your question.

Or when that night you read it, because I provided it to you to read.

I did say to you, "I am available to you tonight, but maybe it's better to meet you here in the morning at 6:45. Call my cell if you want to meet tonight or to talk on the phone."

I don't know if we spoke on the phone.  I do know we did not meet late that night, Sunday night.

And so I can't answer your question as to whether I went over it with you on the phone after you read it that night or whether I went over it with you when you first arrived Monday morning while we were waiting for Nellie or whether I went over it with you at 9:00 in the morning when we got here.

I just know I went over it with you.

Q.   Did you go over this with me in your office on Sunday?

A.   I don't know.

No, not this one.  This one is at 9:20.  We had left my office by then.  So I do know that.

Q.   When was that?

A.   I don't know.

Q.   Was it early in the afternoon?

A.   I'm not sure.  Let me think for a moment.

I think the first emails between us after our hours together on Sunday were somewhere around 6:00 or 7:00 time.  So I would -- my best memory would be that we stayed in the office until just before that time.

Q.   So we left the office before 6:00?

A.   Again, I don't have all the things in front of me, but it would have been probably a half an hour before the first email between either of us Sunday early evening.

Q.   Okay.  So Sunday early evening.

So any changes that happened after that, you weren't in the office, you couldn't go over it with me word for word, correct?

A.   That's not true.  You don't have to be in an office to go over something word for word.

One of the reasons we send things -- if you remember, most of the time you were in Florida when we were working.  We went over things word for word through 4,000 emails, 4,000 emails between us.  Can't remember how many phone calls.  We were going over things word for word during all

that time.

So during that night, I can't tell you on the phone whether we went over word for word the technicality that wires were used, I don't know.

But I do know this: We went over it word for word.

Q. If major changes were made to this after we left the office, and there were multiple emails that reflect that, you couldn't have gone over it word for word with me in person in your office as your affidavits reflect, is that correct?

A. That's not correct. Because in the morning, you got in at 7:00 --

Q. I'm talking Sunday night, sir.

A. Oh, well, it is true --

MR. SCHMEISSER: Objection, Your Honor. He testified about this statement that they actually went over it the next day in the morning. He's cutting him off and not letting him finish his answer.

MR. RIVERNIDER: I'm trying find out about Sunday.

THE WITNESS: I think I've covered it. I keep saying it. I've covered what we did Sunday.

MR. RIVERNIDER: Another exhibit, Your Honor.

MR. FROST: Plaintiff's Exhibit -- putting on the Elmo, Your Honor, Plaintiff's Exhibit 12, which --

BY MR. RIVERNIDER:

Q.   Mr. Bergenn, you recognize this email?

A.   The email I'm looking at at 9:51 from you to me copying Michael Chase and Patricia Vargo, yes.

Q.   So at 9:51 after you sent the 9:20 version of admission of offense of conduct, I write, "So now I was willful?  I screwed Loretta as well.  I can't do this and live with myself. Sorry."

     What did you take that to mean?

A.   I took that to mean that like you had exhibited before, you were perseverating, that is to say backsliding, snapping back, from the many, many hours of word for word understanding and agreement with even the concept of "willful."

     We spoke about that concept.  And I think what happens when you left and you read it, it -- when you read it in black and white, it stirs something in you like "intent to deceive."  And as a lawyer, I have to separate how words feel versus what words mean.  And the words have gloss by court decision.

     And so you were willful, as I describe in my answer to you, the next email back, but my reaction was, okay, he appears now to be backsliding, not focusing again on the victims, but focusing on yourself and your vigorous, genuine, authentic effort to make money.

That was all true, but you were backsliding.

Q.   If you go to the bottom, this is your response and you talk about "willful" is a legal term of art.

And then if we could flip to the next page?

At the top of the next page, you then go into your need to get continued neuropsyche work and the existing monitor will allow the judge to allow your continued release.

So you're telling me you're going right back to the fact that I have brain damage and the fact that I don't -- I need to plea because I have brain damage.

A.   Absolutely wrong.

In fact, let's go back to the preceding page, because you used the word in your question "right back."  No.  Let me tell you what I went right to.

Your question was:  "Oh, so now it's willful?"

So I went right back to willful because willful is the very word that has -- that for you makes you perseverate on your own investment activity, and I know you also know and understand the other part of it, which is the victims' side, the clients' side.  So I was now reviewing with you the same consents we spent hours on.

So I break down why the word "willful" adds nothing to what we already know.  We, meaning you and me, having just spent hours together.  It means to act knowingly,

which we did.

Q.    Let me stop you there and ask a question.

To act knowingly, you said earlier I didn't act knowingly to take anybody's money and not pay them back, correct?

A.    No, that's a completely different concept.

What you wanted to do was make them money.  What you knew was that you were paying out money from other clients and you were not paying out investment returns.  That's what you knew.

Q.    And if I can --

A.    Hold on, sir.

Q.    What you're describing is an accounting issue.

A.    I'm in the middle of an answer, and I have to be permitted to finish the answer.

Q.    We have only have five minutes, sir.

A.    I understand.  Well, then, don't ask the question.

And number two, purposely, which you did.  You said, what did I go back to?  I went right back to willful.

And this is the most important part, number three.  With an intent to do something that the law forbids, which here is to take money when those clients believed the risk is based mostly on continued payments from investment income, when it is really based mostly on continued payments from other clients.

So I immediately clarified and arrested your default into your perseveration and refocused you on what you needed to focus on, which was not your intent to make money.  The crime was not the intent to make money.  The crime was, looking in the mirror, seeing what you saw, and you told me you saw, and I needed, and I did my duty to refocus you so you wouldn't be victimized by your own condition.  Because you were capable of doing it all afternoon.

Q.   And Mr. Bergenn, wouldn't I have to willfully know the law to be able to willfully intend to do something that the law forbids?

I would have to know the law, wouldn't I?

A.   That's not what the law means.  Again, it's a legal term of art.  You don't have to know the specifics of a law.

Somebody might not know that you can't go punch somebody in the nose, but you can't say, look, I didn't know the law said you can't punch somebody in the nose.

So the law doesn't care.

Q.   Right.  But now as we said earlier in the previous document, you said I didn't intend to have anybody lose even a dime, correct?

A.   You intended, in terms of what you wanted, the vernacular, the commonsense use of the word, you were

trying with all your might to make people money.

Q.   Mr. Bergenn you've really explained that a hundred times.  I didn't intend to deprive anybody of money --

MR. SCHMEISSER:  Objection, Your Honor, this has been gone over time and time again.

MR. RIVERNIDER:  Your Honor, one last question.

BY MR. RIVERNIDER:

Q.   I didn't intend to deprive anybody of one dime, correct?

MR. SCHMEISSER:  Objection, asked and answered.

THE COURT:  I'm going to sustain the objection.

MR. RIVERNIDER:  Can we go with the rest of the email?

THE COURT:  Let's try to focus, please, and avoid repetition and argument.  This is not a time for argument.

MR. RIVERNIDER:  I'm just trying to get a simple answer out of him.

He keeps saying his version of the crime, and I'm just trying to get a simple answer.

BY MR. RIVERNIDER:

Q.   Now, going back to this at 10:07, "They will drop the case against Loretta, right?"

I'm trying to get something for me to plead.  I'm trying to get something and you're not getting me that or

anything else.  You got me nothing, did you?

A.    False.  We got you the saving of 14 years --

Q.    Based on?

MR. SCHMEISSER:  Your Honor --

A.    He asked a question, I'm answering the question.

THE COURT:  Okay.

A.    We did hope, by the way, both of us, that Loretta would be able to plead.  We, I think, at some point hoped that they would drop the case.  We tried.  But that wasn't going to happen and you knew that.  That was months earlier.

BY MR. RIVERNIDER:

Q.    But I'm asking for it, right?

A.    Sure.

Q.    And I'm asking you to ask the government for it, right?

A.    No.  You said -- you're asking me to report back, "and they will drop the case against Loretta, right?"

You're asking me a question and a the answer was no. I don't see what my answer is now, but I know the answer wouldn't have been yes.  She pled out.

Q.    Now let's go to ten twenty-two, can you go ahead and read that?  That's part of your response.

A.    "They think," and there I'm referring to the government, "that Wade on Tuesday will end it, but we

cannot stop that. By the way, to get through Ponte

conspiracy issue" -- you want me to read that?

Q.    Yes.

A.    "It is probably easier for us to say the 9/10 and

9/11 email exchanges with Ponte made clear that the

pattern of certain uninterrupted payments was at risk, and

Rivernider knows that Ponte and Sawran continued to

forward to client debt plans for certain uninterrupted

monthly payments after that."

Q.    And when you say, "probably easier to 9/10 and 9/11

email," you're talking about the recipe for for no more

bills disaster, which we disproved at trial that week.  So

you're basically telling me it's easier to go ahead and

lie to the Court?

A.    No, that's not what I'm saying to you.

What I'm talking about there is that we had a

conspiracy issue.  It was a subtle issue, actually,

because we can't speak for Ponte's mind, and he did have a

very unusual one, but we can speak for you.  And so this

was clear that in those exchanges you knew that Ponte was

still telling people "uninterrupted payments."  You knew

that, and that's how conspiracies work.  You get the

people to get the money, and I'll do this, I'll go see if

I can make some money.

And you don't -- at that point you know you don't

have uninterrupted income, you don't have any income, and you're promising uninterrupted income.  At that point it's kind of ridiculous not to see that Ponte and you are working together to get more clients' money, which was exactly what you were using to pay other people.

So I thought that would be easier to get through the conspiracy issue because that was something timing-wise that fit.

Q.   If I could ask one more thing.

Right above it, it says, "See you in court at 9:00 a.m., I will take the lead if need be," in capital letters.  What do you think I meant by that?

A.   It meant that I am perseverating, I am not engaged right now.

Q.   It meant that I wasn't pleading, did it not?

A.   Not necessarily.

My response is, we're due at 8:00.  And I knew that having spent the preceding three days with you, that as soon as you were back saturated with the facts, you were likely to reacquaint yourself with that and get off this perseveration issue that I knew you suffered.

You were below the one percent, so you were going to do this, and my job was to accept you as you were, and then do my very best to do my job, make sure you're looking at both sides, not what you want to look at, but

both sides.

THE COURT:  We need to leave it at that for today.

With regard to a further hearing, are you available on Monday?

MR. SCHMEISSER:  This coming Monday, Your Honor?

THE COURT:  Yes.

MR. RIVERNIDER:  Your Honor, if I may, regarding next week?  Because I didn't have what I needed to have back in August, I now have to have a procedure next week sometime.  They can't tell me when.

THE COURT:  Okay.

MR. RIVERNIDER:  I failed that stress test.

THE COURT:  All right.

MR. FROST:  Your Honor, I have a long scheduled motion to dismiss argument in Bridgeport, but the rest of the day is clear.

MR. BERGENN:  I have a trial practice class, Your Honor, at 3:30.

THE COURT:  Sounds like Monday won't work.

I would ask you to please confer and get back to me and let me know, as best you can, how much longer you're going to need and when you would be available to do that, and we'll schedule it.

MR. SCHMEISSER:  Thank you, Your Honor.

MR. FROST:  Thank you, Your Honor.

THE COURT:  Thank you.

(Proceedings adjourned at 4:30 p.m.)

Vol. II, Page 337

C E R T I F I C A T E


In Re: RIVERNIDER vs. U.S.




I, Darlene A. Warner, RDR-CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.




/s/_____

DARLENE A. WARNER, RDR-CRR
Official Court Reporter
450 Main Street, Room #223
Hartford, Connecticut 06103
(860) 547-0580