UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

ROBERT RIVERNIDER, : No. 3:14CV1000(RNC)

Petitioner,

vs

USA,

Respondent. : HARTFORD, CONNECTICUT : FEBRUARY 13, 2018

- - - - - - - - - - - - - - - - x

EVIDENTIARY HEARING - VOL. III

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

APPEARANCES:

FOR THE PETITIONER (AS STANDBY COUNSEL):

FROST BUSSERT LLC
129 Church Street, #226
NEW HAVEN, Connecticut 06510
BY: ROBERT M. FROST, JR., ESQ.

FOR THE RESPONDENT:

U.S. ATTORNEY'S OFFICE-NH
157 Church Street
P.O. Box 1824; 23rd Floor
New Haven, Connecticut 06510.
BY: CHRISTOPHER W. SCHMEISSER, AUSA
JOHN DURHAM, US ATTORNEY

Darlene A. Warner, RDR-CRR
Official Court Reporter

9:41 A.M.

THE COURT: Good morning. This is the continued hearing in the Rivernider habeas case. Would you please state your appearances.

MR. SCHMEISSER: Christopher Schmeisser for the United States. With me at counsel table is U.S. Attorney John Durham.

MR. FROST: Good morning, Your Honor, Bob Frost standby counsel for Mr. Rivernider, who is present.

MR. RIVERNIDER: And Mr. Rivernider.

MR. SCHMEISSER: Before we begin, I understand Mr. Rivernider has had some health issues and I would like to indicate on the record I understand he's going to be questioning today. If at any time he thinks he needs to take a break, there's certainly no objection from the government to do that.

THE COURT: All right, thank you.

Mr. Rivernider, are you feeling up to this today?

MR. RIVERNIDER: I'm here.

THE COURT: I'll take that as a yes answer and I'll invite you to proceed.

MR. RIVERNIDER: Thank you.

DIRECT EXAMINATION (Continued)

BY MR. RIVERNIDER:

Q. Mr. Bergenn, back on the stand, would you just state your name for the record? Have the witness state his name for the record?

A. Sure, Jim Bergenn.

Q. And just if you can just review real quick, your profession and how you came to be involved in this case?

A. I'm a lawyer with Shipman & Goodwin. I've been doing criminal defense work for now 38 years, and I accepted an appointment upon request from your prior lawyer to serve under the Criminal Justice Act as your defense counsel.

THE COURT: Mr. Rivernider, before you proceed, I don't think Mr. Bergenn has been sworn in today, so why don't we attend to that.

JAMES BERGENN,

called as a witness, having been first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: Please be seated.

Please state your name and spell your last name for the record.

THE WITNESS: Jim Bergenn, B-E-R-G-E-N-N.

THE CLERK: And the city and state of your business.

THE WITNESS: Hartford, Connecticut.

DIRECT EXAMINATION (Continued)

BY MR. RIVERNIDER:

Q. Thank you, Your Honor.

Now, Mr. Bergenn, I know we discussed previously you've been teaching trial advocacy for 27 years or so, is that correct?

A. Thirty-two years.

Q. Thirty-two years now; okay, thank you.

And I did get my paralegal certificate, which you cite, but you have a lot more experience at this, so I want to ask you a question quick.

My understanding, my job is to ask questions and your job is basically to answer those questions in order to help the Judge determine whether or not relief can be granted in a 2255 that I filed back in July 2014; is that your understanding of what we're doing here today?

A. Exactly.

Q. Now, that's what we're going to try to focus on today.

I'm going to ask some specific questions and I'm going to try to get some specific answers to those questions now.

Now, I just want to review some of the things that we -- I believe -- my understanding of what we had discussed the last time we met here.

You stated on Friday sometime after court I approached you and asked to meet, is that correct?

A. I don't recall as I sit here today that being exactly how the conversation went.

I do recall your presentation to me which had started a little bit the day before, but it was very clear afterwards that you were a little stirred by the day's testimony and you seemed like you were sitting on something, and that's my job to inquire.

So I don't know whether you specifically asked to meet with me or I said, "what's up?" I just don't

remember the sequence.

Q. My recollection -- and tell me if this fits your memory -- on Friday after court, which according to the transcripts, court lasted for at least seven hours 52 minutes that day and started about 9:00, so that would bring us to right about the 5:00 hour, is that about right?

A. I seem to remember 4:35 being on the transcript. I could be wrong, but that's my memory from the last time I testified.

Q. Okay, all right. Regardless of the time, tell me if this fits your memory:

You called me after we had left court and asked to meet -- I was in the parking lot with Mr. Ponte and Ms. Seneca, and Mr. Ponte was going to drive us home, and you called and asked to go meet with you and Mr. Chase; does that fit your memory?

A. No, it does not.

Q. All right, so at some point in time, we met over at the bar area of a restaurant, is that correct?

A. Upon the conclusion of the day's testimony, you and I, to my memory, stood up and walked out of the courtroom and began a conversation that continued essentially for approximately three hours. It started here at the courtroom. We then crossed the street, because I know

there's a restaurant there. We walked into the restaurant, took a seat at the window of the restaurant.

It is true that at this restaurant, like most restaurants, there is also a bar. There was nobody at the bar, but we sat at a table and continued the conversation that we had started here in the federal court.

Q. And that was after the day's proceedings?

A. Exactly.

Q. Now an email has just been put up on the screen. Do you recognize the names of the people on the email? Can you tell us who they are?

MR. FROST: For the record, it's Petitioner's Exhibit 18, which is a full exhibit.

A. On this exhibit there appeared to be two or three email messages. If you read from the bottom up, that would give you the chronological sequence.

The first is from me on Friday, February 22 at 11:05 to Kim Johnson, my assistant, Patricia Vargo, paralegal assigned to this case with us, you, and copied to Mike Chase and copied also to myself. And the subject is, all caps, "Next" -- and then regular -- "Friday" is all caps "no court." And I say, "See if an appointment with Nellie can fit her schedule. Please put her email address into my contact."

That's responded to by my assistant, to whom it was

sent, and she replies to all, and she says, "Doesn't he already have an appointment next Friday at 11:00 a.m.?" And that was an 11:38 response to my 11:05 a.m. email.

And then a little over an hour later, 12:48, I respond to her and everybody else saying "Don't know."

BY MR. RIVERNIDER:

Q. Okay, so at 11:05 a.m. we're in court on Friday, correct?

A. We -- I can't say we were in court at 11:05. I'd have to look at the transcript because the Court does sometimes takes breaks. We could have been on a break, we could have been sitting in court. I can't specifically remember without other material what precisely was happening at 11:05 and where I was.

Q. So either way, at 11:00 we're either in court or on a break, but we're taking testimony in this trial, correct?

A. During the course of that day, we took testimony through the whole day when the court was open.

Q. Which would include 11:00 either on break or taking testimony, correct?

A. Exactly.

Q. At that time at 11:00, you're looking for Dr. Filippopoulos?

A. Well, I've just -- it says what it says. You know, see if we can have an appointment with her.

Q. And 11:00 would be hours before I supposedly approached you at the end of the day in order to meet, correct?

A. Well, again, I just have to keep using my own memory.

It is true that 11:00 is hours before we met immediately after court.

MR. FROST: Indicate for the record, I understand from Mr. Schmeisser there's no objection to this exhibit, to Plaintiff's Exhibit 19 coming in as a full exhibit.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, I'm going to ask you a couple of questions. We don't have to read all of this.

But this is an email from you to Ms. Vargo and myself copying Mr. Chase, correct?

A. I'm wondering if we can just move it up a little bit so I can see the bottom for the context. Because they usually go chronologically from the bottom to the top.

MR. FROST: Yes.

THE WITNESS: Thank you.

Okay. And can you now bring it down a little bit?

Thank you. Thank you, I'm refreshed.

BY MR. RIVERNIDER:

Q. Now, if we take a look in the middle here, there's an

email from Dr. Filippopoulos to Ms. Vargo, and it says, "Patricia, I moved this appointment to 3/1/13 at 11:00 a.m.." You see that?
A. I do.
Q. So Dr. Filippopoulos is confirming an appointment on the 1st -- on March 1, correct?
A. That's what it says.
Q. And then at the top, you respond to this back and forth saying, "Be aware now the Judge may use Fridays, maybe need a weekend." You see that?
A. I do.
Q. So I had an appointment follow up with Dr. Filippopoulos on March 1, correct?
A. That's what it appears, yes.
Q. And the day of Friday, the 22nd, you're looking for Dr. Filippopoulos at 11:00 during the day, correct?
A. Give me a minute. I think I had -- the caps in the subject line said something about back in court next Friday.
I apologize. I really have not focused on this aspect.
But if the thrust of your question is, yes, there were communications that Friday the 22nd that we've covered I think word for word, so I'm not sure I could add to what is contained in those emails.

Q. Okay. So hours before you're looking to Dr. Filippopoulos because you needed to meet with Dr. Filippopoulos sooner than March 1?

A. No. In fact, can I have the other one? It would be very helpful for me if I could actually have the documents so I could go back and forth between them. Because the opposite is what my memory is, and I don't want to mislead the Court or this record by not having them both in mind.

(Pause)

A. Okay, so it's plain that I'm not looking to speak with her on the 22nd. I'm saying the following Friday is no court, and it turns out that when I'm doing this it's -- I had lost track of the fact that you already had an appointment on that day, but I knew the last thing I had said is, "Hey, the Judge is using Fridays, we might need a weekend."

So I think what probably happened is the Judge made some mention about how that following Friday there would be no court, in which case I then wanted to squeeze you in, not having paid attention to the email from Nellie that didn't go to me, it went to Patricia, and said she moved it to 3/1.

I didn't get that one. I got a subsequent one from Patricia where I was carbon copied where she really was telling you about the March 1st.

So I probably didn't pay attention to that one, and again I'm trying to help you with inferences. These are not actual memories in the year 2018 from what happened in 2013, but it does seem self-evident that your question to me to which I'm now responding mischaracterizes what happened.

I was not looking for an appointment. I was doing an administrative thing. The Judge said no court the next Friday, so I had said before, be aware, sometimes he uses Fridays, maybe need a weekend.

And I'm saying, nope, you can use next Friday. That's all I'm doing.

Q. The appointment was according to the email on Plaintiff's Exhibit, I believe it's 19, which you're copied on from Ms. Vargo, there was an appointment with Dr. Filippopoulos scheduled Friday, March 1 at 11:00; and that was set on February 17, correct?

A. That appears to be what Nellie and Patricia had communicated to each other about.

Q. Thank you. And you also just mentioned a few minutes ago that your memory here sitting here today five years after this happened isn't as fresh as it would have been three or four or five years ago, correct?

A. I presume that from my experience living, yes.

Q. And then so at some point somehow we end up at

Dr. Filippopoulos's office on Saturday the next day, correct?

A. Well, I wouldn't say yes because of the way you phrased that question. It wasn't at some point somehow. It was based on hours of conversations with you that we covered the last time, which conversations led me to conclude that you would do much better listening directly to Dr. Filippopoulos instead of relying exclusively on me.

I was reporting to you following up on my November 30 conversation where I spent a couple of hours explaining what I learned from Nellie Filippopoulus after having spent four hours with her reviewing your 17 test results over two days.

Then based on our conversation Friday, it seemed it would be valuable to you and to the process for you to gather better understanding of what I had summarized to you on November 30 and then summarized again on that February 22, that Friday. The difference being, on that Friday I was responding to our conversation and your communication with me that suggested an openness and a need to understand better why you were feeling the way you were feeling at that time.

Q. Dr. Filippopoulos wasn't treating me for any psychological issues or any issues and she wasn't treating me for anything, correct?

A. That's absolutely true.
Q. You submitted an affidavit on November 14 to the Court; do you recall doing that?
A. I do recall submitting an affidavit. I'm not positive about the date.
Q. November 14, 2017?
A. I'd have to --
Q. That's the date in your affidavit that you submitted to the Court with your exhibits.
A. It would be helpful if I could see what you're looking at. I do have an affidavit, it says October on it.
Q. That was the draft, but then you submitted the final affidavit, November 14.
A. I'm not trying to argue with you.
MR. FROST: May I approach the witness, Your Honor?
THE COURT: Yes.
(Pause)
A. I'm looking at an affidavit dated November 14, 2017 signed by me on that date.
BY MR. RIVERNIDER:
Q. And if you could flip to page 9 for me of the affidavit.
A. Yes.

Q. And if you could read where it starts with "from my prior experience"?

A. What paragraph number, please?

Q. Seventeen.

A. Yes. "From my prior experience representing a wide variety of TBI clients in personal injury cases, I had worked with and examined under oath many leading TBI experts, including neuropsychologists, neurologists and radiologists. I also knew that Dr. Filippopoulos was well regarded in her field and effective in diagnosing and treating TBI patients."

Q. Thank you.

In fact for that four hours that we spent with Dr. Filippopoulos, wasn't it in fact you who was going through the neuropsychological issues for four hours?

MR. SCHMEISSER: Your Honor, just so the record is clear, I believe we're talking about Saturday the 23rd?

MR. RIVERNIDER: Saturday the 23rd, yes.

A. I could give you my best memory.

We spent four hours with Dr. Filippopoulos, we had spent three hours on the Friday before, and we had also spent, I believe, several hours before we went to see Dr. Filippopoulos.

My purpose in getting you to see Dr. Filippopoulos is to have her knowledge, training and experience available

to you to communicate to you to the extent she could add to what you and I had already covered.

As -- oh, wait.

You and I had spent hundreds, if not thousands of hours together along with my colleagues. You had not a treating relationship with Dr. Filippopoulos. You had, on the other hand, with us a well-earned, trusting relationship; and so it was my objective to maximize our time there to achieve our objective. The objective was for you to understand the relevant results of your I believe 17 hours of testing.

And so I can't allocate how much time was spent by me and how much time was spent by Dr. Filippopoulos, but I can tell you that given that I had this long relationship with you and an understanding of you, but I had no education, training and experience in these detailed tests and their significance as a neuropsychologist, that I would have spoken at some length with you.

We had a good relationship. And having Nellie right there to correct me to the extent if I were summarizing things -- which is part of what a lawyer's job is -- and I was not saying it exactly right, she could clarify.

So who spoke for how many minutes and how many words is much less significant to the question, which is what is the best way to be sure you understood what we were there

for.

So I don't know the answer to your question. I just know that that was my objective. And I never counted, you know, time or words.

BY MR. RIVERNIDER:

Q. Isn't it true that you did all the talking and she just confirmed what you were saying?

A. I don't know. That is within the realm of possibility. I find it highly doubtful. I'm not that good at neuropsychology. I am pretty good at communicating.

So it's possible that I was able accurately to capture, having spent hours reviewing the tests on my own, having spent four hours with her in November, having spent two hours with you in November, having now spent more time before Saturday reviewing them again, it wouldn't surprise me if I was able accurately to summarize the core -- I believe there were four different conclusions -- and that if I were accurate, then it would be not surprising for her to go, "yep," and if I had said something that was not accurate, I would expect her, with her education, training and experience, to correct me.

So you might be right, I don't know.

Q. Now, when you read earlier from your affidavit, you spent plenty of time cross-examining and questioning on

the stand neuropsychologists, neurologists, radiologists, you probably have more experience in Hartford than anybody on this issue, isn't that true?
A. No, not true. Because the neuropsychologist, psychologist and radiologist that I had questioned had typically spent decades at it.
Q. But as an attorney --
A. As an attorney?
Q. -- wouldn't you say you would be the number one guy in Hartford in this area?
A. Well, first, that would be immodest, and I don't really know.
I do have a lot of experience with it and I'd have to think through who else --
Q. Wouldn't it be true that maybe you're the top guy in Connecticut in this area?
A. You know, that would be flattering. I don't know.
I have a lot of experience with it, and I enjoy helping people with TBI's.
Q. You do have a lot of experience with people with TBI. You do a lot of cases with people with TBI, correct?
A. That is correct.
Q. You had a doctor who shared your views and you brought me to that doctor who shared your view based on this one report, on an interim report, and you got me to

agree to plead guilty based on that interim report, correct?

A. There are about three different things that are completely false with what you just said.

I never got a doctor to share my views. I read reports written by doctors following 17 hours of testing, 16, I believe, standard tests. I may have the hours and number of tests wrong.

Q. Let me interrupt you for a second.

A. You can't interrupt me, because I need to finish this. You've asked a compound question, I'd like to answer one portion of the question before we change to --

Q. If we could focus on one test.

A. No, I'm not going to do that.

MR. SCHMEISSER: Objection, Your Honor.

He indicated in his answer he had three points he wanted to respond to the actual question that was posed. Mr. Rivernider cut him off halfway through the answer of the first part, and I think he's entitled to answer the entire question.

MR. RIVERNIDER: And, Your Honor, the focus, as the Court has indicated, that it was just one test that there was a bad score on. So to focus on the 17 when there was just one test, I think we can just focus on the one test that was part of the interim report. That's all

I'm pointing out.

THE COURT: Why don't you rephrase your question and we'll proceed.

BY MR. RIVERNIDER:

Q. Thank you, sir.

Mr. Bergenn, wasn't it just one test there was a bad score on and an interim report, and based on that is what you and Dr. --

A. No, not true at all.

All of the tests mattered. A number of conclusions were particularly significant to the work that I was doing with you.

There were essentially four separate conclusions, each of which were supported by multiple different tests, all of which depended upon an evaluation of all of the tests.

The four conclusions were that you had a low emotional intelligence quotient, which is what set you up to buy into these schemes that you lost your money on. And then also that low EQ set you up, having invested in them, to be at risk because you had other features, and the other core features were that you had strong intelligence, I think it was between average and above average.

The other feature you had and the one to which you're

referring and to which we referred to last time, was the Wisconsin Card Sorting Test. It wasn't just a low score. The scores aren't like passing a history test. The scores are just revealing of someone's brain function, and your brain function in that particular revealed itself.

It wasn't so much a low score like you're no good, it just simply means that when it comes to your executive function, you are off the charts, you were below the one percent.

Now that factors in with your general intelligence, with your low EQ, with what was also to me a very significant test, you were better than average at social responsibility, which was something that I had perceived with you, to your credit, from the outset, and right through I would say to today.

I don't think you are average. I think you are better than average for a feeling of responsibility for others. However, your low score on executive function leads you to perseverate in a thought, in a concept, and not be able to process new information as it argues with your preexisting conclusion.

So your social responsibility index essentially got trumped by your low executive function such that you did not, until the witnesses took the stand, engage in what was going on with them. You were so fixated on trying to

make them money and trying to be successful with your investments and managing all this money -- you were working your butt off it appeared 16 hours a day for years to try to make them money, and that was because you wanted them to be happy. You wanted them to succeed.

Those are laudable things. That's what put us in the suit, because you were not focusing on the problem of their perspective which we covered at length the last time.

Q. Thank you.

You said earlier that we spent a couple of hours on Saturday, I believe, discussing this before we went to see Dr. Filippopoulos. Did I understand you correctly?

A. That's roughly right.

We spent a few hours on Saturday before Nellie Filippopoulos, and how much of that was email, how much was that phone, how much was in person, I just can't tell you today. But I can tell you, my day on Saturday consisted of you, and four hours of you were with Nellie Filippopoulus, and the rest of that day was with you in person, on the phone or with emails.

Q. Do you recall what time we went to Dr. Filippopoulos's office?

A. I do not.

Q. Do you recall what time we left Dr. Filippopoulos's

office?
A. I do not.
Q. Would around between 2:30 and 6:30 be pretty accurate?
A. I can't say that. It would be consistent with the rest of what I've said, but I just don't have a specific memory of what block of my long day was the part where I was at her office.
Q. Would it fit your memory that I came to your office sometime around 2:00, I was there for maybe a few moments, you came out into the reception area and Mr. Chase came out and said he was going to continue to work on cross-examinations for the following week and you and I left? Would that fit your memory?
A. No, but it's not inconsistent with what I've just testified to. I just can't say how much of my time with you was on the phone versus in person versus with emails.
Q. Mr. Bergenn, that morning, I'm going to show you a couple of exhibits from that morning, emails that were sent to you, Plaintiff's Exhibits 1, 2 and 3.
This is Plaintiff's Exhibit 1; and do you recognize the emails at the top there? Who it's from and to?
A. I can see who it's to. Now I can see who it's from. From you to me and Mike Chase copying Patricia Vargo, and it's at 11:17 a.m.

Q. Thank you.

So at 11:17 I sent you an email regarding the next witness who was about to testify with bullet points for cross-examination; do you see that?

A. I do see that.

Q. And then Plaintiff's Exhibit 2, is this consistent now at 11:37 on Saturday, I sent you, Mr. Chase and Ms. Vargo an email; you see that?

A. 11:37, correct.

Q. And I'm forwarding an email that I had previously sent on September 9, 2012 regarding pre and post recipe activity. This is regarding the recipe for no more bills disaster, and I had sent you an email detailing information regarding the recipe email back on September 9 and I re-forwarded it on Saturday, February 23; do you see that?

A. I do.

Q. And Plaintiff's Exhibit 3, witness -- subject, witness, Attorney Paul Hinnes. This is an email from me again to you, Mr. Chase, Ms. Vargo at 12:00 on Saturday, February 23; and this is an email asking you to go find a potential witness for trial, correct?

A. I don't know. I have to read it.

Q. If we can, we can drop down and read it.

A. I am, thank you.

Q. You can read it out loud on the record.

I'll go ahead and do that for you.

I never met him, but he was one of the original people who was responsible for getting me into the Willie Lenz/David Praise deal. The agreement from him is for a trade with Martin Burke who happens to be a partner of David Praise. This dates back to 5/24/2007.

He's somebody who is an attorney who helped me get into one of the trading deals, and I was asking you to find him to be a witness for us in the trial, correct?

MR. SCHMEISSER: Objection, Your Honor. There's a lot of testimony going on from the other side.

The email says what it says and if it's confined to that, that's fine; but otherwise I ask the government to strike the testimony part of --

THE COURT: I won't strike it, but I get the point.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, just having read the email, does that refresh your memory as to whether this was a potential witness for a trial upcoming?

A. This appears to be, from its words, a request by you to put him on the stand to explain why he believed, and as you say in your email, allowed you to believe this stuff before taking a dime from Counts Three to Eight as well as

Reid and Fallow.

I can't make complete sense out of that, but I can say in answer to your question: You are requesting that this attorney come presumably to the trial and testify about why you thought it was legitimate, which frankly was not an issue in the case.

I tried to make it an issue in the case and was successful in the first week, but it really became less of an issue. The fact that you thought everything was legitimate, it seemed like even the government had come to sort of accept that that might be true.

Q. Do you know if any of the defense attorneys ever contacted this potential witness?

A. I can't answer that right now. I can tell you that there were dozens of witnesses that we talked to, sought to talk to, very few that we were unsuccessful when we tried; so I just don't know.

There's way to much work for me to have that answer at my fingertips.

Q. Based on these three emails, isn't it clear that I was continuing to work on trial and moving forward with trial?

A. No.

Q. Correct?

A. No. Because in fact, what this tells me is, just

like this minute today, you are perseverating in your belief that the fact that you were trying to make money and believing you were making money is what we had to convince the Court of; and that would be relevant at the plea, that would be relevant to you at a trial. It was all I had to work with at the trial, so I would have been bringing out those points as I was bringing them out from every witness when we had a chance to bring out your honest belief in what you were doing and their limitations on their expectations, their appreciation of risk.

There were things covered, but this does not directly address your point.

It's not inconsistent with your belief that you might want to persist at trial, but we had already spoken for hours the night before. This 11:00 to 12:00 email sequence would be consistent with both your wanting to go to trial and your wanting to convey to the court even if it was a sentencing.

So it doesn't specifically advance the proposition that you intended to go to trial.

Q. Would these emails be consistent with your testimony that on Friday night I had an epiphany while sitting at the bar area of a restaurant, to be nice about it, and that I had an epiphany and was ready to plead guilty on Friday night?

A. I can't remember how that question started, but I can tell you that your characterization of that discussion on Friday misappreciates the fullness of that conversation.

It was not so much as an epiphany, although you could use the word, it was that you were now in touch with the other half of the case, the victim half, and you were in touch with it yourself on Thursday and Friday and you were stirred by the victims, you identified with the victims; so you appreciated that there was that part of the case, and that's what we talked about, and we talked about it at length. And we talked about why it would appear to you then finally, when they were there when it hadn't really been something you focused on during the preceding year, and it was because you actually saw the people, and you do have a sense of social responsibility, you did care about them, and you hadn't paid attention to that.

Q. Mr. Bergenn let me ask you a question.

You keep saying the sense of social responsibility, does somebody with a sense of social responsibility five years after they and I lost money in this program then decide because they wanted, as you know, a 10 percent interest on the money that they lent, does somebody with a sense of social responsibility then decide to abandon two little kids for the rest of their childhood? Does that show a sense of social responsibility?

A. I don't know what you're talking about, I can't make sense out of that question.

Q. It just hit me that the people that were on the stand, they came in that week and they testified that -- whatever it was that they testified to, and I don't know that -- you've never identified what they said, so I'm a little confused by that -- but does somebody with a sense of social responsibility then abandon two little kids because of that?

A. I don't think you ever abandoned your children. You made a choice that you'd rather be with them in 12 years rather than 26 years. That's the choice you made.

In fact, I think that's the exact opposite of abandonment, that's embracing your responsibility for your children. That's social responsibility, in fact, that when you care about other people, you do the very best you can for them under the circumstances.

The very best you could for your children would be to take this opportunity to save 14 years of separation from your children.

So that's what social responsibility would lead to, actually, not a death march to a certain result of 26 years away from them.

Q. How did I save 14 years?

A. Because the Sentencing Guidelines, if you went to

trial, argued for 26 years, in that range, and at the time of that sentencing, how would I talk to this Judge and say, you know what, he's really not such a bad guy.

Q. But I did go to trial, didn't I?

A. You did. And you went to trial. And then for the first time, in the middle of the trial, you evidenced to us an appreciation for what was going on in that trial, and when I tried to discuss these things with you six to eight months earlier, you always seemed to follow me, you would agree, you'd nod, and we'd understand, and then the next time we talked, it was like we never talked, and then it was all back to how hard you were working on making money.

And so I kept realizing, okay, that's what you want to do, fine we're going to trial. I wasn't going to lose your confidence, I was going to go to trial. But I tried my best to communicate to you the law, the other side of it, and you couldn't receive it and process it.

You could follow it, but you couldn't hold it. And I finally realized, I'm not doing my job, I need some help.

So I asked the Court, got a neuropsychologist, he gave some tests, he said, sure enough, you've got some issues here.

So I hope that answers your question.

Q. When we were here last time, you had told the Judge,

you said to the Judge, if I recall, that you saved 14 years and that's what you're saying right now. You saved me 14 years, is that right?
A. Well, I wouldn't say I did.
Q. Actually you bragged about it, didn't you? You bragged that you saved the 14 years?
A. I wouldn't say bragged.
I will say this: I was doing my job. It was a hard job. I don't know anybody else who could have dealt with what I dealt with you. And I was very happy, very happy, personally satisfied, that you were able to get the sentence you got instead of the sentence you would have got --
Q. You were responsible for saving that 14 years, weren't you?
A. No. There was a whole host of people. There was me, there was Mike Chase, there was Nellie Filippopoulus, there was Dr. Stoll, and of course, more important than anybody, there was you. You were the one alone who had to make the decision, and you processed that information, and it was hard for you, but you did it. And you did it on Friday, you did it on Saturday, you did it on Sunday and did you it on Monday.
So frankly it was you who were principally responsible for saving the 14 years.

Q. But if it wasn't for you getting me to plead?
A. No.
I'll put it this way: I did have a job. Any lawyer in my position would have been ethically obligated to do what I did if it had occurred to them.
As things occur to me, I know what my ethical obligation is, and sometimes more things occur to me than occur to other lawyers, such as: Why is this guy not following me and staying with me? So, hmm, I better get a neuropsychologist. And then he taught me and then the other one taught me, and then in combination, I tried to teach you.
Eventually what they taught me from your tests was something that revealed itself right at the trial when you looked in a mirror and saw these witnesses.
So at that point in time, it was ethically required of me to make sure you stayed focused on both halves of the case. Because the Judge, for sure, was going to look at both halves of the case, and certainly the prosecution was, and I needed you to.
So I will take credit for helping you to stay focused on both halves of the case. That is something I will take credit for.
Q. Isn't it true, Mr. Bergenn, that you assured me that I would probably only get about 24 to 30 months and that's

what you put in the sentencing memorandum, and that I would be able to get home to my kids when they were still kids?

A. The exact opposite is so.

In fact, when I prepared myself for this hearing today, and we had discussed at great length what the time expectation was, and you said that you expected 12 years, and when you came in in September after the plea and you tried to say the same thing and I said to you when we were meeting, you me and Mike Chase, I said, you're not claiming that that's what you ever believed? And you said, no, I know.

You specifically told me in the presence of Mike Chase when you came in and signed the letter on September 5, you specifically said, no, I know you never said to me 24 months, or something like that, a matter of a couple of years.

So not only do I have a very clear memory of never telling you something like that, which is pure fantasy I can't even get that into my own head that you'd get two years.

I do remember when I was conceiving with Mike Chase what we were going to put in that sentencing memorandum, typically what I put in is, this is how I think one can honestly look at the facts and if one honestly looks at

the facts this way, what would be the sentence. And if someone accepted the facts as I averred them to be, then I could in good conscience say, he's deserving of two or three years.

Now, when I advocate for that, do I think a Judge is going to do it? I did have a bank robber do eight bank robberies and I got him three years. Eight bank robberies, three years. And that was Judge B., and that was a long time ago, but it's something that can happen when you're able to persuade a Judge of the individual before them; and that's my job.

So the fact that I advocate for it is fundamentally different from what I prepare you for. My ethical obligation for you is to prepare you for what is more likely to happen.

Q. Mr. Bergenn, did you ever prepare me for a 12-year sentence?

A. You already had told me that you were expecting a 12-year sentence, and we talked very specifically about the difference between going to trial where I expected you were going to max out if I had nothing to talk about, and that would be the 26-year range versus the 12-year range.

And privately, my personal objective was to get you in the single digits. I thought that I had a shot if you had stayed the way you were that day when you cried in

court. If we presented to this Judge the way you were that day, I think we had a shot at getting as low as eight years.

I never for a moment thought we'd get below that.

Q. Mr. Bergenn, you're aware that prior to even being indicted, Ms. Saden, my previous attorney, told me that if I had pled, I'd be looking at half of the time of the trial, which would be about six years; you're aware of that?

A. I'm not only not aware of it. What you just said doesn't make any sense.

Half of 26 is 13, so I don't know where you get to six.

Q. Well, half of twelve is six.

A. I don't know where you come up with 12. Shelly Saden is a very good lawyer. I don't know where she'd come up with 12.

Maybe it's because at the time -- at the time maybe the government hadn't finished preparing its mortgage fraud case, I don't know.

MR. FROST: Mark an exhibit, Your Honor?

THE COURT: Yes.

MR. FROST: Your Honor, just putting on -- publishing to the witness Plaintiff's Exhibit 20, which the government has indicated can come in as a full

exhibit.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, can you identify the email on the screen who it's from and to?

A. From you to Mike Chase and me.

Q. And the date?

A. Friday, September 27, 2013.

Q. So this is contemporaneous to the time in question, we're in between pleading and the sentencing, correct?

A. Well, it is between pleading and sentencing.

Q. Thank you.

Can you read the third paragraph?

A. "But two and a half years, which is a little less than what the government wants and in line with what Jim said he was thinking about but had to maintain his credibility, maybe this case can help you with your credibility."

Q. What I'm referring to in this subject line is "Ex hedge fund manager gets two and a half years for lying about losses," and it's a somewhat similar case where someone got two and a half years, which is in line with what you said, correct?

A. Well, let me just deconstruct that question.

The idea that this case would be similar to your case I cannot imagine it. It's possible, I suppose, but a

26 million-dollar mortgage fraud case and ponzi scheme is larger than any other that I know of in the District of Connecticut, ever.

So the odds that somebody got two and a half years with a similar case is as close to zero as I could imagine.

This also does inform me, however, that the two and a half years is a little less than what the government wants, presumably in that case.

"And in line with what Jim said he was thinking about, but had to maintain his credibility" tells me in line with what I just said in my last answer: That I would have wanted to tell this Judge, if you accept my analysis of who you are and what happened here and your social responsibility and what you were focused on and because of your -- the way your brain functions, that maybe two or three years would be an appropriate sentence.

I also knew that I have to have my credibility with the Judge, and the Judge, even if what I said was true, might just wince at me when I make that kind of an argument; and you don't want a lawyer who is not using every bit of his credibility to help you.

So I do not specifically remember the sentencing memorandum as we sit here today. I haven't looked at it since we filed it, quite frankly.

I don't remember specifically how I articulated at sentencing on your behalf, but I can tell you my objective would have been to get you the lowest possible sentence honoring the facts as we submitted them to the Court and retaining credibility, not ever going past the edge of where the Judge would just say, I can't listen to this guy.

Q. And the argument you're making today is similar to the argument you were making to me prior to me pleading, that I would get somewhere in the neighborhood of two and a half years, that's the argument you were making to me prior to --

A. No.

First of all, I've already explained, and I guess I'll do it one more time, but I won't do it again because I don't think it makes sense.

Q. Thank you.

A. I made it very clear to you that there was no way you were going to get two or three years. And I not only made it very clear to you, but I made it very clear three weeks before this memo on February 5, and you acknowledged to me specifically, and to Mike Chase, no, Jim, you never promised me that. That's what you said when you signed the letter on September 5.

So -- and I don't know what the letter of September 5

says. I don't think it deals specifically with the sentencing time, but I do know our conversation at the time that you signed it, when you read that letter word for word and then signed with your pen, you said to me "I know you never promised me that." You said it.

So it must have been in response to something you said where, Jim -- like, say now -- well, you told me two or three years. And I'm like, I know I never said that. It never went into my brain in the first place.

Q. In Mr. Chase's notes that were submitted to the Court -- withdrawn.

Was there a conversation on Friday night with Mr. Chase and you where you indicated that I said after trial and appeals that I expected to get 10 to 12 years?

A. I remember seeing a note to that effect.

MR. SCHMEISSER: Your Honor, just so we can be clear, we talking Friday, February 22?

A. I understood that myself, but thank you for the clarification.

I do remember seeing a note to that effect that your expression at that time was an expression that was erroneous, but it obviously came out of your mouth, that something in the 12-year range would be your sentence if you went all the way to trial.

I also remember talking to you very specifically and

concretely how that was not true and that the Sentencing Guidelines called for something like twice that, and that at sentencing, if I didn't have anything to say, there was no way you could get 12 years. I couldn't cash in the goodness of your life if you were proving to the Judge the opposite during the course of a trial.

BY MR. RIVERNIDER:

Q. You had mentioned earlier a 26 million-dollar mortgage fraud; you didn't argue the loss, did you?

A. 26 million-dollar ponzi scheme and mortgage fraud. That was the total that was the government's position based on losses that, frankly, also include the destruction of the economy. So we argued for a much lower loss.

I did actually argue the loss, at least I believe it was actually on September 4, the day before you signed the letter where you acknowledged that you wanted us to continue and that you understood what you were doing.

So no, I had argued the loss.

Now, I will absolutely give credit to Mike Chase for having studied and drafted the lion's share of the written submissions on that subject.

Q. Why is it that you didn't argue the loss based on case law at the time under U.S. v. Lacey, which would have the loss down around in the 5 to 6 million-dollar range?

A. I can't answer that question.
Q. Because you're not familiar with the case law?
A. No, it's just because I just don't know -- I didn't prepare myself to review what I did do, much less what else I might have done.
Q. But the case law in the Second Circuit was based on U.S. v. Lacey at the time and you didn't argue it. That would mean you were ineffective at that time, correct?
A. I don't know. I do know that this memorandum that we wrote that succeeded in substantially reducing the loss has been cited by others around the country, including by the bar associations, as being a very good exemplar for others around the country who were trying to get a more favorable review of loss.
So if there was something else that we could have done that was better, great, I'd love to learn about it; but I do know that what we had submitted has since been used as a model by others who do criminal defense work.
MR. SCHMEISSER: Your Honor, I believe again we're getting a little far afield since the purpose of these hearings is to address the guilty plea and the issues that Mr. Rivernider is --
MR. RIVERNIDER: Your Honor, I agree with Mr. Schmeisser.
THE COURT: Fine. Why don't we take a short

recess at this time.

We'll take a 20-minute recess.

(Whereupon, a recess followed)

THE COURT: All set to resume?

MR. RIVERNIDER: Yes, sir.

MR. FROST: Yes, Your Honor.

MR. RIVERNIDER: Your Honor, I'm going to start with Plaintiff's Exhibit 13. Start at the last page -- actually start with the first page just to identify it.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, can you identify the email that's on the screen? Who it's from and who it's to?

A. The top of the first page is a 6:03 a.m. email that I, according to this, sent to you with the subject line "What time you available early tomorrow to talk?"

Q. And this is a string that includes Dr. Filippopoulos, and it's three pages.

I'm going to turn to the third page.

You see on the third page the last email there is an email appears to be at 9:20 from you and the subject would be "Rivernider stipulation draft document;" do you see that?

A. Yes, 9:20 that I wrote at least to you on February 24. And that "at" symbol before and after Rivernider draft doc is indicative of there having been a

Word document, if we went back and found that original February 24 email.
Q. And if we can turn to the next page, at the bottom of the next page it shows an email from me to you at 9:51 on Sunday, February 24; do you see that?
A. Yes.
Q. And if we could turn to the last page for the continuation, it also copies Mr. Chase, Ms. Vargo, and it's the subject responding to that 9:20. It says "Rivernider stipulation." Do you see that?
A. I do.
Q. And can you read the third line there?
A. "I can't do this and live with myself, sorry."
Q. And so that's me saying I can't do this. Would you agree that that indicates I can't plead?
A. That means that that's what you expressed at that point in time, yes.
Q. So you agreed at that point in time that I wasn't pleading?
A. Let me just keep it to what it actually says. That's an expression of what you felt at that moment.
Q. If we can flip back to the second page, and there's an email from you on February 24 at 10:04, you responding to that; do you see that?
A. Yes.

Q. And if you can read the second paragraph there, "I told them"?
A. "I told them that your total compliance with release, your agreement to the counts, your need to get continued neuro psych work and the existing monitor will lead the Judge to allow your continued release. Kit is okay and John said, make my pitch, and he will read the Judge. Kit and I both think that the Judge will be grateful and not detain you. Also, I will tell Judge I need you here."
Q. All right, so when you say neuro psych work, that would indicate mental coercion, wouldn't it?
A. No, no.
Q. Why else would I need neuro psych work?
A. Your need to get continued neuro psych work is reference to the fact that we had done the testing back I think in October, perhaps, several months earlier. We got the results of the testing and processed them.

They indicated to the neuropsychologist that you seemed to have features that were consistent with someone who had had a brain trauma, and we scoured the earth to try to find the medical records for when you had fallen off a ladder, and the hospital ceased to exist, the records were unavailing.

So I knew what neuropsychologists do under those circumstances, is they get the best evidence that is

available. That includes, testing, imaging and witnesses. The witnesses are those who were with the person whose brain was traumatized substantially before and after so that they can answer questions that only a neuropsychologist would know are relevant that would help the neuropsychologist recognize whether there were changes in behavior that are indicative of a brain trauma.

And that's because the imaging that's available for brain trauma is very sophisticated, but it doesn't get to the cellular level. Everybody now understands that because of the football players and the fact that you need to have -- like Aaron Hernandez has got to die before you look in and see how bad his brain is. Most mild brain injury does not reveal it self; however, there is some imaging available.

And there was, I believe his name was Dr. Lee Cranberg, and I think he was affiliated with Harvard, and he had the DTI imaging available, which essentially uses water and changes in the brain that are more evident in that imaging than in other imaging, but still not to the cellular level.

So the neuro psych work was your going to Boston to have that imaging done and having him potentially weighing in based on whatever those findings were.

That was the principle purpose, it's really to flesh

out the extent to which the presumptive TBI, based on the data from the tests you took, and your behavior, which was different post your fall, according to your sisters and your father, we just wanted to flesh it out to the maximum we could to the Judge because we knew it was going to be met with skepticism, surely by the government, and we wanted to do the best we could.

So that's what the neuro psych work was. It was not I think you said coercion.

Other than the Nazis in World War II, I'm not sure about neuro psych work for coercion.

Q. And this is what you were doing throughout the entire three days explaining just like you explained how I had this, for better or -- the explanation, brain damage, correct?

A. Well, there are better explanations, so I'm not just going to say brain damage.

Q. Well I'll use the one that Judge Chatigny used during the evidentiary hearing. He called it brain damage.

And you were explaining to me for two days how I have this brain damage, how I have this problem, and because of this, I had to plead guilty, correct?

A. No, that's not true.

We spent a lot of time, but the time we spent was, for the most part, I would say 90 percent comfortably, was

dealing with the facts in this case and going word for word through the -- first it was the stipulation and later I think we renamed it acceptance of conduct.

And also we went through your own experience of looking into a mirror when you looked at these witnesses who were the victims in your case.

So we actually spent almost all of our case dealing with the facts.

It was coincidental that we'd go through what the tests revealed so you could understand why is it I'm only getting this now. And there was a reason for it.

Q. And moving up to the -- couple emails up, February 24 at 10:22, you write "they think Wade on Tuesday will end it, but we can't stop that"; is that correct?

A. That's what I write.

Q. Tosha Wade testified on Tuesday, right?

A. I don't know, I can't remember.

Q. So we were two days away from having a witness who could have had the entire mortgage charges thrown out and you had me plead two days before that, correct?

A. No.

You pled on Monday, and I don't know when she testified, but I do know that there was no chance that the case was going to get dismissed. The evidence was already sufficient at that point. The government probably could

have rested then.
Q. I'm talking on the mortgage charges.
Didn't she testify that the witnesses were in the know or that the -- I'm sorry -- that the victims, the lenders, were in the know?
A. She could never have testified that the lenders were in the know as to what it is you pled guilty to because the victims were never in the know.
The victims never knew that you never paid a single person --
Q. We're talking about the mortgage lenders, sir.
A. I understand. But the mortgage people also believed that you were able -- you were an able investor, and so that you had the capacity upon buying a piece of real estate to be able to manage it, so they didn't have to do a thing.
And the fact that you had never succeeded once in any of your investments would be something material to those people because some of those people were the same investors who had already done the NMB, no more bills.
So the core of what you pled guilty to was the core of what could not be refuted because the facts to refute those did not exist.
Q. And then going to the next email at 10:25, can you -- that's an email from me to you. Can you read what's in

bold there, in capital letters?
A. Yeah. "See you in court at 9:00 a.m.. I will take the lead if need be."
Q. What did you take that to mean?
A. That at that moment in time, which was 10:25, you were contemplating that you were going to go forward with the trial; whereas at 10:07, you were responding "and they will drop the case against Loretta, right?"
Now, you 20 -- not even 20 -- 18 minutes earlier had responded to me that they will drop the case against Loretta, that's contemplating a plea because that was in response to me at 10:04, three minutes earlier, saying "the government has agreed we can get through this without any fight because we did it right."
So we are actually engaging in a conversation that's predicated on a contemplation of all of the facts: Your intent to make a lot of money and the victims' knowledge -- your knowledge that the victims did not know the material information.
So some of our conversations contemplated all the facts, which you concluded made it more sense for you to plead guilty, and some of our conversations here were you perseverating and reverting back to looking only at your intention to make everybody a lot of money and therefore I can win. And that was of course not true. You can't win.

The case was not a winnable case.
Q. At 10:25 I'm telling you "I'll see you in court at 9:00," and that's to continue with trial and if you're not going to continue to represent me, then I'll take the lead and I'll take over the case. That's what I'm saying, is it not, yes or no?
A. I've answered that question.
Q. Excuse me?
A. I've answered that question.
Q. All right. Let's move on to 10:27.
You respond and what is your response there?
A. "We are due at 8:00."
Q. What we were due at 8:00 for?
A. Court.
Q. And what were we to do in court at 8:00?
A. I think I would know at 7:59.
Q. Were we scheduled for a change of plea hearing at 8:00?
A. No.
Q. Did you receive any emails from Mr. Goldsticker saying that we were due at 8:00?
A. I can't recall.
Q. What was scheduled for the morning?
A. I'd have to go back and look at all the emails.
My best answer from my memory today is that I had

kept the government and the co-defendants informed, at some point I did keep the Judge's judicial law clerk, Michael Goldsticker I think his name was, informed, as an accommodation to the Court, that we contemplated a plea.

I don't know whether I explained to Mr. Goldsticker that you from time to time went back and forth because I didn't think that would be in your interest if you retained your appreciation of the whole case.

Whenever you looked at the whole case, it was very clear to you it was better to get 12 years than 26, and whenever you didn't appreciate all the facts of the case, you would relapse into looking at one part of it. And I knew in the end it was in your best interest for the Court to be able to appreciate you when you were yourself appreciating the whole of the case.

Q. Mr. Bergenn, what is the total punishment that I'm going to suffer with by pleading guilty? Can you tell me?

A. What the total punishment was?

Q. Yes.

A. Are you asking for the time, are you asking for personally?

Q. I'm asking for all the punishment that I'm going to suffer with for the rest of my life based on this plea. Can you tell me what that is?

A. That's personal.

Q. Let me rephrase the question.

What is the punishment you told me that I would suffer with by pleading that weekend before I pled?

A. The Judge has discretion and the government and you, through counsel --

Q. I asked a specific question, Mr. Bergenn.

A. I know. The specific answer is being provided right now.

What I told you was a recap of what you knew already from your hundreds of conversations with us and your educational background, not just as a paralegal, but also as an investigator. You knew that sentencing is something ultimately up to a Judge. The Judge considers what both parties submit. And so I had explained that to you, you knew that, and the Judge could give you as much as 26 years, the Judge could also give you a walk. It was up to him.

But we were going to do our best to get you the best sentence, and I believed that the best sentence after a plea that I felt pretty confident in is like a 12-year sentence. I was actually hoping if things went right for a single-digit sentence.

But I also was very much wanting for your benefit for you not to go into a sentencing where there was nothing positive to talk about. Which if we went through the rest

of the trial, I believed you were at risk of getting the 26 years, or something close to it, because it would have fulfilled the government's fantasy of depicting you as this evil sociopath, which I don't think you are.

Q. Please answer the question: What is the punishment that I will suffer with?

A. If you're asking -- I can't answer whatever -- everybody's punishment is unique to themselves.

If you're asking for the exposure for incarceration, I can answer that question, but your punishment, I don't know.

Q. First of all, did you ever indicate over that weekend that there was a possibility of a 12-year sentence?

A. I think I indicated not only that there was a possibility of a 12-year sentence, but there was a possibility theoretically of a 400-year sentence.

Q. Isn't it true, Mr. Bergenn that we only talked about the possibility of a 400-year sentence as it was a joke. Even Judge Chatigny just blew it off because that was a joke. That wasn't going to happen. And the fact is that we never talked about anywhere near a 12-year sentence, correct?

A. No, that's not true.

No, in fact, I believe that we were typically talking about Plan A and Plan B. Plan A -- and I forget which one

was A and B -- but one of them was about 12 and one of them was about 26.

Q. Mr. Bergenn, are you honestly sitting there telling me that you said that I could possibly get 12 years and I went down and agreed to plead guilty that weekend?

A. Yes.

Q. Okay. Let's move on because I just need to move on.

If you turn to the first page.

At the bottom of the first page there, there's an email from 10:28 February 24.

A. Okay.

Q. And then if we can flip to the second page, then that email is from me to Mr. Bergenn.

If you could read the last three words of that?

A. "Deal is off."

Q. And the deal was to plead guilty, correct?

A. Yes.

Q. And the deal was off, correct?

A. As of 10:28, that's what you expressed.

Q. And you knew that as of 10:28 and as of 9:51 or 10:25 in the previous emails, I wasn't pleading guilty, correct?

A. No. I knew that's what you expressed.

Q. If we could go back to the first page there?

Now you sent this to Dr. Filippopoulos, correct?

A. Sent what?
Q. The email string that you sent to Dr. Filippopoulos; at 11:03 on the 24th, correct?
A. At -- I see from me to her copying Chase, myself and Vargo.
Q. Can you read the email that you sent to Dr. Filippopoulos?
A. Yes. First of all, the subject line is "What time you available early tomorrow to talk?"
The body says, "Client was good to end of night and then is now backsliding completely and wants to self destruct at trial. I am passing on the exchange after he read the stipulation of offense conduct that we had agreed to except for we were talking about a couple inconsequential terms. Read from the bottom up."
Q. And then what you included is an email from me; and can you read the second line of that?
A. I included emails from you in emails from me, I told her to read from the bottom up. I gave her the entire exchange because the entire exchange is what informs her about what your mental framework was; that it was back and forth and it was backsliding completely as of 11:03.
Q. And the second line says "looking forward." What does that say?
A. Second line of what?

Q. Second line of the first email.
A. Can you turn to the last page, please?
Q. No, that's it.
A. That is -- it appears that that is stray words. I don't have the "to" and "from" message. I don't know why that is. It may be because I cut and pasted from an email string.
Q. Correct.
A. And I don't therefore know the time of that. I am sure it would have been after the 10:44 email where I told you please call me, I do not want you to harm yourself. And that is after all we learned after your thorough and honest testing.

"You will be self-destructing and ruin the only angle you have to save a lot of time."

Then you, all caps, respond: "I can't harm myself any more. Looking forward to five more weeks of trial plus defense case."

And then I take that string and send that to the doctor and asking for availability, she responds at 12:58, that is literally Monday, early morning, "Call me in the morning as early as you need to on my cell, or now if you are up. It sounds like you need to be in court at 8:00, so it doesn't sound like we can meet with him at my office in the morning, right?"

And then if you could slide it, please.

And I forward that.

So you now have the whole string of our back and forth from the prior evening, and I send you that at 6:03 in the morning, to you alone, and I say, "The doctor's available, are you? We should at least take advantage of your dad being in town. And that's because part of the continuing neuro psych work, with or without a trial, was for her to get data from witnesses about your brain function before and after what appears to have been your fall off a ladder."

Q. Going back to the 10:34 email, you referenced thorough and honest testing, correct?

A. That's what I did reference.

Q. This was an interim report from Dr. Filippopoulos that you're referring to, correct?

A. No. I'm referring specifically to thorough and honest testing. That is 16 or 17 different tests where there was no indication of malingering. You indicated that you were cooperative and honest, the doctors seemed to agree that had seen you. And so I was referring to the thorough and honest testing, because that's what I say.

Q. And at 6:03 a.m., you email me and say "the doctor is available."

The doctor wasn't available for additional testing at

that point in time, the doctor was needed in order to help you get me to plead because you knew at that time I wasn't going to plead, is that correct?

A. No, nothing like that.

MR. SCHMEISSER: Objection, Your Honor. I think Mr. Bergenn fashioned a response, but I'll object to the form.

THE COURT: Let's proceed.

BY MR. RIVERNIDER:

Q. I'll rephrase the question.

The reason you sent me this email saying the doctor is available is because you needed Dr. Filippopoulos to help you get me to plead; correct, Mr. Bergenn?

A. Absolutely false. And I've covered this at great length repeatedly the last time we were here.

The doctor was a resource available to me if necessary. The doctor was also there, because your father and your sister were there, so that she was going to come.

But because of the way you were presenting yourself going back to Friday evening, to Saturday, to Saturday afternoon, to Saturday evening, to Sunday morning, to Sunday afternoon, to Sunday evening, all of that I was responsible for retaining and acting on; and so I was.

So I knew that Monday morning if you were in grip of the full facts of the case, we were going to plead guilty.

I knew if you were going to lapse again into your persevered thought about "I'm making people money, I'm going to make them money and I never intended on hurting anybody," if you were going to go back to looking at only part of the case, we were going to continue with the trial.

So the issue was I wanted to have her there because if you were going to do the latter, that is perseverate, you were going to substantially risk adding 14 years of time incarcerated.

Q. Would have been happy to do it, Mr. Bergenn, because it would have been less painful than dealing with you right now.

MR. SCHMEISSER: Objection, Your Honor.

THE COURT: Sustained.

A. So I knew that on that Monday morning, given the stakes to you and to no one else, given the stakes to you, it would be better for me to have a professional there just in case I needed a resource.

As it turned out, it was totally unnecessary because you showed on Monday morning that which you showed on Friday, on Saturday and Sunday, that you could maintain a grip of all of the facts, and when you did maintain that grip of all of the facts, you readily recognized that it was better for you to save yourself a lot of time of

incarceration.

BY MR. RIVERNIDER:

Q. You wanted Dr. Filippopoulos there because you were concerned that if you didn't have her there, I wasn't going to plead, correct?

A. No. It was the way I could best perform my function, and at that point, it became a very challenging function.

I was ethically obliged not to disregard that which I knew from tests. You had diminished capacity. I was ethically obliged to serve you just as well as if you didn't, and if I had failed to recognize what they taught me about you, which was completely consistent with my years of spending time with you and the hundreds and hundreds of hours that I had spent on this case, if I had neglected to retain my attention on that and discharged my duty to inform you and help you, and when I saw you lapsing, recognize it and share that with you so that you could keep ahold of the whole of the facts, if I had failed to do that to the best of my ability, I was a failure.

I was not going to fail, so I had her come there just in case I needed to consult with her: What's going on here? Is there anything else I should be doing? Am I missing something, doctor?

And as it turned out, I didn't have to do anything

with her when she was here.
Q. So it was basically your ethical obligation that you had to make sure I pled because you had an ethical obligation, correct?
A. No.
Q. You were ethically obligated to make sure that I pled because I had brain damage, correct, Mr. Bergenn?
A. No.
Q. Now, going back to Monday morning.
As of early Monday morning, you knew I wasn't pleading; correct, Mr. Bergenn?
A. No, not correct.
Q. As of Monday morning, based on the last communication you got from me, I wasn't pleading, correct?
A. No, not correct.
Q. Displaying Exhibit 14. Do you recognize the exhibit on the screen, Mr. Bergenn?
A. Exhibit 14, yes.
Q. And this is an email from -- it starts out an email from you to me, correct?
A. Well, when you say "starts out," if you're speaking to chronologically, we'd have to go from the bottom up.
Q. Since this is a continuation of a previous string we had just talked about in 13, let's just start at the top. And at the top, the email it's 7:02 from you to me,

correct?
A. Well, just reading the words from the top, I can do that.
It's from me to you at 7:02, and I copied Chase and Vargo, and that follows a five-minute earlier email from you to me copying Chase and Vargo.
Q. Okay. And in the email that I send to you at 6:57, on the third line down, it says "Can't do it," doesn't it?
A. Hold on.
Q. Last three words, "can't do it."
A. That's what those last three words say.
Q. And the line after that, I write, "I would rather put everyone on the stand and take the stand myself."
Doesn't that mean I want to go to back to trial at 6:57 a.m. on Monday, February 25, Mr. Bergenn?
A. At 6:57 you were expressing what you're thinking at that time, and I just, based on my extraordinary, lengthy experience with you, that did not lead me to conclude that that's what you were going to do.
That led me to conclude that's what you were saying at that time.
Q. And that's because you weren't going to let me conclude that I was going back to trial because you were going to make sure that I pled, correct?
A. Nope, not correct.

I was going to make sure that you were knowing, intelligent and voluntary, whether you were going to plead or go to trial.

See, most people focus on knowing, intelligent and voluntary in order to plead guilty. It is also true that in order to persist in a trial, you have to do that knowing, intelligent and voluntary. And I was going to make sure that if you were going to persist with the trial you were going to do it knowing intelligently and voluntarily, and my duty never goes away.

So that morning when you're expressing "can't do it, I'd rather put everybody on the stand and take the stand myself," my duty is to be sure that that is knowing, intelligent and voluntary.

So let's talk about knowing --

Q. Thank you, Mr. Bergenn, I appreciate it. I think you've answered the question.

A. I haven't actually, because five minutes after you tell me that, I do what I just explained. You hurt Loretta by persisting.

MR. RIVERNIDER: I'm going to get into this right now, so I appreciate rather I ask the question.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, you respond "You hurt Loretta by persisting"? So you're using my sister and psychological

pressure in order to get me to plead, correct?

A. No. You specifically said to me, "I screw Loretta in the process, can't do it."

When you said "can't do it," by the way, I now have to change the answer to the other testimony. Because when you said, "can't do it," and you told me to read those three words, I did that; but now I realize the way you tried to make your question was, "can't do it," meant "can't plea." That's not what that means.

When you read the sentence it says, the preceding clause, "and I screw Loretta in the process. Can't do it."

That means you were expressing to me "I can't screw my sister." My job then is to inform you so that whatever you do is knowing, intelligent and voluntary. So I needed to inform you in response to your conclusion that I can't screw Loretta in the process, I said you hurt Loretta by persisting. Because that was my opinion then. It remains my opinion now.

Loretta did better by your plea than she would have done by your persisting, and that was my ethical obligation to make sure you knew that, and I fulfilled it when in five minutes it took to write the response and push the send button, I start directly correcting your misimpression based on my judgment.

Q. Now the last line says, "Didn't know things you couldn't know without an expert in two days of 17 tests."

This is part of the ongoing mental coercion where you were continually telling me I got this brain damage, I got this issue and I have to plead because of it, correct?

A. If you just read that whole sentence, the exact opposite of what you just said is what was being said.

You can be the government's view of Bob or the truth's view of the decent person who tried to help everyone but who didn't know these things you couldn't know without an expert and two days of 17 tests.

You didn't understand why it was you were not focusing on your victims. You were only focusing on your own thinking and how you're going to make money for people.

But once you did know -- and by the way it wasn't the tests that taught you, it was the presentation of the victims who stirred you -- you were concerned about them, you cared about them, you actually had a sense of social responsibility when you witnessed them.

So once you had this, I then revealed in more depth what the tests taught us about you; and so I had an ethical obligation to be sure you retained that so that if you were going to go forward at trial, you did it knowingly and intelligently and voluntarily and not

because of some brain deficit that would lead you to forget to stop thinking, to over focus and to perseverate on your desire to make money.

Once you knew how you function, you were able to recognize that you always knew that you were paying people with other people's money. You always knew that, you just weren't looking at it.

Q. Your Honor, I'd like to go to Plaintiff's Exhibit No. 7.

Mr. Bergenn, do you recognize this email? It's an email that's at the top starts from an email from me to you on February 23 at 10:17.

That's the top of the email.

A. I see that.

Q. And then the second email down, February 23 at 8:27, it's an email from me. I write -- and why don't you go ahead and read that email.

A. "I understand. Not trying to be difficult but to be accurate. The facts are, I didn't tell Will and Ponte that I would be using Borovay's $110,000, Robben West's $100 thousand dollars, Scott Meyers' $74,000 and Marie Martin's $50,000, et cetera, to lease a CD for $10 million allowing me to leverage the loan they made to make more money to pay them. And Will and Ponte didn't tell them I was leasing a CD to go into trade with an alleged foreign

exchange trader who I later learned was a scammer and helped put in prison."

Q. Mr. Bergenn, my question: Do you recognize the names there? Aren't they the people who testified earlier in that week?

A. I can't say that for certain. They are certainly victims, and I just, you know, as I sit here today, can't tell you that.

Q. Okay. You keep testifying that I heard the testimony of these victims, and you don't even know who the victims were who testified that I heard the testimony of, is that correct?

A. No, that's not true.

Q. Aren't these the people who testified earlier in the week?

A. I can't answer that question.

Q. So you don't know?

A. I don't know what?

Q. You don't know who it was that testified that made me have this epiphany.

A. I can't identify today with you the actual names of the people who testified. I can tell you what the gist of their testimony was and I can tell you your reaction to it. That was what was germane.

I can't give you a name.

Q. So if these were the people who testified earlier in the week, then the reaction isn't consistent with what I wrote the next day in that email, is it?
A. I don't understand that question.
Q. Well, you're saying I reacted to where I had an epiphany and all of a sudden these people like Joel Borovay, he said $110,000, and I'm saying that I put that money into a CD, in other words, to repay him. That's what I'm saying in the email here.
But you're saying a day earlier I had this epiphany and suddenly I had to plead guilty and give up my life.
A. Wow, let me just say this: The fact that you used his money to invest in some curious idea of leasing a CD for $10 million and that was going to make you a lot of money, but you got scammed and lost all the money, is not at all inconsistent with the fact that when you saw him and he testified and he did not know that up until the time he lent you the $110,000, you had never once paid anybody from any successful investment of yours. And you told me that you knew that if he had known of that, he would not have lent you the money.
So that stirred you, you were disappointed in yourself that you knew that the people who were parting with their money to you were hurt, and you knew that they didn't know something you did know, which was you never

successfully invested anything; and that hurt you. You looked in the mirror when you saw them and you saw that they were hurt by your failing to tell them, by the way, Mr. Borovay and Robben West --

Q. Mr. Bergenn, can I ask one question?

Did anyone ever testify as to what you're saying or are you just making this up now?

MR. SCHMEISSER: Objection, Your Honor, not only to argumentative; but, again, we're sort of rehashing these same issues again and again.

THE COURT: I'll sustain the objection. I didn't understand the question in any case.

MR. RIVERNIDER: I'll move on, Your Honor.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, moving back to Monday morning, on Monday morning, you stated earlier in your testimony that me and Dr. Filippopoulos arrived I believe you said somewhere between 8:30 and 9:00, is that accurate?

A. No, it is not.

Q. What time did me and Dr. Filippopoulos arrive at your office, do you recall?

A. My best memory is you arrived approximately at 7:50 and she arrived at 8:13.

Q. She arrived at what time?

A. 8:13 a.m.

Q. Dr. Filippopoulos arrived at 8:13 a.m.?
A. That's my best memory.
Q. That's a pretty good memory.
A. I don't know. That's my best --
Q. What are you relying upon for that exact reference in time?
A. I had seen the sign-in sheet that we use at Shipman & Goodwin's office. There is a desk that everybody who comes into the office has to sign in when they're coming to Shipman & Goodwin, and I had seen that before my testimony the last time several weeks ago, and I -- it refreshed me that she came in somewhere, when I testified, between 8:00 and 8:30, but in fact, I credit our desk that it was 8:13; but honestly, I did not look at my watch when she then later took the elevator and got to our floor.
Q. So you're testifying that based on what is in the record, which is fine, and she signed in at 8:13, and you're saying I signed in at 7:50?
A. That's what the records reveal.
Q. Thank you, okay.
Now, did you consult with Ms. Filippopoulos on the phone that night?
A. I don't recall.
Q. Or actually it would be the morning of -- Monday morning?

A. I don't recall.
Q. In your affidavit on page 21, Number 44 --
A. Yes, sir.

MR. FROST: For the record paragraph 44 of his affidavit dated November 14, 2017.

BY MR. RIVERNIDER:
Q. Just to help refresh your recollection, somewhere down towards the bottom it says "I also then consulted with Dr. Filippopoulos." Do you see that?
A. Not yet.

Okay, I see it about the sixth line from the bottom of paragraph 44 of page 21 of the November 14, 2017 affidavit.

"Concerned about this new and belated reaction even though he had met over 15 hours during the two preceding days agreeing on each and every material factual term in the admission of offense conduct. I also then consulted with Dr. Filippopoulos."
Q. And then continue on.
A. "Well after midnight, Dr. Filippopoulos agreed to make herself available to me and to Mr. Rivernider early Monday morning so that all three of us could comply with our duties in connection with what was scheduled."
Q. All right. So did you speak with Dr. Filippopoulos well after midnight?

A. I don't remember whether I spoke with her.
Q. But you were consulting with Dr. Filippopoulos?
A. I believe I'm referring in that affidavit to the emails we've just described.
In the emails I provided her robust, complete, thorough, information that had been exchanged between you and me so that she could then digest it with her knowledge, training and experience; and I wanted her to be able to have that in mind to the extent I may need to ask her to give me some insight.
So that's what I meant by "consulting."
I provided her that and asked her availability.
Q. And isn't Dr. Filippopoulos a busy person, I assume had appointments the next day where she just dropped them to make herself available?
A. I do know that she is a busy person. I do know that she is capable.
Most of her clientele are not in emergency situations. They're ongoing treatment for the most part with people with chronic, almost always, permanent traumatic brain injury; and she apparently can modify her schedule sometimes.
I do know that I had asked her if she'd be available first thing in the morning, presumably before her normal appointments.

Q. Isn't it true that Dr. Filippopoulos hasn't made herself available for these proceedings until after March 20th? Are you aware of that?
A. I don't know.
Q. Even though she can drop her schedule at a moment's notice to be available for you to help me plead, is that correct?
A. When she's in the state of Connecticut and going to work every day, it was my belief that she could.
I asked her. I didn't know whether she could or she couldn't, but she said okay, apparently, she showed up.
Q. So now we're there in the office, you say around 8:00 both of us arrive or just after 8:00 she arrives, I arrive just before 8:00, right?
A. You arrive just before 8:00, she arrives sometime after -- up to Shipman & Goodwin's -- I'm on the 19th floor -- sometime after 8:15 would have been when she first presented herself at the firm, and my memory is we were trying to get to court on time by 9:00, have to drive and schlep our stuff, so I probably would have been leaving the office around 8:35, to be timely, parked with the material necessary for those day's events, which could have included a trial and could have included a plea. So we had to bring a lot of material.
So I would have had somewhere, maximum, in the range

of 20 minutes where both of you were at Shipman & Goodwin.

Q. So you're saying in that 20-minute timeframe, that from based on the email that I sent earlier in the morning saying that basically I'm not pleading, that in 20 minutes, I changed my mind and we were ready to go down and plead?

A. No, that's not what I'm saying.

You may have changed your mind five minutes after you had sent the last email, I don't know. I was going to see what happened on Monday.

I knew what I was going to do. I did not know what you were going to do.

And since you arrived 25 minutes or so before Dr. Filippopoulos arrived, my inference -- it's not a memory, I don't know -- my inference is I would have met with you, I would have talked with you.

And I can guarantee you the first thing we would have talked about would be the whole of the case and not a perseverated partial view of the case.

And once you have a grip of the whole, it was just not a controversial issue. When you looked at both sides of this case, it was so obvious and clear to you the advantage to you in your life of pleading guilty that there was no tension.

Q. So the fact that that morning I decided to just give

up my life and plead guilty, it -- that was the advantage to me?

A. You didn't give up your life, you saved 14 years. You may not understand that now, maybe, but it certainly was clear to you then.

Q. Assuming I live past this year.

Okay, the indictment in this case was filed November 5, 2010, is that correct?

A. I don't know.

MR. RIVERNIDER: Can we stipulate the indictment was filed November 5, 2010?

MR. SCHMEISSER: I don't recall at this point. I'm not sure it's material to your question.

BY MR. RIVERNIDER:

Q. From the time the indictment was filed back in 2010, up until that moment -- you weren't with me the entire time -- but up until that moment, I was proceeding with trial, correct?

A. I wouldn't say that, no.

Q. I was fighting this case and working this case for that entire time based on the time that you can attest to, isn't that true?

A. No.

Q. How about up until Friday the 22nd of 2013?

A. Yes.

Q. So for at least two and a half, maybe three years, I was working on this case with the full intention of going to trial, isn't that true?
A. I believe that to be true. I can only tell you that from March of '12 up through February of '13, was it?
Q. Yes.
A. So for that last year you intended to persisting to trial.
Q. Shortly after, sometime after pleading, up to this moment today, have I continued to fight this case?
A. No. Well, fight is ambiguous to me, or vague.
I will say this: That the day that you pled, I remember looking at the --
Q. I'm talking about shortly after.
A. I understand. I'm going after. That's exactly where I'm going.
Q. For five years.
A. Hold on, please, let me just answer the question. This isn't a dialogue.
You pled on a Monday. You and I went through emails on Tuesday, Wednesday, Thursday and Friday, to the best of my memory, because I had refreshed myself before the last time I came here, and on each of those emails, it was evident that you were very focused on whatever it was you were talking about and you didn't once during that week

raise any of these issues, none of them.

And for the next number of months we had more communications. You didn't once raise any one of these issues.

So the answer to your question, well, didn't I for years say to go to trial, and all I can tell you is I only had you for one year, and during that year, like every other case, when somebody gets arrested, they're preparing for trial; and until they come to grips with what the facts are and what's in their best interest, they're intending to go to trial.

It's always the case that a plea is after that, and it's always the case that once they, if they make a decision to plea, it's because they've looked at all the facts in the law and the strategies and recognize it's in their interest to plead guilty.

So there was nothing in that regard that was remarkable about this. It came up, we then -- what was remarkable is that we spent so much time Friday, Saturday, Sunday and Monday, we spent more time than in any other guilty plea that I had. But it wasn't with any doubt about its wisdom ever, ever.

And in the ensuing days, weeks and months, the wisdom of it was never questioned.

Q. Mr. Bergenn, didn't we sit in your office for several

hours on Monday morning having a battle, a discussion, an argument about whether or not I'm going to plead and you continued that morning to press the mental coercion issue that morning?

A. No, that's not my memory at all.

Q. Weren't we sitting in your office for several hours that morning, Mr. Bergenn?

A. I believe to the best of my memory I arrived timely for court, and court was, to my understanding, I felt we had to be due at 9:00.

I believe that you arrived up to Shipman & Goodwin around 8:00, which would have given us about 35 to 40 minutes, at the most, before going. That's my memory.

Now, we did then spend three hours over here alone talking, reviewing the facts.

Q. You said we were in your office about 25, 30 minutes, somewhere in that neighborhood?

A. I'm saying that would have been, to my memory of the anchor points I do remember, have been the maximum amount of time at the office; however, I do know I spent three hours with you here from 9:00 to 12:00.

So if you add the 8:00 to 12:00, I spent four hours with you total, and I believe three quarters of that was here at the courthouse.

Q. Sunday night I'm telling you, I'll see you in court,

I'm not pleading, correct?
A. There was a point in time --
MR. SCHMEISSER: Objection, Your Honor.
A. -- as we've discussed a few times -- where you expressed that, and we've already seen my responses and our dialogue since then.
So we can keep talking about it, but I look at that as just perseverating about a new thing.
MR. SCHMEISSER: Your Honor, I think we're visiting the same issue again and again and again. I would inquire --
MR. RIVERNIDER: I'll withdraw.
MR. SCHMEISSER: -- of Mr. Rivernider how much time we're looking at, because it seems to me we're revisiting the same issues.
THE COURT: Mr. Rivernider, can you give me a sense of how much longer you will be?
MR. RIVERNIDER: Probably an hour, Your Honor.
THE COURT: All right.
BY MR. RIVERNIDER:
Q. Mr. Bergenn, can you tell me when I arrived at your office I was at peace with pleading guilty?
A. I can't remember specifically at your arrival. I don't have a minute-by-minute memory of that Monday morning.

Q. How long did it take you to convince me to plea?
A. I did not convince you.
Q. Why did I plead after sending emails saying I wasn't going to?
A. Because in my judgment at the time you retained a grip of the whole facts of the case and you decided that it was very much in your interest to do so.
THE COURT: Okay, let's see if we can't wrap up this part of it.
The question is, Mr. Rivernider, as I understand it, what happened between 6:58 in the morning when you made it clear that you were going to continue with the trial --
MR. RIVERNIDER: That's correct, Your Honor.
THE COURT: -- and --
MR. RIVERNIDER: Yes.
THE COURT: -- what exactly happened. That's what you want to know.
BY MR. RIVERNIDER:
Q. So Mr. Bergenn, you're telling us and the Court you don't have a memory of what happened between 6:57 in the morning and the time I arrived at your office and what happened and why we came down to court, correct?
A. No, that's not correct.
Q. What is your memory?

A. My memory is that you came over and we continued what we had been doing for the preceding three days.
Q. What we had been doing for the preceding three days is you were telling me that I had brain damage.
A. No. I've already covered -- 90 percent of the time we spent fact by fact by fact making sure you were absolutely certain that every fact to which you were going to plead guilty was true and accurate. That's what we spent our time on.
And whenever you looked at the whole of the facts, you were very clear about it being in your interest to plead guilty; whenever you were not looking at the whole of the facts, you could have gone anywhere in terms of let's keep going to trial or just talking about some investment.
So it was hard to keep you focused. But most of the time we spent was focusing on the facts. There was a small percentage of the time that we spent explaining what the tests revealed, but that was a very small part of our time.
Q. And these are facts that you were presenting and in 15, 20 minutes, you presented these facts and you changed my years of work and got me to go down and plead, correct?
A. No. You --
MR. SCHMEISSER: Your Honor, object.

A. You knew those facts.

MR. SCHMEISSER: Again, been over this again and again and again. If there's specific discussions that he wants to elicit that happened as we go through that morning, that's fine.

MR. RIVERNIDER: That's what I'm trying.

MR. SCHMEISSER: But just repeating the same questions in different forms I don't think --

THE COURT: When we were here for the first day of this hearing, there was testimony by Mr. Rivernider about these events, and we've continued to hear about it today. Let's see if we can't wrap it up.

I'm going to give you some more time, Mr. Rivernider, to see if you can exhaust Mr. Bergenn's memory of what happened during those crucial hours, but let's not use this as an opportunity to argue.

MR. RIVERNIDER: Thank you, Your Honor.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, was it 15 or 20 minutes when we were in your office or was it more like two or three hours?

A. My best memory is it would have been closer to the first figure than the latter, because my best memory is I had to be here in court.

So the four hours approximately that I spent with you -- my memory is three of them were here, it could have

been different than that, but that's my memory, that's all I can give you. And the facts that we would have gone over were facts that you already knew.

Q. Thank you, Mr. Bergenn.

A. There were no new facts that we went over.

Q. The fact is it could have taken at least three hours and it may have been after 11:00 that we actually left your office and didn't get down here to court until sometime after 11:30; wouldn't that be more accurate, Mr. Bergenn?

A. Very, very unlikely. Because I remember dealing with Attorney Schmeisser and him having to run upstairs in order to type out a few words that were changed, and I believe that was early. I believe that would have been around 9:30 or so.

I just don't have a minute-by-minute memory. I'm trying to help you just saying that I know I spent four hours with you. Where is not as clear.

But I was refreshed by my emails saying that we've got to be there at 8:00, we've got to be there at 9:00, and I don't have a specific memory of not doing what I said we were going to do.

Q. Thank you, Mr. Bergenn.

Where was Dr. Filippopoulos at this time?

A. I have no idea.

Q. She wasn't in the office with us?
A. I thought you meant now, you said at this time.
Q. At that time.
A. I believe that she arrived at 8:13. I believe she took the elevator upstairs. I believe we would have exchanged at least some pleasantries. I don't know then whether the three of us --
Q. Mr. Bergenn, isn't it true that --
A. Can I please finish answering the question?
I don't know then whether the three of us sat and talked for a short period of time or a long period of time before we then all came over to the courtroom.
I just know that we spent some time together.
Q. And you were reviewing the testing results with Dr. Filippopoulos and she was in the office because of what I sent you Sunday night and Monday morning, correct?
A. I don't have a memory of reviewing the testing results. We had done that earlier over the weekend. Instead I wanted to focus on how you were going back and forth from the weekend into the night, and that things had changed.
So in my judgment, you appeared to be relapsing into looking at half instead of the whole of the case. So I believe I would have continued my job, which is talk about the whole and not the half. She would have been there.

Q. Mr. Bergenn, can you open to in your affidavit page 29, paragraph 68.

A. Yes.

Q. And read paragraph 68, please.

A. "I have read paragraph 64 through 90 of the affidavit of Michael Chase dated November 14, 2017, and agree with the facts set forth in those paragraphs."

Q. And then can you open up Mr. Chase's affidavit?

A. I'd need that to be handed to me, please.

Q. It's going to be page 18.

MR. FROST: For the record this is Mr. Chase's affidavit dated November 14, 2017.

I'm sorry, which paragraph, Mr. Rivernider?

MR. RIVERNIDER: Seventy-eight to start with.

A. And you'd like me to read it?

BY MR. RIVERNIDER:

Q. Yes.

A. "On Sunday night, the 24th of February, Mr. Rivernider sent a few emails suggesting he no longer wished to plead guilty. See emails at Exhibit 16."

Q. And you agreed with Mr. Chase that I sent emails saying I no longer, or suggesting, I no longer wished to plead guilty, correct?

A. If you read the emails, that's what the emails suggest.

Q. And 79. Can you read 79, please?
A. "The following morning I, along with Ms. Vargo, went to the courthouse as scheduled while Attorney Bergenn met with Mr. Rivernider."
Q. And what was scheduled, do you recall?
A. I believe your sister pled first thing.
Q. But what was scheduled first thing in the morning?
A. Well, I believe that her plea -- well, there were two things scheduled actually. The trial was always scheduled, and there were some communications over the weekend with the government and the Court's judicial law clerk about the prospect of a plea. There were also emails with co-defense counsel and the government.
My latest information, I believe, was that your sister intended to plead guilty first thing in the morning and that that was going to put off the trial by a few hours.
That's my current memory of how things developed first thing in the morning.
Q. Could you read Section 80, please, or paragraph 80?
A. "At that time, Mr. Rivernider's co-defendant and sister Loretta Seneca was in the process of entering a guilty plea in an adjacent courtroom."
Q. And 81?
A. "When Mr. Rivernider arrived at the courthouse with

Attorney Bergenn, I observed him to be calm and coherent. As with my earlier assessments of Mr. Rivernider, I did not doubt his ability to understand the proceedings."

Q. So Mr. Chase and Ms. Vargo go to the courthouse for what was scheduled and you had said in emails there was a change of plea scheduled for 8:00, do you recall that?

A. No, actually, that's not what the emails said.

You said, "I'll see you at 9:00."

And I said, "We're due at 8:00."

I don't know where I came up with 8:00. I don't know. I just don't know.

Q. So we go down to the courthouse.

Now, you just testified a few moments ago that you believed it was around 9:30 that Mr. Schmeisser was running upstairs to make changes to the admission of offense of conduct, is that correct?

A. Yeah, I don't know the exact time. I just know it was with -- it was earlier in the morning, because if I recall, our plea was around noon, and there was time for us to review the tweaks that he had put into it while we sat here.

Q. Okay. According to Mr. Schmeisser at our last hearing, that change of plea ended at 10:35, Mr. Chase's affidavit says that changes were made after she had pled. So that would be later, much later.

A. That could be.
Q. So is your timeframe a little off for the morning?
A. I don't know. I don't know what everybody's relying on.
I just know that there was -- it was after we arrived --
Q. And where was Dr. Filippopoulos all this time?
A. She was generally around. She I think had spent a little bit of time in the hall meeting your dad. I think she met your sister. I don't know if that was before or after her plea.
She was essentially a resource available. I don't recall her having much of a roll other than being a resource available to me.
Q. Now, when the Rule 11 hearing started, you had indicated that we were there. As a matter of fact, you testified before that the only reason we got there was because of the testing done with Dr. Filippopoulos, correct?
A. No.
MR. SCHMEISSER: Objection. We've been through this, I don't know -- many times. To the extent he wants to ask about the plea petition or plea hearing, he could ask those questions, but I don't think it's helpful to have the argumentative phrases at the beginning of the

questions.

MR. RIVERNIDER: Your Honor, I'm going somewhere with this, I just wanted to bring up a quick couple of things.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, you're aware the government hired an expert in order to dispute Dr. Filippopoulos's report?

A. Yes.

Q. And one of those experts was Dr. Kaplan?

A. I believe that's correct.

Q. Your Honor, I don't have the testimony from the day before, but I do have the report and Dr. Kaplan's -- do you recall how Dr. Kaplan characterized Dr. Filippopoulos's opinion?

A. Not specifically.

Q. Do you recall him saying specifically the two words "frankly absurd"?

A. Not those two words, no.

Q. I'd like to refresh the witness's recollection.

Would it refresh your recollection to look at Dr. Kaplan's report?

A. Oh, absolutely.

THE COURT: This is a report that's in the record?

MR. FROST: Yes, Your Honor; and, for the

record, the document being used to refresh the witness's recollection is the report submitted by --

MR. SCHMEISSER: Your Honor, I'm going to object. We were focusing on what was happening factually at the time of the guilty plea, and this report was generated months later relating to a sentencing that happened many months later.

Unless there's some showing of what the relevance would be, at this point in time it seems we're again opening up a whole series of questions that are not directly relevant to the issue at hand.

THE COURT: Mr. Rivernider, what is the point that you're trying to make, please?

MR. RIVERNIDER: Your Honor, Dr. Filippopoulos's opinion was obviously material to my decision to plead, and the other experts have characterized her opinion as frankly absurd, and that's where it goes -- it's material to the issue and material to exactly why I pled.

THE COURT: Is it your claim that Mr. Bergenn knew or should have known that her opinion was as described by the doctor in his report?

MR. RIVERNIDER: Your Honor, it's what I relied on and what Mr. Bergenn relied on. We both relied on Dr. Filippopoulos's report, and if Dr. Filippopoulos's report is later determined to be frankly absurd, then it

was material to why I pled.

THE COURT: Okay. I'm not sure that we need to spend any time on that now because I can read the doctor's report and I can understand your position as you have just stated it.

If you want to ask Mr. Bergenn questions having to do with his reliance on Dr. Filippopoulos, then you can do that.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, you and I both relied on Dr. Filippopoulos on Saturday and spent four hours covering it, correct?

A. No.

Q. Did we not sit in Dr. Stoll's office reading the report prior to going into Dr. Filippopoulos's office?

A. Let me see if I can just get to the quick.

We spent four hours reviewing facts and conclusions from test results. It was not more than that. There were facts about your case that we reviewed, but mostly it was about that experience you had Thursday and Friday, the significant test results of those four items I spoke of before, what they meant for you, why it was that you were for the first time relieving yourself of hyper focus on your own intentions to make money and were finally able to embrace the victims' perspective. So we needed you to

understand that because you had a right to understand that. You underwent the tests.

And so she was a professional explaining the test results or available to correct me if I were explaining them inaccurately.

So when you say relying on her, that's not so. I mean, it was -- she was useful because she had more education, training and experience, surely, than either of us and she lent that to us as you and I were going through the process of looking at the other half of the case that you had not allowed yourself to look at, which was that you always knew where the money came from and where it went. You always knew it. You just didn't look at it.

Q. You had -- two more points, Your Honor -- you continue to talk about and you continue to focus on where the money is from the no more bills programs, but you continue to ignore the real estate program that the government loves to ask about.

I'm going to ask you one question about that.

Mr. Bergenn, did you not tell the probation officer on December 17, 2013, the day before sentencing, that Tosha Wade in her proffer session said that the lenders were in the know?

A. To the probation officer on Sunday?

Q. Ray Lopez.

A. I'm misunderstanding the question. You're saying did I talk to Ray Lopez the day before the plea. The plea was on a Monday.

Q. No, let me rephrase the question.

On December 17, 2013, the day before sentencing.

A. Oh, okay, I'm sorry.

Q. You sent Mr. Lopez an email, and that email states that Tosha Wade stated that the lenders were in the know and knew of the incentive program; do you recall that?

MR. SCHMEISSER: I'm going to object, Your Honor. Again we're talking December of 2013, many months after the guilty plea. I don't see how it could possibly be relevant.

MR. RIVERNIDER: Your Honor, it ties in to directly Mr. Bergenn keeps saying about me and him discussing the charges and the fact that we were discussing the charges.

If we were discussing the charges, part of the charges are the mortgage charges. He doesn't discuss the mortgage charges.

Well, the mortgage charges, as you know, are 22 out of $23 million. If we were discussing the mortgage charges and the lenders were complicit and in the know as the government's witnesses stated, then we should have been discussing that as well. And if we were discussing

that as well, then two days later if I pled knowingly and intelligently, then two days later, the mortgage charges could have been acquitted or thrown out because the lenders were in the know and the lenders were the victims.

THE COURT: Let's see if I can understand the point.

Our concern today is what happened over the weekend leading to the change of plea, and your point is that Tosha Wade was soon going to be a witness, and your claim has always been that she could be helpful to you if she testified truthfully because her truthful testimony would be that the lenders were in the know; am I following?

MR. RIVERNIDER: That's what she said in her proffer session.

THE COURT: Your question for Mr. Bergenn is whether that's true, whether that's something that you talked about over the weekend; is that your question?

MR. RIVERNIDER: If that's something that we talked about over the weekend and if that was part of what he continues to talk about where he continues to talk about how we discussed and whatever he's saying about I understood that I had to plead because of the charges.

THE COURT: So what is the question that you have for Mr. Bergenn?

MR. RIVERNIDER: Well, I'm asking him if he included the fact that we had a witness that was about to testify that could have been very helpful regarding the mortgage charges.

THE COURT: All right, I'll allow that question.

A. Tosha Wade had many things to say, some of which would be helpful, others of which would be damning. They really didn't address the core point that we did discuss over the weekend, and that is that the mortgage loans were secured knowing that information provided to the lenders was not accurate.

You knew specifically and talked about it with me, and I don't think you've ever denied it, that you were able to --

BY MR. RIVERNIDER:

Q. Mr. Bergenn --

A. I'm going to talk to you about the answer to your question about what we talked about on the weekend.

Q. You're making false statements.

A. Then cross-examine me when I finish talking.

THE COURT: Let me follow up and then we'll take a break for lunch.

In advising Mr. Rivernider about his options, Mr. Bergenn, did you consider whether, through Tosha Wade or another witness, you would be able to show that the

lenders were in on it, to use Mr. Rivernider's phrase?

THE WITNESS: I considered everything about Tosha Wade's testimony and the implications of that testimony; and it was true that the lenders -- and we had developed this robustly at trial -- knew a lot. They were dying to get these loans out there so they could make money when they flipped them. That's clear. That was very helpful information.

It was also clear, however, that I also had to consider that the lending packages for these people characterized the borrowers as people who were going to live there, and that allowed a more favorable rate, and it was known that that was not true.

It was also the case that the people who were going to borrow had filled out certain paperwork regarding their income, which didn't jibe completely with the paper work that got submitted. It's my view that those lenders would have lent anyway. But it's also true that that was materially false information.

But the part that we couldn't escape was the part that even these eager lenders charged certain rates for these loans to people who were going to live there because it's a different risk than people who were just investing, arm's length, and all of these people who participated were arm's length investors, lenders,

borrowers, however he wants to characterize it, but they weren't going to live there, and they were always characterized, and I say "always," I should be careful. In the name, my memory is that the paperwork characterized them as owner occupants, which gave them more favorable rates, which meant that the monthly payments would be less.

And there were other issues with respect to what was represented to the banks that didn't conform accurately.

The fact that the banks were, in my opinion, guilty of all kinds of problematic behavior, didn't change our culpability.

That's what I considered, that's what we talked about. We had talked about that for a good part of the six months leading up to the trial because we were trying to mount a defense, and I thought it was a very attractive defense about the big short, so to speak, and the misbehavior of the banks.

But it's also sad, but true, that a lot of people got convicted of crimes, even though the banks sort of set them up.

My job isn't to change the world, my job is to get the best result.

MR. RIVERNIDER: Your Honor, question quick.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, your motion regarding restitution, and I'll put it on the screen, but I want to read a line out of it.

You wrote: It is well established -- it is a well-established rule that co-conspirators who by definition know of the scheme are not victims and may not receive restitution, citing U.S. v. Archer.

Now, my question is, once they knew of the incentive plan because it was linked to them by Tosha Wade or they knew of the incentive plan, or the marketing fee which Mr. Schmeisser had said was part of the overarching scheme, then they were in on the scheme and they can't be seen as victims nor could they receive restitution based on U.S. v. Archer.

So wouldn't that have been an argument for trial and would have had the mortgage charges dismissed or acquitted?

A. No. Restitution is a different issue than guilt.

Q. Archer starts off with "are not victims and may not receive restitution."

A. I understand.

Q. So the lenders, therefore, are not victims when they know of the scheme.

A. Right. And I know, I don't know if I can explain it, but as succinctly as I can, whether someone is a victim and can get restitution is a separate from whether somebody else is submitting something that's materially false.

Someone's guilt for submitting something that's materially false doesn't go away just because the person doesn't qualify as a victim for restitution. Those are discrete things. They are unfortunate, I'm not happy about it, but that's how the law works.

MR. SCHMEISSER: Your Honor, again we're getting far afield from the actual weekend.

THE COURT: All right. I think it would be best if we broke for lunch now; but before we do that, can you tell me what you have in mind for after lunch, please?

MR. RIVERNIDER: Your Honor, we have about two issues to cover, which may take, depending on how long the answers are, 45 minutes to an hour.

THE COURT: How about the government's side?

MR. SCHMEISSER: Your Honor, I would plan to be relatively brief, but I would think somewhere in the range of 45 minutes to an hour.

THE COURT: That should give us ample time to wrap it up I think with regard to the events over the weekend under review.

Okay. We'll be in recess for lunch.

MR. SCHMEISSER: Your Honor, what time would you like to --

THE COURT: One hour.

(Whereupon, a recess followed)

THE COURT: Good afternoon. Are you ready to resume?

MR. RIVERNIDER: Yes, one moment, Your Honor.

THE COURT: Thank you.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, I want to go back in your affidavit to page 9, paragraph 17, I'll read real quick.

You write, "From my prior experience representing a wide variety of TBI clients on personal injury cases, I worked with and examined under oath many leading TBI experts including neuropsychologists, neurologists and radiologists"; do you recall that, Mr. Bergenn?

A. I know what you just said is true, and I'm just looking for that --

Q. Page 9, Section 17.

A. Yes, I see it now, yep.

Q. So you have a lot of experience with neurologists and whatnot as we discussed earlier?

A. That is correct.

Q. And based on that experience and you're, as we talked

about, probably known in the area as an attorney who deals with that type of -- TBI clients, correct?
A. I am known as a lawyer who has done that kind of work, yes.
Q. So if someone had an accident and they were looking for an attorney with that type of experience, you and your firm would be one of the leading candidates for them to hire to help them, correct?
A. I think that's fair.
Q. Isn't that exactly what was happening over the weekend, where someone had previously been in an accident and they were looking for an attorney and they were shopping for somebody with that type of experience and you were discussing with that potential client representing them?
A. That was actually from a month or so earlier. I had been in touch with that particular potential client for a little while.
MR. SCHMEISSER: Your Honor, just so the record is clear, this is the weekend of February 22nd, 2013.
A. That's what I took it to be.
MR. RIVERNIDER: Thank you, Mr. Schmeisser.
BY MR. RIVERNIDER:
Q. So the weekend prior to my pleading, you had spent a month with potentially getting this new client, correct?

A. No. It was about a month earlier plus or minus. It could have been a month and a half to two months. I just don't remember specifically, but I had had some interaction with potential clients with respect to a trauma brain injury case.
Q. And isn't it true that on Sunday afternoon when I was in your office, I had to step out of your office for a period of time while you took a call from a new potential client?
A. This is that same client. It was not a new, it was a month-plus dated client. It was early in the phase of an injury. Those frequently take months before the picture is clear enough.
So it was just a contact that they happened to have made with me on that Sunday.
Q. Okay, so they contacted you that Sunday, and we're going to submit that as an exhibit. And we'll mark it first.
MR. FROST: Putting up Plaintiff's Exhibit 21, which is an affidavit from Mr. Bergenn dated December 5, 2017.
BY MR. RIVERNIDER:
Q. Do you have a copy -- Mr. Bergenn, this is an affidavit that you filed on December 5 with the Court -- or sent to me?

A. It appears to be a copy of Exhibit -- can't see the number there -- 21.

I can see the first five enumerated paragraphs.

Q. And if we can turn to the attached Exhibit A, can you tell us what this is, Mr. Bergenn?

A. That appears to be a printout of a page from my working calendar in a day-to-day, I guess you would call it a Microsoft calendar.

Q. And this is for February 26, 2013, correct?

A. That is correct.

Q. And this shows that you had an appointment with a client from 8:45 to it looks like around 5:00 in the afternoon?

MR. FROST: Let me approach the witness, Your Honor.

THE COURT: Yes.

THE WITNESS: Thank you.

A. This is a time record for -- let's see, February 26 was a Tuesday -- as to how I spent my time.

So I spent my time that day from it looks like 11:00 until 5:30, plus or minus, working on some matter.

BY MR. RIVERNIDER:

Q. And this wasn't a CJA client, was it?

A. No, it was not.

Q. And this was the day after I pled, correct?

A. That is correct.
Q. And wouldn't this be -- was this a TBI client?
A. I'm pausing only because I'm trying to be --
Q. Are you reviewing the --
A. I was waiting for your attention.

MR. HOWARD: Excuse me, Your Honor, if I may?

I'm counsel for Mr. Bergenn and I believe, if I heard the question correctly, the petitioner's asking him for confidential and privileged information.

THE COURT: He asked a question about the nature of the matter?

MR. HOWARD: Correct.

THE COURT: And you claim a privilege with regard to that?

MR. HOWARD: I think the nature of the circumstance with which Mr. Bergenn was consulting with that client is not public information.

THE WITNESS: I think what I was about to say is that the ethical rules do not permit, without permission from the client, to speak to a matter relating to a representation.

So I am --

MR. RIVERNIDER: Your Honor, I'll withdraw that question.

BY MR. RIVERNIDER:
Q. Mr. Bergenn, if we can turn to page 3, and if you could just -- at the top here it says Tuesday, February 26, "It was after I spent most of the workday attending to other matters which involved a lengthy trip to another town in Connecticut to meet with a prospective client and to view a scene relevant to the matter."
"The scene." It sounds like there was an accident or something and you went to another town to view the scene, correct?
A. I think my last answer would govern this next answer.
First of all, it's not necessary to this proceeding, but I'm not supposed to, without consulting with the client, speak to any information relating to the representation.
Q. I'm just asking about what's in the affidavit.
A. I understand what you're asking, and I can answer what's in the affidavit, but I'm not permitted ethically to go beyond what's put in this affidavit.
The affidavit was designed to address a timing issue.
Q. And based on the affidavit, you went to a -- you had a trip to another town in Connecticut, correct?
A. That is correct.
Q. So, and that trip and then you went to visit a scene relevant to the other investigation, correct?

A. To another matter, yes.
Q. And when you were visiting that scene, that was for a client who may have had an issue similar to what happened in this case, correct?
A. I -- again, this will be the last time I say it, I am not ethically permitted if I'm going to comply with the rules of professional conduct --
Q. That's fine. I'll withdraw the question.
Now, you met with this client all day on Tuesday, correct?
A. Well, no, but --
Q. Based on your calendar?
A. Based on my calendar I spent the time that I've already indicated on the calendar.
I think it was from approximately 11:00 or 10:00 or something, to 5:30 or something. Whatever I said before when I had the calendar in front of me was the time I spent.
Q. According to the calendar, it appears to have started at 8:45 and goes to about 5:30. Is that -- we'll hand you a calendar.
A. If we're talking about February 26, I've got something redacted from 8:45 until 11:00. Then I've got something entered from 11:00 to 5:30, and --
Q. Mr. Bergenn, the first calendar entry, the redaction

is taking out the information. The shaded area is the time that you blocked out, and you blocked out 8:45 to about 5:30, is that correct?

A. It having been redacted, I did not realize that that's what was redacted.

Let me tell you from looking at the affidavit itself -- if you give me a moment, please.

(Pause)

A. The affidavit I believe answers your questions. But to be precise, I had scheduled -- hours after our matter was concluded on February 25, I then entered on to my calendar for the following day, February 26, that I would be -- at 3:53 when it was requested -- that I would meet someone at 10:00 a.m. and the -- I don't see the redaction right now, but taking what you've suggested to be true, which I think is right, that would have been the data that identified the client. I would have accounted for time that I would have been traveling to the client.

So somewhere around 8:30 for the calendar.

Q. Doesn't matter what time. Is it fair to say you were busy that time, Mr. Bergenn?

A. Yes. I'm busy every day I go to work.

Q. And this client that you've been working with is somebody you had been working with for about a month now? You had spoke to him on Sunday while I was in your office?

A. Hold on. I do know that I had a request on Monday at 3:53 if then, at that time, which is hours after our matter, yours and mine, was concluded --

Q. Mr. Bergenn, I asked if you had spoke to them on Sunday, this client that you -- or this potential client that you said that you had been working with or talking to for about a month -- you spoke to them on Sunday afternoon, correct?

A. Don't know. Give me a minute.

Normally when I answer those questions, I look at my calendar, and I don't see -- to be --

Q. There's no calendar for Sunday, so I'll help you out there.

There's no calendar for Sunday, but while I was in your office, I had to step outside your office so you could talk to this client, and this is the client you met with on Tuesday, is that correct?

A. I can't answer that for sure because, first of all, that would also violate my ethical obligation, but --

Q. Were they already a client at the time?

A. The person that I spoke -- I visited somebody on Tuesday, that is clear. I can't speak to right now unrefreshed whether I also spoke to that same person on Sunday.

THE COURT: Let me clarify so that there's no

misunderstanding.

Unless I'm mistaken, there is no privilege or other rule of confidentiality that would prevent a lawyer from stating whether he asked someone to step out of a room so that he could speak to a client. To me it would be surprising if there were such a rule. So let's be clear that for purposes of today there is no such rule.

By the same token, I don't think there is any rule that would prevent a lawyer from disclosing his whereabouts or the nature of his engagement as was requested a minute ago. I'm not aware of any rule that says a lawyer can withhold that information in the interest of a client who is unidentified, and as far as I can tell unidentifiable, and whose identity is not sought.

MR. RIVERNIDER: That's correct, Your Honor, thank you.

THE WITNESS: I think it's 1.6(a), and I don't have it memorized, but I think that's the rule that -- and I'm happy to give every piece of information I'm ethically permitted to do, and I always feel a little more comfortable if the Judge tells me to.

THE COURT: Isn't it the case that a lawyer can reveal the identity of a client and even the fee arrangement with a client?

THE WITNESS: That's not true actually.

Any information relating to a representation is non-public without permission, and it's something that --

MR. FROST: Your Honor, my understanding is Mr. Bergenn is correct, that 1.6 is broader than attorney/client privilege which relates to communications, but I believe if the Court thought it was relevant to a proceeding, Mr. Bergenn is free to answer questions in the way the Court has described.

THE COURT: Well, let's look at what we're confronting.

Mr. Rivernider claims that Mr. Bergenn had an actual conflict in that, according to Mr. Rivernider, Mr. Bergenn was interested in being able to take on a case and his continued representation of Mr. Rivernider at the trial of this case would get in the way, and Mr. Rivernider is seeking to establish that the day after the change of plea in this case, Mr. Bergenn met with a client or prospective client with whom he had spoken on Sunday.

That's the whole point, right?

MR. RIVERNIDER: That's correct, sir.

THE COURT: I don't think there's a privilege that stands in the way of Mr. Rivernider getting at whether there was a client contact on Sunday and whether there was a client meeting on Tuesday, as long as we don't

talk about anything more than that.

MR. RIVERNIDER: That's correct.

The TBI issue, Your Honor.

THE COURT: I don't know why that matters.

MR. RIVERNIDER: Only in the sense that this turned into a TBI case, and if he was a potential TBI, that was in his mind at the time and that's why this turned into a TBI case.

THE COURT: I don't think that matters.

MR. RIVERNIDER: That's fine.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, can you, based on what Judge Chatigny just said, can you answer the previous questions?

A. Yes. There was no conflict that to my memory -- and I had looked at my calendar entries before my last appearance, Your Honor, and I believe there was a calendar entry for that same redacted client for a conversation on Sunday. I can't say for certain, but that's my memory.

And when I checked my emails and all the other data available to me, I had no appointments on the 11th other than to continue with this trial.

When I say the 11th -- on the Tuesday through I had no appointments.

After the change of plea noon, 1:00, whatever it was, I went back to the office and continued to work, and late

that afternoon I had a request from that same client, would you be interested and willing to meet with us tomorrow? And my day, having been freed, otherwise it was going to be blocked out with this, but now I had a free day, so I said, yes, and then I did it.

That's exactly what happened.

Q. So you're back at the office now and you spoke to the client on Sunday, you have an appointment on Tuesday set up?

A. No, I did not. You didn't hear my answer apparently.

I had an appointment set up on the afternoon of Monday after 3:53.

Q. Okay, I'll ask you about that.

You said in your affidavit this last page here -- do you have that in front of you?

A. Hold on.

MR. SCHMEISSER: Again, just so the record is clear, this is Plaintiff's Exhibit 20?

A. Yes, this is Exhibit B, and it is a redacted email from somebody to me, subject "Meet" and date Monday, February 25, 3:53 p.m..

BY MR. RIVERNIDER:

Q. I'm sorry, can you read the entire time there?

A. 3:53 dot 15, which I think means 3:53 and 15 seconds is when the email I think would have either left the

sender or hit a server or landed on my desk, I don't know.

But I do know this, I could not have read it until after 3:53, and I don't know when I read it, but I do know it was after 3:53 when I was first asked on Monday if I could meet, because it says, "Hi, Jim, could you and your team meet at our home tomorrow at 10:00 or so? Thanks."

I do know from looking at my calendar entry that I must have said yes at some point. I don't know if that was 3:54 or 8:59, I don't know when it was, but it was after that time since my day was totally now free where it was totally blocked off before 3:53, I made myself available as requested to this other putative client.

Q. And if I hadn't pled, you wouldn't have been available on Tuesday, correct? Because we would have been in trial, Tosha Wade was on the stand.

A. Not only would I not have been available, but I wouldn't have known about this 3:53 email that was going to happen later. I was not clairvoyant.

Q. But if I hadn't pled on Monday morning, if on Sunday night when I told you I wasn't going to plead and on Monday when I was not going to plead, if I hadn't gone in and pled, you wouldn't have been available to meet with this client, correct?

MR. SCHMEISSER: Your Honor, this is a compound question and I think the point has been made.

A. It's self-evident. I would have not been available to anything. I would have been in trial.

BY MR. RIVERNIDER:

Q. So you were sitting in your office and you received this email, correct?

A. I don't know that.

Q. You don't know?

A. I could have been anywhere.

Q. Where did this email come from?

A. The client.

Q. How did you get it?

A. I don't know. I opened up my email and it could have been on my --

Q. You printed out the same email account that you printed every other one out on, right?

A. No. I don't -- it's very rare I print out emails. I would have opened up my iPhone or my iPad or my computer and looked at it and read it.

Q. Why is this in a different format than all the other emails? Why is the timeframe in a different format than all the other emails?

A. I don't think it is. I think that's the same format.

This does not seem different to me.

You know, it's got a from, to, cc, subject and a date. That's the format we use.

Q. And the time 3:53 p.m.. None of the other emails from that same day that we have the seconds.
A. I can't say. It may be that our technological people, IT people, may have printed this out. I don't know.
Q. Mr. Bergenn, we'll move on to another subject.
You've said at the Rule 11 hearing that you had previous hearings -- previous extension before this court, before Judge Chatigny, do you recall that?
A. I don't recall that, but I do believe I have had previous sentencings before this Court.
Q. I'm going to mark an exhibit.
MR. FROST: Your Honor, I spoke to the government prior to starting the proceedings about this exhibit and it's my understanding there's no objection. It's going to be Plaintiff's Exhibit 22.
BY MR. RIVERNIDER:
Q. Mr. Bergenn, do you recognize the email and can you tell who it's from, the second email?
A. The second email, at least not in time, but on the piece of paper, is from Attorney John Durham, it's sent to me and to Michael Goldsticker, who was the judicial law clerk for the Judge, and it's copied to all the lawyers with appearances in the case, as well as Patricia Vargo.
Q. And this is Sunday night, February 24, 2013 at

5:51 p.m., correct?

A. Yes.

Q. And just 5:51 p.m.?

A. That's correct.

Q. And at number two, Mr. Durham writes -- if you can read, I believe it's the second sentence, where it starts "this is especially."

A. "This is especially important in this case so, for example, there is a written explication in the defendant's own hand as to what he admits to doing that violated the federal statute at issue in each count of the indictment."

Q. Was there a written explication submitted in this case?

A. Yes, but not in your own hand.

Q. And isn't it the court rules to submit a written admission?

A. Well, we submitted the admission in writing of offense conduct.

Q. But it wasn't in my own hand, which is one of the court's rules, correct?

A. I can't speak to that. I think it's a custom and a practice, but in cases such as this when it's a very large, complicated case, and in other cases that are similar, there has been, like in this case, back and forth between the defendant and his counsel and the government

to explicate the facts, and that is in writing; and the form that the Court uses does permit you to write it all out yourself and it also permits you to make reference to a previously written, and in this case written and typed, document.

Q. In fact, didn't Judge Chatigny at the Rule 11 hearing ask you for a written admission?

A. I don't have the hearing in front of me. I imagine that we could not have gone through it without him insisting on seeing one, and I do know that one was provided.

Q. And didn't you say to Judge Chatigny that there wasn't time to write out a written explanation?

A. I don't know. I'd have to see the transcript.

Q. We'll pull that up for you.

MR. FROST: Putting up on the screen Plaintiff's Exhibit 15, which is the change of plea transcript from February 25, 2013, and I'm on page 41.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, can you read lines 5 through 9?

A. "And just if you could, Your Honor, it probably makes sense to attach -- there wasn't time to hand write out the two-page single spaced admission, but I would propose that that be appended to the application of the petition."

Q. And didn't you testify that we were in court for most

of the morning from 9:30 until it starts at 12:15; if we were in court all that time, why wasn't there time to hand write an admission?

A. I don't know the answer to that question.

Q. The reason there wasn't time is because we didn't get there until after 11:00 because we were in your office all morning and I wasn't pleading, isn't that true, Mr. Bergenn?

A. Not to my memory, no.

Q. So your memory isn't very good for the Monday morning we talked about, correct?

MR. SCHMEISSER: Objection, Your Honor. It's plainly argumentative.

A. What I indicated is I know I spent four hours with you from approximately 8:00 until noon. I don't recall specifically where I was located with you at each of those four hours. I gave you my best memory because that's all I can do. I can't do more than that.

BY MR. RIVERNIDER:

Q. Maybe this will help your memory. We're going to submit an exhibit here.

MR. SCHMEISSER: Your Honor, this is an email from Mr. Rivernider to Mr. Bergenn on Sunday, August 25, 2013, long after the events at issue.

I assume that because the body of the email is

basically Mr. Rivernider writing to Mr. Bergenn and Mr. Chase that Mr. Rivernider is going to read in his statement and suggest to Mr. Bergenn something.

But in any event, it is long past the events at issue and it would be the government's position that it's not relevant for this particular hearing.

MR. FROST: Your Honor, just to sort of help move this along, he's not intending, is my understanding, to comment on the majority of what's in the email. I think he's going to draw the witness's attention to the second paragraph where there's a reference to what he says is the meeting that they had in the office on that weekend. And that would be the limited purpose of the email being offered.

THE COURT: All right. You may proceed.

MR. RIVERNIDER: Thank you, Your Honor.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, do you recognize the email and who it's from and who it's to?

A. I can read the top. I don't yet recognize it because I haven't read it yet.

(Pause)

Q. Can you just say who it's from and who it's to?

A. From you to me and Attorney Chase dated August 25, 2013 at 8:46 p.m.

Q. Can you read the first line of the second paragraph?
A. To myself or --
Q. You can read it out loud.
A. "In fact, if you recall that fateful morning sitting in your office for several hours right before I did the unthinkable" --
Q. Wouldn't that reference to the unthinkable be the pleading?
A. Oh, I don't know, I haven't finished reading the sentence. I haven't read this sentence since Sunday, August 25, 2013. So it being four and a half years ago, I might want to at least just finish reading the sentence before I address any of its contents.
Q. Please do so.
A. Can I please read that to myself just for efficiency.
(Pause)
A. All right, so the question is -- well, given what your allegations have been in this matter right now, I don't think there's anything else to which you would have made reference as unthinkable than your plea, and so this would have been your expression of your memory of having sat in my office for several hours.
Q. And the several hours would be Monday morning sitting in your office?
A. That's a reasonable inference. I can't speak to for

sure.
Q. You didn't respond to this and deny that we were sitting in your office for several hours on Monday morning, February 25, correct?
A. I don't know. I -- I mean, this is the first time I've seen this in four, whatever how many years. I'd have to look at my emails.
Most of the time I, as you have seen in this case, was very responsive.
Q. Per the Court's order, this is an email in the timeframe that Shipman was to turn over every email that you had to me. This is the email that I have, and the only email regarding this, in that timeframe.
So if you have another email, it would have been turned over, right, correct?
A. I did not get involved in that process. I think counsel for the firm was working with counsel for the government and with your counsel to do that.
I'm here as a witness. I don't know the answer to your question.
Q. So if we're sitting in your office for several hours, as this says, as I've testified to, we weren't down at the courthouse, were we?
A. That is a question that answers itself.
If I assume that we were in our office and we were

not bi-locating, we were not here.
Q. And Dr. Filippopoulos would have been with us the whole time, correct?
A. In your hypothetical, it would be reasonable to infer that she was. I don't know. Because I just don't have this memory.
Q. Based on your previous testimony, you drove Dr. Filippopoulos and me to the courthouse, correct?
A. That's my best memory.
Q. Okay. So if you drove us, then she would have been with us in your office because she arrived at 8:13 a.m..
A. Again, when you're asking me about inferences, I can make them, but if you're asking me as a witness, I'm just telling you, I don't have a specific memory of physically where I was when I was with you.
The one thing I know for sure is I was with you from 8:00 until 12:00 or the time of the plea.
Q. And you --
A. I also know with respect to this question that Dr. Filippopoulos had come in at 8:13, and she was to make herself available.
Q. It's your testimony that you said you don't have a specific memory as to where we were?
A. And the answer is, at that time as between, say, 8:35 and 10:30 -- which is what I've been told from

Chase's affidavit was when your sister's plea wrapped up -- for those two hours, I cannot remember whether we were in my office or here or part of each.

Q. So if we were still down in your office, we weren't here for the change of plea and we weren't here for the change of plea, you would have been getting pretty frustrated because everybody else was down here, wouldn't you?

A. No.

MR. SCHMEISSER: Objection to the form of the question, Your Honor.

A. No, no.

If I were in my office --

THE COURT: Overruled.

BY MR. RIVERNIDER:

Q. So if we're --

A. I'm now answering your question; it was overruled.

Q. Sir --

A. You have to let me answer.

Q. We're in your office --

A. I have your question in mind, I'm going to answer it.

That if I'm in my office, it's because I know the Court is not expecting me to be here.

My earlier answers and my memory were based on the premise, having looked at the emails that said we're due

at 9:00 or then at 8:00, and my knowledge that I don't go late to court, that's where my memory put me here.

If in fact I were there at my office, it would be because I was specifically informed of what was happening over here in court, therefore there was no pressure whatsoever for me to be in court. I would have been at the office doing my job, which with you would have been the same if I was here or there.

Q. And if we're in your office and it's after 11:00, Dr. Filippopoulos is with us, the reason we'd be there is because I'm still refusing to plea, correct?

A. No. But I wouldn't say that.

I don't have any memory that morning of you ever refusing to plea, that morning, other than your email where you expressed yourself while you were all by yourself and focusing, as you tended to, on your half of the case and not on the victims' half, that's what you expressed.

From the time that I was with you until the time of your plea, I don't have a memory of you not focusing on both sides of the case; and that was my job.

Q. Would it help --

A. And when you focused on both sides of the case, there was never, at that time when you looked at both sides, because you knew the facts of both sides, you were

interested and prepared to plead, to get the advantage of a plea as distinguished from the alternative.

Q. Mr. Bergenn, would it help your memory if I told you that I had testified that I was sitting in a chair in your office and you were standing over me and you said, screaming, "I can't go back in there" and pounded the table? Does that help your memory, Mr. Bergenn?

A. Well, no.

Q. No?

A. No. I -- no.

Q. Does it help your memory that we had multiple conversations that day and after that, for months after that, that were heated arguments? Does that help your memory?

A. Well, actually what I did was I examined all the documentation I had from my communications with you during that period of time, which were basically the emails; and in every one of those emails, I didn't see a single concern like this.

The first one now, and you're showing me this one in August, which would have been however many months after February --

Q. Would it help your memory --

A. Six months.

Q. I'm sorry.

A. So I can't tell you whether before August you had started to express those things.

I can tell you that I did examine the emails on Tuesday, on Wednesday, on Thursday and Friday of that week and I also examined emails for the subsequent months, and during that period of time, you were not focused on saying you didn't know or that you were forced. I never heard this issue of forced until well later.

Q. Would it help your memory if you reviewed your emails and the emails showed that shortly after in motions that I filed, the motion to stay surrender, where I've attached emails from March 8 and emails ongoing, that showed I was asking you for depositions or transcripts and records; would that help your memory?

A. I don't know. What are you asking me to remember?

All of the information that's relevant for trial is relevant for sentencing. So the fact that we would have gone back and forth and you had views about facts that would have been relevant for trial or sentencing would not shape the memory in response to a question.

If the question is coercion, I never heard or thought of the word "coercion" until long after.

Q. Mr. Bergenn, did you ever get emotional and pound the table in front of me?

A. Not to my knowledge, not to my memory.

Q. Did you ever say to me at any time, "Don't 'F' with me"?
A. Actually I do remember in September when you came in, because I had just read the notes that were provided to you, I read that this morning, and there was a point in time where you said to me on September 5 "Do you want me to just sign this?" And I think the notes that Mike Chase said is something to the effect of "Don't 'F' with me, we're going to go through this, we're going to go through this. It matters. I'm not fooling around here. This matters."
The fact is I may have used those words that time only because this is a very serious matter.
Q. And mr. Bergenn, didn't we also have a conversation months after pleading regarding the admission of offense of conduct where for the first time, you and Mr. Chase were going over it with me, you got through the first page, you couldn't continue on, said your wife was waiting downstairs for dinner, and that was a heated argument because it was the first time you ever went over the admission of offense of conduct with me, isn't that true?
A. I know to a certainty that that is false because I know to a certainty I went through every word of the statement of offense conduct with you multiple times, multiple drafts.

Then when the minor tweak proposed by Attorney Schmeisser was made, I went through it again.

Q. And who is that --

A. Excuse me -- and you read it again with me sitting next to you when we were in court, whether that was at 11:00 or 11:30, I don't know what time it was, but you had gone through that admission of offense conduct many, many times and I had gone through with you many, many times.

That's my memory.

MR. SCHMEISSER: Your Honor, we appear to be sort of rehashing issues that have been subject to much testimony. I'm just trying to get a sense from Mr. Rivernider how much longer.

MR. RIVERNIDER: Five minutes. I'm actually wrapping up.

MR. FROST: This will be Plaintiff's last exhibit.

Putting up what's been marked as Plaintiff's Exhibit 13. There's no objection, so we move that it be a full exhibit.

I don't know if we moved for the last exhibit to be a full exhibit, with that limited offer. Can we just make sure the record is clear on that?

THE COURT: The clerk and I have assumed that in the absence of objection, all of these would be made full

exhibits.

MR. FROST: Thank you, Your Honor.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, do you recognize the document on the screen?

A. I recognize many of the words on the document, but I can't say for sure where this particular document fit within the multiple drafts we went through.

Q. Mr. Bergenn, isn't this the document that you had with you at Dr. Filippopoulos's office that you pulled out and we went through and you made these changes and this is the document from Dr. Filippopoulos's office?

A. You know, if I -- can I actually see the document? That might help.

MR. FROST: Sure.

BY MR. RIVERNIDER:

Q. These are you handwritten notes, correct?

A. I definitely recognize the handwriting as mine.

MR. FROST: I'm just going to show the witness Plaintiff's Exhibit 4, which I believe is an unmarked up copy of what you're looking at now.

BY MR. RIVERNIDER:

Q. Do you recognize the document, Mr. Bergenn?

A. I'm just about done. It's actually helping me. I apologize for taking the time, but I want to be fair here.

(Pause)

A. I believe that this is the first document that is Exhibit 4, before I put notes on it, is the initial draft that I think Mike Chase had put together for me before we went out to Dr. Filippopoulos's office.

Q. Thank you.

A. And to your point, Exhibit 24 appears to be changes that I made, and I know that we went through facts, as I've indicated earlier, about the events when we were at Dr. Filippopoulos's office; and these logically I can infer, I can't give you a clear memory that that's what this is, but I can infer that these are notes I could have made in your presence with you when we were at Dr. Filippopoulos's office.

Q. Do you see the first paragraph where it says, "The defendant Rob H. Rivernider, Junior (herein Rivernider) and the Government stipulate to the following offense conduct"; do you see that?

A. Yes.

Q. So you got me to agree to plead guilty saying that I and the government would both stipulate to what's on this document, correct?

A. No. This is the form that is used typically for cases resolved by plea. You stipulate to offense conduct.

Q. And the government's going to stipulate as well,

correct?
A. That's the way it works. All guilty pleas in the end have to have some expression with respect to conduct.
There are sometimes government's versions and defense versions. In most, if not almost all of my cases, I seek with the government --
Q. Did you --
A. I have to be able to finish, so sorry.
-- seek to come up with that which is in common so it's easier for a court to focus on the sentence.
So this was a form that would have been the beginning of what we would be doing.
We had not yet spoken to the government. This was just a form that frames the facts.
Q. And this is the form and what I had agreed to that I was going to plead to that night on Saturday, correct?
A. This is the form that sets forth facts --
Q. And the government was going to stipulate to the facts?
A. Please, I've got to be able to answer.
The facts that were typed up were facts that we thought you'd agree to because of our other conversations with you, having gone through these facts many, many times.
The changes are, I infer, I can't remember

specifically, the changes would have been based on conversations with you to make the facts conform to what you were most comfortable with, and in my judgment would still pass muster with the government because it would suffice to hit the elements of the offense.

And our plan was, once we have sufficient facts to support the Judge's conclusion of a finding of guilt on a count, then it's over, then the government really is left without much to say.

If we agree to certain facts and the government agrees to those facts and the Court is satisfied that that is sufficient for the Court to recognize guilt, then we're done, we go onto the next count.

Q. Thank you. And this is a one-page document, correct?

A. That was one page at that time.

Q. And at some point the government decided they weren't going to stipulate to this, correct?

A. I can't remember whether we passed this along to the government.

I do remember that we talked about -- here, for example, this is Counts One and Nine, because in my ambition, what the heck, if I can get the government to agree to two counts, may as well try.

I remember explaining to you, the Judge could sentence you on all counts, so I also did not want to

fight. I didn't want to be resisting in front of the Judge when we were owning responsibility since the Judge was going to sentence you anyway on all of the conduct that he chose to.

The reason I'm telling you that information is at this stage I don't know whether we sent this along to the government, because I don't see a corrected version. I do know that there were later versions that were two pages, if not three pages long, that I know we sent to the government.

Q. And the government's stipulation came out on those other ones, correct?

A. I'm sorry?

Q. The government's stipulation that the government was stipulating was removed at some point because they wouldn't stipulate, is that correct?

A. Oh, I see what you're saying.

No.

Well, let me put it this way: They would prefer to have it characterized as an admission of offense conduct, and either way was perfectly fine with me. It made no difference to my objectives, which was to get you the best possible result in your case.

Q. And wasn't it the government's request or the government's direction to you that it be changed to an

admission from a stipulation and that they be removed?
A. The government preferred to call it an admission as opposed to a stipulation.
I think if I held firm and said no, no, no, it has to be a stipulation, I think the government would have been fine. But at that point I know it made no difference, and I was at that point trying to enlist the government's cooperation so I could get you through the guilty plea in a way that would have the Court receptive to ultimately what our argument was to get you the best possible result in your case, which was a substantially lower sentence.
Q. All right. And on the admission of offense of conduct that was submitted to Court -- I have a copy here, I'll just hold it up to you, you can take a look at it -- I signed the front page, correct?
A. If that's your signature, I'm not going to argue with you. I don't have it in front of me.
Q. This is Government's Exhibit 1, the admission of offense of conduct that was submitted to the Court.
Do you see my signature on the front page, Mr. Bergenn?
A. On the front page of what is labeled -- the top of that page, page 12 of 17 on this exhibit, I believe, is labeled "Admission of Offense Conduct," at the bottom is your signature.

Q. And on the second page or the third page, does my signature appear?
A. It does not.
Q. If we had a video, the video surveillance of the courtroom proceedings that day for when that was handed to me and moments before when Mr. Schmeisser returned and you dropped that document in front of me, isn't it true that that video would show that I did not turn those pages, that I did not read that document, and I signed the first page as instructed?
A. Nope.
MR. SCHMEISSER: Objection, Your Honor, to the several clauses leading up to the actual question.
THE COURT: All right.
BY MR. RIVERNIDER:
Q. Isn't it true that I filed a motion in October requesting the video surveillance of the courtroom for that day; are you aware of that?
A. I am not.
Q. You're not aware that I filed a motion requesting the video surveillance?
A. Not as I sit here today. I may have at the time.
Q. At the previous hearing you said, "And he asked for the video"; you remember that? And you never even thought of the video?

A. I do remember never having thought of the video in the courtroom until these proceedings, and I don't remember back then you asking for one.

I may have back then been aware of it, but I just never thought of video surveillance in a federal courtroom.

Q. Are you aware that court reporters' notes are required to be held for at least ten years but video surveillance of a courtroom you can't get?

A. I did not know.

Q. Mr. Bergenn, I got one last question, are you seriously sitting there today saying that I knowingly, intentionally pled guilty knowing that I would be abandoning my kids for 12 years?

A. No. I'm saying --

Q. Thank you, no more questions.

A. I'm answering your question.

I am saying that you knowingly, intentionally and voluntarily chose to plead instead of knowingly, intelligently and voluntarily choosing to continue to get sentenced -- continue the trial and then be sentenced, and that was in order for you more quickly to be with your children because of the choice between --

Q. Mr. Bergenn --

A. -- getting a sentence after accepting responsibility

and getting a sentence after not accepting responsibility.

So I am seriously reporting that experience I had with you.

Q. If there's no more getting back to my kids, 12 years or 26 years, there's no more getting back now.

I have no more questions.

MR. SCHMEISSER: Your Honor, should I proceed or does it make sense to take a short break for the court reporter?

THE COURT: Darlene, any preference?

(Whereupon, a recess followed)

MR. SCHMEISSER: Thank you, Your Honor. I don't have that much to cover, but I would like to go through some different areas.

CROSS-EXAMINATION

BY MR. SCHMEISSER:

Q. Good afternoon, Mr. Bergenn.

A. Hello.

Q. You had an occasion to prepare an affidavit dated November 14, 2017?

A. Yes.

Q. Do you have a copy of that affidavit in front of you?

A. I do.

Q. I'm going to go through -- and just as a general

matter, have you had occasion before today to again review this affidavit for its truth and accuracy?
A. I went through this affidavit before my last time, all the way through.
Q. And you've been subject to a number of questions from Mr. Rivernider.
Is it your testimony today that the affidavit still remains true and accurate as you sit here today?
A. Yes, to the best of my knowledge.
Q. Let me start first with a question just to follow up on some of the last questions that Mr. Rivernider had, and that had to do with your scheduling of an appointment after the guilty plea; do you recall those lines of questions?
A. I do.
Q. Do you recall your answer that you had scheduled an appointment after the guilty plea actually took place?
A. Correct.
Q. As you were proceeding after that weekend before the guilty plea, was there any intention in your mind to shortchange Mr. Rivernider in his representation by scheduling matters the following week?
A. No. We were still preparing cross-examinations.
Q. So if in fact the case had continued, was it your intention to actually be here in front of Judge Chatigny

with that trial?

A. With the cross-examinations already prepared in my hand, yes.

Q. And it was your intention actually to work late into the night in preparation of this case?

A. Just like all the other days.

Q. And in fact, you had been working extensively on this case for sometime, is that fair to say?

A. That's right.

Q. So let me direct your attention now to page 6 of the affidavit and just go through a couple of these areas as it relates to Mr. Rivernider.

Paragraph 13, you indicated that "His legal skills were as good as any non-attorney client I'd ever represented."

As you sit here today, is that still a true statement?

A. Yes, pretty remarkable; even in court.

Q. And just very briefly, can you explain what was your basis for asserting that "His legal skills were as good as any non-attorney client I'd ever represented"?

A. Yes. Every time we had an issue, he was conversant in the facts and typically would go independently research the law, and then we would focus on those aspects of the cases that were particularly germane to whatever the

subject was; and when he brought up facts and we would then bring up other facts, he would then know where to go look to find responsive facts to those we brought up.

So it was like having more than another full-time paralegal.

Q. Is it fair to say that Mr. Rivernider was someone who actually read things carefully?

A. Very carefully.

Q. And would actually read them repeatedly to make sure he understood exactly what they said?

A. I know he read repeatedly the subject matter of this plea because that's what we spent the weekend on. But most of the time when he was doing his reading, he was not with me, he'd be either in another room or he'd be where ever he was.

So I can't fairly say everything he read --

Q. That's understandable. You were not personally observing him all the time because he was in Florida, right?

A. Exactly.

Q. Based on your interaction with him, it was clear to you throughout the investigation, it was clear to you that he was looking at material and reading it carefully?

A. Yes. Every time we engaged on any factual chapter or subpart of the case, his recall of the events was

remarkable and his access to the material that would be responsive to those events was terrific.

Q. Now, you continue in that paragraph to say, "Mr. Rivernider was clearly one of the most competent clients with whom I have worked in helping with the preparation of the defense."

That statement is true as you sit here today?

A. Yes, it is.

Q. So there is a word here in terms of competency, which we'll get into a little bit later, but during your dealings with Mr. Rivernider, your an interactions with him throughout this case, was there any question in your mind that based on your dealing with him that he was legally competent to proceed in this case?

A. It never was in question.

Q. And that in part was because of your interactions, your dealings, with him and your observations?

A. Yes. In fact, when it was I wanted to get him evaluated, it was so that I could continue to do my job with him.

It never occurred to me that he didn't understand the nature of the proceedings or had the ability to assist me. In fact, he would get an A-plus in both of those.

The issue was something other than that. He could always understand, but like a rubber band, he'd always

snap back to his preexisting thinking.

But it was never that he didn't understand. He followed me at all times and he expressed himself logically at all times.

Q. And in terms of legal competence for proceeding with trial and subsequently with the plea and, frankly, later at sentencing, in your dealings with any of your experts, did any of your experts at any point suggest that he was legally incompetent to proceed with any of those matters?

A. No.

Q. Now, your affidavit continues and says, "He was also very strong willed," and this is again paragraph 13 on page 6.

As you sit here today, is that still your assessment of Mr. Rivernider?

A. Yes. It is a strength of his, and sometimes it can be a problem.

Q. So if there was something that he took issue with, he was willing to raise it up to you?

A. Willing is an understatement.

Q. And that was something that went back to the earliest times when you had first dealt with him, is that fair to say?

A. Well, yes. It's not common in my 37 or 38 years doing this that somebody is able to discharge a lawyer

that's appointed for free. The fact that he was able to essentially discharge a lawyer and get me to come in, along with a team, was pretty impressive in and of itself.

But in all of our dealings with him, he was sharp.

Q. And when you're referring to the lawyer, you're talking about Attorney Saden who had handled his representation before him?

A. Along with Brian Timms, yes.

Q. So was it your experience of Mr. Rivernider when he disagreed with a position that you were taking, that you would know it?

A. Oh, yes, I would know it.

Q. Let me direct your attention now to paragraph -- actually page 13 of your affidavit, paragraph 12.

Directing you to the second week of trial in this case.

A. Hold on. I'm on page 13.

Q. Page 13, paragraph 26. I'm sorry, I misspoke.

Do you see paragraph 26?

A. I do.

Q. And in this paragraph, it says, "It" -- being the government's evidence -- "focused more sharply on specific statements Mr. Rivernider made or material facts he omitted."

And that's referencing the way the government was

presenting its case at trial?
A. Yes.
Q. And in terms of evidence that was being presented, was it evidence that you thought was favorable for Mr. Rivernider as a general matter or unfavorable for Mr. Rivernider's case?
A. It was very harmful.
Q. So you go on to say in the next sentence, "We believe the jury was likely to conclude from this evidence that Mr. Rivernider knew that statements the witnesses read or heard before providing Mr. Rivernider with their money were not true and/or omitted material information available to him."
You see that sentence?
A. I do.
Q. And as you sit here today, when you indicate we's believed," who are you saying "we believed"?
A. Well, at the time it started with me and Mr. Chase and of course Patricia Vargo was involved at all times, and since we were discussing the evidence all the time with our client, we discussed with him our conclusions day-to-day.
We would focus on what happened during the day and what its significance was.
Q. And I will turn shortly to the dinner meeting on

February 22, that evening.

But as you got through that Friday afternoon before that -- that weekend before the guilty plea, is it fair to say that there had been, in your mind, evidence -- substantial evidence -- presented at trial that was harmful for your client?

A. Yes.

Q. And as you looked forward to the following week in terms of testimony that you anticipated, did you anticipate that there would be additional harmful testimony coming down the pike as it related to your client?

A. Oh, yes. It was very clear that the government had sort of stopped its original plan, which was broad, and was much more laser-like, more focused, on facts that we had then discussed with the client.

Q. In fact, as you looked towards the next week, is it fair to say -- and actually a close relative of Mr. Rivernider would be testifying, Ms. Laporte?

A. I believe that is true. I believe that was his other sister or his brother-in-law. I can't remember specifically which relative it was.

Q. Based on your general view of evidence relating to Ms. Laporte, whether it be emails or otherwise, the testimony that Ms. Laporte, a sister, was going to provide

relating to Mr. Rivernider would not be favorable to Mr. Rivernider?

A. That's correct.

Q. And also we've had some discussion about a Tosha Wade; do you recall her name?

A. I do.

Q. Do you recall that the government had on its exhibit list a number of emails from Mr. Rivernider, the defendant, with Ms. Wade?

A. Yes.

Q. And in fact, on your review on a number of those emails between Ms. Wade and Mr. Rivernider, many of those emails were not favorable to the defendant?

A. Well, there was so much in those emails -- and frankly I looked forward to having some fun with those emails. There were a lot of things we were going to bring out favorable, but there were a lot of things in there unfavorable.

The net of it was it was not going to help. To the extent she seemed honestly to believe some things that I thought were not true, and the Judge was going to be witnessing her, I just didn't think that was going to help him, and it really did not change the core facts which we could not beat.

The plea was not because of what was going to happen

the following week, it was what had already happened and what I knew was going to be happening with the balance of the trial.

At that point, you folks, the government, were focused on the core facts that were true.

Q. Let me continue, paragraph 27 of the affidavit -- let me ask you: Paragraph 27 talks about Mr. Rivernider responded in a very unexpected way in discussing the very damaging evidence that had been presented during the second week of trial at a dinner meeting.

You see that sentence?

A. I do.

Q. And that's referring to the dinner meeting at Peppercorn's on the evening of Friday, February 22, is that right?

A. Correct.

Q. And so it's your testimony today that on that evening at the meeting at Peppercorn's, you discussed with Mr. Rivernider the very damaging evidence that had been presented during the second week of trial, is that correct?

A. Yes. He discussed it too. He saw it, he understood it.

Q. But that was basically one of the subject matters that you were discussing at that meeting?

A. It was the impetus of the meeting; and, yes, that was a big focus of the meeting.
Q. Let me direct your attention now to paragraph 29 of the affidavit, and you indicate in the affidavit, "We explained again the results of his prior neuropsychological testing."
"We," is that Mr. Chase and you?
A. Yes.
Q. And this is taking place at the dinner meeting the evening of Friday, February 22, is that correct?
A. Right. And the dinner, meaning the dinnertime meeting more than like a full -- it was the meatball meeting.
Q. That's right. The meeting that took place at Peppercorn's in the evening, is that correct?
A. Yes.
Q. So as you're testifying here today, it's your recollection that you explained at that meeting the results of his prior neuropsychological testing, there was discussion of the neuropsychological testing?
A. Yes.
Q. Now -- and also at that meeting on that evening, if we move further down paragraph 29, it indicates "We explained to Mr. Rivernider that with the evidence before the jury and the evidence still to come into the record,

we did not believe we could win any of the counts at trial"; do you recall having that conversation with him that evening?

A. Yes.

Q. Turning your attention to page 15, paragraph 31, in the middle you indicated that "We reiterated that the decision to change his plea was Mr. Rivernider's alone and that we were prepared to continue putting on our case in his defense at trial."

That also -- is that correct?

A. Yes. I mean, he obviously understood this already, but we discussed it because we were ready.

Q. And that was part of some of the things that were discussed at this Friday evening meeting?

A. Right. We didn't spend a lot of time on that because there was so much other things to talk about. But we did talk about that.

Q. Did you also talk about at that meeting, as it says in paragraph 32, first sentence, "We explained that in the light of what he was now expressing and demonstrating to us about the effect the victims' testimony had on him, it made much more sense to acknowledge what he did, show remorse and accept responsibility for his conduct by changing his plea." You see that sentence?

A. I do.

Q. Did that take place on that Friday evening?
A. That was the core of the meeting and the core of the weekend and the core of the plea.
Q. And that was something that when you say "we explained," it was you and Attorney Chase?
A. Yes.
Q. And then it continues on, and says "We pointed out the potential benefits of agreeing to a guilty plea, including being in a stronger position to argue for a better sentencing."
Do you see that language?
A. Yes.
Q. And that was one of the things that was discussed with him?
A. Right. Because if we went to trial and finished the trial, watching these people, if he felt bane and anguish, for sure, so did everybody else in that courtroom.
Q. And so is it true that in fact that was part of the discussion that evening?
A. Yes.
Q. Now, turning your attention to the top of page 17, paragraph 35, it indicates that Mr. Rivernider decided to pursue the second accepting responsibility by admitting those facts that he knew were true and that supported a conviction and change of his plea of guilty.

You see that sentence?
A. Yes.
Q. Was that a subject that was discussed at the dinner meeting on that Friday evening?
A. Yes. It was a very heavy, emotional meeting, and I knew there was going to be a pretty big weekend ahead; so it wasn't like a cross-examination, it was --
Q. A discussion?
A. Yes.
Q. And actually that gets to Mr. Rivernider's tone during that meeting.
Was his tone -- describe his tone, what was his tone that day?
A. He was subdued, he was, you might use the word chastened, but I don't like that word.
He was feeling compassion for the victims, even as I was sitting with him. He retained that other half of the case, which he there before had not indicated at all.
Q. And when you say -- just to be clear about this -- when you say "there before had not indicated at all," he showed to you an empathy for the victims; is that fair to say?
A. A specific empathy for these victims.
He showed general empathy for the human race, many times. He was actually -- I enjoyed working with him --

but this was the first time he focused that aspect of his personality on these victims, and he retained -- that whole meeting, to my memory, was meaningful because he was very emotionally present about both sides of the case.
Q. All right. Now, let me turn your attention now to paragraph 38 on page 18, and turning now to the Saturday, the next day, February 23, I believe, is that correct?
A. Saturday in the beginning -- 37 is about Saturday and then 38 is also about that Saturday.
Q. So in the affidavit there you say that "That same day, after he and I left Dr. Filippopoulos's office, Attorney Chase, Mr. Rivernider and I spent several more hours reviewing by phone in person and in email the many specific core facts of each count of the indictment," is that right?
A. That's correct.
Q. So there was a lot of discussion earlier today about a shorter version of the stipulation of conduct that you had at Dr. Filippopoulos's office, is that right?
A. I remember, yes.
Q. So there were additional facts that were discussed and the stipulation was developed to a much longer document, is that right?
A. That's correct.
Q. Further down on paragraph 39, you indicated that

Mr. Rivernider participated in the review, drafting and redrafting of the stipulation of offense conduct as actively as he had participated in all the other defense work asking very pointed questions and suggesting many changes; is that a true statement?

A. Yes.

Q. And then let me direct your attention now to page 19, paragraph 40.

Paragraph 40 begins on Sunday, February 24th; do you see that language?

A. Yes.

Q. And it indicates that "Mr. Rivernider, Attorney Chase and I met again in our offices for approximately seven hours"; do you see that?

A. I do.

Q. During this seven-hour time period, can you describe to the Court what Mr. Rivernider's tone or demeanor was during that time period?

A. He was alert, he was engaged, he was sharp.

There were times when he was resigned, but more often he was acute.

We were really dealing with the nits, if you will, of what was true, because I knew, given his personality and his experience with us, that the only things that we would ask him to consider pleading to were things that he

actually knew were true.
Q. In terms of tone, he was actually in a -- he had a demeanor that he was able to discuss things with you in a very evenhanded way, is that fair?
A. Very engaged, yes.
Q. Now, you indicate in paragraph 48, it continues, that "You reviewed word for word each of the facts in various drafts of the stipulation of offense conduct?
A. That's correct.
Q. That's talking about reviewing with Mr. Rivernider, is that correct?
A. That is correct.
Q. Now directing your attention to the bottom of 41, it indicates -- the affidavit indicates "Mr. Rivernider acknowledged the truth of the core" -- let me restate that.
So looking at paragraph 41, page 19, do you see that?
A. Yes.
Q. And there's a sentence that I believe is about four sentences in; do you see that?
A. Yes.
Q. The sentence says, "Mr. Rivernider acknowledged the truth of the core necessary factual allegations that during the operative time period, 2007, when he took in the money of the alleged victims, he intended to take

their money knowing that there was more risk of loss than the victims were made aware of"; do you see that statement?
A. Yes.
Q. And this is in your affidavit, is that correct?
A. Right.
Q. And this was under oath?
A. Yes.
Q. And that's a true statement?
A. Yes. And this covers both sides, the ponzi scheme and the mortgage fraud.
Q. And just so the record is clear, as -- strike that and let me rephrase this.
As it relates to the statement that "during the operative time period 2007 when he, Mr. Rivernider, took in the money of the alleged victims, he intended to take their money knowing that there was more risk of loss than the victims were made aware of"; do you see that language again?
A. I do.
Q. And that refers to during the operative time period, 2007, is that right?
A. Yes.
Q. So it's actually during the time of the charged conduct he had that intent, is that correct, according to

your statement?
A. That's correct.
Q. Just so the record is clear, that during the charged time, in other words, the period of 2007, he had that intent as indicated in that paragraph, is that right?
A. Yes. The intent --
Q. Let me just ask again --
A. Filled with the knowledge, right.
Q. The intent with knowledge.
A. Right.
Q. Let me direct your attention now to paragraph 43, and it's again, to some degree, it's repeating -- let me strike that and say:
You see paragraph 43 on page 20?
A. Yes, I'm reading it now.
Q. It says, "After Sunday's work reviewing with Mr. Rivernider each word of the post admission of offense conduct and assuring that he agreed with the truth of all facts contained therein," you email to the prosecutors the proposed admission. Do you see that?
A. I do.
Q. So in other words, the draft at that point in time had been reviewed with Mr. Rivernider, is that fair?
A. We were finished at that point.
Q. So let me direct your attention now to page 22 in

paragraph 46, and this is turning to Monday morning; do you see that?

A. Yes.

Q. You indicate in paragraph 46 that "We went to court Monday morning with Mr. Rivernider's having again affirmed his decision to enter a guilty plea"; do you see that language?

A. Yes.

Q. "And we talked at length about it this morning."

But that morning of Monday before the guilty plea, he had affirmed to you that he was again going to be pleading guilty, is that fair?

A. That is correct.

Q. All right and in terms of his overall tone and demeanor that morning, I understand there are limitations which you can remember, but if you try to focus on his tone or demeanor, how would you describe that that morning?

A. I think it was resignation. He was calm.

Q. Now, further on paragraph 46, it says, "During the morning of his own change of plea while Mr. Rivernider's sister, a defendant, were changing her own plea of guilty," you sat -- or "I sat" -- you sat -- "I" being you sat with Mr. Rivernider in the other courtroom reviewing the extensive form the Court used for guilty pleas, is

that correct?
A. That is correct.
Q. And when you're talking about the extensive form the Court used for guilty pleas, is that fair that's the Rivernider plea petition that is reflected as Government's Exhibit 1?
A. Yes.
Q. And let me ask you about this plea petition Government's Exhibit 1.
Whose handwriting is that on the plea petition?
A. The first page is Mr. Rivernider's.
Q. As you were sitting there with Mr. Rivernider, did he have occasion to actually read this document?
A. Oh, yeah, we both read it together.
Q. When you say "read it together," what does that mean?
A. Our eyeballs were looking at the same words and we're just sitting there and reading it.
Q. To give the Court a better idea, reviewing it, flipping to the next page, was it being read out loud or --
A. It wasn't being read out loud, but it was being read at a pace where it was plain that we were both reading it together.
I wasn't telling him "write in Robert Henry Rivernider." In fact, this is the first time I've ever

noticed his middle name was Henry. He was filling this in himself as I'm sitting there and reading it also.

Q. And his reviewing this and signing this in, that was consistent with your experience that he would actually review things that you provided him to read?

A. More than any other client I've ever had.

Q. Now, on paragraph 46, it continues and it says, "Again Mr. Rivernider expressly consented to the admission of offense conduct containing his admission to each of the facts necessary for the Court to accept his plea of guilty to each of the counts"; do you see that language?

A. I do.

Q. And so that consent took place again on that Monday morning, is that right?

A. That's correct.

Q. And you reviewed the statement with him that Monday morning before he pled guilty, is that right?

A. I did.

Q. Now, turning your attention to page 23, paragraph 48, the last several sentences, it indicates, the affidavit indicates, "During the time before the court session on his change of plea, I reviewed with Mr. Rivernider the final typed version of the admission of offense conduct as revised that morning prior to his signing it."

Is that true?

A. Yes.

Q. And that final typed version of the admission of offense conduct, that was the one that was actually presented to Judge Chatigny for purposes of a guilty plea?

A. That is correct.

Q. Let me direct your attention to the next page, page 24.

There's furious allegations that Mr. Rivernider has made in this proceeding, and I just wanted your response to them now that you're on the stand.

Paragraph 50 it says, you indicated, "I never at any point said or indicated that we would not go back to trial."

Is that correct?

A. Absolutely true.

Q. So if Mr. Rivernider is saying that in fact you did say -- actually strike that.

Let me go to the next paragraph, paragraph 51.

You see it says, "At no time did I or Attorney Chase in my presence suggest that he was guaranteed a sentence to a camp.

Is that true?

A. Yes.

Q. So at no time did you make any such guarantee, is that right?

A. To any client any time in my career, much less to him with the largest ponzi scheme mortgage fraud case in Connecticut.
Q. Why is that the case, why wouldn't you tell a client something like that?
A. Because I can't. It would be malpractice and it would gum up everything. It's up to the Judge, and the Judge is influenced by the guidelines. But we don't have pleas, in my experience in this district, binding judges.
Q. So let me direct you to paragraph 52. It says, "There was no discussions about promises to get to see his kids as soon as possible."
Is that also true?
A. That's correct, other than implicitly the less time you do, the sooner you get to see your kids. But it wasn't a promise you get to see your kids specific, other than I knew he wanted to be with his children.
Q. All right. Let me direct your attention now back to that plea petition and the attached admission of offense conduct, Government's Exhibit 1.
So I have on the Elmo in front of you Government's Exhibit 1, admission of offense conduct; do you see that?
A. Yes, I do.
Q. And directing your attention down to the fourth paragraph, it says, "He knew clients were led to believe

that almost all of their monthly payments and those of other participants in the program were being made from realized returns on already actively paying investments when they were not."

Did you discuss that information with Mr. Rivernider?

A. At length. That part we had discussed for months, frankly.

Q. And he had acknowledged that as true?

A. When he was focused on it, absolutely true. He knew it. Because I was always looking for evidence contrary, and we could never find any.

Q. And he knew that as of the time that the scheme was going on, is that fair to say?

A. Well, it was always true, other than sometimes he might have believed otherwise; but when we actually looked for evidence, there was never any evidence that money paid out to victims was from investment returns.

Q. And when you're saying you believed otherwise, he had made some claims at different points in the case that there were some payments that had been made to various people that came from investments, but you couldn't establish that as ever being the case?

A. Right.

And to put a finer point on it: He had sometimes invested in entities or people and was told in writings

that his money had grown to certain amounts and he had in his mind assumed that that was still his money, and there were other places where monies went that led him to believe that he was somehow using that growth of money to pay out.

But whenever we tracked actual bank records, we could never track any monies paid out to monies from investments. They always tracked back to, to the extent they could be tracked, to clients.

Q. So at the time that he pled guilty and submitted this admission of offense conduct, it's true and accurate that he knew clients were led to believe that almost all of their monthly payments and those of other participants in the program were being made from realized returns on already actively paying investments when they were not?

A. Right.

And it's important to learn that he wasn't the one who day-to-day interacted with clients, but based on the fact that he alone controlled the money that came in and went out and he alone controlled the information that went out to those who interacted with the clients, meant that he knew that the only basis for people to invest with him was the fact that he was a great investor and getting investment returns.

Q. So let me direct your attention now to further down

to the paragraph that starts with, "Rivernider accepted monies from Michael Mastoris, et cetera, and that Rivernider did not inform the foregoing individuals of the true use of their funds."

You see that language?

A. Give me just a moment, please.

(Pause)

A. Yes.

Q. Do you see that language in the admission of offense conduct?

A. That's what I was just looking at.

Q. I'm sorry?

A. Only because I don't see the top.

Yes, I see that. There you go, sorry.

Q. And, yes or no, that was a true statement at the time of the guilty plea, right?

A. Give me a moment, please.

Yes.

Q. Further down from the admission of offense conduct -- and we've talked a little bit about the sort of the mortgage fraud scheme today, is that right?

A. Not as much, but yes.

Q. But in terms of the actual losses in this case, the mortgage fraud scheme was a substantial portion of the losses in the case, is that fair to say?

A. Sure.

Q. And that the no more bills scheme was much more than in the range of around a million dollars, is that fair?

A. I really can't give you the exact amount. I just know it was a much smaller gross number than the mortgage fraud because of what happened to the real estate market.

Q. So it says in the admission of offense conduct at the bottom, "Rivernider further knew that examples of standard set monthly repayments not derived from actively paying investments and/or realized investment returns were used to encourage and did encourage no more bills clients to enter into real estate purchase agreements"; do you see that language?

A. Yes.

Q. And that is true -- that was true based on your discussions that you had with Mr. Rivernider, is that correct?

A. Well, and based on the evidence, yes.

Q. And also in your discussions with Mr. Rivernider, is that correct?

A. Yes.

Q. And in signing this admission of offense conduct, it was also his acknowledgment to its truth, is that fair?

A. Right. That was very clear.

Q. So turning to the next page, the second full

paragraph, you see the language where it says, "It was part of the conspiracy that Rivernider and others made material misrepresentations and material omissions and concealed material facts from the borrowers"; is that correct?

A. Yes.

Q. And that was true based on your discussions with Mr. Rivernider, is that right?

A. It is.

Q. And you continue to then outline various different ways there were material omissions and concealed material facts from the borrowers, is that right? As the paragraph continues?

A. Yes.

Q. All right. First there's a discussion about "including representing to the borrowers that Rivernider would arrange for the purchase of the properties by the borrowers when Rivernider frequently marked up the appraised value price the sellers agreed net amount to receive on the properties, often by as much as 25 percent, without disclosing the increase in the seller's agreed net amount"; do you see that language?

A. I do.

Q. And based on your review, the evidence at the time before the guilty plea, that is a true statement?

A. Yes.

Can I just have --

Q. And you had discussed that were Mr. Rivernider and he'd acknowledged that?

A. Just give me ten seconds, please.

(Pause)

A. Yes.

Q. Then the next paragraph it says, "It was also part of the conspiracy that others represented that the investment properties would return to the borrowers sufficient monies to cover the carrying costs as well as reduce the borrowers' other debt burden when Rivernider and others knew that the returns alone would not be sure to produce that amount of money"; do you see that language?

A. I do.

Q. And based on your discussions with Mr. Rivernider and your review of the evidence, that was true?

A. Yes, it was true.

Q. And the next paragraph it says, and this is I believe where it says "It was part of the conspiracy that Rivernider and others understood that certain of the borrowers material financial information provided on the 1003 loan applications would differ from information provided by the borrowers on DAS questionnaires"; do you see that language?

A. I do.
Q. And that was true based on your discussions with Mr. Rivernider and your review of the evidence, is that right?
A. That's correct.
Q. In fact, that was some of the discussion of those types of material and misrepresentations you actually referred to earlier today, is that fair?
A. That's correct.
Q. Now directing your attention to the next paragraph, it says, "It was part of the conspiracy that Rivernider, Shelly Kemp, and others caused to be represented in loan applications and other documents provided to the lenders a number of material misrepresentations"; do you see that language?
A. Yes.
Q. And based on your review of the evidence and your discussions with Mr. Rivernider, that statement was true, was it not?
A. Yes.
Q. And that goes on to actually identify various different types of material misrepresentations in the admission of offense conduct.
Do you see that?
A. Yes.

Q. And it says, "Including: One, the income earned by the respective borrower, which was routinely overstated."

You see that?

A. Yes.

Q. And that was factually true, is that correct, based on your review of the evidence and discussions with Mr. Rivernider?

A. Yes.

Q. And, number two, it says, "And the true earnest money payments coming from the borrower which were routinely fronted by no more bills funds at the direction of Rivernider."

You see that language?

A. I do.

Q. And that was also true going on based on your discussions with Mr. Rivernider and your review of the evidence, is that right?

A. Yes.

Q. So, in fact, before when you indicated that Mr. Rivernider controlled the actual monies, Mr. Rivernider was controlling monies that would actually often be paid to lending -- would actually go into borrowers' accounts to supply evidence that they had money to make true, earnest money payments, as it indicates here?

A. That is correct.
Q. So Mr. Rivernider discussed that with you in terms of your discussions in terms of how he was handling this real estate venture?
A. Yes. More than discussed. He studied the evidence, I studied the evidence. That was what the evidence was.
Q. Just so the record is clear: Money was being put in buyers' bank accounts so that banks could look at the account statements of the buyers and also buyers could then provide the bank with these, quote, earnest money payments, is that correct?
A. Yes.
Q. So, in other words, the impression that was being created was that the buyers were supplying money, in other words, they had skin in the game, is that right?
A. Yes.
And just to be clear, in Mr. Rivernider's mind, that was money he promised to pay them.
MR. RIVERNIDER: Objection, Your Honor. I don't know how he could speak to what was in my mind.
MR. SCHMEISSER: Let me go on.
BY MR. SCHMEISSER:
Q. So if we go down to the bottom of page 2, it says, "Rivernider knew that Kemp and others would and did enter on loan applications, figures" --

A. Could you just show it to me?
Q. I'm sorry.
A. That's okay, just -- thank you.
Q. At the bottom it says, "Rivernider knew that Kemp and others would and did enter on loan applications income figures which were higher than those provided to Rivernider by the borrowers in order to qualify them for loans"; do you see that language?
A. Yes, I see the first half of it.
Q. Let me ask you about that first half of it -- oh, I'm sorry, let me turn the page so you can see the entire statement.
Do you see the rest of the language?
A. Yes.
Q. Just so the record is clear, the sentence is, "Rivernider knew that Kemp and others would and did enter in loan applications income figures which were higher than those provided to Rivernider by the borrowers in order to qualify them for loans."
You see that sentence?
A. Yes.
Q. And that was factually true based on your review of the evidence and your discussions with Mr. Rivernider?
A. Yes.
Q. And it goes on to say, "Rivernider would also direct

Kemp and others to qualify borrowers for loans on the basis that the properties would be used as second homes in order to obtain a more favorable interest rate and loan to value ratio when in fact Rivernider knew that the properties would be used as investment properties."

Do you see that language?

A. I do.

Q. And that was factually true based on your review of the evidence and your discussions with Mr. Rivernider?

A. Correct.

Q. In fact, you've already testified today about the second home issue?

A. Yes.

Q. So I just have a last area to ask you about.

So at any time -- and I'm turning to page 30 of your affidavit, paragraph 73. It indicates "At no time did I tell Mr. Rivernider nor did I ever hear Attorney Chase tell Mr. Rivernider, in the form of a threat or otherwise, that we would not go back to trial on Monday," is that correct?

A. That's correct.

Q. And as you sit here today, that's a true statement?

A. That's true.

Q. And that you at -- at no time did you ever tell Mr. Rivernider that he would have to return to trial

without counsel; is that a true statement?
A. That is true.
Q. So at no time you made that statement to him?
A. Nor to anybody else ever.
Q. And it continues to say, "At no time did I tell Mr. Rivernider that Mr. Rivernider had to plead guilty because he had a serious brain deficiency/brain damage."
Do you see that language?
A. That is a true statement.
Q. So at no time you told him that?
A. That's correct.
Q. And also paragraph 73 it indicates at no time did you tell Mr. Rivernider that "we would not go back to trial after receiving Dr. Filippopoulos's report indicating that Mr. Rivernider had deficiencies in his executive functioning"; is that a true statement?
A. Correct. The entire trial took place after receiving that report.
Q. Again, as it related to that report and your dealings with the expert, at no time did you have any belief that Mr. Rivernider was not mentally competent to actually participate in the trial proceedings, in the plea or later at sentencing?
A. That's correct.
Q. Now, as you sit here today, is it fair to say that

you believe that Mr. Rivernider's plea was knowing, voluntary and intelligently made and not coerced by you?
A. I believe that.
Q. And is it fair to say that after the guilty plea, that you tried to do your best for your client, Mr. Rivernider?
A. Right. Frankly up until now, I'm still trying to do it, but I understand my obligations here.
Q. And you advocated at the loss hearing, is that right?
A. Yes.
Q. And you advocated at the two-day hearing relating to the mental health issues?
A. That's correct.
Q. Or the mental issues.
And then you also advocated very persuasively at the final sentencing hearing, is that right?
A. To the best of my ability.
MR. SCHMEISSER: May I have one moment, Your Honor?
THE COURT: Yes.
BY MR. SCHMEISSER:
Q. Now there's been some discussion of it, but I wanted to have you confirm it from where you are sitting right now, but there was actual discussions with Mr. Rivernider on or about September 5 of 2013, is that right?

A. That's correct.
Q. And there was discussions that actually took place in the morning of September 5 of 2013?
A. Correct.
Q. And where did those discussions take place?
A. Shipman & Goodwin.
Q. During the scores of these discussions, you actually reviewed with Mr. Rivernider the September 5 letter that we've been referring to?
A. Yes. That was the date on which the letter was signed.
Q. And that letter was reviewed with him on that date?
A. Word for word.
Q. When you say word for word, was that you reviewing with him or was anyone else there?
A. Mr. Chase was also with me, as was Mr. Rivernider.
Q. All right. And in terms of actually the signatures on that letter, did you see Mr. Rivernider sign that letter?
A. Yes.
Q. And so that was his original signature on the letter?
A. On the original letter, yes.
Q. And that signature was put on that original letter back on September 5 of 2013, is that right?
A. In the morning early, yes.

Q. I have no further questions.

THE COURT: Thank you.

MR. RIVERNIDER: Your Honor, I have a couple of things.

REDIRECT EXAMINATION

BY MR. RIVERNIDER:

Q. Mr. Bergenn, there has been some question about this stipulation that turned into an admission of offense of conduct.

You recall Mr. Schmeisser had made changes to the admission of offense of conduct just before the hearing, correct?

A. Correct.

Q. And during the hearing -- I just wonder if you can just read lines 11 through 17 for me. This is from the Rule 11 hearing.

MR. FROST: This is Plaintiff's Exhibit 15, page 45 of the change of plea transcript.

A. You're talking about what the Court was saying?

BY MR. RIVERNIDER:

Q. Yes.

A. "Listening to the no more bills witnesses, I was struck by their testimony that they thought that their money would be invested in foreign currency exchange

opportunities, and I gather from the admission you signed, their money wasn't going into those investments as promised," is that true?

Q. And line 17, the defendant, Your Honor --

MR. SCHMEISSER: Objection, Your Honor. He's already testified to this.

There doesn't appear to be a question as relating to this, so we're just sort of continuing to revisit the testimony that's already happened, and he's already had a chance to question the witness at length.

MR. RIVERNIDER: Your Honor, I'm just refreshing the recollection.

I don't know if we covered this before. Actually I don't know that we actually read this before, and basically just reading that in and then I'm going to go into what -- I'm going to let Mr. Frost introduce something else.

THE COURT: All right, so it's done.

MR. RIVERNIDER: It's done.

MR. FROST: There may be an objection to this exhibit, but if we can mark it for I.D. as the next exhibit?

MR. SCHMEISSER: Your Honor, as to this exhibit, again it's another email from back in I believe it's Sunday, I don't know what time it was, but it seems to be

rehashing areas that we've already gone through, again, that he's already asked Mr. Bergenn about.

MR. RIVERNIDER: Your Honor, they covered the admission of offense of conduct in detail. This is an email showing Mr. Bergenn -- me telling Mr. Bergenn that I'm not going to plea to what's in the indictment and Mr. Bergenn responding.

THE COURT: Is this not in evidence?

MR. FROST: It's not in evidence, Your Honor.

MR. SCHMEISSER: I don't have an objection to the email, it's just if we're going to go through a whole line of questioning that's duplicative of what we talked about before.

THE COURT: The document may be admitted.

BY MR. RIVERNIDER:

Q. Mr. Bergenn, you recognize the email that's up on the screen? Who it's from and to?

A. Give me a moment, please.

Q. Start at the second --

A. Just give me a moment. I'm going to read it.

(Pause)

A. Yes, I've read it.

Q. Why don't you go ahead and read the second part, it's an email you see from me to you and Mr. Chase, 5:55 a.m. on Sunday, February 24 copying Ms. Vargo, subject

indictment.

Why don't you go ahead and read that for us?

A. "Jim, I want to be clear about something. I just remembered what the actual counts are and reread them.

"Count One says that me and Ponte did unlawfully knowingly and intentionally conspire, blah-blah-blah.

"Count Nine says me, Ponte and Seneca did unlawfully knowingly and intentionally conspire, blah-blah-blah.

"I am not pleading to that language, and if the Judge asks me, I will say" -- all caps -- "that is absolutely not true. I would rather get on the stand, tell the truth and do 26 years than say that is true" -- all caps -- "it is not."

Q. And your response up at the top?

A. "I get that."

Q. So you knew that I wasn't going to plead to what was in the indictment because it wasn't true?

A. Wrong. I get you're now perseverating. You are now going back, and I also knew that that's not the language that you were going to plead guilty to.

So I get how you felt. So part of my job as a lawyer is to communicate effectively with you so you could trust, and I understood what you were saying. That was my introduction, so I could then be able to tell you the other half.

This was one half that you expressed and I needed to express to you the other half; so I said "I get that."

I later emailed you and communicated with you throughout the day so you would feel comfortable that you were not going to plead to any language that wasn't absolutely true.

In fact, during our lengthy conversations, each time we went through any word or phrase or sentence, we said it had to be absolutely true, and the ultimate stipulation of offense conduct -- excuse me, admission of offense conduct -- word for word, phrase for phrase, was absolutely true, and you acknowledged it.

There were some words in the vernacular you didn't like, but you knew once I explained them to you what they meant as a matter of law, and then you acknowledged them to be absolutely true.

Q. So if I say something in an email, you don't take that to mean what it says, you take that to mean what you want it to mean?

A. No, that's not true. I take it to mean exactly what it says, "[Jim, I am thinking right this moment as I am communicating with you the following], and then I read it.

All it is is you're telling me what you're thinking that moment. And what do I respond back? "I get that." I know what you're thinking right this moment because

you're not looking at the rest of it. My job as a lawyer is to be sure you look at the rest of it, and I did my job.

Q. Okay. Now, you had a conversation with Mr. Schmeisser a few moments ago about witnesses who were going to be testifying, one was Carol Laporte and how she might or might not be comfortable.

If she had sent an email in November and said in that email, as for me, the program could end, nothing is a sure thing, Bob works very hard, so that doesn't happen but you never know. I'm not trying to keep you out of the program, I just want you to understand it is a risk."

And she also said, "we could all lose everything."

Wasn't she actually telling people that there was a risk, that we could all lose everything and people did know the risk?

A. Well, you go from she was saying "a risk."

Answer: "Yes."

"So's therefore, don't they know the risk?"

Answer: "No."

They did not know the risk, the risk to which you pled was the risk that you in fact never made any money and gave it to anyone. You in fact only gave out the money that you got from other investors.

So when she said there was a risk, yes, true. That

does not support the conclusion you just drew in your question, "therefore they knew of the risk." They did not know of the risk that you were going to continue to only invest and never get any returns and never give any returns to anyone, you were only going to continue to get money from others.

Q. And, Mr. Bergenn, this is the Bergenn version of the no more bills crime, correct?

A. No, these are the facts.

Q. Okay. And the reason you came up with the Bergenn version of the no more bills crime is because the government's version was proven to be false, correct?

A. I don't know what that means.

I can just tell you, you asked me a question about an email from Laporte, and the email does not support what you just said you thought it supported. It doesn't do what you think.

Q. And wasn't the government's version that the money was stolen?

A. What? I don't know what that means.

MR. SCHMEISSER: Your Honor, I think we're now --

MR. RIVERNIDER: Your Honor, I'd like to submit a documents into evidence.

THE COURT: What is the document, please?

MR. RIVERNIDER: This is an email I sent which actually references a number of people who were involved in the Praise deal, and it's in January of 2008. And this is a document where I'm warning the people who were involved in the Praise deal; and in January of 2008, I state that I'm repeating our request for initial funds to be disbursed, pay back the $12 million you received from everyone, and trade the remaining 24,000,000.

The government's version of no more bills offense is that David Praise stole the money in September of 2007, and that's why we -- they were asking all their witnesses if they knew that the money was stolen.

Well, if I didn't know the money was stolen until January of 2008, this is dated January 18, 2008, then I couldn't have known in September of 2007 that the money was stolen, and that's what this email shows.

THE COURT: Okay. You can mark the email, but I don't think we need to have any questions about it.

MR. RIVERNIDER: That's fine, that's fine. I appreciate that, Your Honor.

And then I just have a couple of other issues, Your Honor.

BY MR. RIVERNIDER:

Q. Now, Mr. Bergenn, at trial transcript 1536, lines 15 to 18, you said, "I choose not to coach the witnesses"; do

you remember saying that?
A. I have no idea what you're referring to. Is this during the trial?
Q. This is days before the plea hearing, a week before.
A. All right, at trial.

MR. SCHMEISSER: Objection, Your Honor. We are now starting to go so far afield from that weekend and the issue of coercion and Mr. Rivernider is now really, frankly, going through the bullet points of how he wants to sort of retry this case.

It's beyond the scope of the cross, frankly, and also the direct.

MR. RIVERNIDER: Your Honor, it's in direct response to Mr. Schmeisser's questions to Mr. Bergenn regarding the witnesses who testified and what they just covered.

THE COURT: I don't follow you, Mr. Rivernider.

What is the point that you would like to make?

MR. RIVERNIDER: Well, what Mr. Schmeisser was asking Mr. Bergenn was about the witnesses who testified prior to where Mr. Bergenn comes up with the scenario arrow about me, then going to the bar and pleading.

Well, if the witnesses may have only believed what they were saying was true, then that's an issue that I'm going to bring out right now with just a couple of

things.

THE COURT: Again, I'm sorry, I don't follow you.

MR. RIVERNIDER: According to Mr. Bergenn, I agreed to plead guilty because of testimony of witnesses who testified before.

THE COURT: You were stirred by their testimony.

MR. RIVERNIDER: I was stirred by their testimony.

Mr. Bergenn stated just in that same time period that he chooses not to coach the witnesses.

The reason he said that at the time was because it was obvious the witnesses were being coached. So if I was stirred by the witness's testimony that was coached by the government, then that's relevant.

THE COURT: That doesn't bear on what we're here for today.

MR. RIVERNIDER: Does it bear -- I'm just asking: Does it not bear on why he claims that I pled guilty?

THE COURT: My understanding is that Mr. Bergenn recalls you reacting to the testimony. Whether the testimony was coached or not, I don't see --

MR. RIVERNIDER: Thank you, Your Honor, I'll move on.

BY MR. RIVERNIDER:
Q. Mr. Bergenn, were you aware that the government was paying actors to testify?
A. I do not understand what that means. Paying actors to testify?
Q. Yes, that's correct.
A. You mean in this case? Your case?
Q. Yes.
A. So these were not real witnesses? They were actors playing witnesses?
Q. They were actors who were being paid to testify on the stand before the grand jury and before this Court.
A. The term "actor" to me connotes a professional person pretending to be someone who they are not.
If you're telling me that you have a belief that the government was paying people professionally to roll play someone who they were not, I -- that's new. I never thought of that, never heard of it.
Q. Was Lisa Gould an actress?
A. I believe she was. At least she --
MR. SCHMEISSER: Objection, this is actually incorrect and this is going far afield --
MR. RIVERNIDER: Your Honor, the reason I'm asking is because I have an email from Lisa Gould to Special Agent Steven M. West, Junior, of the FBI, which is

then forwarded to Mr. Schmeisser, and in the email Ms. Gould writes to agent west saying, "I never received a check for my testimony or reimbursement of expenses. Donna Moore told me she didn't get hers either. Is there any way you can check into this for me or direct me back to the lovely woman who took the information?"

And then Agent West responds to -- or sends the response to Ms. Gould and copies Mr. Schmeisser: "I will follow up regarding the check and get back to you."

So we have witnesses who -- if I pled because of the witnesses who were testifying, we had witnesses who -- by the way, they both lied on the stand. Lisa Gould lied, and I have the document to prove it; and Donna Moore lied on the stand about not getting the $22,000 payment in September of 2007.

THE COURT: I don't see that it has any bearing on what we're here to do today.

MR. RIVERNIDER: Thank you, Your Honor.

MR. SCHMEISSER: Your Honor, just so the record is clear, that's just not factually true. It was the standard witness fee that the defense counsel was well aware of. This is standard practice in this district, and to have the suggestions made is frankly superfluous, but so are many of the allegations.

THE COURT: Mr. Rivernider, we need wrap up and

I have a couple of follow-up questions for the witness.

Mr. Bergenn, do you recall having any conversations with counsel for Loretta Seneca over the weekend prior to the change of plea?

THE WITNESS: I communicated with counsel by email. I have only a vague memory of speaking with them, and I have a memory of having reviewed my time records, which, if I had them in front of me, would confirm.

But I believe I would have spoken with him, because it was a big deal for his client to get the opportunity to get credit for voluntarily of her own accord coming before you.

THE COURT: Was her change of plea linked to Mr. Rivernider's change plea?

THE WITNESS: Not in a sense that it was dependent upon, no. They were -- they each independently came to their own conclusion.

I believe it may have been prompted to some degree that she felt more comfortable pleading guilty if her brother was pleading guilty. I think she kind of held out in loyalty to her brother, and once she learned that he might plead guilty, I think she wanted that opportunity to get before the Court of her own accord, sort of being released of that, you know, brother/sister loyalty obligation.

THE COURT: When do you think she might have learned about that?

THE WITNESS: I believe it was Saturday. There's email traffic on that point. I believe it was perhaps just before I spoke to government counsel -- when I say spoke, emailed. So it was during that weekend.

If I had to bet, I would say it was Saturday, midday. I can't remember precisely.

THE COURT: When did you find out that she was in fact going to plead guilty?

THE WITNESS: I believe it probably would have been during the course of that conversation, because I had other conversations with such counsel and I knew that there was some pent up desire not to continue with the trial.

So I actually thought there was a chance that everybody would plead.

THE COURT: So as of that conversation or communication, you anticipated that she would seek to change her plea at the earliest possible time?

THE WITNESS: Yes. Forthwith would be my expectation. But frankly, I wasn't focusing on that until you now asked it; but I do remember expecting, and my memory is, that her counsel was going to come in right away.

I just didn't rely on it.

THE COURT: The evidence in this record includes an email from you to Mr. Rivernider, I believe on Saturday, in which you state that you had gone to bat for Loretta with the government but they were not going to relent, something like that; do you recall that?

THE WITNESS: Yes, I do.

THE COURT: What was the context of that email?

THE WITNESS: Well, I had those kinds of conversations -- well, now I'm mistaking conversations that I had with Mr. Chase -- with the government as soon as I knew there was a prospect that Mr. Rivernider would plead. I thought the government might be so happy to hear that prospect that they might be open to consider, since that was the real target and he was the one who controlled the money, that they really didn't need to prosecute his sister anymore, so I gave it a whirl.

It did not get received with open arm's, but I believe that that was just in my client's interest because I knew he had affection and loyalty for his sister.

THE COURT: Mr. Rivernider maintains that the critical time period on Monday morning between his last email stating his intention to continue with the trial and the change of plea largely took place in your office in the presence of Dr. Filippopoulos.

Am I right in understanding that you disagree with that and recall that those hours were spent here at 450 Main Street? Or should I understand you to be saying you don't remember one way or the other where it took place?

THE WITNESS: It's the latter.

I can't disagree. I just did my best when I was asked of my independent memory to look at the emails and remember, and my best efforts to remember that produced that we came over here by 9:00, because that's my habit, I get to court on time.

Informed, and even now thinking about your question, about the fact that Loretta probably through counsel indicated a desire to plead right away, it probably -- and I'm now inferring -- it probably eventuated that she was going to occupy that first time, in which case I could have hung out at the firm rather than come over here.

More important to me was the length of time and the content of the conversation rather than the placement of the bodies.

THE COURT: So let's suppose that the probability is that you knew that Ms. Seneca was going to go first and change her plea first thing Monday morning, and let's assume that, as you just said, rather than cool

your heels in the courthouse, it made more sense to stay in your office, understandably, and let's assume then that those hours were spent in your office; does that help you recall what happened during those hours?

THE WITNESS: I do recall what happened during those hours, and again the placement is not what changes my recall.

What happened during those hours is we went through the facts yet again, and we had already been through it. But my last communication from him in the morning was him sort of reverting back, and so once he was with me before Dr. Filippopoulos, we would have just started talking about the facts again.

And my memory of that morning was not contentious, it was just going through those facts again.

Now, there's certainly little phrases that were testy phrases "intent to deceive" is an example. And I tried to negotiate that out because I knew it bothered him so much. But I also knew and explained to him what the law means by "intent to deceive."

So we would sometimes -- that would be hard because he had his own view. He'd read the case and say "Do you see that? Requires intent to deceive." And then I would have to tell him what the gloss on "intent to deceive" is so that he could understand what it was saying

and what it was not saying.

So there were moments whenever we got on one of those subjects where it was tense because, to his credit, he was not going to agree to something that wasn't true; but I stayed focused myself on each word and what did it mean, and that's what we did. That's what those conversations were.

Where ever they were physically, that's what they were. I needed him to be sure he understood what the words meant because every word had to be absolutely true or I wasn't going to go forward with it.

THE COURT: Do you remember the subject of his sister's situation coming up?

THE WITNESS: Well, I do from the emails, and that email where I think we may have covered today where he kind of -- by the way, after he said we're going to trial, and I came back with something like, oh, I get that, but we have some more things to talk about, and the government's going to let us do it kind of the way I had conceived it because of how well we had done this, he then said, and will they drop her case, which to me was signaling clearly that that contemplated his plea; and I said, no, I tried, it didn't work.

So the subject did come up, there was not a whole lot to report, other than I tried.

THE COURT: Do you remember informing Mr. Rivernider that she had actually changed her plea, that it was an accomplished fact?

THE WITNESS: I do remember talking to him about it now that you mention it. That was probably one of the first things we talked about Monday morning is the fact that she was going to go forward and that would help her get some more credit, which in a kind of funny way was going to help him privately, personally, as a human being, that he was helping his sister, that she wanted to get it over with.

So I did, yes, I do remember telling him about her pleading, and that I had -- Mike was going over there with the cross-examinations for Ponte, but not -- but also to be there to see what the government had to say and what Loretta had to say because that was going to be germane to our plea and to everything else in the case. I didn't want to miss out on what was going on.

THE COURT: So there you were in your office with Mr. Rivernider and Dr. Filippopoulos as of sometime shortly after 8:00 a.m., and Mr. Chase went to court understanding that Ms. Seneca was going to change her plea, and you spent the morning going over the draft of offense conduct.

THE WITNESS: The last iteration -- and I know

there were multiple, and I believe they've all been provided to the Court -- the last iteration I had before a final tweak that morning by Attorney Schmeisser. I went through it again because we were going to go through it here, and that's really what we spent our time on.

And then when we got here, I remember we carried it in a couple of, like make three or four words, a couple of different places, was my best memory, and then we went through those words again when we were here.

And then we came down and they were in final, and it was fundamentally the same as what we had just done back at my office and the preceding night, frankly. There hadn't been a whole lot of change.

We then read it again, this time with the careted in language typed up.

THE COURT: Mr. Rivernider maintains that when he arrived at your office that morning, he fully intended to continue with the trial, and he points to his emails of the previous evening and that morning to corroborate his testimony in that regard. He tells us that only reason he finally agreed to plead guilty was your screaming at him and banging your fist on the desk that you could not go back.

I'm wondering if you can tell me at what point Mr. Rivernider did finally agree to plead guilty.

THE WITNESS: The first I saw him that morning, there was no tension. I'd have to go back and look at the emails, but it might have related to Loretta.

But when he was again in my presence, a presence which previously had been saturated with both sides of the case, the victims' and his view, once he was with me, I don't know if it was a sense memory, but I did not get a sense once he came over that he was not going to plead.

I think he was still fighting himself, I guess. Maybe in his own mind he did have that intention, but that's not what I experienced. I did not experience him resisting pleading guilty that morning.

We went through all the facts like we had multiple times through the weekend. There was nothing else to do besides go through those facts, and I knew that you're fairly rigorous, Your Honor, when it comes to pleas. I remember Judge Cabranes was similarly rigorous, and that was I knew your background. So I was very focused on what was going to be happening when we were here and I wanted it to go smoothly.

THE COURT: At 6:57 a.m., Mr. Rivernider sent you an email that said, "I would rather put everybody on the stand and take the stand myself." That's reproduced in Plaintiff's Exhibit 14. You responded, "You hurt Loretta by persisting." And you explain, "You can be the

government's view of Bob or the truth's view of a decent person who tried to help everybody but who didn't know these things, you couldn't know without an expert."

Did that back and forth continue in your office with Mr. Rivernider protesting that he couldn't plead guilty and you explaining to him that it was in his best interest to do so?

THE WITNESS: No. My response to him, which I think was consistent with what he and I had experienced together at great length, was more or less the last word, hey, can we help Loretta some more? No, can't. Well, if I --

THE COURT: But you knew that she was pleading guilty.

THE WITNESS: Right. But he's still thinking that if he pleads then she's hurt, and I'm saying, no, if you persist at trial, she's hurt, and I don't think -- I mean, I can't remember precisely the conversation about Loretta with him.

I do know that I had that view for a long time and I never credited the view that she was somehow hurt by his pleading out. I thought it was the exact opposite, and I felt very strongly about that, as did Mr. Chase.

So to answer your earlier question: There was not this back and forth. There was the review again of

the actual facts because that's what was going to happen here, and I wanted that to be comfortable.

Now, when we talk about certain language that is uncomfortable for a layperson, no matter how sophisticated he is legally, it still doesn't feel good to say you knowingly, intentionally conspired, when in his mind, well, wait a minute, no, I wasn't trying to conspire with them. But I know what the law means and I had to explain that. So there was some of that back and forth. So he may have resisted some words again and I had to reexplain the words, and he would get those.

So there was still some occasional tension, but it was not whether to plead or not, it was about the words.

THE COURT: You have testified that at some point that morning, you perceived that Mr. Rivernider had resigned himself to pleading guilty, that he gave the appearance of resignation.

THE WITNESS: Yes.

THE COURT: Can you tell me when that was?

THE WITNESS: I can't precisely, but my sense was he came over with some of that. He would spike with some reaction to particular words again, I would have to make sure he didn't -- the times I had to get elevated were when he would perseverate. And that was, I had to do

that, that's my job, make sure he's knowing and intelligent and voluntarily trying or pleading.

So when I saw him going off that path, which he would sometimes do, even though he's resigned, then you got to focus on the language, and he's going, but that's not how I was thinking.

So I could see him start arguing in his mind, in his heart, whatever, his brain, well, wait a minute, that's not how I would say it. And I would be like, but those are the facts, and then I'd have to go through it again.

So there was definitely some back and forth, but -- and he was definitely not feeling resignation during those moments when I was sort of assuring that he didn't lose grip of the whole of the case. So my enthusiasm, my work, was to keep him focused on the whole; and it worked.

In other words, my experience with him that morning was he got it. When he was before you, he got it. When he cried, he got it. When in the next four or five days, he emailed me about lots of other things, and the next four or five months, he emailed about lots of other things, he got it. He apparently held it for quite some time until this August email, or whenever it was, and then once I saw that, okay, come on in and let's do it again.

And September 4 and 5 we're going through it again because I want to be sure, now, wait a second, now you're telling me you don't get it, but you told me before you did get it. Let's go through it. And we went through it all over again and he said, yes, I know.

THE COURT: Thank you. All right. Well, you may step down, Mr. Bergenn.

Thank you very much.

With regard to how we should proceed from here, any comments?

MR. SCHMEISSER: Your Honor, I've had some conversations with Attorney Frost, and I think the defendant is requesting there be at least some word from Dr. Filippopoulos.

Attorney Frost can probably better address it, but my understanding is they are talking with counsel. I have not talked with either her or her counsel. Maybe her testimony could be addressed via affidavit or would be in person.

But after that, I think that whether it makes sense for the Court, whether there be further briefing on the issue, if that would be necessary. I think we're in some ways deferring to what the Court believes makes sense.

THE COURT: Thank you.

Mr. Frost?

MR. FROST: Yes, Your Honor. I had intended to try and connect with counsel for Dr. Filippopoulos last week and I was called in on a trial in state court and so I wasn't able to do that.

I did reach out to him this morning and I think he called me back while we were in session this afternoon. I haven't checked that message, but that appears to be the phone call on my cell phone.

I can say in discussing with Mr. Rivernider the affidavit issue that I was exploring, and I did discuss this with Mr. Rivernider, was really aimed at the issues the Court was asking about and that were covered today; namely, where was everybody on Monday morning. And while it seemed as though from the last session there was an impression that perhaps it was very brief over at Shipman & Goodwin and that the bulk of the time was here in court, which was not Mr. Rivernider's testimony as you recall, I think today through some of the questioning both by Mr. Rivernider and the Court, it sounds like it could have been a longer period of time. So I know that one of the issues that I was going to address through an affidavit is whether Dr. Filippopoulos could corroborate one version or the other on that point.

The second issue that would be addressed in the

affidavit, just by way of proffer, if Dr. Filippopoulos could do it, is to address whether what she observed -- and my understanding is she was not with him the entire period of time, she was stepping out and I think taking phone calls with probably patients or people she had scheduled that day -- but did she observe the demeanor of Mr. Bergenn during that meeting and whether -- and conversations with counsel.

I've gotten some indication there was a word used "passionate," and I didn't know whether that applied to that meeting or just in general. Because I know Mr. Bergenn is passionate to representing his clients. I don't know what that means. I don't know if that was a reference to what specifically took place in his office that Monday morning or whether it was just a general description of what took place over the course of the entire representation.

So I've been trying to see if Dr. Filippopoulos has any ability to say those things. I don't know if it would affect the Court's decision on the issue in light of the testimony here today.

I know the issue was sort of left open whether Dr. Filippopoulos was a necessary witness, and we sort of, I think, elected to see how things went with these two witnesses, Mr. Rivernider and Mr. Bergenn.

I think it would be Mr. Rivernider, and he can correct me if I'm wrong, it would be his preference to have something in the record from her. But I'm also not optimistic that we're going to get anything -- if it's not an affidavit, whether we'll be able to get anything until she's back.

The other issue I left with Attorney Lewis was if there would be a need for it whether she could testify by video conference, but I don't have an answer yet on that.

So my goal would be, assuming the Court believes it is material and relevant to the questions we're trying to address here, would be to try to get an affidavit explicating a little bit more what she recalls of being at the office with Mr. Bergenn and Mr. Rivernider that morning and to describe the demeanor of each, if she has any memory of it, which she may not.

MR. SCHMEISSER: As it relates to that, Your Honor, I suppose if the affidavit is going to be the last word, I'm aware that Mr. Bergenn's counsel would like to be sort of part of that discussion process with Dr. Filippopoulos's attorney as it relates to sort of the issues that may be addressed. And it probably makes sense for the government to in some way be involved, but we can have further discussions with Mr. Frost.

MR. FROST: I'm happy to do that, Your Honor.

MR. SCHMEISSER: I think two other housekeeping matters, Your Honor. I assume this is already being considered part of the record.

It looks like on February 7, there was an affidavit filed under seal, two affidavits, one of Attorney Howard and also one of Attorney Chase relating to the September 5 letter of 2013. I won't formally mark those as exhibits. I don't have a clean copy with me right now. But my understanding is the Court has that already as part of the case file and would be considering that in any ruling.

THE COURT: Yes.

MR. SCHMEISSER: And then the second thing is it probably does make sense, given that the hearings have been taken some time, that at the point where it makes sense for the Court, that we should probably have some limited briefing on the issues that are at issue here to sort of tee it up for the Court.

THE COURT: All right, thank you.

I would like to at least try to get an affidavit from Dr. Filippopoulos concerning her recollection of that Monday morning. If she wants to weigh in on anything else, that's okay too. It might be worthwhile asking her if she has any recollection of the Saturday afternoon

meeting in her office.

But my main interest would be trying to get her recollection of what happened Monday morning starting with her first communications with Mr. Bergenn up to and including the change of plea by Mr. Rivernider, which she attended.

It goes without saying, I suppose, but I'll say it anyway, there's a stark conflict between Mr. Rivernider's version of what occurred and Mr. Bergenn's.

Mr. Rivernider states that he was essentially brow beaten into agreeing with Mr. Bergenn to change his plea and finally did so only after he was subjected to pressure that morning over a fairly long period of time culminating in Mr. Bergenn screaming at him, "I won't go back there."

And we've just heard Mr. Bergenn explain that when Mr. Rivernider appeared that morning, he seemed to be already amenable to pleading guilty and there was no continued debate about that, although there might have been some discussion of the wording of the admission of offense conduct.

So those are two extremely different accounts of what happened, and it would be helpful to have her recollection.

So why don't we leave it that way. You'll get back to me and let me know about her availability to give us an affidavit and, if so, the timing on that; and if she doesn't want to provide us with an affidavit, then maybe we need to bring her in when she's available to come to court. I think it's worth hearing from her.

MR. FROST: Yes, Your Honor.

MR. RIVERNIDER: Your Honor, one other thing, I'm still at the Wyatt, and if we're not going to have hearings, I'm assuming the writ would have to be released and I would go back to South Carolina. So I don't know where we stand with that.

Plus being at the Wyatt and my current condition is not very safe or healthy for me to be there.

THE COURT: Would you rather go back to South Carolina?

MR. RIVERNIDER: If we're not going to have another hearing, I think I have to do that, because it's not a good thing for me to be there.

THE COURT: Okay. Well, I'm glad you mention it, and I think that at this point, all things considered, it probably would make more sense if you were to go back than stay on at Wyatt. If we do have another session with are Dr. Filippopoulos here in court, we may be able to include you by video as we did before.

But I agree, I don't think you should sit around wondering, waiting, not knowing; and so, yes, I think the better thing for you to do would be to go back to South Carolina.

MR. FROST: Your Honor, I did speak to Mr. Rivernider about this. I know he has a follow-up appointment with the surgeon who performed his surgery, which he won't be told when exactly that is. My understanding is the timeframe is about two weeks, and his surgery was performed in Boston. So I certainly wouldn't want to interfere with that in any way.

But after that, I think that appointment -- and I can communicate to chambers when that has happened -- if there's anything more that the Court needs to do --

THE COURT: Okay. If the marshals need anything from me, then we can take care of it. But we'll leave it that way.

Mr. Rivernider, you'll be at Wyatt pending your next conference with your surgeon, and then assuming everything is okay, you'll be on your way back to South Carolina.

MR. RIVERNIDER: Yes.

THE COURT: Okay, thank you.

(Proceedings adjourned at 4:50 p.m.)

C E R T I F I C A T E

In Re: RIVERNIDER vs. U.S.

I, Darlene A. Warner, RDR-CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/______________________________

DARLENE A. WARNER, RDR-CRR
Official Court Reporter
450 Main Street, Room #223
Hartford, Connecticut 06103
(860) 547-0580