UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

ROBERT RIVERNIDER, : No. 3:14CV1000(RNC)

Petitioner, :

vs :

USA, :

Respondent. : HARTFORD, CONNECTICUT
MARCH 21, 2018

- - - - - - - - - - - - - - - - x

EVIDENTIARY HEARING - VOLUME IV

BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.

APPEARANCES:

FOR THE PETITIONER (AS STANDBY COUNSEL):

FROST BUSSERT LLC
129 Church Street, #226
NEW HAVEN, Connecticut 06510
BY: ROBERT M. FROST, JR., ESQ.

FOR THE RESPONDENT:

U.S. ATTORNEY'S OFFICE-NH
157 Church Street
P.O. Box 1824; 23rd Floor
New Haven, Connecticut 06510.
BY: CHRISTOPHER W. SCHMEISSER, AUSA
JOHN H. DURHAM, AUSA

Darlene A. Warner, RDR-CRR
Official Court Reporter

TABLE OF CONTENTS


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GALANI NELLIE FILIPPOPOULOS | | | | |
| BY MR. RIVERNIDER: | 553 | | | |
| BY MR. FROST: | 571 | | | |

8:38 A.M.

THE COURT: Good morning.

MR. SCHMEISSER: Your Honor, just by way of a little background, we all know we're here for the testimony of Dr. Filippopoulos. There had been discussions of this with standby counsel and the government.

There are certain timing restrictions the witness is under, and so what we anticipated was having between 8:30 and 11:30. I think both parties were going to try to stay at around possibly no more than an hour understanding things may go over here or there, but to try to keep within those time limits.

THE COURT: Very good.

MR. FROST: That's correct, Your Honor, and it's our understanding that Dr. Filippopoulos had a rather significant role in the case in its entirety, but for the scope of this hearing, her examination is going to focus on that critical weekend before Mr. Rivernider's plea.

That's also a further understanding, at least between myself and Mr. Schmeisser, I've discussed it with Mr. Rivernider, and we're prepared to proceed.

THE COURT: Thank you.

MR. SCHMEISSER: Along those lines, Your Honor, we certainly see her today as a fact witness based on her observations. I think the idea is not to get into a lot of her sort of opinions as an expert, as a lot of those are addressed at sentencing or aren't relevant to the issue right now before the Court.

Thank you.

MR. RIVERNIDER: Your Honor, I just want to bring one thing to the Court's attention.

The Court had asked for Dr. Filippopoulos to prepare an affidavit. Dr. Filippopoulos apparently prepared an affidavit. I was just handed the affidavit just now. Mr. Frost had read it to me a couple weeks ago, but I was just handed it now, so I haven't had a chance to really go through it. I'm going to do my best to ask her questions about it, but I'm really not sure exactly everything that's in here, but I'll do what I can.

THE COURT: All right.

MR. SCHMEISSER: Your Honor, to give the Court some context about actually the unsigned affidavit is that as the Court recalls at our last hearing there was an effort to possibly get her to prepare an affidavit and avoid a hearing today.

My understanding is that there was conversations between Mr. Frost and Mr. Howard and Scott Lewis, as the

attorney for Dr. Filippopoulos, and that there were efforts made to put together an affidavit that Dr. Lewis actually -- that Attorney Lewis actually put together an in affidavit form.

The concern I think on both sides in reading it is that it was put in that type of form together by a lawyer, not a layperson, and there were areas that raised frankly more questions than answers.

And so if in fact the affidavit had as initially anticipated just said I don't remember anything from four years ago, then that was not going to be an issue for either side. As she does recall certain things, I think it was just sort of the lawyer's interpretation putting things down on paper, it was an additional lens through which the doctor's thoughts were being interpreted, and we felt it was important to allow both sides to elicit from the doctor what happened.

MR. FROST: Just so it's clear, during those discussions, we were trying to see if we could reach an agreement of the affidavit. That draft I had, but we didn't have the ability to get it quickly to Mr. Rivernider. So I did read it in its entirety to him. We actually took a position on whether it could be submitted.

The parties couldn't reach an agreement, and

that's how we actually indicated the witness would be here so that both sides would have an opportunity, as well as the Court.

But it's true that Mr. Rivernider hasn't gotten a physical copy of that, but it's also not executed by Dr. Filippopoulos. It was a draft, it's marked as a draft. And I just want to make sure Mr. Rivernider understands that the Court didn't direct that an affidavit be prepared. That was something that counsel indicated we would attempt to do to avoid, if necessary, the need to have her be brought in.

Those efforts were unsuccessful and that's why we're here.

THE COURT: Very good. Let's get started.

Dr. Filippopoulos, would you please come forward and be sworn in.

The clerk will swear you in.

THE CLERK: Please raise your right hand.

GALANI NELLIE FILIPPOPOULOS,

called as a witness, having been first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: Please be seated.

Please state your name and spell your last name for the record.

THE WITNESS: Galani Nellie Filippopoulos, F-i-l-i-p-p-o-p-o-u-l-o-s.

THE CLERK: And please state your city and state of business.

THE WITNESS: 18 North Main Street, Third Floor, West Hartford, Connecticut 06107.

THE CLERK: Thank you. Please be seated.

DIRECT EXAMINATION

BY MR. RIVERNIDER:

Q. Good morning, Dr. Filippopoulos.

A. Good morning.

Q. I assume you remember who I am?

A. Absolutely.

Q. It's been a long time.

A. It has been a long time.

Q. Can you just for the record give the Court some -- a little background on your experience and how you became involved in this case?
A. I was involved in this case in terms of conducting neuropsychological testing of you. I did neuropsychological testing of you as requested by your counsel at the time.
Q. And your years of experience and what exactly you're a doctor of?
A. My degree is as a doctor of psychology.
Q. What type of psychology?
A. Doctor of psychology.
THE COURT: Doctor, it would be helpful if you would adjust the microphone so that everybody can hear you.
BY MR. RIVERNIDER:
Q. Now, just briefly, if you can, on Friday, February 22, 2013, the day before we met, which was on Saturday the 23rd, Mr. -- there's been an email submitted in this case where Mr. Bergenn was attempting to find you. Did he contact you that day?
A. I don't remember.
Q. You don't remember.
Did he send an email on Friday to contact you?
A. I don't remember.

Q. On Saturday, we appeared at your office somehow. How did we get there and --

MR. SCHMEISSER: Your Honor, just objecting. He is sort of stating facts. I'm not sure if the witness even recalls meeting on that Saturday.

It seems that the question would be "Did we meet on Saturday" as opposed "We met on Saturday."

I think that in fact there is a question whether she actually recalls that.

THE COURT: All right.

MR. RIVERNIDER: I'll rephrase the question, Your Honor.

BY MR. RIVERNIDER:

Q. Do you recall meeting the weekend before the change of plea on February 23, 2013?

A. I do.

Q. And how is it that we came about to meet at your office?

A. My recollection is that you came in to go over the testing results and discuss those in detail.

Q. Was that a scheduled appointment or was that something that -- did Mr. Bergenn call you and ask to meet?

A. I don't remember.

Q. And it was because this was five years ago, correct?

A. That is correct.

Q. If we were having this hearing four years ago, it would be a good opportunity that you would probably recall, have a better opportunity to recall?

MR. SCHMEISSER: Objection, Your Honor.

THE COURT: I'll sustain it.

BY MR. RIVERNIDER:

Q. Now, Dr. Filippopoulos, that weekend, if you recall, if you could just give us an idea of what happened that weekend from Saturday through Monday, if you could just run through?

A. My recollection is that we met on Saturday, went over the testing results. We were able to provide some information about how the testing results explain some of the things that actually happened.

And later on you were able to meet with Attorney Bergenn at the different office in my building, in my suite actually, to my understanding is to prepare a document. I don't remember the name of the document, but I believe you were preparing a document that included what you were admitting to before your plea.

Q. All right. Now, I'm going to go through the weekend and then after the change of plea hearing. You remember being at the hearing with us that day on Monday?

A. I do.

Q. And then after the hearing, when we left, you had left with Mr. Bergenn, is that correct?
A. I don't recall, but I remember leaving.
Q. Do you remember being in the car?
A. I remember being in the court and then leaving later on. It could have been with Attorney Bergenn. I do not remember.
Q. Do you remember being in his car in the parking lot and waving good-bye to me?
A. I don't recall that, but I do remember being in his car.
Q. And did you guys go to lunch together after that?
A. No, we did not, as far as I remember. I went back to my office.
Q. So he took you back -- his car was back at your office, he took you back there?
A. Correct. That's how I remember it anyway.
Q. Going back to Saturday, you don't remember how we got to your office, but when we got there, you had another appointment, isn't that true?
A. I don't recall.
Q. When we got there, you had previously prepared an interim report; do you recall that?
A. That is correct.
Q. And when Mr. Bergenn and I went over the interim

report, you actually opened the door and had us go into Dr. Stoll's office; do you recall that?
A. That is correct. But you and Attorney Bergenn went into Dr. Stoll's office to continue your document that you were actually preparing at the time.
Q. So we -- that's when we read over your interim report, is that correct?
A. I thought that you read the interim report ahead of time, if I remember it correctly.
Q. Do you recall making copies of it for us?
A. I'm sorry, copies of?
Q. Copies of the interim report. Do you recall making copies of the report?
A. Not specifically I don't recall that, but I very well may have done that.
Q. So when we were in Dr. Stoll's office reading the interim report, you had a young woman who you were meeting with in your office; do you recall that?
MR. SCHMEISSER: Objection, Your Honor. Again, I'm not sure that's what she actually testified to. He's putting his own factual statement and then asking a question; and so when she responds, it's unclear as to what she's responding to.
MR. RIVERNIDER: I'm asking if she recalls meeting with a patient, a young woman, in her office while

me and Mr. Bergenn were in Dr. Stoll's office.

THE COURT: I think it would be most helpful if the witness could tell us in as much detail as possible what she remembers about that weekend, and then you would have an opportunity to see if you could refresh her recollection as to any matters that you would like to ask her about. That way we could avoid the problem that could interrupt the testimony to the point where we don't get the testimony, as we all hope to do this morning. So that's how I would like to proceed.

That being said, doctor, I'd like you to tell me in as much detail as you can provide, what you remember about that weekend as you sit here now before anybody's had an opportunity to show you documents or ask you leading questions.

THE WITNESS: Okay.

THE COURT: All right?

And it would be helpful to me if you would speak as distinctly as you can so that everybody can hear you. You do have an accent and I, for one, have had some difficulty understanding you.

So I would ask you to please help me in that way.

THE WITNESS: Okay. I will speak slower, if that helps, and I will try to do what I can. English is

my second language.

So what I remember from the weekend is that we did meet with Mr. Rivernider and Attorney Bergenn, went over the results of the testing that was done and an interim report, which was prepared in detail, and tried to basically make some connections between the findings of the report and some of the actions that actually got Mr. Rivernider into little difficulties. Some actions, for example, that took place.

I don't remember the details of the conversation, but I remember that's what it centered about.

Further, from what I understood at the time, Mr. Rivernider was going to plead guilty and he and Attorney Bergenn were actually working on a document. I don't know what the document is called, but my understanding was it involves Mr. Rivernider coming out with certain things from the list of accusations or charges that he was going to actually agree on. My understanding was this document was going to be presented to the judge at the time, or the court.

I was not part of that discussion between the two of them, so I don't really know anything about the content.

I do remember that they went into a different

office than I was. So when that took place, I was not in presence.

THE COURT: That was the Saturday?

THE WITNESS: That was the Saturday.

THE COURT: Do you have any other recollection of what happened on Saturday?

THE WITNESS: I do not.

THE COURT: What is your last recollection of what happened on Saturday?

THE WITNESS: My last recollection is of Mr. Rivernider and Attorney Bergenn being in Dr. Stoll's office having a discussion; and after that, I don't know exactly how people left, but we all left.

THE COURT: Okay. Do you recall having any communications, written or oral, with Mr. Bergenn that evening after he and Mr. Rivernider left your office?

THE WITNESS: I don't specifically remember any communications. I know that at some point in time, Attorney Bergenn had asked me to go to Court to actually meet with Mr. Rivernider's parents, and I believe his sister, and that I was going to basically try to observe Mr. Rivernider during that time to use this information in my later report, because there were time constraints.

And all I was able to do in the time allotted to me was an interim report. It was not the most complete

report, it was not the thorough examination. That took place later on in time and after I had a chance to meet with his parents and also do further testing of Mr. Rivernider.

THE COURT: So you were in the courthouse on Monday?

THE WITNESS: I was in the courthouse on Monday, that is correct.

THE COURT: Okay. Before we discuss Monday, what do you remember about Sunday?

THE WITNESS: I don't remember anything about Sunday. In fact, I had in my mind been kind of confused as to whether we met on Saturday or Sunday. I knew it was over the weekend. It seems like it was Saturday. I certainly don't remember having more than one meeting. So if there was a meeting on Saturday, I assume there was not another one on Sunday to my recollection.

THE COURT: Have you reviewed any documents in preparation for today?

THE WITNESS: I have not.

THE COURT: Did anybody communicate with you, as far as you can remember, between the time Mr. Rivernider and Attorney Bergenn left your office on Saturday and the time you arrived in court on Monday?

THE WITNESS: I think there was some

communication. Yeah, there was some communication with Attorney Bergenn. I don't remember what that was, but it was basically about my going to the Shipman & Goodwin offices to meet with Attorney Bergenn and with Mr. Rivernider.

THE COURT: Did such a meeting take place?

THE WITNESS: It did take place, Your Honor.

THE COURT: What do you remember about that meeting?

THE WITNESS: What I remember about that meeting was that at the time Mr. Rivernider had changed his mind about taking the plea deal and there was discussion about several legal aspects of his case between him and Attorney Bergenn.

Attorney Bergenn at the time had really felt very strongly, it seemed to me, that Mr. Rivernider's best interest would have been to take the plea deal, because unless he did that, he strongly believed he was going to be convicted, and he felt that his own chance to get the lighter sentence perhaps would be for him to understand some of the actions that took place, to understand that he had legal responsibility for those actions, and to really see it from the perspective of his clients who had testified, which had already affected, I think, Mr. Rivernider. It upset him because the people were

upset about losing money, and to be able to honestly show remorse and take responsibility. He felt that unless this is what took place, he would get a very long sentence.

The way that it came across to me, Attorney Bergenn was very much invested in protecting his client. And he really felt that his only way of a better out would have been for him to take that plea deal and truly feel remorseful and take responsibility.

THE COURT: Do you remember anything else about the meeting in the law office that morning?

THE WITNESS: I do remember couple of occasions where Mr. Rivernider actually did show emotion. Both people in the meeting were very much active. They were very spirited. They had a very lively discussion, it seemed to me.

And I remember one point that was very important I think in how things turned out later on, because at that point I saw that Mr. Rivernider actually really showed empathy for his clients, and that was at the time when he was discussing the situation where he felt there was some entities or individuals that he was trying to invest with, he was trying his best to get back the money so he can pay his clients back, and he felt like these people basically took his money and ran.

When he was trying to contact them, I remember

it, he was not able to because they would not get back to him.

And there was this discussion at the time about how perhaps his clients who were testifying and who would testify later on would perhaps --

THE COURT: There's water if you want it.

THE WITNESS: At that moment I think he was feeling exactly the same way they did. In fact, his facial expression showed that understanding to me. I don't know whether he did or not. That's how I saw it.

And he was tearing up a little bit at that moment. And it seemed like that to me was a turning point where a better understanding was developed, at least at that moment, on his part.

THE COURT: Anything else you recall?

THE WITNESS: Later on my understanding was that he did agree that it would be to his best interest to actually proceed with the plea deal.

THE COURT: Were you present throughout the discussion that you just described?

THE WITNESS: I was present during the discussion that I described. I know somebody had posed a question at some point as to whether I was there during the entire meeting that Mr. Rivernider had with Attorney Bergenn, and I really cannot answer that, I really don't

remember.

It could be I was there for the whole time, but it also could be that at some point it could be I left and they continued. I truly don't remember.

THE COURT: As you do your best to recall that meeting in as much detail as possible, seeing it in your mind's eye, so to speak, is there anything that stands out to you? Any particular statement by anybody, any particular action by anybody, or anything else?

THE WITNESS: The two things that stood out to me that I do remember are as follows:

The instance that I just described, because everything else actually was conversation between Attorney Bergenn and Mr. Rivernider depending basically about different aspects of the charges in the case. There was so many charges and it was so complicated, and most of the time I was there silent and listening, that I don't remember a lot of it because of the complexity of it if nothing else, and because of the multitude of things that pertain to this but not to that, and so forth.

The other moment that I remember because that stood out in my memory, was Mr. Rivernider accusing at some point Attorney Bergenn of wanting to making him plea, to take the plea deal because he wanted to work on a more lucrative case, which Attorney Bergenn denied.

I really had felt that Attorney Bergenn was very much invested in helping Mr. Rivernider, so that stood out in my mind.

So those are the two things that are specific conversations that stood out in my mind.

THE COURT: How would you describe the quality of the interaction between Mr. Rivernider and Mr. Bergenn during that meeting?

THE WITNESS: What do you mean exactly by quality?

THE COURT: I use that word because I wanted to leave it to you to tell me how you would describe or characterize the quality of their interaction.

THE WITNESS: Well, I would say that initially it seemed almost a little bit antagonistic. They both were standing their ground. Later on it seemed to me as if there is an agreement as to how to proceed.

I don't know if that answers your question, Your Honor.

THE COURT: It's helpful to me, yes; thank you.

Are you able to tell me about how long the first phase lasted, what you described as seemingly somewhat antagonistic with both people standing their ground?

THE WITNESS: I don't have a recollection as to the timing, but I know that it was not as if -- what I can

tell you if it is helpful is that in my memory, in my memory, it was not antagonistic throughout. There were spurs of that, but I did not really feel as if they were not on the same team at some point.

THE COURT: All right. What happened after the meeting as best you can remember?

THE WITNESS: After the meeting I believe that everybody went to court, I believe people were in court for awhile. I remember that I spoke to Mr. Rivernider's father. I believe I spoke to his sister. And after a period of time, Mr. Rivernider actually entered his plea in front of the judge.

THE COURT: Were you present at the change of plea proceeding in front of the judge?

THE WITNESS: I was, Your Honor.

THE COURT: Do you recall having any conversation with Mr. Rivernider after the meeting in the law office?

THE WITNESS: He was in court and everybody else was, and people were talking to each other, but I don't remember a specific conversation, Your Honor.

THE COURT: How about any conversation with Attorney Bergenn? Do you have any present memory of any conversation you had with him after the meeting in the law office?

THE WITNESS: I do not.

THE COURT: Do you remember any antagonism between Mr. Rivernider and Attorney Bergenn in the courtroom?

THE WITNESS: Not at all. At the time I truly felt that Mr. Rivernider was going to take the plea and that there was agreement, that both sides were on the same page.

THE COURT: Based on your perception of what occurred during the meeting, what do you think caused Mr. Rivernider to change his position and agree with Attorney Bergenn that he should plead guilty?

THE WITNESS: I was not in Mr. Rivernider's mind so I cannot answer anything other than what it seemed to me.

To me it seemed that he actually did develop empathy, firstly for his clients; that he understood that even though he said -- he went out doing this business to help people. Some of the decisions he made later on actually caused people to lose money and he was remorseful and understood that people indeed had been hurt. And he also, I thought, understood that it was to his benefit in terms of a lighter sentence to take the plea.

I think he had perhaps listened to Attorney Bergenn explain that he felt that the way the trial was

going, Attorney Bergenn expected that he would be convicted.

I don't remember detailed conversations with the passage of time, but that this is how my recollection is of the tone of the conversation at the time.

If that --

THE COURT: Do you recall Attorney Bergenn saying anything that you thought was over the line?

THE WITNESS: I did not. I did not feel that Attorney Bergenn said anything that was threatening, abusive or something that would intimidate Mr. Rivernider to the point that he would do something that he did not want to do.

Had I seen something like that, for the record, I would have never not talked about it, called attention to it.

THE COURT: Is there anything else that you would like to add?

THE WITNESS: Nothing else comes to mind right now; however, I'm willing to ask questions that anybody has to clarify what I just talked about to the extent that I remember.

I do want to say that my memory of the events is incomplete with the passage of time and I remember general ideas, but I don't remember specific sayings and

discussions and other specific events.

THE COURT: Thank you. All right.

MR. FROST: Your Honor, just for the record, Mr. Rivernider has requested I do any follow-up with Dr. Filippopoulos.

So with his consent, I'll do some follow-up questioning based on the Court's questions.

THE COURT: All right.

EXAMINATION

BY MR. FROST:

Q. Good morning, Dr. Filippopoulos.

A. Good morning.

Q. We met a short while ago in the hallway. I'm Attorney Bob Frost, standby counsel for Mr. Rivernider.

Thank you for being here.

I just want to ask some follow-up questions based on the Court's questions about that weekend before Mr. Rivernider pled guilty.

The meeting on what we believe was I think it's, for the record, probably establishes it's Saturday.

You were saying you just remember one meeting with Mr. Bergenn and Mr. Rivernider on Saturday or Sunday?

A. That is correct.

Q. We'll assume for the second it was Saturday. I'll

call it the Saturday meeting.
A. Okay.
Q. That Saturday meeting, can you give us a sense in terms of time how long that meeting lasted that you were present for, the one where it was the three of you?
A. I wouldn't -- I would guess if I was to give you that information.
Q. Let me try it this way: Was it a brief meeting, meaning 10 or 15 minutes?
A. No, it was a longer meeting, definitely.
Q. Are we talking about perhaps an hour or more?
A. Yes.
Q. Would it be more than two hours?
A. I don't remember.
Q. But certainly more than an hour or more?
A. Yes. Now, you've got to understand that part of the meeting -- part of the time that we met at my office, rather, that day was spent between Mr. Rivernider and Attorney Bergenn.
Q. So your recollection is that they were in your office space, as it were, meeting separately before you met with them to talk about the interim report?
A. My office space is three offices. I don't remember in which office specifically the meeting took place initially when we went over the test results.

I do remember that Mr. Rivernider and Attorney Bergenn met later on for a period of time at the office next to mine, which was Dr. Stoll's office, and I was during that time in my office.
Q. So the sequence was they came to your office, you met, and then they went off to meet privately after your group meeting?
A. That's how I recall it; however, I don't recall which meeting we met at first. It could have been any one of the three offices in the suite.
Q. Okay, I'm not necessarily focusing on which office in your suite it was. I guess I'm just trying to establish, it sounds like there was a meeting with the three of you, you think that lasted an hour or more, correct?
A. Correct.
Q. And then the sequence is that they then went to some other office somewhere in your suite to meet privately where you were not present?
A. Correct.
Q. And do you have any idea how long that separate meeting between Mr. Rivernider and Mr. Bergenn lasted after your group meeting? Do you have any sense of that?
A. I don't really know how long it was, but it was a lengthy meeting.
Q. Okay. And so between your group meeting where it was

the three of you and that separate meeting, are we talking about several hours of time on that Saturday?
A. So you're saying adding the two meetings, I would say it was several hours, yes.
Q. And I think the Court asked you about what was your last recollection on that Saturday. Do you remember saying good-bye to Mr. Rivernider and Mr. Bergenn?
A. Not specifically. I assume I did, but actually I do not remember that.
Q. They were not there when you left the office that night. I'm trying to figure out, did they leave without talking to you or did you say good-bye as they left?
A. I am sure that I would have said good-bye to them when they left. I assume that. But again, I don't specifically remember.
Q. And it's your recollection that you don't really remember any communications with Mr. Bergenn later that evening on Saturday. We're still on Saturday.
A. You mean after they left my office if there was any other communication with --
Q. Mr. Bergenn.
A. Mr. Bergenn, I don't remember.
Q. I guess what I'm getting at is there wasn't any follow up phone call between the two of you to discuss how do you think that phone meeting went?

A. If there were any, I don't remember.
Q. I think I heard that the next thing you remember is there was some communication from Mr. Bergenn prior to that Monday where the change of plea occurred where you somehow understood that Mr. Rivernider was having second thoughts about the plea.
A. At some point I remember that I learned that there was second thoughts, that's correct.
Q. Dr. Filippopoulos, I'm going to show you what is already a full exhibit in this hearing, Plaintiff's 13. And it's going to show up on the screen in front of you.
So I want to focus your attention on what I believe is the first email exchange where you are either -- you are a recipient, and that's in the middle of this page.
It's sent on Sunday, February 24 at 11:03 p.m.; do you see that?
I've got my finger pointed.
Is that your email address, galani320@aol.com?
A. That is correct.
Q. So this appears this is an email from Mr. Bergenn to you and copies to members of the defense team; do you see that?
A. Yes.
Q. And it states, "Client was good to end of night and then is now backsliding completely and wants to self

destruct at trial. I am passing on the exchange after he read the stipulation of offense conduct that we had agreed to except we were talking about a couple of inconsequential terms. Read from the bottom up."

Do you see that?

A. I do see that.

Q. And there was a response from you that appears at, you sent a response sort of really, really early on the Monday morning, it looks like, Monday, February 25 at 12:58 a.m.; do you see that?

A. I do.

Q. You state in the email, "Call me in the morning as early as you need to on my cell or now if you are up. It sounds like you need to be at Court at 8:00, so it doesn't sound like we can meet with him at my office in the morning, right?"

And then it looks like Mr. Bergenn forwarded that exchange to Mr. Rivernider; is that correct?

Do you recognize that as his email address?

A. I do.

Q. Is that the communication you're thinking of where you somehow became aware that Mr. Rivernider was having second thoughts about the plea?

A. It could be.

Q. And --

A. It seems like it would be from what I see here.
Q. And so following those exchange of emails, that's what you remember as being one of the reasons why you went to Shipman & Goodwin the next morning to meet with Mr. Rivernider and Mr. Bergenn?
A. It appears to be that way.
Q. And so I just wanted to make sure it was clear. You had indicated in questions from the Court that you were going to Shipman & Goodwin in part to meet with his family; did I hear that right?
A. That was correct.
Q. So that was one of the reasons, but another reason was to have a meeting to discuss this what sounds like a potential either emergency or crisis issue involving the client?
A. Correct.
Q. And you do you remember approximately what time you arrived at Shipman & Goodwin on that Monday, the 25th?
A. What I remember is I was there around 8:00.
Q. And when you got there around 8:00, was Mr. Rivernider there, do you know? Was he already there with Mr. Bergenn when you arrived?
A. He may have been. I don't remember.
Q. And so at some point, as you described for the Court, there was a meeting where you were present and Mr. Bergenn

was present and Mr. Rivernider was present, right?
A. Correct.
Q. Did that meeting take place in Mr. Bergenn's office?
A. I know it took place at Shipman & Goodwin. Which office it was, I wouldn't know.
Q. Okay. I guess what I'm trying to establish is the meeting that you were describing for the Court, was that in a large conference room or was that in an office where Mr. Bergenn was behind a desk?
A. I don't remember.
Q. Do you remember where Mr. Bergenn was standing when he was interacting with Mr. Rivernider?
A. I don't remember.
Q. Was he standing or sitting, do you know?
A. I don't remember.
Q. You described the -- I think the words you used to describe the interaction between -- for at least part of the meeting between Mr. Rivernider and Mr. Bergenn as active and spirited; did I get that right?
A. That is correct.
Q. Would passionate also be a word the way you would describe the interaction between the two for some part of that meeting?
A. That is correct.
Q. And you described it for some part of the meeting

they seemed to be each holding their ground and sort of arguing with each other?

A. That is correct.

Q. At some point did you observe Mr. Rivernider crying at all?

A. I saw him tearing up on one occasion.

Q. Fair to say he was emotional?

A. I think that he showed emotion. At least the time that I remember him showing emotion was the time when he felt, I think, there was a similarity between how he was feeling about what was happening to him by those who exploited him by taking his money to how his own clients had felt.

Q. Do you remember whether Mr. Rivernider was seated or whether he was standing at all during the meeting?

A. I don't remember.

Q. During the exchanges that you observed between Mr. Bergenn and Mr. Rivernider, did Mr. Bergenn reference Mr. Rivernider's mental profile or any mental conditions that Mr. Bergenn believed he had?

A. I don't recall specifically.

Q. Do you recall Mr. Bergenn in the course of the back and forth that you observed between him and Mr. Rivernider, whether Mr. Bergenn referenced Mr. Rivernider's low emotional intelligence?

A. I don't remember specifically that taking place, but I can tell you that there was a question as to that in terms of the informing. The informing session on Saturday, we did go over that item.

Q. So during the informing session on Saturday, there was obviously a discussion about his low emotional intelligence?

A. Correct.

Q. And during the meeting regarding his change of plea, Mr. Bergenn was discussing the testing results that you discussed on Saturday?

A. I don't remember.

Q. I'm trying to understand your prior answer. Was there some reference about what had happened on Saturday by --

A. This is not what I said. It could have been. I just don't remember it. I would guess it right now if I was to say one way or the other. I simply don't remember the content of the conversation that well.

Q. Did you contribute anything to the meeting between Mr. Bergenn and Mr. Rivernider on that Monday morning in terms of saying anything that you remember now?

A. Most of the interaction was actually between the two of them, Mr. Rivernider and Attorney Bergenn.

I do remember that they personally actually did say

to Mr. Rivernider when they were discussing something about the people who -- the bad investments that Mr. Rivernider expected would actually be windfalls, I remember him talking about how they never called him, that nobody was able to help him get this right or whatever from these people that exploited him and how he felt about that and that he actually was somewhat emotional about that issue. And I remember that I did in fact say to Mr. Rivernider that could it be that this is how your own clients felt when they could not reach your office. I do remember saying that.
Q. Do you remember saying anything else?
A. Not specifically.
Q. That's the one thing that sticks out in your mind?
A. Correct. I could have said other things, but this is the only one that sticks out in my mind.
Q. I know you're trying your best. It was five years ago, and I guess we're just trying to figure out if you remember certain exchanges that took place that you said something in that meeting. I'm asking about those. If you don't have a memory now, say so.
A. I don't have that memory.
Q. The part of the meeting that you just described where Mr. Rivernider showed emotion and you said something to the effect of now you know how your clients felt, that

emotional part of the meeting, how long did that last? Where he was emotional.

A. I don't know.

Q. You don't know?

A. No.

Q. In response to one of the Court's questions, you said that you remembered that the meeting on that Monday morning was not antagonistic throughout, is that right?

A. That is correct.

Q. Did you ever get a sense that Mr. Rivernider at some point acquiesced to the statements and arguments that Mr. Bergenn was making?

In other words, did he seem to shut down in any way where Mr. Bergenn was dominating the conversation and he just started listening?

MR. SCHMEISSER: Objection to the form, Your Honor. It sounds like defense counsel on direct is trying to put words into the witness's mouth.

THE COURT: I'll allow it.

BY MR. FROST:

Q. Do you understand the question?

A. I think you're asking me if it became to my awareness that during the discussion Mr. Rivernider felt intimidated and simply gave up?

Q. Right.

A. That was not my impression. I don't know what was on his mind, but that was not my impression.

I actually saw Mr. Rivernider as a very strong personality, as a very strong person, very self-directed.

He's here today representing himself, I think, in court, in federal court. To me that is a strong personality and a person that can really take care of himself and be an independent thinker.

So, no, it was not my understanding that he felt that he had to do something he did not want to do. I did not see him as somebody who does what other people want him to do. I saw exactly the opposite: A very independent person, and a very strong willed person.

Q. The meeting that took place on that Monday morning prior to the change of plea, can you give us a sense in terms of time how long it lasted where it was you, Mr. Bergenn and Mr. Rivernider in that discussion?

A. I don't recall. I would be misleading the Court if I came up with a guesstimate because it would not be correct.

The only thing I can say is there are perhaps some records that show what time Mr. Rivernider actually got to court and what time the plea was.

Q. So that was going to be my next question.

Did this meeting essentially last until you all

packed up and went over to the courthouse for his hearing?
A. If I remember it correctly, Attorney Frost, there was a part of time between the time when we arrived in court and the time Mr. Rivernider was actually in front of the Court. I don't know what span of this time that was, but it was my recollection that it was some span of time because I remember speaking to his father, I believe, during that time and so for.
Q. So you remember speaking to Mr. Rivernider's father awhile after you had arrived at the courthouse?
A. That's how I remember it. I'm not sure as to this.
Q. So that conversation with his family didn't take place at the Shipman & Goodwin offices before you went over, right?
A. I'm not sure that my memory's exactly right with this. I think I will say that I don't remember specifically.
Q. Thinking back on the meeting on Saturday that lasted several hours, was this meeting longer or shorter than that, the meeting on Monday?
MR. SCHMEISSER: Objection.
A. That would be a guess on my part.
BY MR. FROST:
Q. You arrived at the Shipman & Goodwin offices on Monday at around 8:00 is your best memory?

A. That's my best memory.

Q. I just want to make sure I have this established: It's not that you got there 8:00 and went over to court at 8:15 and that this meeting that you've been telling us about occurred in those 15 minutes?

A. Correct.

Q. It was longer than that?

A. It was longer than that.

Q. It was probably longer than an hour?

A. I really don't remember, Attorney Frost. I wish I could.

Q. Is it fair to say that whatever the length of the meeting was, it lasted from not long after you arrived at 8:00 a.m. until you, Mr. Bergenn and Mr. Rivernider left Shipman & Goodwin?

A. That's how I remember it.

MR. FROST: Moment, Your Honor?

THE COURT: Yes.

(Pause)

BY MR. FROST:

Q. Just a few more questions.

On that Monday morning meeting before Mr. Rivernider went over to court and pled guilty and you were present in that meeting with Mr. Rivernider and Mr. Bergenn, did Mr. Bergenn go over any document related to what he was

going to agree to or admit, the way he had done on Saturday? Do you understand my question?

Let me break it down.

On Saturday you testified that in some portion of the meeting you remember Mr. Bergenn having a document that he reviewed with Mr. Rivernider, right?

A. Correct.

Q. And that document, although you didn't understand everything that was in it, you thought related to things that Mr. Rivernider would agree to as part of his plea?

A. It may have been. I'm just concerned that I may be confusing the two times.

Q. Okay.

A. I think there were some documents they went through, I don't remember exactly.

Q. Having that in your mind, moving to Monday morning, was there anything similar that occurred between Mr. Bergenn and Mr. Rivernider on that Monday morning where he had a document that he was referencing and discussing with Mr. Rivernider?

A. They may have. There was some documents that were kind of like discussed. I'm not really sure exactly as to the nature of the documents.

Q. So you don't have a firm memory as to --

A. I don't. I'm afraid I don't.

Q. As you testified, you did eventually go over to court and you were physically present in court when Mr. Rivernider entered his guilty plea in front of the Judge?
A. That is correct.
Q. And do you know why you were -- why you stayed and attended the change of plea hearing for Mr. Rivernider, what your role was?
A. My understanding was to actually witness the event. I was going to, later on, continue testing of Mr. Rivernider. And I was in court to also meet with his father and sister.
It was requested that I stay. I don't remember the particulars.
Q. Was it Mr. Bergenn who requested you stay for the change of plea hearing?
A. That's how I remember it.
Q. Have you ever attended a change of plea hearing for any other client?
A. I have not.
MR. FROST: No further questions, Your Honor.
THE COURT: Thank you.
MR. FROST: Thank you.
MR. SCHMEISSER: One moment.
(Pause)

MR. SCHMEISSER: Your Honor, the government has no questions for this witness.

THE COURT: All right.

Thank you. You may step down.

Why don't we take a recess at this time. I want to give you an opportunity to think about how we should proceed from here and, more specifically, I want to give Mr. Rivernider an opportunity to speak with Mr. Frost, and then I'd like Mr. Frost to have a chance to speak with Mr. Schmeisser, and after the recess you can tell me where things stand, okay?

Why don't we say we'll be in recess for 20 minutes.

(Whereupon, a recess followed)

MR. SCHMEISSER: Thank you, Your Honor.

We've had an opportunity to confer. We have discussed a possible briefing schedule, it has to do with Attorney Frost and Mr. Rivernider's next several months of defense filing a written submission on May 15 addressing the various issues that have come up in this hearing relating to the issue of coercion and the plea, and then the government would file a response within 30 days of the defense filing addressing any issues that are raised by the defense.

I think one of the outstanding questions that

have been discussed, at least from the government's side, and we will defer to the Court's assessment, the Court carefully canvassed this defendant before these hearings and attained the assurance from the defendant that he would like to proceed pro se. It's obvious from the transcripts that he's done a very able job in proceeding pro se with the questioning of the witnesses in formulating his strategic response.

The question sort of still remains as to further briefing whether in fact Attorney Frost or Attorney Rivernider -- Mr. Rivernider is the one who actually drafts the actual pleadings in response.

Just because there are obviously funds issues, CJA funds at issue, but that's obviously something for the Court's consideration, and I guess it sort of has to do with whether Attorney Frost is acting as a standby capacity or is actually stepping in as actual counsel for Mr. Rivernider.

So that was just one of the things that we were discussing on this side in terms of the schedule.

Again we would propose a May 15 filing by the defense and 30 days later a response by the government on the coercion.

If the Court makes a ruling after that relating to those claims, then there would be a determination of

what additional steps would need to be taken, if any.

THE COURT: All right.

MR. FROST: Your Honor, Mr. Rivernider and I discussed next steps and he had made a request that I draft the brief that would address the issues raised in these proceedings related to the coercion claim or the involuntary nature of the plea.

And I'd indicated to him -- we were both having some issues in terms of the time because we were going to make a request of the government that Mr. Rivernider's writ be released and he be returned to South Carolina. These trips are sometimes unpredictable in terms of how long it will take and it's not clear when he would be in a position to start preparing such a brief.

From my standpoint, I'm away next week and then I come back and have a homicide trial in Bridgeport in April, which is how we sort of arrived at that middle of May date. But it was Mr. Rivernider's request that I address that -- file that brief in consultation with him.

There was also discussion of obviously the government would have 30 days to respond to that given that it's our burden, and Mr. Rivernider had indicated a willingness to, by the time of that middle of June deadline for the government's response, to file any written response on the what we call the stayed claims.

Because as Your Honor will recall, the affidavit submitted by Mr. Bergenn and Mr. Chase sort of covered the landscape in terms of, you know, the issues they were responding to, and the government did file a brief that addressed both the stayed and non-stayed claims.

So Mr. Rivernider's proposal was he could respond by the middle of June to the stayed claims and then the Court would have essentially everything in front of it by the middle of June rather than prolonging it further after June.

But he had proposed that he would do the response on the stayed claims, which would be filed in June, not me. And I had raised that with the government. I don't know -- there was some concern on the government as to sort of whether he's pro se or whether I'm representing him.

I think our position would be that standby counsel is not well defined, it's a flexible role and it's defined sort of by representation by representation.

And I think -- I've obviously assisted him in this hearing. I think the Court would have the discretion to allow me to file the brief that's due in May on these issues and that he could address the other claims in the fashion that he desires by June and do that himself. But I leave that to the Court.

But that was sort of the proposal that was discussed between myself and government counsel.

THE COURT: Okay, thank you.

Your proposal is fine with me. I think that it makes sense, for the moment anyway, to proceed with Mr. Frost continuing in a standby capacity. It seems to have worked well, and I don't want to upset that apple cart, so I adopt your suggestion.

Mr. Frost will prepare the petitioner's submission regarding the coercion claim, and that will be filed on or before May 15; and meanwhile, Mr. Rivernider can return to South Carolina and prepare whatever he wants to submit by way of a reply to the government's brief on the so-called non-stayed claims, and that can be filed on or before a date in mid June, why don't we say June 18.

MR. FROST: Your Honor, I think the Court may have misspoken, that brief that Mr. Rivernider will be filing will be on the stayed claims.

THE COURT: I'm sorry, that's what I meant to say.

So we'll proceed that way.

With regard to the stayed claims, I think it would be in the interests of all concerned, Mr. Frost, if you were to do whatever review might be necessary to enable you to counsel Mr. Rivernider in connection with

those claims. What I think would be most helpful in that regard would be a review that would enable you to form an opinion as to the strengths and weaknesses of those claims so that you would be able to prioritize those claims accordingly.

I say that because, as I recall, there's something in the neighborhood of 50 claims, which is an unusual number of claims, and this case has been pending a long time, and if Mr. Rivernider were to present a winning claim, it would be better to have that addressed sooner rather than later. I wouldn't want to have a potentially winning claim hanging out there indefinitely while less worthy claims take up people's time and attention.

Just to wrap that up, it seems like Mr. Rivernider wants to challenge the validity of his conviction and also the validity of the sentence, and I have not reviewed these numerous claims. My attention has been focused on the coercion aspect of the case.

But it may be, hypothetically speaking, that in a situation like this, the chance of getting relief from the conviction is relatively remote, but the chance of getting relief from the sentence might be more realistic, and I wouldn't want to spend a lot of time addressing the validity of the conviction if that's not likely to be productive if there is a claim bearing on the validity of

the sentence that could actually be non-frivolous.

So I think it would be a good use of CJA funds if you're willing to take that on.

MR. FROST: Yes, Your Honor, of course.

THE COURT: Thank you.

MR. SCHMEISSER: So, Your Honor, in terms of the government's response, you would propose June 15 or before, assuming -- I believe he mentioned -- June 18, that's fine. I might be on vacation at some point in June, but I'll work around that.

The second point though as it relates to the Court's observations just now, it probably makes -- I don't know whether it works with Attorney Frost's schedule to have an opportunity to do that review since there are many, many claims other than the claims that relate to the voluntariness of the plea or the coercion issue.

It probably does not make sense for Mr. Rivernider to prepare a long submission to file June 18 if Attorney Frost has not had occasion to undertake that review and have that discussion with Mr. Rivernider.

So I don't know what Attorney Frost's schedule is and whether that would be possible. I raise that as one issue.

And then obviously the second issue as it

relates to depending how the Court rules on the coercion issue, that may impact Attorney Frost's analysis that he would undertake.

So I just throw those two points out there.

MR. FROST: Your Honor, I think we could leave the schedule in place. If I feel as though my ability to communicate with Mr. Rivernider and do that review that the Court outlined is -- I'm unable to do it in the timeframe we anticipated, I'll let the Court know, and I can always ask for an extension of that June 18 date for submission on the stayed claims.

I think that's probably the way to handle it and leave the schedule in place that we have.

THE COURT: All right, that sounds fine.

Yes?

MR. SCHMEISSER: Just so the record is clear, my understanding from Attorney Frost is that communication from South Carolina is actually in some ways easier than Wyatt, so there's not an issue with Mr. Rivernider going back to South Carolina forthwith as opposed to waiting here to review the claims with Attorney Frost.

MR. FROST: That's my understanding. I was appointed after Mr. Rivernider was brought to South Carolina, but in discussing it, Mr. Rivernider's experience has been that legal calls are accommodated in

an easier fashion. They are allowed a longer period of time to do legal calls in South Carolina as opposed to Wyatt where there's just 15 minute intervals.

So I think it's actually Mr. Rivernider's impression that it would be actually easier to communicate with me by phone in legal calls when he's back in South Carolina. It's just that trip to get there that I think is a little unpredictable. But once he does get there, I think he's confident that he will be able to communicate with me.

Is that correct?

So the word is clear, I think the government will take, now that the Court has indicated and Mr. Rivernider has requested it, will release the writ that is holding him here at Wyatt and I think he can go back forthwith.

MR. SCHMEISSER: As the Court is aware, it's the Court's writ.

THE COURT: That's so ordered.

If anybody needs anything else, just please let me know.

All right, thank you.

(Proceedings adjourned at 10:25 a.m.)

C E R T I F I C A T E

In Re: ROBERT RIVERNIDER vs. U.S.

I, Darlene A. Warner, RDR-CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/______________________________

DARLENE A. WARNER, RDR-CRR
Official Court Reporter
450 Main Street, Room #223
Hartford, Connecticut 06103
(860) 547-0580