UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT RIVERNIDER | : | |
| | : | Civil No. 3:14CV1000 (RNC) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | November 25, 2019 |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S § 2255 MOTION AND THE REMAINING CLAIMS**

## I. INTRODUCTION

A 2255 action is a last check that a defendant's Constitutional due process rights have been protected. Given that a 2255 action comes after the defendant has already been afforded considerable process, the action is simply to make sure that the defendant had representation at trial or sentencing that was not *so poor* compared with the national norms of criminal defense that it would violate the U.S. Constitution, or that neither the Court nor the Government offended Constitutional requirements. The strictures are even more limited where a defendant actually *pled guilty* to the charged offenses and submitted a detailed confession to his actual crimes. In short, for a host of practical and systemic reasons, a 2255 motion is simply not intended and cannot be a forum where a defendant is permitted to start litigation anew; relitigate decided issues or issues that should have been decided; and to cast out nets for information far beyond what is permitted even in a direct action and would ultimately be immaterial given the scope of his illegal conduct and the fact of his guilty pleas.

As the Court is well aware, the schemes at issue involved primarily an expansive real estate fraud scheme with losses exceeding $20 million and a markedly smaller, albeit related, traditional Ponzi scheme based on the defendant's fanciful projections of returns where such

"returns" were primarily paid with the monies received by the defendant from prior investors. Gov. 2255 Resp. (CV Docket # 126) at 8-9 & Attachment A (summarizing factual background). Here this defendant was afforded a resource-intensive defense, which obtained and reviewed tens of thousands of documents from the Government and obtained separate materials through its own extensive investigation. Faced with overwhelming evidence, the defendant entered a knowing and voluntary guilty plea mid-trial to all counts of the indictment. *See* Gov. Response to Defendant's 2255 Motion ("Gov. 2255 Resp.") at 12-19, 22-27 (CV Docket # 126)[1]; *see generally* Government Response to Post Hearing Brief ("Gov. Supp. Resp.") (CV Docket # 161).

At sentencing, the Court gave little, if any, weight to the applicable Guidelines and, after urging from defense counsel, imposed a sentence that was a steep discount off the agreed-upon applicable Guidelines range. Gov. 2255 Resp. at 28-29. The defendant went through his direct appeal and his conviction was broadly affirmed, including a finding of the reasonableness of the sentence, leaving only narrow considerations for any 2255 motion. Gov. 2255 Resp. at 29-31 (describing procedural history and Second Circuit ruling). The defendant has also been afforded substantial deference by this Court in this 2255 matter, which has thoroughly litigated many of the defendant's claims. For the reasons discussed below and in the Government's prior submissions and in the lengthy affidavits submitted by defense counsel, it is time to recognize that this defendant has been afforded all the process he is due, and deny his 2255 Motion for resentencing and release and deny his motions for additional discovery.

In this 2255 action, the defendant seeks to revisit many issues raised in the original action and question the strategic decisions made by his experienced counsel, filing now over fifty claims. As the Court is aware, formal consideration of a number of these 2255 claims were

[1] To reflect the docket of the underlying criminal case, the abbreviation "CR" is used preceding the docket cite. For the 2255 action, the abbreviation "CV" is used.

stayed pending the Court's assessment of the defendant's claims regarding the guilty pleas, as a finding of a valid plea would bar a number of the defendant's claims. After extensive hearings and briefing, the Court affirmed that the defendant's plea had been knowing and voluntary and not subject to coercion, and rejected the defendant's claims surrounding that plea. *See* Gov. 2255 Resp. at 12-28 (describing the plea related facts); *see generally* Gov. Supp. Resp. (hearing developed facts regarding plea); Court's Preliminary Order (CV Docket # 198).

The Government and defendant's former trial counsel have already addressed all of defendant's previously raised claims in the Government's prior omnibus response to defendant's 2255 Motion, affidavits from counsel, and a subsequent submission – all of which are incorporated by reference. *See* Gov. 2255 Resp.(CV Docket # 126); the submitted affidavits; Gov. Supp. Resp. (CV Docket #161) (after the various hearings, on the defendant's plea related claims).[2] In fact, defense counsel have previously responded point by point to the factual assertions of most of the defendant's claims in filed affidavits, including CV Docket # 123 (Bergenn Affidavits); # 124 & 144 (Chase Affidavits); and #143 (Howard Affidavit). These submissions alone are sufficient to plainly demonstrate that this defendant has been afforded more due process than perhaps any defendant of recent memory in this District and far more than is required to address the defendant's claims. While this memorandum supplements the Government's previous submissions to address, as needed, specific arguments raised in the defendant's recent submissions, the defendant's recent submission confirms that the defendant will keep making up claims, demanding confirmations of "facts" that are not true or demanding the production of documents that either were produced, never were in the Government's

[2] The defendant has also raised additional claims in his Supplement to Section 2255 Motion, CV Docket # 213 (claims 53-56), which may denied on the current factual record. *See* discussion *infra* at 33-34.

possession or never existed. The Government submits that the defendant has not come close to establishing a basis for any relief and respectfully requests that the defendant's remaining claims and requests for additional discovery be denied.

To keep some uniformity to the review by the Court, the Government has followed the categories used in its original response which distinguishes between the plea/pre-plea claims and the post-trial/sentencing/appeal claims, as the fact of the defendant's guilty pleas adds an additional ground for denying the defendant's pre-plea claims.

### A. **Summary -- Post-Trial Sentencing and Appeal Claims**

The defendant's Post-Trial/Sentencing Claims, other than for ineffective assistance of counsel, are barred under the **Procedural Bar Rule** and, in addition, as to certain claims, the **Mandate Rule** for the reasons discussed in the Government's omnibus response. Gov. 2255 Resp.at 70-88 (CV Docket # 126). As to the claims levied against defense counsel, those are quickly dispelled **on the facts** for the reasons set forth in defense counsel's affidavits as discussed in the Government's omnibus response, *see generally* Gov. 2255 Resp. (CV Docket #126), which reflect very competent counsel making very competent assessments of sentencing strategy.

Because standby counsel now focuses on certain Sentencing and Appeal Claims and certain pre-plea claims, those claims will be more fully addressed in this memorandum below at 11-38. With defendant's Supplemental Brief ("Def. Supp. Br."), CV Docket # 219, standby counsel has primarily focused on various speculative arguments that try to suggest that defense counsel at sentencing should have pursued an entirely different sentencing strategy, done more investigation and taken more time blaming the victim banks and NMB clients to try to challenge Guidelines losses and the applicable number of victims. Def. Supp. Br. at 9-22. As discussed in

greater detail below, there is absolutely nothing to these claims. Defense counsel at sentencing made the ***extremely*** reasonable judgment not to focus the Court more on the facts of the defendant's fraud, which would have more concretely reflected the defendant's involvement with overseeing all aspects of obtaining approximately 104 properties by fraud and his additional involvement in the much smaller, albeit related, Ponzi scheme. Instead defense counsel at sentencing, using their strategy, were able to secure a sentence for the defendant ***far below*** the applicable Guidelines range, despite Rivernider's efforts to sabotage his own sentencing.

In his recent memorandum, standby counsel also takes issue with the defendant's appellate counsel. Def. Supp. Br. at 26-27. As discussed below, the claims against appellate counsel are primarily a restatement of claims lodged against trial counsel in the underlying case. The case law is clear that appellate counsel is permitted to assess which claims to pursue and which not to pursue. Given the valid guilty plea, which would preclude claims prior to the plea, and defense counsel's reasonable strategic decisions before the plea and through sentencing, the defendant hasn't articulated any ground that would reasonably challenge appellate counsel's review of the record to identify issues to pursue other than what she did. Further, it would appear that the record is sufficiently developed for the Court to rule on the claims against appellate counsel without the Government seeking out appellate counsel and requesting the submission of an affidavit in support of the course taken.

### B. Summary: Pre-plea claims (pretrial, trial and residual claims about the plea process)

With the determination of the voluntary plea, and in light of the procedural posture of the case, the pre-plea Claims, including all constitutional claims such as ineffective assistance of counsel, are barred (with a narrow, arguable exception of constitutional violations tied closely to the entry of the guilty plea) because of the defendant's **knowing, voluntary guilty plea**. *See*

Gov. 2255 Resp. at 36-39 (CV Docket # 126) (case law on preclusive impact of valid guilty plea) and Gov. Supp. Resp. at 43-45 (CV Docket # 161). Further, as a general matter, pre-plea claims, other than allegations of defense counsel's ineffective assistance, are separately barred under the **Procedural Bar Rule** (requiring any claim that could have been litigated previously should have been raised in the direct case or appeal); and the **Mandate Rule** (precluding litigation of specific matters raised on appeal). The case law on the Mandate Rule, Procedural Bar, and Valid Guilty Pleas are set forth in the Government's prior pleadings, Gov. 2255 Resp. at 31-39; Gov. Supp. Resp. at 43-45, and will not be repeated here. Even despite the above bars, defense counsel previously submitted affidavits that address the extensive pre-trial preparation undertaken and the effective conduct of counsel. The Government submits that those affidavits and all the other information previously considered by the Court warrant rejecting the defendant's pre-plea claims, as discussed in the Government's first omnibus response to defendant's 2255 claims and the Government's supplemental filing. CV Dockets # 126 & 161. In response, the defendant has in his recent filing raised various arguments. Those arguments will be address below at 11-38, but do not alter the fact that this defendant has been afforded due process and all his pre-plea claims should be dismissed and requests for further discovery denied.

## II. <u>LEGAL STANDARDS</u>

The Government has previously briefed much of the relevant law in prior submissions, which are incorporated by reference. *See* Gov. 2255 Resp. at 31-47; Gov. Supp. Resp. at 43-45. Recourse under a 2255 action is narrowly limited. *See United States v. Addonizio*, 442 U.S. 178, 184-5 (1979) (Section 2255 "narrowly limit[s] the grounds for collateral attack," noting that "long settled law" is that an error that may justify reversal on direct appeal will not necessarily support a collateral attack). As set forth in prior submissions, a petitioner alleging ineffective

assistance of counsel must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1987), that is, that counsel's performance was markedly deficient and petitioner was prejudiced as a result. *Id*. at 687. Failure to satisfy either prong is fatal. *Id*. at 697. As the Supreme Court stated, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. A petitioner must identify specific acts or omissions which reveal that counsel did not provide "reasonably effective assistance," *Strickland*, 466 U.S. at 687, as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Counsel is strongly presumed to have provided effective assistance, and the petitioner has the burden to show otherwise. *Strickland*, 466 U.S. at 689. The prosecution has no duty to attempt to prove that defense counsel's strategy was actually reasonable (or even to define that strategy); rather, a petitioner must rebut the presumption that counsel's decisions were strategic. *See Strickland*, 466 U.S. at 690 (**"strategic choices ... are virtually unchallengeable"**) (emphasis added).

As relevant to the defendant’s multiple claims against defense counsel for not pursuing various avenues of investigation, either because they were unavailable or did not appear they would be fruitful, the decisions made by counsel were strategic and sensible. *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up."); *Tollett v. Henderson*, 411 U.S. 258, 267-68 (1973) (once a defendant pleads guilty, he cannot set aside his plea by showing that "if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings"). Further, "the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will

recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982).

The Supreme Court has unequivocally rejected the assertion that effective assistance requires litigation of every conceivable issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Decisions about which issues to raise on appeal rest with counsel, who is better suited than his client to estimate the probability of success on any given argument. *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also Coleman v. Mitchell*, 268 F.2d 417, 430-31 (6th Cir. 2001) (holding that counsel is not ineffective for refusing to litigate every conceivable issue). "The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). "[I]t is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

**A. <u>Limited Relevance of *Miller* to the Facts Here</u>**

The defendant has not meaningfully challenged the recent line of cases post *United States v. Ruiz,* 536 U.S. 622 (2002) that, for important policy reasons, bar the litigation of pre-plea issues as a result of a valid guilty plea. *See* Gov. 2255 Resp. at 37-39 (citing the law). Instead, the defendant cites *Miller v. Angliker*, 848 F.2d 1312, 1319 (2d Cir. 1988), to argue that there remains a narrow opening to challenge a "knowing" plea if material evidence was withheld by the prosecution that directly impacted whether the defendant would have pled guilty. Def. Supp.

Br. at 22. The defendant seeks to rely on *Miller* to litigate all his various pre-plea claims. The viability of *Miller* is questionable after *United States v. Ruiz*, which was litigated 14 years later, particularly as to alleged non-disclosure of purported impeachment evidence, a circumstance directly addressed in *Ruiz*. *See, e.g., United States v. Moussaoui*, 591 F.3d 263, 285-286 (4th Cir. 2010). In any event, *Miller* has no applicability to this case for a number of reasons:

*First*, unlike the circumstances in *Miller*, the purported instances of misconduct were raised by the defendant in the district court action and not pursued at that time by his trial or appellate counsel. Thus, such claims against the Government would be **Procedurally Barred** for various important policy considerations discussed in prior filings, including finality.

*Second*, as a factual matter, as it relates to disclosure issues, there is nothing to defendant's speculative assertions that the Government failed to comply with its disclosure obligations. The Government did not suppress evidence. Further, the defendant hasn't proffered any actual evidence of Government misconduct, but instead simply makes speculative assertions.

*Third*, as the litigation regarding a knowing plea reflected, defense counsel themselves were apparently aware of most, if not all, of Rivernider's claims about purported Government misconduct and stuck with their plea and sentencing approach, facts that weigh heavily against the defendant's present claims of materiality and prejudice. *See generally* Bergenn & Chase Affidavits (outlining extremely detailed investigation and well thought out approach to plea and sentencing).

*Fourth*, even if *Miller* remains good law, it is properly narrowly construed not to undercut the strong policy considerations of *Ruiz*. Here, the broad scope of the inculpatory evidence against Rivernider as to both schemes – including his emails, his bank statements, and his various inclupatory spreadsheets and other records taken from his own computer – were

documents he created or reflected his direct knowledge and control. The evidence against the defendant was overwhelming and is not undercut by the defendant's present speculative claims. In addition, as defense counsel testified under oath, an important motivation for the plea was the defendant's appreciation of the harm his fraud had caused to his victims – a sentiment unrelated to whatever defendant now claims he was denied and thus wouldn't have changed any decision to plead. *See* Gov. Supp. Resp. at 14 (describing factual background of guilty plea). In short, *Miller* simply does not justify litigating or relitigating pre-plea issues in this case.[3]

### B. <u>Permissible Discovery Is Sharply Limited in 2255 proceedings.</u>

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, a habeas petitioner is only permitted discovery upon demonstrating to the district court that "good cause" exists for the requested materials. This is a "heavy burden" to establish. *Renis v. Thomas*, No. 02 Civ. 9256, 2003 WL 22358799, at *2 (S.D.N.Y. Oct. 16, 2003) (*citing Bracy*, 520 U.S. at 904). In order to show "good cause," a petitioner must set forth "specific allegations" that provide "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" – in other words, be entitled to a new sentencing or other defined relief sought. *Bracy,* at 908-909. "Generalized statements about **the possible existence** of discovery material**"** are **insufficient** to constitute "good cause." *Green v. Artuz*, 990 F. Supp. 267, 271 (S.D.N.Y. 1998) (emphasis added). Instead, a petitioner

[3] Assuming that a claim based on the impact of "cumulative errors" is even viable after *Ruiz*, it affords no basis for relief where a petitioner does not establish any errors by counsel that could be accumulated. *E.g.*, *Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (assuming, without deciding, that cumulative error could provide the basis for a § 2254 claim, but finding no relief warranted where "there are simply no errors to cumulate"); *accord United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir. 1990) ("a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors").

must produce "specific evidence that supports his claim that the requested material exists." *Id. See also Cohen v. United States*, No. 07 Civ. 7397 (GBD), 2013 US Dist. LEXIS 156441 at *23-*24 (S.D.N.Y. October 29, 2013) ("vague, overbroad, generalized statements 'about the possibility of uncovering materials through discovery that would support [otherwise unsupported] legal claims' are not sufficient to meet this burden") (quoting *Renis*, 2003 WL 22358799 at *3). A district court has full discretion to deny a motion for discovery where the petitioner fails to provide specific evidence that the requested material would support his habeas corpus petition. *See Charles v. Artuz,* 21 F. Supp. 2d 168, 170 (E.D.N.Y. 1988). A habeas petitioner cannot use discovery for "fishing expeditions to investigate mere speculation." *Calderon v. U.S. District Court*, 98 F.3d 1102, 1106 (9th Cir. 1996); *Titus v. United States*, 2014 WL 2215705, *20 (E.D. Va., May 28, 2014) (rejecting discovery requests where petitioner has not established "a reasonable inference that the discovery he requests would yield materials that would entitle him to relief").

## III. **THE SENTENCING RELATED CLAIMS**

While the post-plea sentencing related claims *against defense counsel* would not be barred by the fact of the defendant's knowing and voluntary guilty pleas, such claims against the Court or the Government are subject to bars under the **Procedural Bar Rule** or t**he Mandate Rule –** particularly as virtually all of the defense claims directed at the Court or the Government relate to issues, albeit unfounded, that were raised and known in the original action. The Second Circuit has already affirmed the substantive reasonableness of Rivernider's sentence, finding the District Court acted "well within its discretion in determining Rivernider's sentence." *See Rivernider*, 828 F.3d at 111. To the extent that the defendant raises other claims now to the procedural reasonableness of the sentence – namely, the calculation of the Guidelines -- those

claims would be barred by the Procedural Bar Rule. In fact, the Second Circuit already considered and rejected Rivernider's codefendant's contemporaneous claims of procedural reasonableness as to loss and other sentencing enhancements. *Id.* at 112-113.

In short, Rivernider's only claims that would remain viable must focus on whether *defense counsel* failed to act within wide constitutional norms in representing the defendant after the defendant's guilty plea and through sentencing. Defense counsel have in sworn affidavits – CV Docket # 123 (Bergenn Affidavits); CV Docket ## 124 & 144 (Chase Affidavits); and #143 (Howard Affidavit) -- explained the significant effort and care taken in the case, including throughout the sentencing process, and the Court can determine, based on its own determination of the sentencing process and the evaluation of the affidavits, whether the two experienced defense counsel were constitutionally ineffective in getting the defendant a sentence far below the applicable Guidelines range. Further, defense counsel have reviewed the defendant's sentencing related claims and noted that defense counsel's "objective for him at sentencing was to obtain a discretionary sentence below what the Sentencing Guidelines called for, and we achieved that objective on his behalf." Bergenn Aff. 78. Counsel further noted that "Rivernider's claim regarding other actions we may or should have taken would not have serviced that purpose." *Id*. Defense counsel acted well within Constitutional requirements and these claims should be promptly denied and no additional discovery afforded.

The following provides a brief response to specific post-plea items noted by standby counsel in the defendant's recent submission:

a. The defendant's assertion that defense counsel failed to investigate and argue lender <u>culpability and lender knowledge at sentencing (Claims 1 & 8).</u>

The defendant argues that defense counsel failed to investigate and argue lender culpability and lender knowledge at sentencing. Def. Supp. Br. at 9-16. Defense counsel acted

entirely reasonably in following the accepted sentencing strategy of downplaying discussion of the criminal conduct and instead focusing the Court on other factors, in an effort to minimize the significance of the Guidelines and sentencing ranges suggested by the Guidelines. That age-old approach of minimizing discussion of the defendant's criminal conduct is simply inconsistent with the approach now advocated by the defendant to get into the weeds and focus on items that either would be immaterial or, in fact, prejudicial to the defendant's sentencing objectives. While the Government submits defense counsel took the best approach to sentencing, the Court is not asked to decide that point, but is simply asked to reach the easy conclusion that, within the very wide range of legal practice in this country, defense counsel's representation was not so poor as to be characterized as violating the Constitution. As a result, the defendant's claims must be dismissed.

1. The Sentencing Backdrop

*First*, the over $20 million fraud loss attributable to the defendant was based on 104 loans and property transactions, primarily in one area of Tennessee and one area of Florida, that were taken off a summary spreadsheet *on the defendant's own computer*. And the actual loss calculation was based on taking the remaining principal balance on outstanding loans as reported by the banks – in other words, crediting the defendant with all payments actually made against principal – and then subtracting the sale value of the underlying property. *See* Gov. Mem. Concerning Loss at 9-10 (CR Docket # 497); *See generally* Gov. Sent. Mem. with Exhibits (CR Docket # 524) (Oct. 24, 2013); *id.* at 23-24; *Cf.* Government's Supplemental Memorandum Re Restitution at 4-5 (CR Docket # 619) (determination of certain restitution issues post sentencing); Government Reply Re Restitution at 6-10 (CR Docket # 628) (outlining facts supporting fraud loss). The actual real estate principal losses caused by Rivernider's fraud are

not – and have not been --subject to meaningful debate. And defense counsel at sentencing fully acknowledged that the Guidelines loss calculations were correct – while reserving the right to argue they overstate the seriousness of the conduct. Sentencing Transcript (12/18/2013) at 57-58. Similarly, the losses suffered by NMB victims were calculated using an extremely conservative assessment, based on available information. Gov. Mem. Concerning Loss, *supra* at 5-6. At no point has the defense posited any meaningful challenge to the actual losses incurred.

*Second*, the nature of Rivernider's real estate scheme, which kicked back millions of dollars to unsophisticated buyers, was far more extensive than a fraud based simply on a buyer's overstated income, which would focus more on a borrower's ability to pay, rather than the valuation of the property itself. *See* testimony of Barbara Flores at 637-638 (trial testimony on 2/13/13) (CR Docket # 640) (explaining how misrepresentations regarding benefits given the buyer go to core valuation issues); *Id.* at 633-674 (Flores testifying regarding the plain materiality of specific types of illegal misrepresentations, relevant to the extensive, multi-layered fraud caused by Rivernider). Rivernider's scheme simply made no economic sense at its core, as both trial counsel and the defendant knew. Virtually all, if not all of the properties at issue in the case, were based on Rivernider determining the price for a property, which involved agreeing to a sale price with the seller and then Rivernider marking up that price with little or no input from the actual buyer to the highest price Rivernider could in any way justify. *See, e.g,,* CV Docket #126-3 at GA170-71 (Email from Rivernider showing his detailed knowledge of how to manipulate and set prices through the selection of appraisers); Gov. Sent. Memo. (CR Docket # 524 at 7 n. 2 (discussing pricing manipulation regarding Tennessee properties); *Id.* at 21 (noting that Rivernider received approximately **$7.7 *million*** from property sellers relating to the property sales). Rivernider would *kick a good portion of the money he received from the sellers back to*

*the unsuspecting buyer* through covering earnest money deposits, all purchase costs and then the cost of the ongoing mortgage payments.

A review of the mortgage applications makes clear that there were no disclosures made to the corporate decision makers at the banks that (1) the price of the real estate (the banks' collateral) had been effectively set by Rivernider with no input by the buyer; (2) Rivernider was kicking back a substantial portion of what he extracted from the deal to the unsuspecting buyers, through undisclosed earnest money advances, and freeing the buyers from paying mortgages and in certain instances offering to purchase the properties at a later date; and (3) as a result, the buyers had little or no incentive to take issue with the purchase price for the property. In other words, because of the earnest money payments fronted by Rivernider and the other kickbacks and promises made the buyers (not disclosed to the lenders), the true value – the effective price paid -- for a property was markedly less than the lenders understood.[4] Further, the evidence or testimony reflected that Rivernider or others never explained the details of the scheme to the unsophisticated buyers, as the buyers were pushed through the process by Rivernider, Ponte, Seneca, Kemp and others. *See infra* at 29-30.

*Third*, the illegal core nature of each transaction was magnified by multiple instances of other fraud, as discussed at trial and addressed by a lender representative who testified before the guilty plea. *See* Flores testimony, discussed above. This included a wide range of illegal acts caused by Rivernider, such as (1) paying the earnest money for many clients; (2) kicking back substantial monies to the buyers obtained from the seller; (3) overstating buyers' income; (4) misrepresenting the nature of the purchased property (investment vs. primary residence); and (5)

[4] Because the sales with the promised kickbacks did not reflect true arms-length-transactions between an unrelated buyer and seller, Rivernider was able to create sale "comparables" that skewed appraisals that used Rivernider's prior sales to set the market – which would undercut the accuracy of any appraisals based on faulty comparables.

advising clients to buy multiple properties at the same time ("stacking the loans") so the new debt would not show up on a lender's credit check of the buyer. And the record made clear that Rivernider and his conspirators – unlike the banks – knew that many of his clients from the NMB scheme were in poor financial circumstances and yet Rivernider still pushed them into investments they could not afford. At trial, there was lender testimony that all these acts would be material to deciding whether to lend. *See generally* CR Docket # 640 (Barbara Flores trial testimony on 2/13/13 at 633 through 674.) *See generally* Gov. Supplemental Re Loss Calculation (CR Docket # 501) (Sept. 6, 2013) (example of fraudulent loan submission).

*Fourth*, the record was replete with evidence of the defendant taking steps to hide his illegal conduct and material misrepresentations from Wells Fargo and the other lenders – as he had admitted in the detailed offense conduct at the time of the guilty plea. *See, e.g.*, Gov. 2255 Resp.to 2255 Motion at 126-1 at 5 through 11 (listing some of Rivernider's and coconspirator's efforts to mislead lenders to lend monies); CV Docket 126-3 at GA90 (**Rivernider's expressly admitting that he caused material misrepresentations to be made on lenders, including Wells Fargo**). As specifically relevant to Wells Fargo, in September 2007, Rivernider tellingly emails his coconspirator Ponte that Rivernider has two representatives that can do at Wells Fargo some of what Kemp (a coconspirator) has been able to do there. CV Docket # 126-5 (GA277). Rivernider comments: "I will use both this time as not to overwhelm one and ***red flag her with Wells*** for suddenly have a lot of business in this market." *Id.* (emphasis added). Evidence such as this highlights that Rivernider knew Wells Fargo would shut him down if his fraud became known there.

*Fifth*, there was no real dispute that at least one lower level Wells Fargo employee, Shellie Kemp, was in on the scheme as she pled guilty to her involvement with Rivernider in

duping her own employer – and the upper-level decision makers at the bank. And the defendant's own sister, Loretta Seneca, and his coconspirator Robert Ponte had pled guilty to involvement in the scheme. There is an obvious distinction between rogue employees and the institution that employs them. *See United States v. Demauro*, 581 F.2d 50 (2d Cir. 1978) (generally, a corporation is only liable for the criminal acts of its employees "if done on its behalf and within the scope of the employees' authority"). By engaging in criminal acts which included, for example, falsifying income to circumvent Wells Fargo's loan requirements, *see, e.g.*, Gov. Supp. Resp. to Restitution at 10-11 (CR Docket # 628), citing Government's Version of the Offense at 28-30; Exhibits attached to Version, Exhs. 117, 124, 125, 129, 130, 144 (emails with Rivernider, Kemp and others to conspire to defraud her employer), Kemp clearly acted in a way that reflected her interests diverged sharply from that of her employer. In a proffer session with the FBI, disclosed to the defense, Kemp admitted to keeping her fraud from her employer and acknowledged that she had been expressly told that the loan applications she was providing could not include any funny business. Again, far from explaining the scope of the fraud to her employer, she made clear that Rivernider had to keep any reference to Rivernider's company off any closing papers for loans. *Id.* Exh. 124. In the same email chain, again far from suggesting that Wells Fargo as an organization was complicit with Kemp and Rivernider, she warned Rivernider not to use her Wells Fargo email, which she appeared to suggest Wells Fargo could monitor, but to stay in touch on her personal email. *Id.* In short, the record repeatedly reflects that Rivernider, Kemp and the other coconspirators did their best to operate in the shadows, hiding from the victim lenders how they were pitching deals that made no economic sense. *See also* CV Docket #126-3 at GA124 (Ponte's detailed admission of conspiracy with Rivernider to defraud lenders and NMB clients).

*Sixth,* most of the defendant's sentencing related claims go to issues of Guidelines loss. While there is no merit to any of the claims, there is also no prejudice as defense counsel were actually successful in convincing the Court that the Guidelines loss in this case was simply not an appropriate measure to determine the defendant's culpability and the appropriate sentence; there is therefore simply no relevance to standby counsel now focusing on Guidelines issues as the defendant was not prejudiced by the application of the Guidelines in this case. *See* Sentencing Transcript (12/18/2013) at 206 (Court giving reasons why loss guidelines not appropriate); at 212 (questioning the validity of the guideline and finding guideline "clearly excessive"). Further, to the extent the defendant asserts that the Guidelines were a toehold, influencing the Court, the record makes clear that the Court was independently guided by a range of other factors in this case in setting an ultimate sentence– and simply not materially influenced by the applicable Guidelines calculation. *Id.*

2. The defendant's claims about lender culpability or lender knowledge in no way undercut the reasonableness of trial counsel's strategy (Claims 1 and 8).

The defendant now tries to distance himself from the evidence of his fraud by claiming that defense counsel should have argued the lenders were culpable. Rivernider wants us to speculate and infer lender knowledge about the fraud in his specific loans in the hope that such arguments result in a lower sentence than he ultimately received.[5] Def. Supp. Br. at 9 – 17. Having given these arguments due consideration, defense counsel plainly decided that such an

[5] The defendant's sentencing claims simply seek to repackage what is, in essence, a non-jurisdictional, non-constitutional claims of Guidelines error. But "[b]arring extraordinary circumstances," such claims cannot be raised in a 2255 action. *See, e.g., United States v. Pregent*, 190 F.3d 279, 283-84 (4th Cir. 1999); *Buggs v. United States*, 153 F.3d 439, 443 (7th Cir. 1998). Instead, the Court is faced with the very narrow question, not whether the Guidelines ranges are correct (which they are), but whether *defense counsel's* approach to sentencing was so deficient as to find defense counsel constitutionally ineffective. Far from constitutionally deficient, defense counsel actually made the correct sentencing choices in trying to avoid focusing the Court at sentencing on the details of Rivernider's illegal conduct.

approach would be inconsistent with a more reasonable strategy of staying out of the weeds and trying to turn the Court's focus away from Rivernider's criminal conduct. *See, e.g,*. Gov. 2255 Resp.at 73-74; and 60-61 (factual arguments from defense counsel's affidavits). There are multiple reasons why defense counsel's approach was entirely reasonable and certainly not constitutionally ineffective.

*First*, defense counsel knew that Rivernider's crime and ultimately his punishment would focus on the defendant's intent to deceive the lenders by denying them accurate discretionary economic information regardless of the lender's culpability. *United States v. Dinome,* 86 F.3d 277, 283–84 (2d Cir.1996); *United States v. Rabuffo*, 716 Fed. Appx. 888, 900, 2017 U.S. App. Lexis 23323, at 24 (11th Cir. 2017) (focus of criminal fraud statutes is on the defendant's intent, not on issues of lender reliance). Defense counsel knew that, even if they could seek to establish at sentencing a lender's recklessness or even gross negligence, such a finding would not mitigate or excuse the defendant's fraud. *See* Government's Motion in Limine to Preclude Evidence or Arguments Blaming Victim Lenders at 3-5 (CR Docket # 314) (filed 1/15/13) (and cases cited).

*Second*, defense counsel also knew that the defendant had already pled guilty *to defrauding the lenders*, including Wells Fargo specifically, as set forth in the detailed Admission of Offense Conduct. Entirely consistent with Rivernider's guilty plea and Rivernider's own admissions at the plea, significant evidence in the record reflected the defendant's effort to keep the lenders, including Wells Fargo, in the dark regarding his fraud. *See supra* at 16-18. As a result, by Rivernider's own admissions, defense counsel knew at sentencing that Wells Fargo or the other lenders never knew the true extent of Rivernider's fraud.

*Third*, defense counsel knew that to advance a theory that the lenders were in on the fraud, they would need to make the defendant look even worse at sentencing by detailing the

entire scope of his fraud and then insist certain lenders knew of all his fraud. Counsel would have had to detail loan by loan all the types of misrepresentations willfully caused by the defendant (the kickback scam, the earnest money scam, the overstated income scam, the stacking loans scam, the misrepresenting the loan use scam, the clients' lack of assets scam) and then try to draw a speculative link that certain lenders actually embraced, joined in and even encouraged Rivernider's extensive fraud. Again, the approach would have simply highlighted again and again to the Court at sentencing the broad scope of the defendant's fraud with much greater downside risk than potential upside reward. In addition, given the defendant's broad guilty plea, to seek to accuse the lenders of participating with the defendant in the fraud would potentially alienate the Court and raise real question of the defendant's likely recidivism.

*Fourth*, while carefully avoiding getting stuck in the weeds, defense counsel, in fact, *did suggest* some possible broker/lender culpability so that the Court might minimize the importance of loss at sentencing. In fact, during the sentencing loss hearing defense counsel expressly pressed the argument of lender knowledge as a mitigating factor, citing information provided from Wade about the knowledge of certain brokers. CR Docket # 651 at 84-91 (9/4/2013 Sentencing Hearing on loss). Standby counsel also has acknowledged that defense counsel brought to the Probation Office's attention prior to sentencing that several mortgage brokers were "in the know." Def. Supp. Br. at 10. And the Court actually acknowledged the lending environment at the time of the defendant's fraud when discussing the imposition of sentence. *See* Sentencing Hearing Transcript (12/18/2013) at 209-210 ("If this was a cesspool of fraud, you eagerly jumped in and you swam around in it with no reluctance, taking advantage of other people in a way that shows a lack of ethics and, frankly, a lack of conscience.") In short, defense counsel was able to raise lender knowledge as a possible mitigating factor without dragging the

Court further into the specific details of the defendant's extensive fraudulent conduct, and the Court gave due consideration to the real estate environment when sentencing the defendant.

To try to make a case now for the "in the weeds" strategy, the defendant tries to make something of what are ultimately various immaterial tangents. The defendant tries to deflect by arguing that defense counsel should have followed up on statements made by Tosha Wade, disclosed in discovery, that certain other mortgage representatives were aware of Rivernider's incentive program and counsel should have investigated this more. Def. Supp. Br. 10-11. But what some local brokers who were working with Rivernider may have known establishes nothing about what the regional decision makers at the banks knew of the specifics of Rivernider's fraud out of the thousands of legitimate loans approved by the banks. *Cf.* testimony of Barbara Flores at 637-638 (CR Docket # 640) (2/13/13) (describing mortgage brokers status as separate contractors from lenders). The Government made the appropriate discovery disclosures and there is no evidence that the loan decisions-makers for the relevant banks, in reviewing and approving the 104 loans at issue, had knowledge of Rivernider's fraud, much less its depth and its breadth. Again, Rivernider, in making his claims, appears to conflate what a low-level conspirator like Shellie Kemp, who pled guilty to conspiring to defraud her own employer, knew with what a higher level manager at the bank knew of Rivernider's multi-pronged fraud.

The defendant goes on to criticize trial counsel for not emphasizing at sentencing that Shellie Kemp had been disciplined and then later fired by Wells Fargo after the conduct at issue and that Wells Fargo refused to cooperate with defense counsel regarding her termination. Def. Supp. Br. at 11. But defense counsel's conduct was reasonable as counsel has explained in the affidavits. Further, it is hard to see how raising this information would have helped the

defendant at sentencing. The fact of Kemp's firing appears to directly undercut Rivernider's speculative claim that Wells Fargo condoned Kemp's and Rivernider's illegal conduct. Further, it would be entirely understandable that a victim of the defendant's fraud – particularly a corporate entity -- would not willingly discuss internal personnel matters with the defendant.

The defendant spends much time asserting that counsel should have focused on the fact that Cut Above Ventures is identified as a recipient of certain monies on the seller side of the HUD settlement statements; the defendant argues that the HUD statement thus gave lenders notice of his scheme. Def. Supp. Br. at 11. *See, e.g.,* CR Docket # 501-3 (example of Cut Above Ventures listed on the seller disbursement side of the HUD statement). But this argument again focuses the sentencing Court on the ingenuity of Rivernider's fraud. Certain HUD statements may indicate *on the seller side of the ledger* how the seller may be choosing to spend the proceeds of a property sale, whether it be to pay off another lender's mortgage or to pay unrelated bills or debts. As a practical matter, defense counsel reasonably understood that a lender typically may not care about how the seller spends funds from a sale, because the seller with the sale does not have a continuing relationship with the buyer, the lender or the property. What was ***not*** disclosed on the HUD statement or any other mortgage application document provided the lender was that the substantial payment made by the seller to Cut Above Ventures ***would be kicked back*** to the buyer by Cut Above Ventures through earnest money payments or subsequent mortgage payments thereby effectively substantially altering the true economic value of the property. In short, Rivernider kept this truly fraudulent aspect of the deal hidden from the lenders. The HUD statement never indicated the kickback nature of the seller disbursement. *See* CR Docket #501-3 (sample HUD, listing Cut Above Ventures, but not indicating payment was kicked back to the buyer). And the potential kickbacks were substantial. *See, e.g.,* Gov. Supp.

Mem. re loss at 4-5 n.6 (CR Docket # 501) (providing example of Rivernider taking a $235,000 payment for a property which had an purported states price of $649,000, with the monies than funneled back into his Ponzi payments); *supra* at 14-15 (Rivernider obtaining $7.7 million from sellers). Finally, and inconsistent with the decision makers at the lenders supporting Rivernider's fraud, Kemp (a co-conspirator) and Rivernider discussed removing any identification of the payment made to Cut Above Ventures on the HUD statement and thereby avoided anyone even asking questions. And, of course, the fraud on the purchase price was just one aspect of the many misrepresentations caused by Rivernider on the loans at issue, as noted above at 15-16.

The defendant further claims that Wells Fargo and SunTrust, large national banks, entered several settlement agreements concerning lending practices during the last five years and then tries to draw significance from those settlements. Def. Supp. Br. at 12. The gist of the claim is that defense counsel should have obtained more information or made more of an issue about certain civil litigation that resolved months or years after Rivernider's sentencing.[6] The Government had disclosed the one civil suit against Wells Fargo (filed in Oct. 2012) prior to trial, including the civil complaint and press release, and then litigated certain matters relating to

[6] To the extent this claim is somehow directed at the Government, that claim is baseless as the issue of DOJ's ongoing litigation with banks was raised during the direct case and addressed then. None of the defense counsel pressed the matter further, presumably for the understandable reasons addressed above that the civil litigation had limited relevance, at best. As the matter was raised before and not pursued, that claim against the Government is Procedurally Barred. *See supra* at 4. Further the Government and members of the Prosecution Team made all required disclosures, having produced information known to the Prosecution Team in discovery. *See, e.g.*, *United States v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009) (no error for USAO not to produce notes from SEC interviews information that it did not possess); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (noting that requiring inquiry of other offices would condemn prosecutions to a "state of paralysis"); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996) (no obligation to learn information possessed by government agencies with no involvement in the investigation or prosecution at issue, citing *Kyles*).

blaming the victims lenders. *See* Gov. Motion in Limine, at 2 n.1 (CR Docket # 314) (noting discovery production). In its present pleading, the defendant cites various allegations from the civil complaint regarding the underwriting of government insured mortgage loans. Def. Supp. Br. at 8. The conduct alleged in the complaint related to conduct between May 2001 and October 2005 involving a FHA government program, two years before defendant's conduct here. *Id.* (as reflected in complaint and in cited quotation). This matter appears to have been resolved by settlement (1:12CV07527, SDNY Doc. 320) in April 2016, two and a half years after the defendant's sentencing, with no admission of fault by Wells Fargo (whether breach of contract, negligence or otherwise) and a reservation of rights to contest applicability of document in future litigation.

The defendant also notes that the Department of Justice entered a later settlement with Wells Fargo in 2016, three years after the sentencing in this case, regarding allegations of representations made regarding loans in residential mortgage backed securities. *See* Def. Supp. Br. at 8-9. The actual settlement agreement, attached to the press release, at subsection I makes clear that: "This settlement agreement is neither an admission of any facts or liability or wrongdoing by Wells Fargo . . ." In fact, "Wells Fargo disputes the contentions . . ."

Similarly, the defendant cites a June 17, 2014, agreement with the Department of Justice and others to resolve civil litigation with SunTrust arising out of litigation in the District of Columbia. Def. Supp. Br. at 7. The public record consent judgment in that action (from the DOJ website), attached to the press release, reflects that SunTrust did not admit facts, with the exception of facts to establish jurisdiction of the court and limited facts set forth in Attachment A to Exhibit J of the consent judgment. Consent Judgment at 2. Attachment A, in turn, addresses representations made to the government by the lender regarding certain FHA-insured loans and

SunTrust's representations regarding obtaining FHA mortgage insurance. The Attachment to the Consent Judgement reflects that SunTrust FHA mortgage insurance for certain loans didn't meet certain eligibility requirements and that there were apparent failures in processing certain loans. In Attachment A, however, the parties expressly agree that SunTrust is not admitting any legal liability – much less negligence or fraud -- and "reserves the right to contest the use and/or application of" Attachment A in any future litigation. And both the SunTrust and Wells Fargo settlements, while large, ultimately reflect but a small fraction of the size of these huge entities overall loan portfolios and resolved outstanding litigation, enabling the entities to move forward having addressed pending litigation risk.

In short, given no admission by Wells Fargo or SunTrust of breach of contract or negligence in the above actions, much less fraud, long after the defendant's sentencing, the defendant has not offered evidence to suggest that defense counsel failed to act appropriately at sentencing – much less violated the Constitution -- by pursuing the sentencing strategy that they did. Further, certain of the settlements, which discussed some spot testing of portions of loan portfolios for incorrect information do not undercut the significance of the extensive fraud in the 104 loans at issue in this case. The defense has proffered nothing that establishes that Wells Fargo or SunTrust would have known of, much less approved, the defendant's extensive fraud as to the specific loans at issue (with substantial kickbacks, with earnest money payments, with the payment of closing costs and future mortgage payments) that went to the very heart of the valuation of the underlying collateral. In fact, given Rivernider's efforts to keep lenders in the dark, *see supra* at 16-17, it is entirely implausible that the lenders knew of ***this*** conduct when making ***these*** 104 loans. Finally, as has been reflected by at least one other Court in addressing the SunTrust settlement, the settlement is beside the point because the defendant was sentenced

for ***his own intentional conduct and his specific efforts to defraud lenders.*** *See United States v. Rabuffo*, 716 Fed. Appx. 888, 899-900; 2017 U.S. App. Lexis 23323, 23 (11th Cir. 2017) (finding SunTrust settlement did not change defendant's conduct, affirming the district court conclusion that the marginal relevance was outweighed by potential jury confusion).

As a corollary to the settlement arguments, the defendant notes that defense counsel failed to interview one Wells Fargo employee, a quality assurance analyst who apparently opined in 2011 about certain Wells Fargo loans. Def. Supp. Br. at 12. Again, defense counsel are simply not required to find and follow every lead – however tangential. *See, e.g,, Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up."); *Engle v. Isaac*, 456 U.S. 107, 134 (1982) (The Constitution "does not insure that defense counsel will recognize and raise every conceivable constitutional claim."). It is also entire speculation that the proffered employee would have offered any meaningful information as it related to the specific 104 loans at issue in this case; and, given the substantial evidence in the record of Rivernider's pervasive fraud, it was entirely appropriate to approach the sentencing as counsel did – trying to focus sentencing on other more positive aspects of the defendant's character, rather than the crimes he committed.

Standby counsel then tries to identify some prejudice to the defendant, but to do so counsel assumes as true those "facts" that haven't been established and most likely never existed. Rather than dealing with the actual strategic decisions made by counsel at the time of sentencing, standby counsel instead speculatively assumes some non-specific "lender culpability and knowledge" that would hypothetically lessen the actual fraud loss. Def. Supp. Br. at 13-14. In short, standby counsel is arguing that defense counsel were constitutionally ineffective by not tracking down at sentencing an unidentified hypothetical and likely non-existent corporate

insider at Wells Fargo and SunTrust who reviewed the specific 104 loans at issue in this case; uncovered all the multiple and different ways Rivernider was seeking to defraud the banks, despite Rivernider's efforts to cover it up; and who decided to fund the specific loans nonetheless. But pursuing such an entirely speculative hypothetical scenario is so contrary to the record, with so little upside and substantial potential downside of blaming the victims that defense counsel showed appropriate judgment and wisdom – and was hardly constitutionally ineffective -- not to push such an argument.[7]

Further Rivernider goes on to argue that, if he, in fact, conspired with the lender, to push through 104 loans filled with fraud on downstream lenders, those downstream lenders should not be considered victims of fraud by Rivernider, but instead a victim of Wells Fargo's purported fraud. Def. Supp. Br. at 14. But again there is no evidence that Wells Fargo actually knew of Rivernider's pervasive fraud, much less joined in it. And, regardless of purported lender involvement, Rivernider's fraud still caused the downstream lenders loss – they were still victims of *Rivernider's* intended fraud. *See United States v. Napoli*, 179 F.3d 1, 7 (2dCir. 1999) (victim is anyone who lost money as a direct result of fraud). *Cf. United States v. Turk*, 626 F.3d 743 (2d Cir. 2010) (in real estate transactions, losses include subsequent market losses).

[7] While the Government established actual loss, which exceeded $20 million, defense counsel also well knew that, even under Rivernider's speculative theory that Wells Fargo looked past certain stated income misrepresentation on some of the loans, there is no evidence that the lenders would have ignored Rivernider's multi-faceted fraud that so implicated the valuation of collateral. Again, the defendant pulled approximately $7.7 million out of the real estate deals, and used a substantial portion for kickbacks to buyers to further his Ponzi schemes. *See* discussion *supra* at 14-16. Even under a theory of intended loss, defense counsel knew the fraud losses were in the millions. *See also United States v. Lacy*, 699 F.3d 710, 720 (2d Cir. 2012) (using short sale prices rather than purported appraised value as true sales price as credit against principal in an intended, rather than actual, loss calculation). In short, advancing entirely speculative blame-the-victim theories would not have advanced the defendant's sentencing interest.

Discovery. During the direct case, the defendant and his counsel were provided tens of thousands of documents in wide ranging discovery, including the information known to the Prosecution Team regarding the Wells Fargo civil litigation. Defense counsel conducted their own independent discovery. The defendant now makes broad, speculative claims, presumes the Prosecution Team had materials it did not have and demands production with the hope that something might turn up from which he can manufacture additional claims. But the Government has made its required disclosures and, as a result, nothing more is required. *See, e.g.*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) ("Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."); *United States v. Joseph*, 996 F.2d 36, 41 (3d Cir.1993)(no requirement for government to undertake "open-ended fishing expeditions"); *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003). Further, any claim the defendant would seek to pursue with any purported discovery does not change that defense counsel acted entirely reasonably at sentencing and before. And the asserted claims against the Court and Government, which existed prior to sentencing and appeal as noted in the Government's prior response, are barred under the Procedural Bar or Mandate Rule, or both, for the reasons noted above and thus it makes no sense to open discovery for claims that are barred or waived for whatever reason. The defendant is simply not entitled to endlessly relitigate approaches or issues in the hope for a better result or to engage in a fishing expedition to pursue every speculative theory – particularly, post guilty plea and sentencing. *See* above at 10-11 (discussing significant restrictions on discovery in 2255 actions); *see Richie, Joseph, Merlino, supra*. The defendant's request for discovery should be denied and his claims dismissed.[8]

---

[8] Standby counsel raises certain of the requests for discovery that are addressed in this response. Counsel also more generally cites and requests the broad range of documentation

b. Defense counsel failed to argue that NMB clients were unindicted coconspirators and not victims (Claim 9).

Rivernider claims defense counsel should have investigated NMB clients to get them to admit they were engaged in Rivernider's fraud on the lenders. Under this theory, the NMB clients might not be considered victims, but co-conspirators in Rivernider's fraud on the lenders and thus a different Guidelines calculation might apply. Def. Supp. Br. at 17-19. The appropriateness of the Guidelines and/or sentence was the subject to appeal and thus both barred by the **Procedural Bar Rule** and/or the **Mandate Rule**. Further, the evidence in the record reflected the NMB clients' status as victims. *See, e.g.*, Gov. Sent. Mem. at 11-13 (CR Docket #524). To the extent the claim is attacking defense counsel's decision not to press the issue,[9] it is clear why defense counsel made a strategic decision not to go this route. There is rarely a good reason for the defense to spend time focusing the Court at sentencing on the victims, and defense counsel made the wise choice not to blame the victims here, as explained previously. *See* Gov. 2255 Resp.at 74-75 (CV Docket # 126). As reflected by witnesses who testified, the record was replete with evidence that the NMB victims had been led to believe that Rivernider would be paying them with regular, substantial returns from overseas investments, when that simply was not the case. So the NMB clients were plain victims of *that* fraud. The record further suggests that virtually all of those NMB clients who were talked into real estate investments were unsophisticated and relied on Rivernider and his coconspirators' explanations regarding the various representations made to lenders. *See* Gov. Version of Offense Conduct,

requested in Rivernider's Motion for Documentation, CV Docket # 199. To the extent specifics are not otherwise addressed in this response, the Government submits that there is no good cause for the requested discovery, given the procedural posture of the case at this time or the nature of the records requested.

[9] Again, the Government has made appropriate disclosures, and there is no viable claim here against the Government.

Docket CV 126-1 n.2 (noting instances where NMB clients testified Rivernider hid sellers' kickbacks to him and would not have gone through with loan had they known).

Discovery. The defendant continues to demand documentation. As noted above, the Government made the appropriate disclosures and the defense was provided with the available 302s during the direct case. The defendant is not entitled to a further fishing expedition. The defendant's claims and request for additional discovery should be denied.

c. Defense counsel allegedly failed to obtain – and the Government failed to discharge its *Brady* Obligations – regarding Bank of America, Tennessee Bank Records (Claims 13 and 33).

The defendant makes allegations against the Government's document production regarding Bank of America and Tennessee State Bank financial records (Claim 13). Def. Supp. Br. at 19-22. As the Government has stated before, the Government has made the required disclosures of Bank of America and Tennessee State Bank records in its possession. Contrary to the defendant's assertion, the Government never had the payment records from Bank of America bill pay system. But the Government had and produced the bank account statements that reflected the credits and debits to the Cut Above Ventures accounts.

As to the conduct of defense counsel, defense counsel has explained their efforts and acted appropriately. *See* Gov. 2255 Resp.at 77-78; 81 (CV Docket # 126) (addressing claim 13 and 33).

It should also be noted that the financial records already available to the parties enabled a conservative assessment of Guidelines loss. *See* discussion *supra* at 14 (discussion of loss). In particular, the defendant claims that the produced financial records fail to reflect the payments made to client mortgages and that, if each mortgage payment was identified, the loss figure would be reduced. Def. Supp. Br. at 20. But the loss figure used for the Guidelines already gives

the defendant the benefit of the principal payments made because the figures available at sentencing reflected the remaining principal balance *after* crediting the payments received by the lenders and *after* giving the defendant credit for the value of the sold collateral. *Id.*

Standby counsel has reiterated Claim 33 against defense counsel for purported failures to obtain records from Mountain Charm Cabin Rentals, asserting that Rivernider was entitled to monies from Hall that would purportedly decrease Guidelines loss. Def. Supp. Br. at 20. Defense counsel acted reasonably. *See* Gov. 2255 Resp. at 81. Further, this information, even if true and available, would be irrelevant to the Guidelines loss analysis. Rivernider was responsible for the losses intended and/or actually caused the lenders or NMB clients.[10] The actual loss figure methodology has not been subject to meaningful dispute. Putting aside whether Rivernider's present unsubstantiated assertion that Hall stole from him has any validity, it simply doesn't mitigate the losses Rivernider caused victims of his fraud that others purportedly misused the monies or property that Rivernider had obtained through his fraud, which might have otherwise been available for repayment.[11]

Discovery Needed. For the reasons noted above, the Government has made required disclosures. To the extent standby counsel is seeking production of previously produced financial records, those materials would be available from prior counsel, although the defendant

[10] In the same way, the monies Rivernider gave to Praise when Rivernider was seeking an overseas lottery return toward the end of the scheme did not reduce Guidelines loss because the victims did not receive the monies.

[11] The defendant includes a throwaway comment that the Government had information about Hall's and Perdue's location which it didn't disclose. Def. Supp. Br. at 21. The Government has made appropriate disclosures, including a FBI 302 of Hall (disclosed on 11/22/2010) and had no obligation to do more. *See infra* at 36-38 (citing case law).

has established no relevant basis for such records given the conservative manner in which Guidelines losses were determined.

## IV. APPEAL RELATED CLAIMS

The defendant acknowledges that a number of his appeal related claims (40 – 45) relate to the knowing and voluntary guilty plea.[12] There is no basis for those claims against appellate counsel. *See* Gov. 2255 Resp. at 83-88. In fact, given that the pleas were knowing and voluntary and thus the pre-plea related claims would be barred, appellate counsel acted entirely appropriately in not pursuing those claims. The claims 46 and 47, relating to allegations regarding supplementing the record, are baseless for the reasons stated in the Gov. 2255 Resp. at 87-88, and for the reasons stated herein regarding the appropriateness of trial counsel's decisions. For the reasons identified above as to the non-existence, immateriality or irrelevance of many of the underlying claims and requests for documents, appellate counsel acted well within constitutional norms in picking and choosing those matters that she chose to pursue on appeal. *See, e.g.*, Gov. 2255 Resp.at 43 (noting case law).

---

[12] The defendant asserts that appellate counsel failed to argue that the Government's purported use of false evidence at trial to obtain a conviction was unconstitutional (Claim 40); failed to argue that mental coercion was used to get the defendant to plead guilty, as evidenced by neuropsychologists' presence at the Rule 11 hearing (Claim 41); falsely stated that the defendant admitted items listed in the admission of offense conduct, which petitioner denied and detailed in his motion to stay surrender (Claim 42); failed to argue the plea was not voluntary because the defendant allegedly did not possess an understanding of the law in relation to the facts (Claim 43); failed to argue that trial counsel's defective advice to plead guilty affected the voluntary nature of plea (Claim 44); waived petitioner's arguments listed in *pro se* motions, while advancing weaker arguments (Claim 45); and was prevented from perfecting appeal because of a lack of a complete record (Claim 46). The defendant further asserts that the Government and Court impeded the defendant's ability to perfect his appeal by preventing a record to be made for review (Claim 47).

## V. THE DEFENDANT'S NEW CLAIMS

The defendant has sought to amend his 2255 motion with new claims 53-56. *See United States v. Fuller*, 815 F.3d 112, 113 (2d Cir. 2016) (permitting certain new claims). These additional claims are simply an effort to relitigate the Court's finding of a knowing and voluntary guilty plea. The defendant's new claims are set forth at CV Docket # 213. The claims are summarized as follows and raise a number of the issues already addressed in this response:

- Claim 53 – defense counsel purportedly admitted defendant was guilty when he knew Rivernider wanted to continue with trial;
- Claim 54 – defense counsel gave erroneous advice to plead guilty;
- Claim 55 – defense counsel had a conflict of interest; and
- Claim 56 – defense counsel lied to induce the guilty pleas.

Each of these claims should be denied as the existing factual record established that defense counsel acted appropriately under the circumstances here.

## VI. PRE-PLEA OR OTHER CLAIMS

The defendant in his supplemental memorandum focuses on unfounded allegations of purported *Brady/Giglio* violations by the Government. As a threshold matter, the items raised by the defendant were known to the defendant and his counsel in the direct case and thus those claims now are barred by the **Procedural Bar Rule** and/or **Mandate Rule** as noted in the Government's original omnibus response. Further, the defendant's guilty plea would provide a separate and additional bar to such claims unless the purported violation was sufficiently entwined with the guilty plea to not uphold the guilty plea bar. For the reasons discussed above at 9-10 regarding the *Miller* case, none of these claims survives the valid guilty plea. Further, to

the extent any claim could survive the multiple bars, there would be no prejudice. As the Court is aware, defense counsel testified that a primary reason for Rivernider's change in outlook was seeing how his deceit impacted victims and that counsel needed to put Rivernider in the best position for sentencing. These big-picture strategic considerations were entirely distinct from Rivernider's present "in the weeds" claims which do not alter those issues or, frankly, the fundamental overwhelming evidence of Rivernider's guilt and thus would have not, at the time of his plea, impacted the decision to plead guilty.[13]

Regarding specific claims raised by standby counsel:

Claim 10. The defendant alleges that the Government failed to make disclosures of e-Gold, e-bullion, and MYCIS information. Def. Supp. Br. At 24. The Government made the proper disclosures and provided the relevant financial records in its possession.

Claim 13. The defendant alleges that the Government withheld Bank of America records. *Id.* The Government produced the Bank of America records in its possession. It should also be noted that, far from helping the defendant, the Bank of America records fully supported the Government's case that Rivernider was engaged in a large scale real estate fraud scheme and smaller Ponzi scheme.

Claim 28. The defendant alleges that the Government failed to disclose non-prosecution agreements with NMB clients and with lenders. *Id.* There were no non-prosecution agreements,

[13] To the extent the defendant seeks to group arguments to suggest there is some cumulative impact, there is nothing to this claim. First, by pleading guilty, a petitioner waives all non-jurisdictional issues, including allegations of constitutional error. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea"); *see cases* cited at Gov. 2255 Resp. at 37-39. In addition, there are no legitimate claims to accumulate or that would have impacted the plea. *See also supra* at 9-10 (discussing *Miller* case).

as alleged, with NMB client or lenders. The evidence established, despite the defendant's claims to the contrary, that the NMB clients and lenders were victims of the defendant's fraud.

Claim 49. The defendant alleges that the Government suppressed evidence relating to Danny Trutman. Def. Supp. Br. at 25.

In trial-prep in late January 2012, just prior to the start of evidence, the Government reached out to interview Trutman as he might prove to be a potential Government witness, given his indirect involvement with a portion of Rivernider's scheme. Trutman (or his entity) had been a seller of some of the properties purchased by Rivernider's clients. The Government anticipated that Trutman might offer additional background information relevant to further establishing Rivernider's guilt. *See, e.g.*, loss hearing at 54-56 (CR Docket # 651) (discussing inculpatory email exchange between Trutman and Rivernider). Trutman's criminal counsel, Ergio I. Fernandez, thereafter informed the Government that, per counsel's direct instruction, Trutman would not provide a statement to either side in the case. Trutman was thus a dead-end as he was, per his criminal counsel's instruction, effectively asserting his Fifth Amendment right against self-incrimination. Thereafter, at the loss hearing prior to sentencing, in September 2013, SA Agent discussed an inculpatory email between Rivernider and Trutman regarding Rivernider making earnest money payments for NMB clients. In responding to questioning from Government counsel, West agreed that the Government had been planning to subpoena Trutman but Trutman had, through counsel, effectively asserted his rights against self-incrimination. Loss Hearing Tr. at 54 (CR Docket # 651). Rivernider's sentencing took place in December 2013, over three months later after the loss hearing.

There is no basis for the allegation that the Government acted improperly by not mentioning its contact with Trutman prior to the loss hearing, and, in addition, the allegation is Procedurally Barred.

*First*, any issue regarding Trutman was effectively raised in early September 2013, long before the defendant's sentencing. At no point prior to sentencing or thereafter did defendant's counsel suggest any impropriety. This claim is thus Procedurally Barred. *See supra* at 4. This is the exact reason for the Procedural Bar Rule: to preclude a defendant's manufacturing issues and promoting endless litigation years later.

*Second*, the fact that a tangential potential Government witness refused to be interviewed was not a legally required disclosure. The witness, with his past dealings with Rivernider, having worked with the defendant in the same area of Florida that Rivernider worked and lived, was reasonably more available to the defense than the Government. Information is not considered to have been "suppressed" within the meaning of the *Brady* doctrine if the defendant or his attorney " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.' " *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)) (testimony not suppressed where witness known to defense before trial and could have been called by the defendant).[14] The "reasonable diligence" requirement is, in effect, a rule that a *Brady* claim will not lie when the evidence in question was available to the

[14] *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." Appeals court also denied requested discovery as it would "add little or nothing to the proceedings.").

defense by the exercise of reasonable diligence. *E.g.*, *Brown v. Cain*, 104 F.3d 744, 750 (5th Cir. 1997).

*Third*, Trutman was never interviewed and his criminal counsel indicated Trutman would not provide a statement in the case. Trutman thus did not provide any material exculpatory information requiring disclosure. In fact, by refusing through criminal counsel to have his client interviewed, a fair inference is that Trutman's counsel had concerns that Trutman might implicate himself and further corroborate Rivernider's scheme if Trutman participated in the case.[15]

Claims 25 and 50. The defendant alleges that the Government violated his Constitutional rights by reading privileged emails or listening to privileged Wyatt calls. Def. Supp. Br. At 25. The Government has not reviewed privileged emails or privileged prison calls. Further, the prison calls were from the non-privileged line at Wyatt. Standby counsel himself acknowledges that he is not aware of any privileged calls with counsel being recorded at Wyatt. Def. Supp. Br. at 25. In fact, the Government attorneys never reviewed the prison calls, which were produced in discovery. (A paralegal may have reviewed a limited number of the calls). The prison recordings have been in the possession of defendant's counsel for years and no issue was raised by counsel. These claims are also barred by both the **Procedural Bar Rule** and the fact of the defendant's **valid guilty plea**.

---

[15] Rivernider's fabricated testimony for Trutman would have been irrelevant to Rivernider's guilty plea as it related to impeaching certain aspects of Wade's testimony that came after Rivernider made the decision to plead guilty and had actually pled guilty. Further, nothing Trutman might have said would contradict the extensive damning facts reflected in actual emails *between Wade and Rivernider* – the lions' share of Wade's testimony -- and Rivernider's unchallenged fraudulent conduct with the lenders, as noted above. *See supra* at 16. Rivernider's speculative theories of Trutman's testimony would not have been in any way material to any plea or sentencing determination other than to perhaps further corroborate the details of Rivernider's fraud.

## VII. Conclusion

Upon the review of all the claims, the Government requests the Court enter an order denying each of the defendant's claims for the reasons previously noted in any ruling by the Court and for the reasons identified in the various submissions by the Government. The Government further requests that the Court deny all requests for additional discovery.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

JOHN H. DURHAM
Federal Bar No. ct05087
U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
Tel.: (203) 821-3700
Email: John.Durham@usdoj.gov

*/s/ Christopher W. Schmeisser*
CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY
157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3700
Federal Bar No. CT14806
Email:christopher.schmeisser@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2019, a copy of the foregoing response was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

A copy of this Response has been sent to:

Robert Rivernider
Reg. No. 96006-004
P.O. Box 0699
Satellite Camp Unit F
Estill, SC 29918-0699

*/s/ Christopher W. Schmeisser*
Assistant United States Attorney