UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ROBERT RIVERNIDER          :

v.                         :   No. 3:14-cv-1000(RNC)

UNITED STATES              :

RULING AND ORDER

This is a habeas case brought pursuant to 28
U.S.C. § 2255 by petitioner Robert Rivernider,
who pleaded guilty to two counts of conspiracy
to commit wire fraud in violation of 18 U.S.C. §
1349 and sixteen counts of wire fraud in
violation of 18 U.S.C. § 1343.  See United
States v. Rivernider, 3:10-cr-222(RNC), ECF No.
366 (petition to enter plea of guilty).
Rivernider was indicted along with his sister,
Loretta Seneca, and business partner and friend,
Robert Ponte.  Two others – Tosha Wade and
Shellie Kemp - were charged separately and
pleaded guilty.

Rivernider, Seneca and Ponte went to trial.
After two weeks of trial, Rivernider filed a
petition to plead guilty to all the charges
against him unaccompanied by a plea agreement
with the government.  See 3:10-cr-222, ECF No.
366-1.  Seneca and Ponte also pleaded guilty.
Extensive proceedings ensued with regard to
Rivernider's motion for a downward departure

1

pursuant to U.S.S.G. § 5K2.13 based on
diminished capacity, and the loss amount that
should be used to calculate his guideline range
under U.S.S.G. § 2B1.1.

Ultimately, Rivernider was sentenced to 144
months' imprisonment, followed by five years of
supervised release, and ordered to pay
restitution of more than $20 million.  His
convictions and sentence were affirmed on
appeal.  See United States v. Rivernider, 828
F.3d 91 (2d Cir. 2016).  In 2020, he was granted
compassionate release due to the Covid pandemic
after serving approximately 77 months in
custody, and began serving his 5-year term of
supervised release.

During the pendency of this action,
Rivernider has presented an extraordinary number
of claims, more than fifty in all.  Some claims
have been withdrawn, and others denied or
rendered moot by his release from custody, but
numerous others remain to be addressed.  Some
challenge the validity of the guilty pleas on
the basis of ineffective assistance of counsel.
Others allege constitutional deprivations
unrelated to the guilty pleas.  And still others
relate only to the sentence, specifically, the
amount of the restitution obligation and the
length of the term of supervised release.

For reasons discussed below, Rivernider's
challenge to the validity of his guilty pleas is
unavailing.  Because the pleas are valid, his

other claims seeking to undo the convictions are
barred.  His challenge to the restitution
obligation is not cognizable, and his challenge
to the length of the supervised release term is
without merit.  Accordingly, the action is
dismissed in its entirety with no certificate of
appealability.

                        I.

     The charges against Rivernider and his
associates grew out of two related schemes to
defraud.  One of them, known as the "No More
Bills" program ("NMB"), functioned like a Ponzi
scheme.  As detailed in his Admission of Offense
Conduct, 3:10-cr-222, ECF No. 366-1, Rivernider
received money from NMB clients on the
understanding that he would repay them by paying
their bills directly, at a rate of approximately
10 percent per month for several years, until
the debts were paid in full.  Rivernider made
scheduled payments to NMB clients ostensibly
using funds realized from successful investment
activity when, in fact, those funds had been
invested in the program by other NMB clients.

     Rivernider participated in obtaining money
from NMB clients knowing that clients of the
program had been led to believe payments were
being made from realized returns on successful
investments when that was not true.  In doing
so, he specifically intended to deceive them in
that he knew they would be placing their funds

at a risk of loss more substantial than the risk represented to them.

Rivernider continued to solicit new client money until the scheme collapsed.  Between 2005 and 2007, the NMB program had eighty-four investors.  Thirty-six of them were left with losses totaling more than $2 million.  For some, the losses were life-altering.

The other scheme involved mortgage fraud tied to the housing bubble.  Acting through an entity called Cut Above Ventures ("CAV"), Rivernider and Ponte recruited NMB clients and others to purchase condominiums in Florida and cabins in Tennessee as passive investments, with financing arranged by CAV through mortgage lenders, including Wells Fargo Bank, NA. Rivernider orchestrated the scheme from an office in Florida, where he worked closely with Seneca, who had a real estate background, and Wade, a real estate agent.  Kemp, a mortgage consultant in Florida, was drawn into the conspiracy under the false impression that Rivernider was making millions in real estate. She helped him obtain financing from Wells Fargo, her employer.

The real estate scheme depended on deception of both buyers and lenders.  As part of an "incentive program," Rivernider promised to pay the buyer's closing costs, taxes and mortgages for at least two years.  The buyers were led to believe that Rivernider would be

4

able to make the mortgage payments using rental income from the properties. Rivernider knew there was a risk the rental income would be insufficient, in which case, he would be unable to make the payments as promised. In addition, buyers were frequently kept in the dark about kickbacks Rivernider took from sellers in the form of "marketing fees." Rivernider generated these fees by marking up the sale price agreed to by the seller to the highest price possible in light of friendly appraisals. Rivernider took fees of $7.7 million out of the real estate deals, which he used to keep both fraudulent schemes afloat.

Lenders were deceived by material misrepresentations concerning the true price of the properties, the income earned by the borrower, the source of cash provided by the borrower at closing and the borrower's other liabilities. Rivernider also directed Kemp and others to qualify borrowers for loans by falsely representing that the properties would be used as second homes in order to obtain a more favorable interest rate and loan-to-value ratio.

As a result of the mortgage fraud scheme, buyers of condominiums and cabins wound up owning properties they could not afford. Rivernider was unable to make the mortgage payments on 104 properties. Lenders were left with fraud-based losses of more than $21 million.

Rivernider's activities resulted in his indictment on one count of conspiracy to commit wire fraud based on the NMB scheme (count one), and seven counts of wire fraud related to that scheme, each based on a wiring involving funds invested by NMB clients (counts two through eight).  In addition, he was charged with one count of conspiracy to commit wire fraud based on the CAV scheme (count nine) and nine counts of wire fraud related to that scheme, each based on a wiring involving the sale of a property with financing provided by Wells Fargo (counts ten through eighteen).  As mentioned, he went to trial but pleaded guilty to every count.

## II.

Rivernider's offenses exposed him to a guideline imprisonment range of 324 to 405 months.  An evidentiary hearing was held on his request for a downward departure based on diminished capacity.  The request relied on a neuropsychological evaluation conducted by Dr. Nellie Filippopoulos, a psychologist, who concluded that Rivernider had interrelated deficits in aspects of executive function and emotional intelligence that contributed to the conduct culminating in his arrest.  See 3:10-cr-222, ECF No. 515.  The government opposed the request and presented expert testimony that Rivernider's offense conduct reflected intact executive function.  At the conclusion of the two-day hearing, I stated that, although the deficits identified by Filippopoulos might well

be relevant to Rivernider's sentencing, the
executive dysfunction discussed in her report
would not warrant a downward departure.

Rivernider reacted by immediately seeking
to withdraw his guilty pleas, which had been in
place for nine months.  His appointed counsel,
James W. Bergenn and Michael C. Chase, declined
to file a motion to withdraw the pleas, so
Rivernider filed a motion himself.  The motion
was permitted to be filed and argued by
Rivernider.  After it was denied on the merits,
he was sentenced as set forth above.

In due course, Rivernider's co-conspirators
were also sentenced following their guilty
pleas.  Ponte, whose guideline range was 168 to
210 months, was sentenced to 90 months'
imprisonment, followed by five-years of
supervised release, and ordered to pay
restitution of more than $20 million at a rate
of $300 per month.  Seneca, who had the same
guideline range as Ponte, was sentenced to 27
months' imprisonment and three years of
supervised release, with a $5 million
restitution obligation, payable in monthly
installments of $300.  Kemp, who had a guideline
range of 51 to 63 months, received a downward
departure pursuant to U.S.S.G. § 5K1.1,
reflecting her substantial assistance to the
government in prosecuting the case against
Rivernider, Seneca and Ponte.  She was sentenced
to time-served, and supervised release for three
years, with a restitution obligation of $50,000

payable at a rate of $200 per month.  Wade,
whose guideline range was 27 to 33 months, also
received a substantial assistance departure.
She was sentenced to time-served, and supervised
release for three years.

Rivernider and Ponte appealed.  Rivernider
argued that his pro se motion had been
mishandled, the convictions lacked a factual
basis, and the 144-month sentence was
substantively unreasonable.  As support for his
argument that the convictions should be vacated,
Rivernider repeated conclusory assertions from
his pro se motion to withdraw his guilty pleas
that the pleas had been coerced by his counsel.
The Court of Appeals affirmed the judgment in a
comprehensive opinion.  United States v.
Rivernider, 828 F.3d 91 (2d Cir. 2016).

In short, the Court of Appeals ruled that
Rivernider's pro se motion to withdraw his
guilty pleas was properly denied because there
was a sufficient factual basis for the pleas and
no basis for finding that Bergenn's refusal to
file such a motion was tainted by an actual
conflict of interest; the 144-month sentence
easily fell within the range of reasonableness,
inasmuch as it was substantially below the
guideline range; and there was no reversible
error in the restitution order.

III.

Rivernider seeks relief from his convictions
and sentence on the ground that his guilty pleas

8

are invalid due to his counsel's alleged failure
to provide the effective assistance guaranteed
by the Sixth Amendment.

The standard for determining the validity
of a guilty plea is "whether the plea represents
a voluntary and intelligent choice among the
alternative courses of action open to the
defendant." North Carolina v. Alford, 400 U.S.
25, 31 (1970); see also Boykin v. Alabama, 395
U.S. 238, 242 (1969).  A plea constitutes an
"intelligent" act if it is "done with sufficient
awareness of the relevant circumstances and
likely consequences." Brady v. United States,
397 U.S. 742, 748 (1970).  A plea is "voluntary"
unless it results from "actual or threatened
physical harm, mental coercion overbearing the
defendant's will, or the defendant's sheer
inability to weigh his options rationally."
Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir.
1988), citing Brady, 397 U.S. at 750.

When a defendant pleads guilty on the
advice of counsel, he can challenge the validity
of the plea based on ineffective assistance of
counsel in the plea process or an earlier stage
of the case if the pre-plea ineffectiveness
prevented him from making an informed choice
whether to plead guilty.  See Hill v. Lockhart,
474 U.S. 52, 56-57 (1985); Tollett v. Henderson,
411 U.S. 258, 266-67 (1973); McMann v.
Richardson, 397 U.S. 759, 771 (1970).

The two-part test of <u>Strickland v. Washington</u>, 466 U.S. 668, 687-688 (1984), for evaluating claims of ineffectiveness of counsel applies in this context.  <u>Hill</u>, 474 U.S. at 58. To obtain relief, a defendant must "allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act." <u>McMann</u>, 397 at 774.  This depends "not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases."  <u>Id.</u> at 771; <u>see</u> <u>Tollett</u>, 411 U.S. at 267 (defendant who pleads guilty upon advice of counsel must show that counsel's advice was not within the standards set forth in <u>McMann</u>).  In addition, there must be "a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial."  <u>Hill</u>, 474 U.S. at 59; <u>see</u> <u>Lee v. United States</u>, 137 S.Ct. 1958 (2017).

A.

In attacking the validity of his guilty pleas, Rivernider first claims that his counsel rendered ineffective assistance in the plea process.  His primary claim is that Bergenn improperly coerced him into pleading guilty. Findings of fact with regard to this claim are set forth in a previous filing, which is incorporated here.  <u>See</u> ECF No. 257.

10

There is no allegation that Bergenn
pressured Rivernider to plead guilty prior to
trial or at any time during the first two weeks
of trial.  Bergenn raised the issue at the
conclusion of the second week of trial after
Rivernider expressed empathy for victims of the
NMB scheme in light of their trial testimony.
Bergenn and Chase believed the trial was not
going well and would almost certainly result in
a guilty verdict on all counts in the
indictment.  Under the circumstances, viewed
from the perspective of Rivernider's counsel, it
was objectively reasonable for Bergenn to
undertake to advise Rivernider about the
desirability of changing his plea.

The determinative issue for Rivernider in
deciding whether to plead guilty was the length
of time he would be away from his two young
children as a result of a conviction after a
full trial or a mid-trial plea.  Bergenn
believed that if Rivernider pleaded guilty, the
likely consequence would be a sentence
significantly below the sentence he would
receive after a full trial.  Chase agreed.  In
forming this opinion, they relied on Dr.
Filippopoulos's evaluation, which helped explain
both Rivernider's criminal conduct and his
previous inability to accept responsibility.

Bergenn and Chase provided Rivernider with
honest advice concerning the reasons and factual
basis for a guilty plea.  Rivernider told them
he was open to pleading guilty.  The next day,

11

Bergenn and Rivernider met with Dr.
Filippopoulos, who helped explain the
significance of the results of the
neuropsychological evaluation.  Bergenn
recommended that Rivernider change his plea in
light of those results in order to best present
himself for sentencing.  Rivernider agreed that
a change of plea was in his best interest and
that of his children.

Bergenn and Rivernider proceeded to work
together drafting what became the Admission of
Offense Conduct.  Their collaboration on the
draft continued the following day.  When the
draft was essentially complete, a copy was given
to the government, which had been notified of
Rivernider's decision to change his plea.  Later
that night, Rivernider sent Bergenn an email
stating that he could not plead guilty.

At a meeting with Rivernider the next
morning, Bergenn insisted on the soundness of
his advice that a guilty plea was in
Rivernider's best interest.  Dr. Filippopoulos
attended the meeting but did not actively
participate.  At the conclusion of the meeting,
Rivernider again agreed with Bergenn's
recommendation.  He changed his plea later that
day.

Rivernider contends that Bergenn forced him
to plead guilty in order to escape the time-
consuming demands of the trial.  According to
Rivernider's account, Bergenn used the results

of the neuropsychological evaluation to
undermine his independent decisionmnaking.
Then, at the morning meeting preceding the
change of plea, Bergenn resorted to threats and
intimidation to coerce him into pleading guilty.
When he refused to capitulate, Bergenn refused
to continue with the trial, leaving him with no
option but to plead guilty.

    Rivernider's account is unsupported by
objective evidence. It also conflicts with his
own statements, both in his petition to plead
guilty and in response to my questions during
the hearing on his petition, which, together
with his demeanor, led me to find that his
guilty pleas were voluntary.  In addition, his
account is contrary to the testimony of Bergenn
and Dr. Filippopoulos at the evidentiary hearing
in this case, which I credit.  Dr. Filippopoulos
testified that, although the meeting was
somewhat antagonistic at the outset, at no time
during the meeting did Bergenn engage in threats
or intimidation or other improper conduct to
coerce a guilty plea.  Moreover, the record
establishes that Rivernider's defense team was
ready to continue with the trial if he elected
to do so.

    In addition to alleging blatantly improper
conduct by Bergenn, Rivernider claims that
Bergenn exerted undue influence on his decision
to change his plea, which can violate the
performance prong of Strickland.  See Purdy v.
United States, 208 F.3d 41, 45 (2d Cir. 2000).

13

"The performance issue is contextual; it asks
whether defense counsel's actions were
objectively reasonable considering all the
circumstances."  Id. at 44.  Counsel must be
careful to respect a client's right to decide
for himself whether to plead guilty.  However, a
"blunt rendering of an honest but negative
assessment of [the defendant's] chances at
trial, combined with advice to enter the plea,
[does not] constitute improper behavior or
coercion that would suffice to invalidate a
plea."  United States v. Juncal, 245 F.3d 166,
172 (2d Cir. 2001), citing United States v.
Moree, 220 F.3d 65, 72 (2d Cir. 2000)("That the
attorney advised [the defendant] to take the
[plea] offer and warned him that his failure to
do so would lead to a thirty years sentence
merely asserts that the lawyer gave professional
advice as to what the consequences of his choice
might be.  The defendant's statement that he was
'scared' is understandable, but is not
attributed to any misconduct of his attorney.").

     "Counsel's conclusion as to how best to
advise a client in order to avoid, on the one
hand, failing to give advice and, on the other,
coercing a plea enjoys a wide range of
reasonableness."  Purdy, 208 F.3d at 45.
"Counsel rendering advice in this critical area
may take into account, among other factors, the
defendant's chances of prevailing at trial, the
likely disparity in sentencing after a full
trial as compared to a guilty plea (whether or

not accompanied by an agreement with the
government), whether the defendant has
maintained his innocence, and the defendant's
comprehension of the various factors that will
inform his plea decision."   Id.

Rivernider appears to be claiming that it
was improper for Bergenn to arrange another
meeting with him and Dr. Filippopoulos after he
sent the email stating that he could not plead
guilty.  But the deficits shown by the
neuropsychological evaluation required Bergenn
to be vigilant in fulfilling his duty to advise
Rivernider fully concerning the desirability of
a change of plea.  In the circumstances, it was
proper for Bergenn to arrange another meeting
with Rivernider and Dr. Filippopoulos.

It is undisputed that Bergenn strongly
urged Rivernider to change his plea during the
meeting.  He did so because he thought
Rivernider's best interests clearly required it.
His judgment in that regard, assessed in light
of the totality of the circumstances as they
existed at the time, falls within the "wide
range of reasonableness" described by the Second
Circuit in Purdy.

This conclusion is supported by the
following factors: the lack of a realistic
chance of avoiding conviction at trial; the
likelihood of a material difference in the
sentence of imprisonment if Rivernider continued
to refuse to accept responsibility; Rivernider's

15

acknowledgement that he and his associates had
knowingly deceived victims by means of material
misrepresentations; and his above-average
ability to comprehend and weigh the factors
bearing on the decision whether to change his
plea due to his background as a criminal
investigator and training as a paralegal.

Rivernider claims that his guilty pleas
must be vacated because Bergenn pressured him to
plead guilty due to a conflict of interest.
Ineffective assistance of counsel can occur when
an attorney actively represents conflicting
interests, in breach of the duty of loyalty, and
the conflict adversely affects specific aspects
of the attorney's performance.  See Cuyler v.
Sullivan 446 U.S. 335, 348-50 (1980).

There is no allegation or evidence that
Rivernider's counsel actively represented
another client whose interests conflicted with
his.  Rather, the claim is that Bergenn
pressured Rivernider to plead guilty because the
trial was interfering with his ability to
represent other clients.  It is undisputed that
Bergenn met with another client the day after
the change of plea.  However, based on Bergenn's
testimony, which I credit, he did not pressure
Rivernider to plead guilty in order to free up
his schedule.  And his advice to Rivernider

regarding the desirability of a change of plea
would have been the same in any event.[1]

Rivernider also seeks to invalidate his
guilty pleas on the ground that his counsel
misled him into believing that if he pleaded
guilty, he would get a downward departure based
on diminished capacity resulting in a sentence
of imprisonment of not more than two or three
years, which he would serve at a camp.  He has
stated emphatically that he never would have
changed his plea if he thought he could be
sentenced to a significantly longer term of
incarceration.

To the extent Rivernider is claiming that
his counsel promised him a sentence of not more
than two or three years, the claim fails because
it conflicts with his sworn statements at the
change of plea proceeding, and is contrary to
his counsel's hearing testimony and affidavits
in this case, which I credit.  To the extent the
claim is that his counsel grossly misrepresented
what the sentence exposure would be if he
pleaded guilty, it fails for similar reasons.

---

[1] Rivernider claims that Shipman & Goodwin LLP,
the law firm where Bergenn and Chase practiced,
had previously represented Webster Bank in
connection with unrelated matters.  There is no
support for a finding that the firm's prior
representation of Webster Bank had any effect on
the advice Rivernider received from Bergenn and
Chase with regard to his plea or any other
aspect of their performance as his counsel.

In agreeing to change his plea, Rivernider
stated that he understood the sentence could
fall within the guideline range.  There is no
objective evidence that his counsel told him the
sentence exposure would be capped at a level
representing a small fraction of the guideline
range, and his counsel have credibly stated that
no such assurances were given.

Rivernider knew and understood that a term
of imprisonment substantially longer than two or
three years would be a likely consequence of
pleading guilty.  His assertion to the contrary
is not believable.  His counsel's sworn
submissions, which I credit, show that he went
to trial anticipating a sentence of imprisonment
of up to twelve years.  That expectation was
formed as a result of his own deep involvement
in preparing the case for trial.  In advising
him that a change of plea would be advantageous,
Rivernider's counsel thought it would maximize
his ability to get a sentence in "the single
digits," in other words, a sentence of less than
ten years, which was the goal.  That advice,
given in good faith, did not mislead Rivernider
as to the likely consequences of a change of
plea.

Rivernider's final challenge to the
validity of his guilty pleas based on his
counsel's alleged ineffectiveness during the
plea process relates to the Admission of Offense
Conduct discussed above.  He claims that his
counsel submitted the Admission at the change of

18

plea proceeding without his approval, after
altering it without his knowledge.  However, it
is undisputed that Rivernider actively assisted
Bergenn in drafting the document that was
submitted in conjunction with his petition to
change his plea.  At the change of plea
proceeding, he testified that he had an
opportunity to review the final version in
detail prior to signing it.  In addition, the
evidence shows that he affirmed the accuracy of
the Admission months later in a conversation
with his counsel and in a letter he signed at
their request.

                          B.

     Rivernider also claims that his guilty
pleas must be invalidated because of his
counsel's pre-plea ineffectiveness.  He contends
that his counsel failed to conduct an adequate
investigation and provided incompetent
representation at trial, thereby preventing him
from making an informed choice to plead guilty.
Rivernider has not alleged a pre-plea lapse by
his counsel that affects the validity of his
guilty pleas.

    Rivernider's defense team conducted a
reasonably adequate investigation in the
circumstances.  They reviewed Rivernider's
extensive records, as well as tens of thousands
of pages of documents produced by the government
in discovery, including more than 90 FBI form
302s.  When Rivernider raised concerns about the

                         19

truth of some of the information in the 302s,
his counsel followed up as appropriate.  In
addition, defense investigators interviewed
witnesses with regard to potential defenses.

The investigation conducted by Rivernider's
counsel led them to conclude that the government
would have little difficulty proving his guilt
with regard to both fraudulent schemes.  NMB
clients interviewed by defense investigators
said that before placing money with Rivernider,
they had been falsely assured there was no risk
of loss.  And loan applications used in the CAV
scheme were replete with material
misrepresentations.  Evidence taken from
Rivernider's computer, including emails, bank
statements, and spreadsheets, established his
leadership role in both schemes.

Rivernider's main criticism of his
counsel's performance prior to the change of
plea is that they failed to adequately
investigate Wells Fargo's risky lending
practices.  He points to a settlement that the
Department of Justice reached with Wells Fargo
in 2016, three years after his sentencing,
stemming from representations made by Wells
Fargo in connection with residential mortgage
backed securities.

Rivernider's counsel undertook to defend
him against the charges stemming from the CAV
scheme by highlighting the conduct of
residential mortgage lenders whose practices

contributed to the financial crisis, including
Wells Fargo.  Discovery provided by the
government in response to a comprehensive
request by Rivernider's counsel included
information known to the prosecution team
regarding the Wells Fargo civil litigation.
Rivernider's counsel conducted their own
independent research and investigation into
Wells Fargo's potential culpability.  Nothing
they obtained in discovery or found on their own
supported an inference that loan decisionmakers
at Wells Fargo had knowledge of the fraudulent
nature of the loans underlying the indictment.
And even if those decisionmakers had been
reckless or grossly negligent with regard to
those specific loans, Rivernider could still be
convicted.

    Rivernider's claim that his counsel should
have done more to investigate the conduct of
Wells Fargo rings hollow in light of evidence in
the record showing that he actively covered up
his fraudulent scheme from Wells Fargo.  After a
fraud alert was issued at Wells Fargo with
regard to certain loan files involving Kemp and
CAV, Wells Fargo prohibited Kemp from working on
deals with CAV.  But Rivernider continued to use
Kemp to get loans from Wells Fargo.  In an
email, Kemp warned Rivernider to "make sure Cut
Above is nowhere on any papers . . . very, very
important."  He responded, "Cut Above will not
appear anywhere, no problem."  She replied,
"Yeah, I am very careful about what I send

through Wells so stay in touch via [my personal
email]." In an email to Ponte, Rivernider said
he had two representatives at Wells Fargo who
could do some of what Kemp had been doing.
Rivernider confided to Ponte, "I will use both
this time [so] as not to overwhelm one and red
flag her with Wells for suddenly hav[ing] a lot
of business in this market." Transactions
facilitated by Kemp on behalf of Rivernider
resulted in losses to Wells Fargo of $6.3
million, increasing her offense level under
U.S.S.G. § 2B1.1 from 7 to 25. In accepting
responsibility, she expressed shame and remorse
for conspiring with Rivernider to defraud her
employer.

"In any ineffectiveness case, a particular
decision not to investigate must be directly
assessed for reasonableness in all the
circumstances, applying a heavy measure of
deference to counsel's judgments." Strickland,
466 U.S. at 691. The decision by Rivernider's
counsel to recommend a change of plea without
conducting further investigation was reasonable
in the circumstances. "[T]he duty to
investigate does not force defense lawyers to
scour the globe on the off chance something will
turn up; reasonably diligent counsel may draw a
line when they have good reason to think further

investigation would be a waste."  Rompilla v. Beard, 545 U.S. 374, 383 (2005).[2]

In a related vein, Rivernider claims that his guilty pleas are invalid because his counsel failed to obtain information in the government's possession relating to lender culpability. Under Brady v. Maryland, 373 U.S. 83, 87 (1963), due process requires prosecutors to disclose impeachment evidence and exculpatory evidence on request.  In United States v. Avellino, 136

---

[2] Rivernider's other criticisms of his counsel's investigation do not warrant extended comment. He argues that his counsel failed to adequately investigate his concerns about misrepresentations by grand jury witnesses, but his counsel considered the matter and reasonably concluded that the alleged misrepresentations did not provide a basis for dismissing the indictment.  Similarly, he contends that his counsel failed to investigate the government's presentation of perjured testimony in the grand jury, but his counsel reasonably concluded that there was no basis for pursuing such an investigation.  He contends that his counsel failed to investigate witnesses who could impeach Wade, but defense investigators did interview her husband (and tried unsuccessfully to interview her former boss, Danny Trutmann), and Rivernider's counsel were adequately prepared to cross-examine Wade.

F.3d 249 (2d Cir. 1998), the Second Circuit
stated that the government's obligation to
disclose Brady material "is pertinent not only
to an accused's preparation for trial but also
to his determination of whether or not to plead
guilty." Id. at 255. Since then, however, the
Supreme Court has held that, because Brady
relates to the fairness of a trial, the
government need not disclose impeachment
evidence before a defendant pleads guilty.
United States v. Ruiz, 536 U.S. 622, 629 (2002).

Whether Ruiz supercedes Avellino with
regard to exculpatory evidence is unclear. See
Friedman v. Rehal, 618 F.3d 142, 154 (2d Cir.
2010)(state court's rejection of Brady claim
based on prosecution's pre-guilty plea failure
to disclose use of hypnosis to induce
complainants to recall instances of sexual abuse
did not constitute unreasonable application of
Supreme Court precedent). Assuming for present
purposes that it does not, Rivernider's
allegations are insufficient to support a viable
claim that his counsel were ineffective in
failing to obtain material exculpatory
information from the government.

Evidence is material for purposes of Brady
if there is a reasonable probability that
disclosure of the material would have changed
the outcome of the proceeding. See United
States v. Bagley, 473 U.S. 667, 682 (1985). A
"reasonable probability" is "a probability
sufficient to undermine confidence in the

outcome." Id (quoting Strickland, 466 U.S. at
694). Rivernider has not identified such
evidence and it is implausible that such
evidence actually existed given the extensive
nature of his multifaceted fraud.

IV.

Rivernider further claims that his counsel
rendered ineffective assistance as follows: they
failed to inform him that a motion for a bill of
particulars had been denied; they failed to move
to dismiss the indictment based on prosecutorial
delay; they failed to object during voir dire to
a prospective juror's comment, which tainted the
jury pool; they failed to object to certain
questions at trial; they failed to pursue a
trial subpoena of a witness; they failed to
challenge the government's argument at trial
that he made misrepresentations to certain NMB
clients and lenders regarding the true risk of
investments and loans; and they failed to
properly cross-examine some witnesses.

These alleged deficiencies do not provide a
basis for relief because they do not detract
from the voluntary and intelligent character of
the guilty pleas. A valid guilty plea generally
bars a defendant from raising claims about
deprivations of constitutional rights prior to
the plea. Tollett, 411 U.S. at 267. When a
conviction based on a valid guilty plea has
become final, only claims affecting the court's
power to enter the conviction may be raised on

25

collateral attack.  See United States v. Broce,
488 U.S. 563, 569 (1989).  None of the claims
just listed falls within the scope of this
exception.

V.

Rivernider claims that his convictions must
be vacated because of wrongdoing by the
government.  He alleges that the government
violated his due process rights under Brady,
engaged in electronic surveillance without a
warrant, tampered with witnesses,
surreptitiously read and listened to privileged
communications between him and his counsel, and
presented perjurious testimony in the grand jury
and at trial.  With the possible exception of
the Brady claim, all these claims are foreclosed
by the guilty pleas.  See United States v.
Montilla, 870 F.2d 549, 553 (9th Cir. 1989,
opinion amended, 907 F.2d 115 (9th Cir.
1990)(claim that indictment should be dismissed
based on outrageous government conduct in
violation of due process barred by guilty plea
because indictment on its face alleged offenses
within the government's power to prosecute).
Even assuming the Brady claim is not barred, it
does not provide a basis for relief.  As
discussed above, the government had no duty to
disclose impeachment evidence before the guilty
pleas were entered, and Rivernider's allegations
that the government withheld material
exculpatory evidence do not support a plausible
claim.

26

VI.

Rivernider also seeks relief on the basis
of ineffectiveness on the part of his appellate
counsel.  To prevail on this claim, he must
prove both that his counsel's failure to raise
an issue was objectively unreasonable and that
there is a reasonable probability the outcome of
the appeal would have been different if the
issue had been raised.  See Mayo v. Henderson,
13 F.3d 528, 533 (2d Cir. 1994).
Ineffectiveness may be shown if appellate
counsel "omitted significant and obvious issues
while pursuing issues that were clearly and
significantly weaker."  Id.

Rivernider complains that he was deprived
of effective assistance on appeal because his
counsel: failed to argue that the government
presented false evidence at trial, failed to
argue that mental coercion was used to coerce
his plea, failed to argue that his plea was
invalid because he did not possess an
understanding of the law in relation to the
facts, failed to argue that his trial counsel's
defective advice to plead guilty rendered the
pleas involuntary, and failed to pursue
arguments raised in his pro se submissions.  All
these claims are effectively precluded by my
findings that the guilty pleas are valid.[3]

_____

[3] In addition to claiming that his appellate
counsel omitted clearly meritorious arguments
while making weaker ones, Rivernider claims that

Finally, Rivernider claims that his counsel rendered ineffective assistance by failing to perfect the record on appeal.  Though the basis for this claim is unclear, Rivernider has complained that the record does not include two items: a transcript of a colloquy concerning scheduling that occurred at the end of a trial day after the court reporter had been excused; and a security camera videotape of the interior of the courtroom on the day of the change of plea before the change of plea proceeding took place.  He has argued that these items, if they existed, would help him prove that his guilty pleas are invalid.  His appellate counsel was not ineffective in proceeding with the appeal despite these alleged defects in the record, neither of which calls into question the validity of his pleas.

## VII.

Turning to Rivernider's challenge to his sentence, he acknowledges that his release from custody moots any claims predicated on the length of his sentence of imprisonment.  But he continues to seek relief from his five-year term of supervised release and his obligation to pay restitution.  He is not entitled to either form of relief under § 2255.

_____

his counsel falsely stated that he had admitted matters in the Admission of Offense Conduct. This claim is also foreclosed by the guilty pleas.

A.

Rivernider's challenge to the restitution part of his sentence is not cognizable here. The Second Circuit has held that an obligation to pay restitution generally does not restrict liberty to the degree that it satisfies the custody requirement of § 2255.  See United States v. Rutigliano, 887 F.3d 98, 107 (2d Cir. 2018).  In Rutigliano, each of the four defendants was sentenced to pay restitution in excess of $20 million in accordance with installment payment schedules that had yet to be fixed by the district court.  The Second Circuit held that the defendants' obligations to pay restitution in installments did not create a sufficiently severe restraint on their liberty to equate to custodial punishment.  Id.

Like the defendants in Rutigliano, Rivernider has been sentenced to pay restitution in excess of $20 million in accordance with an installment payment schedule.  The only difference between the cases is that here the schedule has been set: Rivernider is required to pay $500 a month while on supervised release. If he were to comply with this schedule, he would pay a total of $30,000 while on supervision.  Under Rutigliano, this obligation falls far short of the severe restraint on liberty required to satisfy the custody requirement of the statute.

B.

With regard to the five-year term of
supervised release, Rivernider's convictions
exposed him to a mandatory minimum term of two
years and a maximum of five.  He claims that the
"extended" nature of the term he received must
be reduced based on his counsel's
ineffectiveness at sentencing.  However, his
sentencing-related arguments do not provide a
basis for reducing the term of supervised
release.

Rivernider argues that his counsel rendered
ineffective assistance at sentencing because
they failed to adequately develop the record
with regard to lenders' knowledge of material
misrepresentations in loan applications and
other documents.  If their losses had been
excluded from consideration, he argues, the
guideline imprisonment range would have been
reduced to 135 to 168 months.  In addition,
downstream purchasers of the loans would be
considered their victims not his, so the
sentencing enhancement for more than 50 victims
would not apply.

These arguments do not pertain to the
length of the supervised release term.
Rivernider was sentenced to supervised release
for five years, three years more than the
mandatory minimum, because of his aggravated
role in the fraudulent schemes, his refusal to
accept responsibility for his actions and his
obligation to pay restitution.  In addition, a
five-year period would enable him to access any

needed treatment, at a cost he could afford, throughout the full five-year period.  Even if the loss calculation had been reduced and the sentencing enhancement for more than 50 victims had been rejected, the same five-year term of supervised release would have been imposed subject to the same conditions.

### VIII.

Accordingly, the petition is hereby dismissed.  No certificate of appealability will be issued.

So ordered this 19th day of September 2022.


_____/s/ RNC_____
Robert N. Chatigny
United States District Judge